Meriel L. Darzen, OSB No. 113645
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB No. 135436
(503) 227-2212 │ oliver@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for All Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, an Oregon non-profit corporation; **OREGON WILD**, an Oregon nonprofit corporation; **CENTRAL OREGON LANDWATCH**, an Oregon non-profit corporation; **SIERRA CLUB**, a California non-profit corporation; **GREAT OLD BROADS FOR WILDERNESS**, a Montana non-profit corporation; and **WILDEARTH GUARDIANS**, a New Mexico non-profit corporation, <br><br> Plaintiffs, <br><br> v. <br><br> **HOMER WILKES**, in his official capacity as Undersecretary for Natural Resources and Environment; **GLENN CASAMASSA**, in his capacity as Regional Forester for Region 6; and the **UNITED STATES FOREST SERVICE**, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br> (5 U.S.C. § 706(2)) <br><br> (Environmental Matters – National Environmental Policy Act, National Forest Management Act, and Administrative Procedure Act) |

## GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| dbh | Diameter at breast height |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| Eastside Forests | Deschutes, Fremont-Winema, Ochoco, Malheur, Umatilla, and Wallowa-Whitman National Forests |
| Eastside Screens | Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales on Eastside Forests |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| HRV | Historic Range of Variability |
| INFISH | Inland Native Fish Strategy |
| LOS | Late Old Structure |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| PACFISH | Strategies for Managing Anadromous Fish-producing Watersheds in Eastern Oregon and Washington, Idaho and Portions of California |
| Plaintiffs | All named Plaintiffs |
| RHCA | Riparian Habitat Conservation Area |
| Screens Amendment | Forest Plans Amendment Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington |

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 1

## INTRODUCTION

1.      Plaintiffs Greater Hells Canyon Council, Oregon Wild, Central Oregon LandWatch, Sierra Club, Great Old Broads for Wilderness, and WildEarth Guardians (collectively, "Plaintiffs" or "GHCC") bring this challenge to the final agency action of Homer Wilkes, Glenn Casamassa, and the United States Forest Service ("Defendants," "Forest Service," or "agency") to approve the Forest Plans Amendment to Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington ("Screens Amendment" or "Decision").

2.      Responding to the pervasive loss of large and old trees across Eastern Oregon and Washington, the Forest Service in 1995 adopted the Revised Continuation of Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales, a set of protective standards known and hereinafter referred to as the "Eastside Screens." The Eastside Screens are a comprehensive management strategy that until recently protected *inter alia* large and old trees from logging across approximately 8 million acres of national forestland on all or parts of six national forests in Eastern Oregon and Southeast Washington (the "Eastside Forests"). Though originally intended to provide only interim protections, the Eastside Screens have been in place for over 25 years.

3.      Large and old trees have outsized ecological and social importance. They provide critical ecosystem functions such as storing carbon, providing wildlife habitat, and maintaining water quality. Retention of large and old trees has widespread public support and is of great importance to the Nez Perce Tribe, whose treaty rights extend across large swaths of the Eastside Forests. Large and old trees remain at substantial deficits in Eastern Oregon as the region still

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

recovers from more than a century of high-grade logging (*i.e.*, removing the biggest trees) and clearcutting.

4.      The 2021 Screens Amendment at issue here removes the long-standing protections for large and old trees. The Decision was made after a rushed and incomplete public process that omitted the required administrative review process, effectively denying Plaintiffs, Native American Tribes, and the public of their procedural rights and public involvement opportunities. Nonetheless, Plaintiffs participated extensively in the short public process by submitting comments and reports from expert scientists, and participating in the virtual meetings conducted by the Forest Service.

5.      The Forest Service processed the Screens Amendment as an "insignificant" amendment under the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600–1614, and did not prepare an Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and instead prepared a less searching and less careful Environmental Assessment ("EA"). The agency made this decision despite significant deviation from 25 years of policy, despite the fact that the Screens Amendment applies to a landscape the size of Maryland, despite significant public and scientific controversy, despite potentially adverse consequences for scores of fish and wildlife species dependent on large trees and mature forests, and despite the value of large trees as major and increasing stores of carbon that help mitigate climate change.

6.      Plaintiffs' challenge is a programmatic, facial challenge to the Screens Amendment. Plaintiffs bring procedural claims under NFMA and NEPA, and seek declaratory and injunctive relief. Plaintiffs also intend to add a claim under Section 7 of the Endangered

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 3

Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), upon the expiration of the 60-day notice period, if the underlying issues have not been resolved. This action is brought pursuant to the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

7.      Plaintiffs seek an order holding unlawful and setting aside the Screens Amendment because: (1) Defendants violated NEPA, its implementing regulations, and the APA by failing to (a) prepare an EIS, and b) take a "hard look" at the direct, indirect, and cumulative impacts of the Screens Amendment; (2) Defendants violated NFMA, its implementing regulations, and the APA by failing to (a) subject the Screens Amendment to the required administrative review process, and (b) process the Screens Amendment as a "significant" plan amendment.

8.      Defendants are in the process of implementing the Screens Amendment through site-specific projects on all six of the Eastside Forests, including but not limited to: South Warner, Cliff Knox, Neighbors, Ellis, Mill Creek, 42 Road GNA, and Morgan-Nesbit. Plaintiffs seek vacatur of the Decision and an injunction prohibiting Defendants from implementing the Screens Amendment until an EIS is prepared in conformity with NEPA and the APA and an adequate NEPA analysis is completed; and the Forest Service complies with NFMA's procedural requirements.

9.      Should Plaintiffs prevail at any stage in this litigation, Plaintiffs will seek an award of costs and attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable authorities.

## **JURISDICTION**

10.      Jurisdiction over this action is conferred by 28 U.S.C. § 1331 as it presents a

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 4

federal question because it arises under the laws of the United States, including the APA, NEPA, and NFMA. There is a present, actual, and justiciable controversy between the parties. The requested relief is proper under 28 U.S.C. § 2201 (declaratory relief) and § 2202 (injunctive relief), and 5 U.S.C. §§ 705 & 706.

11.     Plaintiffs have exhausted their administrative remedies because they submitted comments on the Screens Amendment EA. Defendants provided no opportunity for Plaintiffs to file an administrative objection. In the ordinary course, the challenged agency action is subject to this Court's review under 5 U.S.C. §§ 702, 704, and 706.

## VENUE

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all six of the National Forests impacted by the Screens Amendment are either entirely or partially located within this judicial district. Defendants maintain an office in this judicial district.

13.     **Intradistrict Assignment**. This case is properly filed in the Pendleton Division pursuant to Local Rule 3-2 because a substantial part of the Project area is located in Wallowa, Union, Baker, Morrow, Grant, Harney, Crook, and Wheeler Counties. A substantial part of the events or omissions giving rise to this claim occurred and the property that is subject to this action is situated in the Pendleton Division.

## PARTIES

### Plaintiffs

14.     Plaintiff GREATER HELLS CANYON COUNCIL (formerly known as Hells Canyon Preservation Council) is a regional nonprofit organization based in La Grande, Oregon with approximately 1,000 members. For over 50 years, GHCC's mission has been to connect,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 5

protect, and restore the wild lands, waters, native species and habitats of the greater Hells

Canyon region, ensuring a legacy of healthy ecosystems for future generations. GHCC has been

actively involved in commenting on, objecting to, and in some instances, litigating Forest

Service projects implementing the Eastside Screens, and GHCC played a lead role in

commenting on the Screens Amendment.

11.     Plaintiff OREGON WILD is a non-profit organization with approximately 20,000

members and supporters throughout the State of Oregon and the Pacific Northwest. Oregon Wild

is headquartered in Portland, Oregon and maintains field offices in Bend, Eugene, and

Enterprise, Oregon. Oregon Wild's mission is to protect and restore Oregon's wildlands,

wildlife, and waters as an enduring legacy. Oregon Wild's wilderness, old-growth forest, and

clean rivers/watersheds programs protect pristine drinking water, unparalleled recreation

opportunities, and fish and wildlife habitat across Oregon.

15.     Plaintiff CENTRAL OREGON LANDWATCH is a non-profit organization based

in Bend, Oregon, with over 700 members and thousands of supporters. LandWatch's mission is

to defend and plan for Central Oregon's livable future. LandWatch works to protect and

conserve the region's wildlife habitats and open spaces; to foster thriving, sustainable

communities; and to guide development where it belongs and protect the land and water that

sustains the region's communities and ecosystems.

16.     Plaintiff SIERRA CLUB is a national nonprofit organization whose mission is to

explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible

use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore

the quality of the natural and human environment; and to use all lawful means to carry out these

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 6

objectives. The Sierra Club has 3 million members and supporters, including approximately 20,000 members in Oregon. The Juniper Group of the Sierra Club specifically is dedicated to preserving Central and Eastern Oregon's environment, natural resources, and quality of life.

17.    Plaintiff GREAT OLD BROADS FOR WILDERNESS is a national grassroots organization, led by women, that engages and inspires activism to preserve and protect wilderness and wild lands. Conceived by older women who love wilderness, Great Old Broads for Wilderness gives voice to the millions of Americans who want to protect their public lands as Wilderness for this and future generations. Great Old Broads for Wilderness has over 10,000 members and supporters, including the Central Oregon Bitterbrush Broadband Chapter who conducts stewardship projects and advocates for the protection of public lands in Central and Eastern Oregon.

18.    Plaintiff WILDEARTH GUARDIANS is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. WildEarth Guardians has 7,990 members and more than 187,000 supporters, and maintains an office in Portland, Oregon.

19.    Plaintiffs' members, supporters, and staff regularly visit and enjoy the Eastside Forests and the project areas where the Forest Service plans to implement the Screens Amendment, and intend to do so again in the near future. The members, supporters, and staff appreciate the aesthetics of the Eastside Forests, including their waters and wildlife, and use the area to engage in recreational, scientific, and spiritual activities, such as hunting, hiking, camping, fishing, photography, watershed research, and observing wildlife.

20.    Plaintiffs have organizational interests in the proper and lawful management of

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 7

the Eastside Forests. Plaintiffs, and their members, supporters, and staff have participated extensively in relevant administrative actions and have actively participated in the Screens Amendment's limited public and administrative process.

21.     Plaintiffs, and their members, supporters, and staff would sustain injury to aesthetic, educational, recreational, spiritual, and scientific interests if the Screens Amendment is implemented as authorized. Plaintiffs, and their members, supporters, and staff have concrete plans to return to the areas where the Forest Service intends to implement the Screens Amendment. Unless this Court grants the requested relief, Plaintiffs, and their members, supporters, and staff would be adversely and irreparably harmed by the Screens Amendment.

**Defendants**

22.     Defendant HOMER WILKES is the Under Secretary for Natural Resources. Defendant Wilkes predecessor, James Hubbard, signed the decision approving the Screens Amendment.

23.     Defendant GLENN CASAMASSA is the Regional Forester for Region 6 of the Forest Service, which covers the six forests impacted by the Screens Amendment decision. Region 6 of the Forest Service issued the draft and final Environmental Assessments for the Screens Amendment.

24.     Defendant the UNITED STATES FOREST SERVICE is an agency within the United States Department of Agriculture entrusted with the management of our national forests. The Forest Service is headquartered in Washington, D.C., and it has nine regions across the country. The national forests of Oregon are in Region 6. All or a significant portion of the actions and omissions alleged in this Complaint occurred in Region 6.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 8

## LEGAL BACKGROUND

## The National Environmental Policy Act (NEPA) and the CEQ Regulations

25.     Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the nation." 42 U.S.C. § 4321.

26.     The Council on Environmental Quality ("CEQ") promulgated uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342, 40 C.F.R. §§ 1500 *et seq*. Although CEQ modified the NEPA regulations by final rule on July 16, 2020 (and then rescinded some of the modifications by final rule on April 20, 2022), the Forest Service in approving the Screens Amendment relied on the previous version of the CEQ regulations, 40 C.F.R. §§ 1500–1508 (2019). All citations to the CEQ regulations in this complaint are to the 2019 version of the regulations.

27.     NEPA's primary purposes are to ensure fully informed decisionmaking by the agency and to provide for informed public participation in the environmental analyses and decisionmaking process. 40 C.F.R. § 1500.1(b), (c).

28.     To accomplish these purposes, NEPA requires all agencies of the federal government to prepare a "detailed statement" for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Commonly known as the Environmental Impact Statement or EIS, the detailed statement must describe, *inter alia*, the adverse environmental impacts of the proposed action and alternatives to the proposed action. *Id.*

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

29.    To determine whether an action requires an EIS, an action agency may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b). An EA is a concise public document that briefly describes the proposal, examines reasonable alternatives, and provides a listing of individuals and agencies consulted. *Id.* § 1508.9. If the agency decides an EIS is not required, it must supply a convincing statement of reasons that explains why a project's impacts are not significant.

30.    Whether in an EIS or EA, an agency must take a "hard look" at the direct, indirect and cumulative environmental impacts of a proposed action. 40 C.F.R. §§ 1502.16, 1508.7–.8. Direct impacts are those that are caused by the action and occur and the same time and place. 40 C.F.R. § 1508.8(a). Indirect impacts also are caused by the action, but occur later in time or are farther removed in distances. *Id.* § 1508.8(b). Cumulative impacts are the impacts of the proposed action, as well as impacts from other past, present, and reasonably foreseeable future actions, both federal and non-federal. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

31.    The NEPA documentation must provide the decisionmaker and the public with adequate information, evidence, and analysis to fully assess the potential impacts of the proposed action before decisions are made. *Id.* § 1500.1(b). NEPA requires an agency to ensure the professional integrity, including the scientific integrity, of the NEPA analysis. *Id.* § 1502.24.

32.    Agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," *Id.* § 1500.2(d), and must integrate the NEPA process with other planning at the earliest possible time to ensure that planning and decisions reflect environmental values. *Id.* § 1501.2.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 10

**The National Forest Management Act (NFMA) and Implementing Regulations**

33.     NFMA is the primary statute governing the administration of America's national forests. Pursuant to NFMA and its implementing regulations, management of national forests occurs at two levels: forest and project.

34.     At the forest level, NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans ["forest plans"] for units of the National Forest System." 16 U.S.C. 1604(a). Plans may be "amended in any manner whatsoever," provided that if such amendment "would result in a significant change," the amendment must be subjected to heightened procedures including for public involvement. *Id.* § 1604(f)(4).

35.     The Forest Service, which manages the National Forest System, uses forest plans to guide all natural resource management activities, including use of the land for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 36 C.F.R. § 219.1; 16 U.S.C. § 1604(e)(1). A forest plan is a broad, long-term programmatic planning document for one or more entire national forests, containing goals and objectives for individual units of the forest and providing standards and guidelines for management of forest resources. Each forest plan must "provide for diversity of plant and animal communities." 16 U.S.C. § 1604(g)(3)(B).

36.     NMFA requires the Forest Service to promulgate regulations for the development and revision of forest plans. 16 U.S.C. §1604(g). In 1982, the Forest Service promulgated the first set of forest planning regulations. *See* 36 C.F.R. Part 219 (2000).

37.     The Deschutes, Ochoco, Malheur, Fremont-Winema, Wallowa-Whitman, and Umatilla National Forests are part of the National Forest System and are therefore subject to

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 11

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

NFMA and its planning regulations. These administrative units developed individual forest plans pursuant to the 1982 planning regulations. These forest plans have not been comprehensively revised under any subsequent version of the planning regulations.

38.     In 2012, the Forest Service promulgated a new set of forest planning regulations. *See* 36 C.F.R. Part 219 (2022). The Screens Amendment was processed pursuant to the 2012 planning regulation.

39.     At the project level, once a forest plan is in place, the Forest Service develops project-level plans for specific, on-the-ground actions, such as timber harvest and recreation. 16 U.S.C. § 1604(i). Each site-specific project must be consistent with the governing forest plan. *Id.*

## The Administrative Procedure Act (APA)

40.     The APA confers a right of judicial review on any person adversely affected by agency action. 5 U.S.C. § 702. Plaintiffs' claims are reviewed under the APA.

41.     "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *Id.* § 704.

42.     Upon review, a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with and/or without observance of procedure required by law. *Id.* § 706(2).

## FACTS

## Background on the Eastside Forests

43.     The Eastside Screens apply to six National Forests east of the Cascade Mountain Crest in Oregon, spanning down to the California border and north to and across the Washington border to include a small part of southeastern Washington: the Deschutes, Fremont-Winema,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 12

Malheur, Ochoco, Umatilla, and Wallowa-Whitman (Figure 1).  In total, the Eastside Screens

cover 7,867,951 acres, exclusive of parts of the Deschutes and Fremont-Winema National

Forests that are covered under a separate, regional plan.

Figure 1: Map of the Eastside Forests



44.     This massive area spans two broad ecoregions, the Blue Mountains Ecoregion and

the Eastern Cascades Ecoregion, and multiple types of forest that are home to a variety of

dominant trees: ponderosa pine, Douglas-fir, juniper, Englemann spruce, western larch, grand fir,

white fir, and lodgepole pine.

45.     This sprawling and varied landscape includes an assortment of habitats that

support a diverse cast of plant and animal life. Three ESA-listed and one ESA-candidate

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 13

terrestrial wildlife species are found within the area—Canada lynx (*Lynx Canadensis*) (Threatened), Gray wolf (*Canis lupus*) (Endangered), Oregon spotted frog (*Rana pretiosa*) (Threatened), and Wolverine (*Gulo gulo*) (proposed for listing)—as well as 86 terrestrial species listed as "sensitive" by Region 6 of the Forest Service. Two ESA-listed and one ESA-candidate plant species are documented in the area: Macfarlane's four-o'clock (*Mirabilis macfarlani*) (Threatened), Spalding's catchfly (*Silene spaldingii*) (Threatened), and whitebark pine (*Pinus albicaulis*) (proposed for listing).

46.     There are also a variety of aquatic species that inhabit this landscape, including at least nine ESA-listed species: Bull trout (*Salvelinus confluentus*), Steelhead trout - Middle Columbia River Distinct Population Segment and Snake River Distinct Population Segment (*Onchorinchus mykiss*), Shortnose sucker (*Chasmistes brevirostris*), Lost River sucker (*Deltistes luxatus*), Warner sucker (*Catostomus warnerensis*), Chinook salmon - Snake River Spring/Summer Evolutionarily Significant Unit (*Onchorinchus tshawytscha*), Chinook salmon - Snake River Fall Evolutionarily Significant Unit (*Onchorinchus tshawytscha*), Sockeye salmon – Snake River Evolutionarily Significant Unit (*Onchorinchus nerka*).

47.     Tribal communities have long relied on the lands and waters in and around the Eastside Forests for the provision of traditional foods such as salmon, deer, elk, and huckleberries. For example, some old trees within the forests bear evidence of indigenous use, including scars from harvesting of their sap and inner bark for food and medicinal use, dating as far back as the 1400s.

48.     Recreational users such as hunters, fishers, kayakers, hikers, photographers, skiers, and campers, among many others, frequent the eastside forests. Expenditures from these

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

users are an essential part of local economies surrounding the affected forests.

*Large Trees On the Eastside Forests*

49.    On the Eastside Forests, large trees make important contributions to the structural and spatial diversity of forests, which in turn provide for the development and persistence of diverse plant, fungal, lichen, and fish and wildlife communities.

50.    Large trees also provide security functions for wildlife in the form of screening vegetation, vertical escape structures, and horizontal connections for canopy dwellers. When large trees die, they also contribute habitat for many animals and plants.

51.    With climate change impacts, forests containing large trees will become increasingly more important for wildlife population persistence, and for animals responding to changing disturbance regimes and thermal stress.

52.    On Eastside Forests, trees 21 inches and larger account for 3% of trees, yet store 42% of the aboveground carbon.

53.    Large trees have many positive effects in riparian areas. For example, large trees provide shade to cool streams and sources of large downed wood that create pools and instream habitat. Large trees provide shade that keeps streams cool and oxygenated, and when they die and fall in and near streams large wood provide structure that shapes stream channels and creates pools.

54.    Compared to smaller trees, large, old trees store a disproportionate amount of carbon, in part because of greater leaf surface area for $CO_2$ absorption and massive carbon-storing tree trunks and roots.

55.    It is easier to assess the size of a tree than the age of a tree.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 15

56.     Large trees serve many of the same ecological functions as old trees.

_The Six Eastside Forests_

57.     The Deschutes National Forest comprises 1.6 million acres extending from the eastern slope of the Cascades in the west to Oregon's high desert region in the east. The forest has over 150 lakes, 500 miles of streams, and six Wild and Scenic rivers, which provide habitat for numerous species of game fish.

58.     The 2.3-million-acre Fremont-Winema National Forest lies to the south of the Deschutes National Forest. It ranges from the Cascade Range in the west to the Warner Mountain Range in the east. The forest is home to more than 300 species of fish and wildlife.

59.     To the east of the Deschutes National Forest, the Ochoco National Forest consists of 845,498 acres of land in the Maury and Ochoco Mountain Ranges, southward extensions of the Blue Mountains. The forest provides habitat for 375 different species of reptiles, amphibians, birds and mammals, as well as fifteen species of game fish.

60.     Further east, the Malheur National Forest covers 1.7 million acres in the Blue Mountains.  Elevations in the forest vary from about 4000 feet to 9038 feet at the top of Strawberry Mountain. The forest has an assortment of scenery and wildlife habitats, ranging from high desert grasslands to alpine lakes and meadows. It also contains a diverse fishery that comprises many species of fish including cutthroat trout, bull trout, smallmouth bass, and Columbia River spring Chinook salmon.

61.     The Umatilla National Forest encompasses 1.4 million acres in the Blue Mountains in northeast Oregon and Southeast Washington.  The Umatilla National Forest is home to a large herd of Rocky Mountain elk, as well as the only herd of moose in Oregon, and

_Crag Law Center_
_3141 E Burnside St._
_Portland, OR 97214_
_Tel. (503) 227-2725_

many other fish and wildlife species.

62.    The Wallowa-Whitman National Forest lies to the northeast of the Malheur and Umatilla National Forests. It consists of 2.4 million acres of land in northeastern Oregon and parts of western Idaho—the portions in Idaho are not covered by the Eastside Screens. There are 379 species of terrestrial vertebrate wildlife within the geographic area of the Wallowa-Whitman National Forest.

63.    Each of the six forests is subject to a forest plan completed in either 1989 or 1990. The Fremont-Winema National Forest has two separate forest plans, covering the respective areas of the previously separate Fremont and Winema National Forests.

64.    These forest plans set out the general management direction for the forests including goals and objectives for where the forests should be in the future as well as standards and guidelines to help get there. The six forest plans also each include land management allocations, which designate certain mapped areas to specific uses and/or management objectives.

### The Eastside Screens

*History of the Eastside Screens*

65.    By the early 1990s, the impacts from a century of industrial logging in the Pacific Northwest were becoming readily apparent. Forests, including the six Eastside Forests were comprised primarily of clearcuts, thinned stands, and young plantations; relatively few large and old trees remained.  The landscape was fragmented by roads, riparian areas were severely degraded, and the viability of old-growth dependent species was at risk.

66.    Triggered by lawsuits, scientific studies, and direction from Congress, the Forest

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 17

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Service set about updating its management approach to the Eastside Forests to address the loss of large and old trees across the landscape.

67.    In March 1993, the Natural Resources Defense Council ("NRDC"), representing 22 other organizations, filed an APA petition with John Lowe, the Regional Forester of the Pacific Northwest Region of the Forest Service, seeking to (1) revise minimum management requirements for old-growth associated wildlife on the Eastside Forests to meet species viability requirements under NFMA and its implementing regulations; and (2) impose a moratorium on the logging and roading of mature and old growth forests and roadless areas until scientifically supportable minimum management requirements were established. The petition set off a chain of events leading to the adoption of the Eastside Screens.

68.    The previous year, concerned members of Congress wrote to four societies of professional scientists requesting a review and report on the state of national forests in eastern Oregon and Washington and recommendations for their management. In response, the societies convened the Eastside Forests Scientific Society Panel, which, in 1994, released a report, entitled "Interim Protection for Late-Successional Forests, Fisheries and Watersheds: National Forests East of the Cascade Crest, Oregon and Washington" (Henjum, *et al.*1994). The report concluded that continued logging of old forest stands in the region would likely jeopardize many components of biological diversity and result in endangerment and/or extinction of sensitive wildlife. The Panel recommended that to rehabilitate the Eastside Forests on an interim basis, the Forest Service should—among other measures—prohibit the cutting of any tree, live or dead, over 150 years old or with a diameter at breast height ("dbh") of 20 inches or greater; stop construction of roads within roadless areas 1,000 acres or greater, or within smaller, but

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 18

biologically significant, roadless areas; halt timber harvest in riparian areas; designate Aquatic Diversity Areas and not log, build new roads, or mine within these areas; restrict timber harvest in areas prone to landslide or erosion; limit post-fire or "salvage" logging; and develop a comprehensive monitoring program.

69.    Also around the same time, Congressman Foley (Washington) and Senator Hatfield (Oregon) requested the Secretary of Agriculture form an interagency panel to complete a scientific evaluation of the effects of Forest Service management practices on the sustainability of national forests in eastern Oregon and Washington. The report, entitled the "Eastside Forest Ecosystem Health Assessment" (Everett, *et al.* 1994), concluded that management of the forests had led to a decrease in the diversity of forest ecosystems, underlined by the loss of old growth forest, and left the forests vulnerable to insect, fire, and disease.

70.    The Assessment concluded that eastside forest ecosystems were stressed and unstable as a result of forest management and timber harvest in late and old structure ("LOS") forests, and that further harvest of large trees could threaten ecosystem balance and interfere with efforts to move watersheds towards sustainability of all biophysical environments, and could undermine needed habitat protection for old forest associated wildlife species, potentially threatening the Forest Service's obligations under NFMA.

71.    The Assessment found that numerous wildlife species were threatened by the cumulative effects of past forest management, including northern goshawk, several species of woodpeckers, and the American marten.

72.    In July 1993, President Clinton ordered the Forest Service to "develop a scientifically sound and ecosystem-based strategy for management" of the national forests in

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 19

eastern Oregon and Washington as well as all federal land in the Columbia Basin upstream of where the Columbia River cuts through the Cascade Range.

73.    In response, in February 1994, the Forest Service and the Bureau of Land Management proposed a strategy for coordinated ecosystem management of the lands east of the Cascades. The effort became known as the Interior Columbia Basin Ecosystem Management Project.

74.    To protect the forests in the interim, the Forest Service proposed what came to be known as the Eastside Screens, based on recommendations from the Everett, *et al.* report.

75.    The Eastside Screens were designed to "screen out" logging projects that threatened to further degrade old growth habitat and riparian areas, and were made to be "intentionally restrictive."

76.    An initial version of the Eastside Screens was announced in an Interim Direction by the Regional Forester in August 1993. This was followed by a Decision Notice issued in conjunction with a final EA and Finding of No Significant Impact (FONSI) formally adopting the Eastside Screens in May 1994.

77.    A second Decision Notice was issued in June 1995 that established a revised version of the Eastside Screens that largely remained in place until it was altered by the issuance of the decision approving the Screens Amendment challenged in this case.

*Content of the Eastside Screens*

78.    The Eastside Screens adopted by the 1995 Decision Notice originally applied to all timber sales on more than 11 million acres of national forests in eastern Oregon and Washington, subject to limited exceptions like personal use firewood sales. It consisted of three

standards used to "screen" timber sales: a riparian standard, an ecosystem standard, and a wildlife standard.

79.     The riparian standard, which has since been replaced by the Inland Native Fish Strategy ("INFISH") and the Pacific Anadromous Fish Strategy ("PACFISH"), discussed below, applied to logging activities in certain sensitive riparian areas.

80.     The ecosystem standard, which is still in effect, obligates the Forest Service to analyze current forest structure in a proposed timber sale area and its associated watershed, and compare that current forest structure to the area's Historic Range of Variability ("HRV"). The HRV should be based on conditions in the "pre-settlement era," however photography from the 1900s may be acceptable to determine HRV.

81.     Determining HRV is done on a watershed scale. Then, within a watershed, the area is classified into biophysical environments based on plant association groups that are grouped based on similarity of disturbance regime characteristics.

82.     Because of natural (such as fire) and human-caused (such as logging) disturbances, stands of trees in a particular watershed can comprise different structural stages. The Eastside Screens refers, *inter alia*, to canopy "strata" to classify different structural stages. For instance, a stand of trees can have an open canopy (indicating trees growing farther apart) or a closed canopy (indicating trees growing closer together), a multi-layered canopy (indicating trees of varying heights) or a single-layered canopy (indicating trees of roughly the same heights). The ecosystem standard requires the Forest Service to characterize the structural stages present in a timber sale area, watershed, and broader landscape.

83.     The wildlife standard, as adopted in 1995 and prior to the Screens Amendment at

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

issue in this case, provides direction for different scenarios, based on the outcome of the HRV analysis. It applies, in part, to late and old structural ("LOS") forest stages. LOS stages can be either "Multi-strata with Large Trees" (*i.e.*, consisting of two or more canopy layers and containing numerous large trees ≥21 inches diameter at breast height), or "Single Strata with Large Trees" (*i.e.*, consisting of a single canopy layer and containing numerous large trees ≥21 inches diameter at breast height). Within a biophysical environment, one, both, or no LOS stages may be present.

84.     If either LOS stage is below HRV, that entire biophysical environment (within a given watershed) falls under "Scenario A" of the wildlife standard and all timber sales are prohibited in the deficit LOS stage or stages.

85.     If both LOS stages are present, and one stage is within or above HRV and one is below (known as "Scenario A1"), some timber sale activities are permitted within the above-HRV LOS stage. Logging has to maintain that stage at or above HRV, move logged stands toward the HRV-deficit LOS stage, and—until the Screens Amendment at issue here—maintain all live trees ≥21 inches diameter at breast height. Such activities only can be carried out as long as they maintain or enhance LOS.

86.     Also until the Screens Amendment, portions of Scenario A watersheds outside of LOS fell under Scenario A2, which allowed more timber sale activities if they maintained and/or enhanced LOS components and left all trees ≥21 inches diameter at breast height.

87.     If all LOS within an area is within or above HRV then timber sale harvest activities can occur so long as no LOS stage falls below HRV. There is no prohibition on the cutting of trees ≥21 inches diameter at breast height. This is "Scenario B."

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 22

88.     Additionally, the wildlife standard provides that large snags and green replacement trees are to be maintained at levels sufficient to meet the needs of wildlife dependent on them and downed logs sustained at specific thresholds depending on the type of tree.

*Application and Interpretation of the Screens*

89.     After the Screens were adopted, the Regional Forester appointed an oversight team to review and monitor implementation of the Eastside Screens, with the objective of ensuring that the Eastside Screens were being applied consistently across the Eastside Forests.

90.     The oversight team began reviewing timber sale projects across the Eastside and documented their findings. The findings were issued to all of the forests as a "lessons learned" tool and were signed by the Regional Forester to provide official guidance on Eastside Screens interpretation and policy. A particular focus in the early implementation of the Eastside Screens was the wildlife screen, particularly with respect to Scenario A1.

91.     The Regional Office issued a series of guidance documents intended to clarify and provide direction as to the correct interpretation of the applicable standards for Scenario A1. These guidance documents comprise the official policy of the Forest Service.

92.     In a guidance document dated November 14, 1995, Regional Forester John Lowe provided direction for implementation of the Eastside Screens under Scenario A of the wildlife standard. Specifically, Regional Forester Lowe noted that while the wording for Scenario A1 could be erroneously interpreted to mean that large trees ≥21 inches diameter at breast height could be cut in above-HRV LOS, the Eastside Screens do not permit such an approach. Rather, "the screen direction under Scenario A of the wildlife standard is intended to maintain all live

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 23

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

trees ≥21 inches [diameter at breast height] regardless of tree species and regardless of whether a stand is LOS or not."

93.     In a separate guidance document dated November 14, 1995, Regional Forester Lowe confirmed that trees ≥21 inches diameter at breast height and over cannot be cut anywhere in Scenario A. Thus, under Scenario A, trees ≥21 inches diameter at breast height and larger cannot be cut without a Forest Plan amendment.

94.     In a guidance document dated October 2, 1997, Regional Forester Robert Williams confirmed that cutting large trees in stands that are under Scenario A requires a site-specific amendment, and that "[i]t is difficult to develop clear and compelling rationale to harvest big trees under Amendment 2 because biological risk and urgency are hard to justify . . . Amendments should satisfy the following criteria: Clear biological or ecological urgency exists for cutting big trees in the next 5 years. The situation is unique. The rationale for the amendment does not apply across landscapes."

95.     In a guidance document dated December 23, 1997, Regional Forester Robert Williams noted that all of the Forests are intimately familiar with the regional guidance stipulating that trees ≥21 inches diameter at breast height within LOS stands should not be cut in Scenario A.

96.     Under official Forest Service policy, therefore, no cutting of trees ≥21 inches diameter at breast height was permitted under Scenario A, whether A1 or A2.

97.     None of these guidance documents were ever rescinded.

## *PACFISH AND INFISH*

98.     In 1991, Snake River sockeye and chinook salmon were listed as endangered and

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 24

threatened, respectively. ESA listing of other western United States fish species followed, including bull trout.

99.     In response, in 1995, the Forest Service issued Decision Notices adopting PACFISH and INFISH. PACFISH and INFISH replaced the riparian screen. PACFISH and INFISH have been incorporated into each of the forest plans for the six forests.

100.    PACFISH and INFISH were intended to provide interim management direction over an 18-month period while long-term management strategies were developed. Although intended as interim strategies, PACFISH and INFISH remain in place today.

101.    PACFISH provides management direction for anadromous fish-producing watersheds on Federal lands in eastern Oregon, Washington, Idaho, and portions of California.

102.    INFISH provides management direction for watersheds on 22 National Forests in eastern Oregon, eastern Washington, Idaho, western Montana, and portions of Nevada not covered by PACFISH.

103.    PACFISH and INFISH require the Forest Service to "take prudent measures to arrest the degradation and begin the restoration of riparian and aquatic ecosystems." PACFISH and INFISH apply to areas designated as Riparian Habitat Conservation Areas ("RHCAs"). These are areas where aquatic and riparian-dependent species receive primary emphasis and where management activities are subject to certain Standards and Guidelines.

104.    While PACFISH and INFISH are intended to minimize and mitigate the impacts of management activities in riparian areas, like timber harvest, they generally do not proscribe activities. For example, timber harvest is allowed in riparian areas so long as the Forest Service determines that such logging will not "retard or prevent attainment" of designated measures of

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 25

ecosystem health called "Riparian Management Objectives."

*Failed Attempts at a Comprehensive Ecosystem Approach*

105.    The Eastside Screens were initially intended to be in effect for 12–18 months, until the Forest Service completed a regional EIS and implemented a more comprehensive strategy. The Forest Service completed a Final EIS for the Interior Columbia Basin Ecosystem Management Project in December 2000, but never issued a decision adopting one of its alternatives.

106.     A subsequent attempt at a sub-regional EIS for the three Blue Mountain forests— the Malheur, Umatilla, and Wallowa-Whitman National Forests—was initiated but ultimately abandoned by the Forest Service in 2019.

107.    The Forest Service has never initiated a plan revision process for the other three forests—the Deschutes, Fremont-Winema, and Ochoco National Forests.

108.    The Eastside Screens, subject to the amendment at issue in this case, remain in effect today.

*Site-Specific Amendments*

109.    The Forest Service has approved multiple site-specific amendments to the Eastside Screens. Since 2003, there have been 24 amendments related to the 21-inch standard. Some of the amendments applied to the Eastside Screens as written, while others addressed direction provided in the guidance documents.

110.    For example, the Malheur National Forest has approved site-specific amendments for projects including the Big Mosquito Project, the Ragged Ruby Project, and the Camp Lick Project, each of which allowed logging of large trees in certain circumstances.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 26

111.    In most other proposed and approved forest management projects on the Eastside

forests, the Forest Service has applied the Eastside Screens as written and clarified by the

guidance documents. In other words, the Forest Service has determined that cutting trees ≥21

inches diameter at breast height is not needed to accomplish management objectives, such that

site-specific amendments are not necessary.

## 2020 Amendment to the Eastside Screens

*The Administrative Process*

112.    The Forest Service did not provide any public scoping notice disclosing its intent

to consider amending the Eastside Screens, change its long-standing interpretation of the Screens

as currently written, or remove the 21-inch rule from the Screens.

113.    Instead of undertaking the required scoping process, the Forest Service gave

notice that it would be hosting three virtual meetings on pre-selected days, with pre-selected

agendas. Reference to a proposed amendment of the 21-inch standard was made, but no specifics

were given.

114.    On May 11, 2020, the Forest Service initiated a Science Forum to present

different scientific perspectives on amending the wildlife screen's 21-inch standard. At the

forum, the Forest Service invited ten scientists to share their differing perspectives on the

importance of the 21-inch standard.

115.    Much of the forum focused on disagreement among the scientists invited by the

Forest Service on the effects of the removal of the 21-inch standard.

116.    For example, while some of the scientists claimed that removing the 21-inch

standard could have some beneficial effects if done in certain narrow circumstances, others,

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 27

including Dominick Dellasala, Ph.D., Beverly Law, Ph.D., Chad Hansen, Ph.D., and John Alexander, Ph.D., testified to the importance of large trees, regardless of species, for matters such as climate mitigation, forest resiliency, wildlife habitat, and moderating fire hazard, and the serious risks to forest and ecosystem health from removal of the 21-inch standard.

117.    Some of these scientists disagreed with the Forest Service's claims regarding the current state of the forests—including how their structure, composition, and fire ecology had been altered—and the potential effects of cutting large trees.

118.    The Forest Service held two other meetings in May 2020 to discuss amending the Eastside Screens: an Intergovernmental Technical Workshop, which invited county, state, and tribal representatives to discuss the forest plan amendment process, and a Partner Technical Workshop, which invited Forest Service partner organizations and interested citizens to do the same.

119.    The Intergovernmental Technical Workshop, to which Tribal government were invited, was held on May 13, 2020, which is National Indian Day, which is a holiday for the Nez Perce Tribal government.

120.    After the three forums, the Forest Service released a Draft EA in August 2020.

121.    The Draft EA proposed to replace the 21-inch standard—which, as previously applied, prohibited the cutting of any tree ≥21 inches diameter at breast height or larger on the Eastside Forests in most circumstances—with a discretionary guideline focused on retaining some old and large trees.

122.    The proposed guideline stated that "[m]anagers should retain and generally emphasize recruitment of old trees and large trees." It defines old trees as ones "having external

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 28

morphological characteristics that suggest an age ≥150 years." In the Draft EA, the definition of "large trees" remained at ≥21 inches diameter at breast height, except for Douglas-firs, grand firs and white firs, for which the definition was changed to ≥30 inches diameter at breast height.

123.    Independently from the primary proposed action, the Forest Service also proposed to replace the existing snag and green tree retention standard.

124.    The previous snag and green tree retention standard mandated that snags and green tree replacements ≥21 inches diameter at breast height be maintained at levels sufficient to meet 100% of the habitat needs of snag-reliant species. It also provided specific quantities of downed logs that had to be maintained, prohibiting any removal of downed logs where these quantities were not met.

125.    The Draft EA proposed changing this standard by splitting it up into two different standards, one for snags and one for green trees, and eliminating the quantitative requirements for downed logs.

126.    For snags, the Forest Service proposed changing the standard by giving forest managers the option to meet it either by preserving all large snags *or* by maintaining or increasing "diverse snag composition . . . for a diverse composition of wildlife species and ecological site conditions."

127.    The Draft EA gave no explanation of the purpose and need for adapting the snag and green tree standards.

128.    The Draft EA included a "Current Management" alternative. Under this Alternative, the Forest Service assumed, for the purpose of analyzing impacts, that "there will be no change in the common practice" of interpreting the Screens to prohibit cutting of trees ≥21

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

inches diameter at breast height in late and old structure forests that are within or above HRV.

129.    Conversely, for the remaining Alternatives, the Forest Service interpreted the Screens as permitting cutting of trees ≥21 inches diameter at breast height in LOS that is within or above HRV in all Scenarios.

130.    The Forest Service did not disclose or explain the basis or rationale for the change in interpretation of the Screens Scenario A from the current interpretation (which was established and recognized in official agency guidance and is reflected in the no action alternative) to the new interpretation reflected in the action alternatives.

131.    On October 13, 2020, Plaintiffs timely submitted extensive comments on the Draft EA. The comments highlighted, *inter alia*, the Draft EA's failure to use the best available science and the lack of discussion of the scientific controversy surrounding the proposed amendment. The comments also provided evidence demonstrating that the proposed amendment would have significant effects on the environment, including climate, wildlife, and wildfires, among other issues.

132.    Plaintiffs' comments (and the comments of other groups and individuals) pointed out the lack of clarity around the change in interpretation of Scenario A and requested further explanation and analysis of this change.

133.    Plaintiffs in their comments also called on the Forest Service to conduct an EIS and provide more robust opportunities for public comment, including by holding a scoping period.

134.    Plaintiffs attached to their comments an expert report prepared by Dr. Dominick DellaSala and Dr. William Baker, and a letter from Dr. Chad Hansen. Both documents addressed

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 30

the Draft EA's failure to discuss opposing scientific evidence, its unsupported conclusions, and its reliance on faulty evidence.

135.    The Forest Service did not respond to the comments.

136.    In January 2021, the Forest Service released the Final EA along with a Decision Notice and Finding of No Significant Impact for the Screens Amendment.

137.    The Decision Notice adopted the amendment proposed by the Draft EA largely unaltered. The only changes were that the definition of "large tree" for Douglas-firs—but not grand or white firs—was changed back to ≥21 inches diameter at breast height, and some minor details were added to the monitoring strategies of the adaptive management strategy.

138.    The Decision Notice was signed on January 15, 2021 by Jim Hubbard, Under Secretary for Natural Resources and Environment.

139.    Because the Decision Notice was signed by the Under Secretary, the Decision Notice claimed that the amendment was not subject to any further administrative process, including the "objection process" ordinarily required for plan amendments. The Decision Notice cited 36 CFR § 219.51(b), which provides for an exception to the objection process only for "plan amendments . . . *proposed* by the . . . Under Secretary for Natural Resources and Environment." (emphasis added).

140.    The Under Secretary did not propose the Screens Amendment.

141.    The decision to bypass an objection process contradicted the Forest Service's earlier statement in its notice for the Draft EA that an objection process was required.

*Analysis in the Final EA*

142.    The purpose and need given by the Forest Service for the Screens Amendment

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 31

differed from the original purpose and need of the Eastside Screens in that it no longer emphasized the protection of large trees.

143.    The Final EA considered four alternatives to removing the 21-inch standard and a no action alternative. The Final EA did not discuss in detail several alternatives proposed in comments from Plaintiffs and from the Nez Perce Tribe that would have met the Screens Amendments' purpose and need.

144.    The Forest Service did not analyze *any* alternatives to its proposed snag and green tree retention standard, including a no action alternative.

145.    Nor did it consider an alternative that restricts the proposed amendment from application to ecologically sensitive areas most likely to be harmed by the loss of large trees, such as RHCAs.

146.    The Final EA also failed to disclose and consider the scientific controversy surrounding the amendment.

147.    The Forest Service claimed that the presence of large Douglas-fir, grand fir, white fir, and lodgepole pine has "increased density (trees per acre) and canopy cover in stands, and it directly limits the persistence and recruitment of fire tolerant trees, making forests more likely to die when a wildfire, drought, or other natural event occur."

148.    However, the Forest Service omitted discussion of scientific debate surrounding these rationales, all of which was brought to its attention during the Science Forum that it hosted and in Plaintiffs' comments and attached expert analyses.

149.    The Final EA did not adequately address the scientific uncertainty surrounding the effectiveness of thinning, especially thinning large trees, for fire risk reduction.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 32

150.    The Final EA dismissed an extensive body of research brought to its attention by the Science Forum, expert reports, and comment, that demonstrated how thinning and particularly the logging of large trees can actually increase fire severity, and how significant the protection of large trees is for maintaining fish and wildlife habitat, riparian health and carbon storage.

151.    The Final EA intentionally left out or overlooked scientific studies and other disagreements on the project's effects on climate change and ignored multiple lines of evidence and conclusions raised by the plaintiffs and scientists.

152.    The Final EA relied on flawed and unsupported assumptions about, *inter alia*, how the six Eastside Forests would implement the Screens Amendment. The Final EA also relied on, *inter alia*, assumptions derived from models that were not scientifically sound or based on other incorrect or overly-generalized assumptions.

*Section 7 Consultation*

153.    The Forest Service engaged in informal Section 7 Consultation with the United States Fish and Wildlife Service ("USFWS") over the Screens Amendments' impacts on two terrestrial species: gray wolf and Spalding's Catchfly.

154.    On December 15, 2020, the USFWS issued a Letter of Concurrence concurring in the Forest Service's determination that the Screens Amendment may affect, but is not likely to adversely affect, the two species.

155.    There are at least nine listed aquatic species that may be present in the action area under the jurisdiction of the USFWS (freshwater species) and National Marine Fisheries Service ("NMFS") (anadromous salmonids).

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 33

156.    The Forest Service did not prepare a Biological Assessment for listed aquatic species.

157.    The Forest Service did not engage in Section 7 consultation over the Screens Amendments' impacts to these listed species.

158.    The Forest Service decided that the Screens Amendment would pose "no effect" on any aquatic species, including listed aquatic species. The Forest Service relied on the fact that that PACFISH and INFISH management direction apply to timber harvest in riparian areas. PACFISH and INFISH do not prohibit timber harvest in riparian areas. Under the Screens Amendment, PACFISH, and INFISH, there is no enforceable prohibition on cutting large trees in riparian areas.

## **Implementation of the Screens Amendment**

159.    The Forest Service is now actively planning and authorizing projects that implement the Screens Amendment. Combined, these projects cover hundreds of thousands of acres of Eastside Forests. The following are illustrative examples; several additional projects are currently in the planning stages.

*South Warner Project, Fremont-Winema National Forest:*

160.    On December 27, 2021, the Forest Service signed the final Decision Memo approving the South Warner Project on the Fremont Winema National Forest. The expected implementation for the project was listed as March, 2022.

161.    The Forest Service determined that the South Warner Project was categorically excluded (CE) from documentation in an EIS or EA because it was covered under CEs applicable to "timber stand and/or wildlife habitat improvement activities," 36 C.F.R.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

§ 220.6(e)(6), and "restoring wetlands, streams riparian areas or other water bodies by removing, replacing, or modifying water control structures," 36 C.F.R. § 220.6(e)(18).

162.    The South Warner Project proposed actions include commercial thinning, small tree thinning, and prescribed burning on up to 69,567 acres. Commercial thinning is proposed on 16,000 acres.

163.    Commercial thinning is prescribed for units outside of LOS and within multi-strata LOS. Ponderosa pine 150 years or older and white fir 150 years or older (or ≥30 inches diameter at breast height) will be retained. All other species and size classes may be cut. Trees ≥21 inches diameter at breast height may be cut both inside and outside LOS.

*Cliff Knox Project, Malheur National Forest:*

164.    On April 27, 2022, the Forest Service released the Final EIS for the Cliff Knox Project on the Malheur National Forest. A final decision is expected July 2022.

165.    The Forest Service's proposed alternative proposes a variety of logging activities across a 40,300-acre Project area. It proposes 18,700 acres of commercial and small diameter thinning, 10 acres of commercial thinning only, 4,360 acres of small diameter thinning, 4,260 acres of non-commercial thinning including over 1,500 acres in RHCAs, 80 acres of mechanical riparian activities, and 40,250 acres of prescribed burning.

166.    Within most commercial units, grand fir and white fir ≥30 inches diameter at breast height may be cut. Within Aspen and Mountain Mahogany restoration units, trees of any size may be cut with the exception of trees over 150 years old.

167.    Commercial harvest may occur both outside LOS and inside LOS stands above HRV. Trees ≥21 inches diameter at breast height may be cut both inside and outside LOS.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 35

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*Ellis Integrated Vegetation Project, Umatilla National Forest:*

168.    On March 3, 2022, the Forest Service released the Draft EIS for the Ellis Integrated Vegetation Project on the Umatilla National Forest. A final decision is expected August 2022.

169.    Alternative 5 proposes approximately 75,000 acres of logging activities— including 29,076 commercial and non-commercial logging activities implementing the Screens Amendment—across a 110,000-acre Project area.

170.    Under Alternative 5, Douglas-fir, grand fir, and white fir between 7 and 30 inches in diameter, and trees between 7 and 21 inches for all other species, would be commercially thinned (unless more than 150 years old).

171.    Commercial harvest may occur both outside LOS and inside LOS stands above HRV. Trees ≥21 inches diameter at breast height may be cut both inside and outside LOS.

*Mill Creek Project, Ochoco National Forest:*

172.    On December 20, 2020, the Forest Service issued a Scoping Notice for the Mill Creek Project on the Ochoco National Forest.

173.    The Mill Creek Project proposes logging activities on approximately 23,015 acres in the Lookout Mountain Ranger District 23 miles east of Prineville, Oregon. The Scoping Notice for the Mill Creek Project proposes, *inter alia*, 7,282 acres of commercial thinning and 606 acres of commercial thinning in RHCAs.

174.    Upon information and belief, the Forest Service intends to issue an EA for the Mill Creek Project that includes at least two alternatives that involve cutting trees ≥21 inches diameter at breast height. A draft EA is expected in June or July 2022.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*42 Road GNA Wildfire Resilience Project, Deschutes National Forest:*

175.    On September 15, 2021, the Forest Service issued a Scoping Notice for the 42 Road GNA Wildfire Resilience Project on the Deschutes National Forest.

176.    The 42 Road GNA Project proposes 2,994 acres of vegetative treatment activities in areas west of LaPine State Park. The activities include, *inter alia*, 758 acres of commercial thinning and 57 acres of riparian and meadow logging activities.

177.    Upon information and belief, the 42 Road GNA project will involve cutting trees ≥21 inches diameter at breast height. A final decision is expected any day.

*Morgan Nesbit Forest Resiliency Project:*

178.    On December 15, 2020, the Forest Service released pre-scoping information for the Morgan Nesbit Forest Resiliency Project on the Wallowa-Whitman National Forest. A final decision is expected in January 2024.

179.    The Morgan-Nesbit project is located southeast of Joseph, Oregon and will propose activities including commercial logging, including the removal of trees ≥21 inches diameter at breast height and thinning in riparian areas within a 87,000 acre project area that includes areas within the Hells Canyon National Recreation area.

*Neighbor Wildfire Resiliency Project, Malheur National Forest*

180.    On October 29, 2021, the Forest Service released the decision for the Neighbor Wildfire Resiliency Project. The Forest Service determined that the project was exempt from NEPA through a categorical exclusion.

181.    The Neighbor Wildfire Resiliency Project includes commercial and noncommercial logging activities on approximately 1423 acres on the Malheur National Forest.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 37

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

182.    The project activities include cutting white fir and grand fir up to 30 inches diameter at breast height. Larger trees of any species may be cut if they are a hazard to operations.

## FIRST CLAIM FOR RELIEF
### (NEPA, Implementing Regulations, and APA Compliance)

183.    Plaintiffs re-allege and incorporate all preceding paragraphs into each count below.

**Count One:    Failure to Prepare an EIS**

184.    NEPA requires that federal agencies prepare an EIS when a major federal action is proposed that may significantly affect the quality of the environment. 42 U.S.C. § 4332(C). Impacts that must be studied in an EIS include effects to the components, structures, and functioning of the affected ecosystems and may be beneficial as well as detrimental. 40 C.F.R. § 1508.8(b).

185.    NEPA requires that an agency prepare an EIS if "substantial questions" are raised about whether its decision may cause significant degradation of some human environmental factor.

186.    An agency's decision not to prepare an EIS must be fully-informed and well-considered, supported by a convincing statement of reasons why they are not significant.

187.    In deciding whether an action may have a significant impact, the agency must consider the context and intensity of the proposed project. 40 C.F.R. § 1508.27.

188.    The intensity of the project includes consideration of, *inter alia,* the degree to which the effects of the project are likely to be highly controversial, whether its possible effects are highly uncertain or involve unknown risks, the degree to which the action threatens

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 38

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

endangered or threatened species or their critical habitat, and whether the action is related to other actions that together with it have cumulatively significant impacts. 40 C.F.R. § 1508.27(b).

189.    The agency's statement of reasons must show that none of these factors is present.

190.    The administrative record for the Screens Amendment includes substantial scientific dispute over, *inter alia*, its effects on carbon storage and therefore climate change, on fish and wildlife species, fire ecology, and ecosystem health.

191.    The administrative record for the Screens Amendment shows that its effects are highly uncertain and involve unknown risks because, *inter alia*, it is being applied to millions of acres where forest composition and climate behavior have changed significantly since the last time large trees were logged there, and because the Forest Service is abandoning an enforceable standard relating to such logging for a flexible guideline to be implemented at the discretion of agency line officers.

192.    The administrative record for the Screens Amendment shows that it may adversely affect species listed under the ESA or their critical habitat, including bull trout, by reducing the shading, groundwater, nutrient, and down wood benefits associated with large and old trees on aquatic environments.

193.    The administrative record for the Screens Amendment shows that its effects could cumulate with those of previous, related amendments to the Eastside Screens implemented by individual national forests, as well as with the effects of human alteration of the global climate.

194.    The EA and FONSI for the Screens Amendment do not contain a convincing statement of reasons why those potential impacts are insignificant, notwithstanding the factors described above.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

195.     Substantial questions inherently exist about the potentially significant adverse impacts of a decision that could result in logging tens if not hundreds of thousands of large trees across eight million acres, trees that would take many decades to regrow to their current size and ecological function.

196.     The Forest Service's failure to prepare an EIS for the Screens Amendment violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count Two:     Failure to Disclose, Analyze, and Consider at the Direct, Indirect and Cumulative Effects of the Proposed Amendment**

197.     The CEQ regulations and the Forest Service's own rules contain provisions governing preparation of environmental assessments.

198.     These regulations require an environmental assessment to provide sufficient information, evidence and analysis, including disclosure and consideration of the environmental impacts of the proposed action and alternatives, to determine whether to prepare an EIS or a FONSI.

199.     The agency must disclose, analyze, and consider the direct, indirect and cumulative effects of a proposed action.

200.     To take the required "hard look" at a project's effects, an agency may not rely on incorrect assumptions or data. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.

201.     The Forest Service failed to disclose, analyze, and consider the Screens Amendments' direct, indirect and cumulative effects on, *inter alia*, carbon storage, fish and

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 40

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

wildlife species and their habitats, fire ecology, and ecosystem health.

202.    The Forest Service's limited and cursory effects analysis was predicated on flawed assumptions about the implementation of the Screens Amendment, namely that the Screens Amendment only would trigger *de minimis* changes in management practices over the status quo. The Forest Service failed to rationally explain its assumptions, given, *inter alia*, (1) the significant interpretive change that now allows large tree logging under Scenario A1; (2) the significant change from a "standard" to a "guideline" under Scenario A2; (3) overreliance on an underdeveloped and unfunded adaptive management plan, and (4) incentives including new management direction and funding to conduct more logging than annual averages in recent years.

203.    The Forest Service's failure to sufficiently disclose, analyze, and consider the direct, indirect, and cumulative effects of the amendment violates NEPA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF
### (NFMA, Implementing Regulations, and APA Compliance)

204.    Plaintiffs re-allege and incorporate all preceding paragraphs into each count below.

**Count One:    Failure to Hold an Administrative Objection Process as Required by 36 C.F.R. § 219, Subpart B**

205.    According to its own regulations, the Forest Service must conduct a "pre-decisional administrative review . . . process for plans, plan amendments, or plan revisions." 36 C.F.R. § 219.50. This process, known as an "objection process," provides an "opportunity for an independent Forest Service review and resolution of issues before the approval of a plan, plan

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 41

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

amendment, or plan revision." *Id*. The Forest Service must disclose during the NEPA scoping

process and in NEPA documents that a plan amendment is subject to the objection process. *Id*.

§ 219.52(a).

206.    In the objection process, individuals or organizations who provided substantive

comments during the earlier phases of an amendment are allowed to file an objection. *Id*.

§ 219.53. Then, once the objection-filing period ends, "[t]he reviewing officer must issue a

written response to the objector(s) concerning their objection(s) within 90 days." *Id*. § 219.56(g).

207.    The objection process is an important tool for involved members of the public to

respond to the agency's final proposal and articulate their concerns, and for resolving disputes

before they reach the federal courts.

208.    Pursuant to 36 C.F.R. § 219.51(b), plan amendments "proposed" by the Under

Secretary for Natural Resources and Environment are not subject to the objection process.

209.    Region 6 of the Forest Service proposed the Screens Amendment and disclosed

that it would be subject to the objection process, including when it announced the availability of

a Draft EA in August 2020.

210.    In the Decision Notice, the Forest Service reversed course, and claimed that the

Screens Amendment was not subject to the objection process because it was signed by the Under

Secretary for Natural Resources and the Environment.

211.    The Under Secretary did not propose the Screens Amendment.

212.    Because the Under Secretary did not "propose" the Screens Amendment, 36

C.F.R. § 219.51(b) is inapplicable and the Forest Service was required to conduct an objection

process for qualified commenters on the Draft EA.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

213.    Defendants' failure to hold an objection process violates NFMA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law. 5 U.S.C. § 706(2).

**Count Two:**    **Failure to Follow the Required Procedures for a "Significant Change" to a Forest Plan**

214.    Under NFMA, if amending a forest plan would result in a significant change in such plan, it must be amended in accordance with heightened procedural and public participation requirements. 16 U.S.C. § 1604(f)(4).

215.    The requirements for an amendment that will result in a significant change include preparing an EIS, holding a 90-day comment period, and making the plan "available to the public at convenient locations in the vicinity of the affected unit for at least three months before final adoption." *Id*. § 1604(d)(1).

216.    A plan that may cause significant environmental impacts under NEPA, and therefore requires an EIS, automatically qualifies as a significant change under NFMA. 36 C.F.R. § 219.13(b)(3).

217.    For the same reasons that the Screens Amendment requires an EIS, it is a significant plan amendment requiring the same public involvement process as initial adoption of a forest plan.

218.    The Screens Amendment also represents a significant change because it applies to six forest plans across 8 million acres and permanently replaces a binding standard preserving scarce and ecologically important trees that was in place for 25 years with a discretionary and unenforceable guideline.

219.    Defendants' failure to follow the required procedures for a significant plan

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 43

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

amendment violates NFMA and its implementing regulations and is arbitrary, capricious, an abuse of discretion, not in accordance with, and without observance of procedure required by law 5 U.S.C. § 706(2).

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

220.    Declare the Forest Service has violated the National Environmental Policy Act, its implementing regulations, and the APA by failing to (a) prepare an EIS, and (b) take a "hard look" at the direct, indirect, and cumulative impacts of the Screens Amendment;

221.    Vacate the Decision Notice, Finding of No Significant Impact, and Environmental Assessment and remand to the Forest Service for additional consideration;

222.    Declare the Forest Service has violated the National Forest Management Act, its implementing regulations, and the APA by failing to (a) subject the Screens Amendment to the required administrative review process, and (b) process the Screens Amendment as a "significant" amendment;

223.    Issue preliminary and permanent injunctive relief prohibiting the Forest Service from implementing the Screens Amendment until such time as the Forest Service can demonstrate compliance with the requirements of the National Forest Management Act, National Environmental Policy Act, and Administrative Procedure Act;

224.    Award to Plaintiffs costs, including expenses, expert witness fees, and reasonable attorney fees under applicable law; and

225.    Grant Plaintiffs such further relief as may seem to this Court to be just, proper, and equitable.

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 44

DATED this 14th day of June 2022.

CRAG LAW CENTER

Meriel L. Darzen, OSB No. 113645,
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB No. 135436,
(503) 227-2212 │ oliver@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

COMPLAINT FOR DECLARATORY AND
AND INJUNCTIVE RELIEF - 45

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*