Meriel L. Darzen, OSB No. 113645
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB No. 135436
(503) 227-2212 │ oliver@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

*Attorneys for All Plaintiffs*

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL, OREGON WILD, CENTRAL OREGON LANDWATCH, SIERRA CLUB, GREAT OLD BROADS FOR WILDERNESS**, and **WILDEARTH GUARDIANS**,<br><br>    Plaintiffs,<br><br>    v.<br><br>**HOMER WILKES**, in his official capacity as Undersecretary for Natural Resources and Environment; **GLENN CASAMASSA**, in his capacity as Regional Forester for Region 6; and the **UNITED STATES FOREST SERVICE**,<br><br>    Defendants,<br><br>**AMERICAN FOREST RESOURCE COUNCIL**, and **EASTERN OREGON COUNTIES ASSOCIATION**,<br><br>    Defendants-Intervenors. | Case No. 2:22-cv-00859-HL<br><br>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT**<br><br>**Oral argument set for April 24th at 10:00 a.m.** |

**MOTION**

Greater Hells Canyon Council, Oregon Wild, Central Oregon LandWatch, Sierra Club, Great Old Broads for Wilderness, and WildEarth Guardians (collectively, "Plaintiffs" or "GHCC") hereby submit their *Motion for Summary Judgment*. Pursuant to LR 7-1, the undersigned certifies that the Parties made a good faith effort to resolve the dispute but were unable to do so.

GHCC challenges the final agency action of Homer Wilkes, Glenn Casamassa, and the United States Forest Service ("Defendants," "Forest Service," or "agency") to approve the Forest Plans Amendment to Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington ("Screens Amendment" or "Amendment"). The Screens Amendment applies to approximately eight million acres of national forestland spanning six national forests east of the Cascade crest in Oregon and Southeast Washington: the Fremont-Winema, Deschutes, Ochoco, Malheur, Umatilla, and Wallowa-Whitman (the "Eastside Forests"). AR34510.[1] See also map at page IV.

The Screens Amendment modifies an ecosystem management strategy known as the "Eastside Screens" that was in place for approximately 25 years. The heart of the Eastside Screens was a binding standard prohibiting the cutting of old and large trees measuring ≥21

---

[1] Citations to the record are to the Revised Administrative Record ("AR"), *see* ECF36, 37. A Table of Citations is appended to this brief, with a crosswalk between all cited documents and their location in the AR.

The AR contains a single, 5,058-page document containing all comments submitted to the Forest Service during the public comment period. AR43448–48505. Given the inherent difficulty in locating specific comment letters in this massive document, Plaintiffs have provided the court excerpts containing relevant comment letters, attached as exhibits 2 through 12 to this filing.

MOTION FOR SUMMARY JUDGMENT - i

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2775*

inches in diameter at breast height ("dbh") (known as the "21-inch Rule"). Old and large trees have outsized ecological and social importance. They provide critical ecosystem functions such as storing carbon, providing wildlife habitat, and maintaining water quality. Retention of old and large trees has widespread public support and is of great significance to the Nez Perce Tribe, whose treaty rights extend across large swaths of the Eastside Forests.

Although old and large trees remain at substantial deficits across the Eastside Forests as the region still recovers from decades of high-grade logging (*i.e.*, removing the biggest trees) and clearcutting, the Screens Amendment replaced the 21-inch Rule with a non-binding guideline. Whereas the Eastside Screens prohibited the cutting of all tree species ≥21 inches dbh in most forest stands, the Screens Amendment now suggests that old trees should be retained, and where there are insufficient numbers of old trees, "large" trees should be retained.[2]

Despite the fact that the Screens Amendment represents a substantial deviation from 25 years of agency policy, despite significant public and scientific controversy over the Screens Amendment's effects, and despite a rushed and incomplete administrative process, the Forest Service removed the binding protections for old and large trees by final decision on January 12, 2020.

The final decision (codified in a Decision Notice ("DN"), AR34750–67) was signed by the U.S. Department of Agriculture Under Secretary for Natural Resources and the Environment,

---

[2] "Old trees" are defined by the agency as having "external morphological characteristics" (based on a simple visual assessment) that suggest an age ≥150 years; "large" trees are defined as grand fir or white fir ≥30 inches or trees of any other species ≥21 inches dbh. AR34753. However, in this motion and memorandum "large trees" refer to trees of all species ≥21 inches dbh.

MOTION FOR SUMMARY JUDGMENT - ii

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

even though the Screens Amendment was proposed and processed by the Pacific Northwest Region of the Forest Service (Region 6). By employing this tactic, Defendants unlawfully exempted the decision from the pre-decisional administrative "objection" process, denying Plaintiffs, Native American Tribes, and other stakeholders their procedural rights under regulations implementing the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600–1614. Bypassing the objection process is allowed under the NFMA regulations only where the Under Secretary "proposes" an amendment; because this did not occur here, the Forest Service violated the regulations codified at 36 C.F.R. Part 219 Subsection B.

The DN was supported by an Environmental Assessment ("EA"), AR34504–749, and Finding of No Significant Impact ("FONSI"), AR34763–66, meaning that the agency forwent preparation of a more searching and careful Environmental Impact Statement ("EIS") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h. But the removal of the 21-inch Rule in favor of a discretionary guideline is highly controversial and will yield uncertain effects—two factors that obligate the agency to prepare an EIS under Council on Environmental Quality ("CEQ") regulations binding on the Forest Service. *See* 40 C.F.R. § 1508.27(b)(4), (5).[3] The Forest Service's EA and FONSI also relied on incorrect and unsupported assumptions about how the Screens Amendment would be implemented, resulting in the agency failing to take a "hard look" at environmental impacts that NEPA requires.

---

[3] The CEQ promulgated uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq.* Although CEQ modified the NEPA regulations by final rule on July 16, 2020 (and then rescinded some of the modifications by final rule on April 20, 2022), the Forest Service in approving the Screens Amendment relied on the prior version of the CEQ regulations, 40 C.F.R. §§ 1500–1508 (2019). All citations are to the 2019 version of the regulations.

MOTION FOR SUMMARY JUDGMENT - iii

Finally, the Forest Service violated both NEPA and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544 by concluding that the Screens Amendment would have "no effect" on aquatic species—including those listed as threatened or endangered under the ESA—despite the fact that the Screens Amendment permits large-tree logging in riparian areas that provide essential habitat conditions for those species. The Forest Service used an arbitrary and unsupported "no effect" determination to avoid preparation of a Biological Assessment ("BA") and to avoid undergoing required consultation with the U.S. Fish and Wildlife Service ("USFWS") and National Marine Fisheries Service ("NMFS"), making the Amendment unlawful under Section 7 of the ESA.

GHCC respectfully moves for an order granting judgment in its favor on Claims One, Two, and Three of its First Amended Complaint, ECF12. Because the Forest Service approved the Screens Amendment in a manner inconsistent with its legal obligations, GHCC respectfully requests that this Court grant GHCC declaratory and injunctive relief:

1.      Declare the Forest Service has violated NFMA, its implementing regulations, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, by failing to hold the required objection process;

2.      Declare the Forest Service has violated NEPA, its implementing regulations, and the APA, by failing to (a) prepare an EIS, and (b) take a "hard look" at the direct, indirect, and cumulative impacts of the Screens Amendment;

MOTION FOR SUMMARY JUDGMENT - iv

3.      Declare the Forest Service has violated the ESA, its implementing regulations, and the APA, by failing to (a) prepare a BA, and (b) undergo Section 7 consultation with the USFWS and NMFS regarding the Screens Amendments' impacts to listed aquatic species;

4.      Vacate the EA, DN, and FONSI, set aside the Screens Amendment, and remand to the Forest Service for additional consideration;

5.      Issue permanent injunctive relief prohibiting the Forest Service from implementing the Screens Amendment through site-specific projects named in GHCC's complaint and any future site-specific project until such time as the Forest Service can demonstrate compliance with the requirements of NFMA, NEPA, the ESA, and the APA;

6.      Award to Plaintiffs costs, including expenses, expert witness fees, and reasonable attorney fees under applicable law; and

7.      Grant Plaintiffs such further relief as may seem to this Court to be just, proper, and equitable.

In support of this Motion, GHCC respectfully refers this Court to the following *Memorandum in Support* and the declarations of Richard Bailey, Brian Kelly, Doug Heiken, Rob Klavins, Chris Krupp, Jamie Dawson, Rory Isbell, and Mathieu Federspiel, filed herewith.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## MEMORANDUM IN SUPPORT

## TABLE OF CONTENTS

MOTION...................................................................................................................... i

TABLE OF CONTENTS............................................................................................... I

TABLE OF AUTHORITIES ........................................................................................ III

GLOSSARY OF TERMS ............................................................................................. VIII

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND........................................................................................ 2

   I.   The Forest Service Adopted the Eastside Screens to Protect Old and Large Trees. .......... 2

     A.   The Importance of Old and Large Trees Is Not Disputed. ............................................. 2

   B.   The Forest Service Updated Its Management Approach to Forestall the Loss of Old and Large Trees Across the Landscape. ....................................... 3

       1.   The Eastside Screens Prohibited Cutting Trees ≥21 inches dbh in Most Forest Stands.......................................................................................................... 4

       2.   Standards Governing Logging in Riparian Areas .................................................. 6

   II.   The Forest Serviced Used a Rushed and Procedurally-Flawed Process to Adopt a Controversial Amendment to the Eastside Screens. ........................................ 8

   III.   Site-Specific Implementation of the Screens Amendment ............................................. 14

LEGAL BACKGROUND ............................................................................................. 14

   I.   National Environmental Policy Act ............................................................................... 14

   II.   National Forest Management Act .................................................................................. 15

   III.   Endangered Species Act ................................................................................................ 16

STANDARD OF REVIEW ........................................................................................... 17

ARGUMENT ................................................................................................................. 18

MOTION FOR SUMMARY JUDGMENT - I

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

I.  This Court Has Jurisdiction Over Plaintiffs' Claims: Plaintiffs Have Standing and This Case Is Ripe for Review. ........................................................................ 18

II.  The Forest Service Violated NFMA by Failing to Hold an Objection Process. ............... 19

    1.  Region 6 of the Forest Service—Not the Under Secretary—Proposed the Screens Amendment and Advised the Public that the Amendment is Subject to the Objection Process. ................................................................................. 19

    2.  The Forest Service's Failure to Hold an Objection Process Violates the Plain Language of the Planning Regulations. ...................................... 20

III.  The Forest Service Violated NEPA by Failing to Prepare an EIS. .................................. 24

    A.  The Screens Amendment Is Highly Controversial. ...................................... 25

        1.  Controversy Over the Historical Condition of Eastside Forests ............................. 27

        2.  Controversy Over the Effects of the Screens Amendment ....................................... 30

    B.  The Effects of the Screens Amendment Are Highly Uncertain. .................................. 32

    C.  The Screens Amendment "May" Adversely Affect Endangered or Threatened Species. ................................................................................. 36

IV.  The Forest Service Violated NEPA By Failing to Take a "Hard Look." ......................... 38

    A.  The Forest Service Erroneously Assumed that the New Guideline Would Be Applied as a Standard Across the Landscape. .......................................... 38

    B.  The Forest Service Erroneously Equated PACFISH/INFISH Consistency with "No Effect." ................................................................................. 39

V.  The Forest Service's Failure to Prepare a Biological Assessment, "No Effect" Conclusion, and Failure to Engage in Section 7 Consultation Violated the ESA. ........... 42

RELIEF REQUESTED ................................................................................. 45

CONCLUSION ................................................................................. 45

TABLE OF EXHIBITS ................................................................................. B

TABLE OF RECORD CITATIONS ................................................................................. C

CERTIFICATE OF COMPLIANCE ................................................................................. H

MOTION FOR SUMMARY JUDGMENT - II

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

# TABLE OF AUTHORITIES

**Cases**

*All. for the Wild Rockies v. Gassmann*,
  No. CV-21-105-M-DLC-KLD, 2022 U.S. Dist. LEXIS 93986 (D. Mont. May 25, 2022)...... 43

*All. for the Wild Rockies v. Savage*,
  897 F.3d 1025 (9th Cir. 2018) ................................................................................. 15

*All. for the Wild Rockies v. U.S. Forest Serv.*,
  907 F.3d 1105 (2018)............................................................................................... 34

*Appalachian Voices v. United States DOI*,
  No. 20-2159, 2022 U.S. App. LEXIS 3147 (4th Cir. Feb. 3, 2022) ........................................ 32

*Bark v. United States Forest Service*,
  958 F.3d 865 (9th Cir. 2020) ................................................................. 25, 26, 29, 32

*Barnes v. U.S. Dep't of Transp.*,
  655 F.3d 1124 (9th Cir. 2011) ................................................................................. 24

*Cal. Comm'ys Against Toxics v. U.S. EPA*,
  688 F.3d 989 (9th Cir. 2012) ................................................................................. 45

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
  575 F.3d 999 (9th Cir. 2009) ........................................................................... 16, 44

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)................................................................................................. 17

*Conserv. Cong. v. U.S. Forest Serv.*,
  No. CIV. S-13-0832 LKK/DAD, 2013 U.S. Dist. LEXIS 127671 (E.D. Cal. Sept. 6, 2013) .. 37

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
  789 F.3d 1075 (9th Cir. 2015) ................................................................................. 42

*Ctr. for Biological Diversity v. U.S. DOI*,
  623 F.3d 633, 642–43 (9th Cir. 2010) ....................................................................... 41

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020)............................................................................................. 17

MOTION FOR SUMMARY JUDGMENT - III

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ............................................................................................ 14

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgm't.* ("*EDC*"),
   36 F.4th 850 (9th Cir. 2022) .......................................................... 15, 24, 38, 39

*Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*,
   681 F.2d 1172 (9th Cir. 1982) ............................................................................ 31

*Friends of the Clearwater v. Petrick*,
   No. 2:20-cv-00243-BLW, 2022 U.S. Dist. LEXIS 38690 (D. Idaho March 2, 2022) .............. 43

*Friends of the Earth v. Laidlaw*,
   528 U.S. 167 (2000) ............................................................................................ 18

*Idaho Sporting Cong. v. Rittenhouse*,
   305 F.3d 957 (9th Cir. 2002) .............................................................................. 38

*Karuk Tribe v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) ...................................................................... 16, 44

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) .............................................................................. 15

*League of Wilderness Defenders/Blue Mts. Biodiversity Project v. U.S. Forest Serv.*,
   445 F. Supp. 2d 1186 (D. Or. 2006) .................................................................. 41

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................ 18

*Maracich v. Spears*,
   570 U.S. 48 (2013) .............................................................................................. 21

*Minnick v. Comm'r of Internal Revenue*,
   796 F.3d 1156 (9th Cir. 2015) ............................................................................ 21

*Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"),
   463 U.S. 29 (1983) .................................................................................. 17, 27, 37

*Nat'l Parks & Conserv. Ass'n. v. Babbitt*,
   241 F.3d 722 (9th Cir. 2001) ...................................................................... passim

MOTION FOR SUMMARY JUDGMENT - IV

*Native Ecosystems Council v. Marten*,
   CV-18-87-M-DLC, 2020 U.S. Dist. LEXIS 52990 (D. Mont. Mar. 26, 2020) ........................ 43

*Native Ecosystems Council v. U.S. Forest Serv.*,
   418 F.3d 953 (9th Cir. 2005) ........................................................................................... 38

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
   18 F.3d 1468 (9th Cir. 1994) ........................................................................................... 16

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
   402 F.3d 846 (9th Cir. 2005) .................................................................................... 24, 32

*Or. Natural Res. Council Fund v. Goodman*,
   505 F.3d 884 (9th Cir. 2007) ........................................................................................... 17

*Or. Wild v. BLM*,
   No. 6:14-CV-0110-AA, 2015 U.S. Dist. LEXIS 32584 (D. Or. Mar. 14, 2015) ............... 30, 37

*Or. Wild v. Cummins*,
   239 F. Supp. 3d 1247 (D. Or. 2016) ............................................................................... 40

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.* ("*PCFFA v. NMFS*"),
   265 F.3d 1028 (9th Cir. 2001) ......................................................................................... 44

*Pac. Rivers Council v. Thomas*,
   30 F.3d 1050 (9th Cir. 1994) ........................................................................................... 16

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .................................................................................................. 14, 30

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   985 F.3d 1032 (D.C. Cir. 2021) ...................................................................................... 32

*Thomas v. Peterson*,
   753 F.2d 754 (9th Cir. 1985) .................................................................................... 42, 43

*Tulelake Irrigation Dist. v. U.S. FWS*,
   40 F.4th 930 (9th Cir. 2022) ........................................................................................... 21

*W. Watersheds Proj. v. Kraayenbrink*,
   632 F.3d 472, 481 (9th Cir. 2011) ................................................................................. 17

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

*W. Watersheds Project v. USDA Aphis Wildlife Servs.,*
   320 F. Supp. 3d 1137 (D. Idaho 2018) ................................................................ 37

*Wild Virginia v. United States Forest Service,*
   24 F.4th 915 (4th Cir. 2022) .............................................................................. 22

*Wilderness Soc'y v. Rey,*
   180 F. Supp. 2d 1141 (D. Mont. 2002)............................................................... 23

**Statutes**

5 U.S.C. § 706(2) ...................................................................................... 17, 45

16 U.S.C. § 1531 ............................................................................................ 15

16 U.S.C. § 1532 ...................................................................... 1, 15, 16, 36

16 U.S.C. § 1536 .............................................................................. 16, 42, 43

16 U.S.C. § 1604 ........................................................................................ 1, 15

16 U.S.C. § 1612 ............................................................................................ 23

42 U.S.C. § 4332 .................................................................................. 1, 14, 20

**Regulations**

36 C.F.R. § 218.13 .......................................................................................... 22

36 C.F.R. § 219.50 .......................................................................................... 13

36 C.F.R. § 219.51 ............................................................................. 19, 21, 22

36 C.F.R. § 219.52 .......................................................................................... 20

36 C.F.R. § 219.56 .......................................................................................... 20

36 C.F.R. § 220.4 ............................................................................................ 20

36 C.F.R. Part 218 .......................................................................................... 22

36 C.F.R. Part 219 .......................................................................................... 15

36 C.F.R. Part 219, Subpart B ................................................................ 12, 19, 22

40 C.F.R. § 1501.4 .......................................................................................... 14

MOTION FOR SUMMARY JUDGMENT - VI

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

40 C.F.R. § 1508.23 .................................................................................................. 20

40 C.F.R. § 1508.27 ........................................................................................ 24, 25, 36

40 C.F.R. § 1508.9 ................................................................................................... 14

50 C.F.R. § 402.12 ................................................................................................... 42

50 C.F.R. § 402.14 ................................................................................................... 43

**Other Authorities**

51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ................................................................ 44

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| BA | Biological Assessment |
| dbh | Diameter at breast height (a unit of measure of the size of a tree) |
| CEQ | Council on Environmental Quality |
| Defendants | All named Defendants |
| EA | Environmental Assessment |
| Eastside Forests | Fremont-Winema, Deschutes, Ochoco, Malheur, Umatilla, and Wallowa-Whitman National Forests |
| Eastside Screens | Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales on Eastside Forests |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| GTR Report | USDA Forest Service General Technical Report PNW-GTR-990 ("The 1994 Eastside Screens Large-Tree Harvest Limit: Review of Science Relevant to Forest Planning 25 Years Later") |
| HRV | Historic Range of Variability |
| INFISH | Inland Native Fish Strategy |
| LOS | Late Old Structure |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NMFS | National Marine Fisheries Service |
| PACFISH | Strategies for Managing Anadromous Fish-producing Watersheds in Eastern Oregon and Washington, Idaho and Portions of California |
| Plaintiffs | All named Plaintiffs |
| RHCA | Riparian Habitat Conservation Area |
| RMO | Riparian Management Objective |
| Screens Amendment | Forest Plans Amendment Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington |
| Secretary | Secretary of Agriculture |
| Under Secretary | U.S. Department of Agriculture Under Secretary for Natural Resources and Environment |
| USDA | United States Department of Agriculture |
| USFWS | United States Fish and Wildlife Service |

MOTION FOR SUMMARY JUDGMENT - VIII



*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## INTRODUCTION

Plaintiffs bring this lawsuit to challenge the "Screens Amendment," a Forest Service decision that unlawfully rolled back a long-standing protection for mature and old growth trees across eight million acres of national forestland in Eastern Oregon and Washington. As set forth below and in the attached declarations, the Screens Amendment decision should be vacated and remanded because the agency: 1) skipped the required procedural step of holding an administrative objection process; 2) failed to take a "hard look" and prepare an EIS despite the effects of the action being highly controversial and uncertain; and 3) failed to adequately consider and consult over the effects to threatened and endangered aquatic species.

Plaintiffs and others, including the Nez Perce Tribe, which will be filing an amicus brief in support of Plaintiffs' motion, repeatedly requested that the agency engage in a full and fair consideration of the environmental consequences of removing the 21-inch Rule, which protected old and large trees from logging for over 25 years. But instead, the agency engaged in a rushed and incomplete public process, drafting a perfunctory EA and conclusory DN and FONSI that ignore the high level of scientific debate and uncertainty over the exact issues at the core of the decision: how eastside forests existed historically, and whether cutting large trees will help restore those forests and make them more resilient in the future. Then, after promising that the public would be able to participate in an objection process to further explore these complex issues, on the eve of the presidential transition, the agency pulled a bait and switch, having the Under Secretary sign the final decision in order to skip the objection process. The agency's actions must be vacated and remanded because they are arbitrary, capricious, and not in accordance with NFMA, NEPA, and the ESA.

MEMORANDUM IN SUPPORT OF MSJ - 1

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2775*

## FACTUAL BACKGROUND

**I.      The Forest Service Adopted the Eastside Screens to Protect Old and Large Trees.**

After years of logging removed the oldest and largest trees on forests east of the Cascade Mountains, in the mid-1990s the Forest Service charted a new management approach. Spurred by scientific information, the threat of lawsuits, and presidential and congressional directives, the Forest Service developed a process to protect remaining old and large trees—which form the backbone of healthy upland forest and riparian ecosystems.

### A.      The Importance of Old and Large Trees Is Not Disputed.

"[Large, old, live, and dead trees and old forest patches] have distinct ecological, economic, and social values, as reflected in widespread fish and wildlife use, public support for protecting them, and commercial interest in harvesting them[.]" AR28048. In upland forests, "large trees contribute a variety of habitat functions for forest wildlife, including food, shelter, and security from predators or competitors." AR28096. For wildlife, large trees provide critical nesting, resting, and denning structures in the form of cavities, platforms, and exfoliating bark, as well as thermal refugia enhanced by the deep shading and cool-moist microclimates provided by large trees with complex canopy structures. *Id.* Large trees also are integral to a variety of aquatic and riparian ecosystem functions and processes, "creating instream structure by adding complexity to stream channels and providing shade [and] creating high-quality, durable fish habitats." AR28104; *see also* AR28565; AR28705–08. Old and large trees store a disproportionate amount of carbon, with greater leaf surface area for $CO_2$ absorption and massive, carbon-storing tree trunks and roots. A recent study found that on Eastside Forests, trees over 21 inches account for only 3% of all trees but 42% of stored carbon. AR28168.

MEMORANDUM IN SUPPORT OF MSJ - 2

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

**B.      The Forest Service Updated Its Management Approach to Forestall the Loss of Old and Large Trees Across the Landscape.**

By the early 1990s, the impacts from a century of logging in the Pacific Northwest were becoming readily apparent. Forests consisted primarily of clearcuts, thinned stands, and young plantations; relatively few old and large trees remained. AR33318. This spurred actions from Congress, scientists, and conservation groups to request changes to eastside forest management. *See* First Amd. Cmpl. ("FAC"), ECF12, ¶¶ 80–92; AR14389–92.[4]

In response, in February 1994, the Forest Service and others proposed a regional strategy for coordinated ecosystem management of lands east of the Cascades. AR14502. This longer-term effort became known as the Interior Columbia Basin Ecosystem Management Project (although it was later abandoned). *Id.*; AR48140. To protect forests in the interim, the Forest Service proposed the "Eastside Screens" to "screen" in an "intentionally restrictive" manner logging projects that threatened to further degrade mature and old growth forests. AR14383-84.

In August 1993, the Regional Forester announced an initial version of the Eastside Screens. AR14405–31; AR30040–63. An EA, DN/FONSI followed in May 1994 formally adopting the Eastside Screens and amending the forest plans governing 11 million acres of national forestland in eastern Oregon and Washington. AR14383–480; AR14481–91. A second EA, DN/FONSI issued in June 1995, establishing a revised version of the Eastside Screens that remained in place until it was altered by the Screens Amendment. AR14492–631; AR14632–41.

---

[4] *See also* AR14333–14382 (NRDC Petition); AR15308–374 (Everett, et al. (1994)); 15730–977 (Henjum, et al. (1994)).

MEMORANDUM IN SUPPORT OF MSJ - 3

The Eastside Screens' primary goal was to conserve old and large trees (of all species) ≥21 inches dbh and "late and old structure" ("LOS") forest stands. *See* AR14384-88.

1.      **The Eastside Screens Prohibited Cutting Trees ≥21 inches dbh in Most Forest Stands.**

The Eastside Screens adopted by the 1994 DN (as revised by the 1995 DN) consists of three standards used to "screen" timber sales: 1) ecosystem, 2) wildlife, and 3) riparian. *See* Exhibit ("Ex") 1 (AR34722–34) (copy of original Eastside Screens). The riparian standard and its subsequent iterations are described in the subsection below.

The ecosystem standard, which remains in effect, obligates the Forest Service to analyze current forest structure in a proposed timber sale area and its associated watershed, and compare that current forest structure to the area's Historic Range of Variability ("HRV"). *See* AR34723–28. [5] Within a watershed, the area is also classified into "biophysical environments" based on plant association groups.[6] Then, the comparison of HRV to current structure/biophysical environment is used to select areas for "treatment" (such as logging). *Id.*[7] The Forest Service's goal is to manage stands to within their HRV. AR14394.

---

[5] Forest "structure" is associated with a given stand's canopy layer. A forest stand can have an open or a closed canopy (indicating trees growing further apart versus closer together, respectively); and a multi-layered or a single-layered canopy (indicating trees of trees of varying heights versus roughly the same heights, respectively). *See* AR34725–26; AR33232.

[6] For example, there are warm dry forests, cool moist forests, and cold forests. AR34607–08, 34727.

[7] HRV is described as "the historical pattern and abundance of structural stages within watersheds, using pre-settlement (1800–1900) conditions as a reference point. It involves the determination of whether a particular [timber] sale might critically alter the abundance of any structural stage within the project area." AR14386.

MEMORANDUM IN SUPPORT OF MSJ - 4

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Because of natural (such as fire) and human-caused (such as logging) disturbances, forest stands in a particular watershed can comprise different structural stages and substages. *See* AR34724–26. Late old structural (LOS) stages can have "closed" canopies (*i.e.*, two or more canopy layers containing numerous large trees ≥21 inches dbh) or "open" canopies (*i.e.*, a single canopy layer containing numerous large trees ≥21 inches dbh). *Id.* Whether an area is LOS can be determine, in part, by the number of large trees per acre. *See* AR34451–53 (6–20 large trees per acre is LOS depending on location and vegetation zone).

The wildlife standard, which is the standard modified by the Screens Amendment, provides timber management direction applicable to different "scenarios" based on whether (1) an area is inside or outside LOS; and (2) if inside LOS, whether LOS is below, or within or above HRV. *See* Ex. 1 (AR34729–34).

If an area is inside LOS, one or both LOS stages ("open" or "closed") may be present. Timber sales are prohibited in any LOS stage falling below HRV. Prior to the Screens Amendment, if both LOS stages were present, and one stage was within or above HRV and one was below, some timber sales were permitted within the within/above-HRV LOS stage, subject to the 21-inch Rule. This is "Scenario A1."[8] If all LOS within an area was within or above HRV, then timber sales can occur. This is "Scenario B," and the 21-inch Rule did not apply. AR34731–32. If an area was outside of LOS, timber sales, subject to the 21-inch Rule, was allowed. This is

---

[8] A series of guidance documents from the Regional Forester confirmed "the screen direction under Scenario A of the wildlife standard was intended to maintain all live trees ≥21 inches [diameter at breast height] regardless of tree species and regardless of whether a stand is LOS or not." AR14659*; see also* AR14661–62.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

known as "Scenario A2." AR34729–30.[9] Under all Scenarios, timber sales generally must

maintain or enhance LOS. *See* AR34729, 34733.

| | WILDLIFE STANDARD SCENARIO (pre-amendment) | | |
|---|---|---|---|
| | Scenario A | | Scenario B |
| | A1 | A2 | |
| **LOS** | Inside LOS | Outside LOS | Inside LOS |
| **HRV** | One LOS Stage Below HRV & One LOS Stage Within/Above HRV | N/A | Within/Above HRV |
| **Timber harvest constraints** | No timber sales in LOS Stage below HRV; timber sales allowed in LOS stage within/above HRV but 21-inch Rule applies | Timber sales allowed; 21-inch Rule applies | Timber sales allowed |

Since the adoption of the Eastside Screens, the Forest Service has applied the 21-inch

Rule, as written and clarified by the guidance documents, to hundreds of projects. It has also

approved 24 project-specific forest plan amendments relating to the 21-inch Rule. AR34509.

Most of these amendments have been targeted toward specific circumstances and applied to

limited acreage. In other words, in most cases, the agency has determined that cutting trees over

21 inches dbh was not needed to accomplish management objectives.

## 2. Standards Governing Logging in Riparian Areas

The riparian standard, which has since been replaced by the Pacific Anadromous Fish

Strategy ("PACFISH") and the Inland Native Fish Strategy ("INFISH"), applied to logging

activities in sensitive riparian areas. Given the legacy of degraded riparian conditions, AR14450,

---

[9] Additionally, the wildlife standard prior to the Screens Amendment provided that large snags and green replacement trees are to be maintained at levels sufficient to meet the needs of wildlife dependent on them and downed logs sustained at specific thresholds depending on the type of tree. AR34731–32.

MEMORANDUM IN SUPPORT OF MSJ - 6

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

and wanting to preserve future management options, the Regional Forester in 1993 deferred any new logging project within certain riparian areas. AR14408–09. This approach continued until PACFISH and INFISH were adopted, in 1994 and 1995, respectively.

PACFISH and INFISH restrict the extent of riparian logging through standards and guidelines applicable to logging activities in Riparian Habitat Conservation Areas ("RHCAs"). AR14806; AR15172.[10] PACFISH/INFISH set RHCA widths (or "buffers") for four different categories of streams and other waterbodies to protect them from sediment inputs from management activities and preserve other riparian functions. AR14836–37; AR15060–61.

While PACFISH/INFISH were intended to arrest the steep declines in fish populations and loss of habitat, they do not prescribe management activities in RHCAs. Instead, PACFISH/INFISH allow logging activities in riparian areas, subject to limitations. *See, e.g.*, AR15056 (requirements not intended to "lockout" management activities). Standard TM-1 of both PACFISH/INFISH allows for silvicultural practices to acquire desired vegetation characteristics and attain certain indicators of aquatic ecosystem health called Riparian Management Objectives ("RMOs"). AR14838, 15062. Such silvicultural practices are allowed if they are applied in a manner that does not retard attainment of RMOs and that avoids adverse effects on inland native fish. *Id.*[11] PACFISH/INFISH themselves "do not limit the size of trees harvested within RHCAs," AR34594, and thus, the removal of the 21-inch Rule also affects logging in riparian areas.

---

[10] RHCAs include traditional riparian corridors, wetlands, intermittent streams, springs and seeps, and other areas that help maintain the integrity of aquatic ecosystems. *Id.*

[11] To "retard" means to slow the rate of recovery below the near natural rate of recovery if no additional human caused disturbance was placed on the system. AR15058.

MEMORANDUM IN SUPPORT OF MSJ - 7

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

II.     **The Forest Serviced Used a Rushed and Procedurally-Flawed Process to Adopt a Controversial Amendment to the Eastside Screens.**

Believing that the current condition of most stands on Eastside Forests diverges from their HRV, the Forest Service in the Spring of 2020—during the height of the Covid-19 pandemic—initiated a process to amend the Eastside Screens. According to the Forest Service, increased presence of certain tree species, like grand and white fir, are encroaching on more fire-tolerant species like ponderosa pine, and the 21-inch Rule is inhibiting restoration of desired forest conditions because it restricts the cutting of large grand and white fir trees. Although the Eastside Forests are incredibly diverse, with varied altitudes and climate, and with large areas where grand and white fir were historically the dominant species, the agency believes that a higher incidence of forest stands containing fire-tolerant species across the Eastside Forests would be beneficial for resilience to wildfire, drought, and other natural events. *See generally* AR34511–52; *contra* AR34526 (chart showing 42% of the analysis area in the White Fir/Grand Fir potential vegetation zone).

While the agency presented these issues as being "scientifically settled," thus justifying the removal of the 21-inch Rule, even during the truncated public process for the Screens Amendment, extensive criticisms were brought forward—including from leading scientists, former Forest Service officials, and Native American Tribes. But the agency summarily dismissed any scientific viewpoints with which it did not agree and short-circuited the administrative process to cut off further debate.

Rather than holding a formal scoping process, in May of 2020, the Forest Service gave notice that it would be hosting three virtual forums on pre-selected days, with pre-selected

MEMORANDUM IN SUPPORT OF MSJ - 8

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

agendas regarding the proposed amendment of the Eastside Screens.[12] AR32115. The first forum

was the "Scientific Forum," initiated to present different scientific perspectives on amending the

Screens. AR32159; 32119. This Forum focused on the disagreement between Forest Service

scientists on the one hand, and outside scientists on the other. AR33047. Drs. DellaSala, Law,

and Hanson provided counterarguments to the agency's scientists' claims that current conditions

were dramatically out of line from the HRV. *See* AR32203 (powerpoints), 32151 (video

recording). These scientists—who collectively have published hundreds of peer-reviewed

scientific papers and have been engaged with forest management issues in the western United

States for decades—also disputed the agency's insistence that large trees of certain species

(namely, grand and white fir) were "undesirable" and explained instead the importance of large

trees of all species for climate mitigation, forest resiliency, wildlife habitat, and moderating fire

hazards. *Id.*[13]

The other two forums were the Partner Technical Workshop and the Intergovernmental

Technical Workshop. AR32854, 32778, 32505, 32427. The Intergovernmental Technical

Workshop, which invited county, state, and tribal representatives, was held on May 13, 2020,

National Indian Day—a holiday for many tribal governments, including the Nez Perce Tribe,

---

[12] Scoping is a critical phase of the NEPA process intended to help guide the development of the proposed action and analysis. 36 C.F.R. § 220.4(e)(1); *see also* 40 C.F.R. § 1501.7. By bypassing the scoping process, the Forest Service denied the public the ability to help shape issues of concern, alternatives, and analytical methodologies and instead, predetermined the range of alternatives and scope of analysis.

[13] Some of these disagreements had their genesis years prior; rigorous debates in the scientific literature over many of these issues have been ongoing for some time. *See, e.g.*, AR25519 (Hagmann et.al. (2018), critiquing Baker and Hanson (2017), who were critiquing several earlier articles that dealt with "knowledge of historical forest conditions" in the Western United States; AR30531 (Odion (2016)).

MEMORANDUM IN SUPPORT OF MSJ - 9

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

who had a vested interest in the Screens Amendment. *See* Ex. 2 (AR48296–311) (comments of Nez Perce Tribe).

Following the three forums, the Forest Service released a Draft EA for the Screens Amendment. AR33213–387. The agency proposed replacing the 21-inch Rule (a binding standard that was the core of the wildlife screen) with a guideline that "emphasizes" recruitment of old and large trees. AR33223–24. The proposal replaces the 21-inch Rule and language applicable to stands under Scenario A2 with the following discretionary language:

> Outside of LOS, many types of timber sale activities are allowed. The intent is still to maintain and/or enhance LOS components in stands subject to timber harvest as much as possible, by adhering to the following plan components: a) Managers should retain and generally emphasize recruitment of old trees and large trees. Management activities should first prioritize old trees for retention and recruitment. If there are no old trees, the largest trees should be retained. Old trees are defined as having visual characteristics that suggest an age ≥150 years. Large trees are defined as grand fir, white fir, or Douglas fir ≥30" dbh or trees of any other species ≥21 inch dbh. Old and large trees will be identified through best available science. Management activities should consider species composition and spatial arrangement within stands and across the landscape[.]

*Id.*[14]

The agency also proposed changing its interpretation of Scenario A1. In its description of the "Current Management" alternative, the Draft EA notes the longstanding official interpretation of the 21-inch Rule as applying to stands under Scenario A1. AR33240; *see also supra* p.5 n.8. Conversely, for the proposed alternative (and the other action alternatives), the Forest Service changed the interpretation: Cutting trees greater than 21 inches dbh would be authorized under Scenario A1. *Id.* The Forest Service did not disclose or explain the basis or

---

[14] The agency also proposed amending the language applicable to retention of snags, as well as adding an adaptive management strategy. *Id.*; AR33226.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

rationale for the interpretive change; it was not included as part of the "proposed action,"

AR33223–24, nor otherwise described other than as an "additional management assumption."

AR33240; *see also* AR 33229, 34444 (analysis "narrowly focused" on Scenario A2); AR 34756

(same).

Despite the significant changes to a management framework that had been in place for 25

years, the Forest Service summarily concluded—based principally on the results of a modeling

exercise—that the Amendment's impacts would be minimal. AR33229, 33254. On the one hand,

the agency's stated "purpose and need" for the Amendment was the dramatic and unequivocal

need to cut trees of certain species ≥21 inches dbh in order to shift species composition. *See*

AR33220–21. But on the other hand, despite this stated need, the agency found that the proposed

alternative would cause only "slight changes" beyond the status quo. *See* AR33319.

On October 13, 2020 Plaintiffs, together with 19 other organizations, timely submitted

extensive comments on the Draft EA. *See* Ex. 3 (AR48133–216) (Plaintiffs' comments).

Plaintiffs' comments highlighted, *inter alia*, how the Amendment's allowance of logging trees

≥21 inches dbh would cause significant environmental effects. *See, e.g.*, AR48142–43, 48158–59

(wildlife habitat); AR48159–66 (carbon storage); AR48168–69 (aquatic species).

Plaintiffs attached to their comments an expert report co-authored by Dr. DellaSala (who

participated in the Science Forum) and Dr. Baker, as well as a separate letter from Dr. Hanson

(another participant in the Science Forum). Ex. 4 (AR33922–98), Ex. 5 (AR48129), Ex. 3

(AR48133–216). These scientists addressed the Draft EA's failure to discuss opposing scientific

evidence, its unsupported conclusions about the efficacy of the proposed guideline to achieve

MEMORANDUM IN SUPPORT OF MSJ - 11

desired conditions, and its reliance on faulty evidence—most notably, the Forest Vegetation

Simulator ("FVS") model used by the agency to evaluate the Screens Amendment's

environmental effects. Ex. 4 (AR33943), Ex. 5 (AR48129).

Comments also were submitted by other scientists, agencies, and Tribes, all of whom

questioned the Forest Service's analysis and assumptions: A group of over 100 scientists with

expertise in ecology, natural resource management, and climate change, Ex. 6 (AR28200–304)

Drs. Franklin, Johnson, and Seager—recognized forest ecology experts— Ex. 7 (AR48118–128);

other scientists, *see, e.g.*, Ex. 8 (AR43798–800); a retired Deputy Chief of the Forest Service,

Ex. 9 (AR44909–10); the U.S. EPA, Ex. 10 (AR43618–20); and the Oregon Department of Fish

and Wildlife, Ex. 11 (AR45182–86). For example, Drs. Franklin, Johnson, and Seager had

"significant concerns about the science and analysis in the EA relevant to achieving the stated

goals." Ex. 7 (AR48119); *see also* Ex. 11 (AR45183) ("ODFW currently cannot determine how

the Amendment's decision-space will be bounded and applied[.]"). The Confederated Tribes of

the Umatilla Indian Reservation, Ex. 12 (AR46981–84) and Nez Perce Tribe also commented

and requested the Forest Service to prepare an EIS. Among many other critical comments, the

Nez Perce Tribe directly informed the Forest Service that it "[did] not support the Forest's

proposed action or any of the alternatives." Ex. 2 (AR48298).

Throughout the administrative process, the Forest Service explicitly and repeatedly

advised that the Screens Amendment would be subject to a pre-decisional administrative

"objection" process required by regulation. *See generally* 36 C.F.R. Part 219, Subpart B;

AR33599 ("The EA is subject to Forest Service regulation 36 C.F.R. 219 Subpart B, known as

MEMORANDUM IN SUPPORT OF MSJ - 12

the administrative review, or objection process."). The objection process serves an important role by facilitating public review and discussion over a draft decision and providing an opportunity for resolution before matters reach the federal courts. *See* 36 C.F.R. § 219.50.

Given the substantial controversy over the Screens Amendment and the Forest Service's analysis, an objection period would have been particularly instructive. And yet, despite repeated promises of an objection period, on January 12, 2021 the Forest Service unexpectedly released the Final EA along with a DN and FONSI for the Screens Amendment, forgoing the objection process. AR34762. The DN selected the proposed alternative from the Draft EA containing the new guideline.[15] The DN did not describe or explain the interpretive change regarding the removal of the 21-inch Rule under Scenario A1 that was part of the selected alternative. *See* AR34753–56 (description of and rationale for decision).

The Forest Service conducted ESA Section 7 consultation with the USFWS over the Amendment's impacts on listed terrestrial wildlife species. *See* AR34174–83. The Forest Service did not, however, engage in Section 7 consultation over impacts on listed aquatic species, despite the Amendment's allowance of logging trees ≥21 inches dbh in riparian areas. Plaintiffs submitted a 60-day Notice of Intent to Sue for Violations of the ESA on June 14, 2022. AR49259–302.

---

[15] The only changes to the new guideline were to the definition of "large tree" for Douglas fir (≥30" dbh in the draft and ≥21" dbh in the final), and some adjustments to the adaptive management strategy. *Compare* AR33223–24 *with* AR34516.

MEMORANDUM IN SUPPORT OF MSJ - 13

III.     **Site-Specific Implementation of the Screens Amendment**

The Forest Service is now actively planning and authorizing projects that implement the

Screens Amendment (*i.e.*, to allow logging of trees ≥21 inches dbh). At least three projects

implementing the Screens Amendment have already been approved, authorizing thousands of

acres of logging: the South Warner project on the Fremont-Winema, the Cliff Knox Project on

the Malheur, and the Neighbor Project also on the Malheur.[16] There are a series of additional

projects proposing to implement the Screens Amendment in various stages of development

across all six of the forests.

## LEGAL BACKGROUND

I.     **National Environmental Policy Act**

To achieve its twin aims of informed decisionmaking and meaningful public

participation, NEPA and its implementing regulations set forth "action-forcing" procedures

designed to (1) ensure that the agency took the requisite "hard look" at the environmental

consequences of the proposed action, and (2) foster meaningful public participation. *See*

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989); *Dep't of Transp. v.*

*Pub. Citizen*, 541 U.S. 752, 768 (2004).

To accomplish these purposes, NEPA requires all federal agencies to prepare a "detailed

statement" for all "major federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C). Commonly known as the EIS, the detailed statement

must describe, *inter alia*, the adverse environmental impact of the proposed action and

alternatives to it. *Id.*; *see also id.* § 4332(2)(E). If the significance of a proposed action is

---

[16] *See* FAC, ECF12, and Answer, ECF15, ¶¶ 175–207.

MEMORANDUM IN SUPPORT OF MSJ - 14

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

uncertain, an agency may prepare a less rigorous EA, a concise public document that briefly

describes the proposal, examines reasonable alternatives, and provides a listing of individuals

and agencies consulted. 40 C.F.R. § 1501.4(b); *id.* § 1508.9. If the agency decides an EIS is not

required, it must supply a "convincing statement of reasons to explain why the proposed action's

environmental impacts will not be significant." *Envtl. Def. Ctr. v. Bureau of Ocean Energy*

*Mgm't.* ("*EDC*"), 36 F.4th 850, 879 (9th Cir. 2022).

## II.  National Forest Management Act

"NFMA sets forth the statutory framework and specifies the procedural and substantive

requirements under which the Forest Service is to manage National Forest System lands." *Lands*

*Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008). NFMA provides for forest planning and

management on two levels: (1) the forest level, and (2) the site-specific project level. *All. for the*

*Wild Rockies v. Savage*, 897 F.3d 1025, 1032 (9th Cir. 2018). At the first level, NFMA requires

the Forest Service to develop, maintain, and revise a forest plan for each national forest. 16

U.S.C. § 1604(a). At the second level, the Forest Service implements the forest plan when

approving or denying site-specific projects. *Id.*

NFMA requires the Forest Service to promulgate regulations for the development,

revision, and amendment of forest plans. 16 U.S.C. § 1604(g). In 2012, the agency promulgated

the planning regulations applicable to the Screens Amendment, 36 C.F.R. Part 219 (2022).[17]

---

[17] In 1982, the Forest Service promulgated the first set of planning regulations, and the
Forest Plans for the six Forests, as amended by the Eastside Screens, all were developed under
the 1982 rule. *See* FAC, ECF12, and Answer, ECF15, ¶ 37.

MEMORANDUM IN SUPPORT OF MSJ - 15

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

### III.    Endangered Species Act

Congress enacted the ESA to "provide a means whereby the ecosystems upon which endangered and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered and threatened species[.]" 16 U.S.C. §§ 1531(b), 1532(6), 1532(20). The heart of the ESA is Section 7, which sets forth substantive and procedural duties binding on all federal agencies. Substantively, Section 7 provides that federal agencies must "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the adverse modification of [critical habitat]." *Id.* § 1536(a)(2). The statute defines "agency action" as "any action authorized, funded, or carried out" by such agency. *Id.* "Actions" include programmatic decisions like forest plans and amendments thereto. *See, e.g.*, *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994).

Procedurally, Section 7 requires a federal agency (the "action agency") to engage in consultation with the applicable Service before undertaking a discretionary action that may affect listed species or critical habitat. 16 U.S.C. § 1536(a)(2). The action agency may avoid the consultation requirement only if it determines that its action will have "no effect" on a listed species. 50 C.F.R. § 402.12; *see also Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). "[A]ctions that have any chance of affecting listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## STANDARD OF REVIEW

The Ninth Circuit endorses the use of Rule 56 summary judgment motions to resolve claims brought pursuant to the APA. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Plaintiffs' claims are reviewed pursuant to the APA, 5 U.S.C. § 706(2), which "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (citation omitted); *Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (NFMA & NEPA); *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 481, 496 (9th Cir. 2011) (ESA).

Agency actions must be "set aside" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Agency action is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[.]" *Mtr. Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983).

Under this standard of review, a court is not permitted to substitute its judgment for that of the agency, but must assess whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). It is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action. *Homeland Sec'y*, 140 S. Ct. at 1907 (citation omitted).

MEMORANDUM IN SUPPORT OF MSJ - 17

## ARGUMENT

**I.    This Court Has Jurisdiction Over Plaintiffs' Claims: Plaintiffs Have Standing and This Case Is Ripe for Review.**

As set forth in the declarations filed herewith, Plaintiffs are non-profit organizations whose members, supporters, and staff use and enjoy the Forests, and whose interests are harmed by the Screens Amendment but would be redressed by a favorable decision.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 183 (2000) (citations omitted). The injury here is "imminent": The Forest Service is actively planning and authorizing projects implementing the Screens Amendment, with at least nine projects either approved or in the planning stages across the Forests. *See* FAC & Ans. ¶¶ 175–207, ECF 12, 20. Across the Forests generally, and specifically within the project areas slated to be impacted by the Screens Amendment, Plaintiffs' members engage in variety of personal and professional recreational, scientific, and spiritual purposes and have firm plans to return. *See* Decl. Dawson, ¶¶ 6, 18; Decl. Federspiel, ¶¶ 7, 17; Decl. Heiken, ¶¶ 7, 12; Decl. Kelly, ¶ 10; Decl. Klavins, ¶¶ 10, 15; Decl. Isbell, ¶¶ 4, 6, 9; Decl. Bailey, ¶¶ 5-7, 13.

Plaintiffs' members' interests would be irreparably damaged by the Screens Amendment, but redressed by the remedy requested. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572–73 n.7 (1992); Decl. Krupp, ¶ 17; Decl. Federspiel, ¶¶ 7, 17; Decl. Heiken, ¶ 15; Decl. Isbell, ¶ 13; Decl. Bailey, ¶ 15.[18]

---

[18] Because Plaintiffs' members have standing, Plaintiffs themselves have organizational standing to bring the case. *See Friends of the Earth*, 528 U.S. at 181.

MEMORANDUM IN SUPPORT OF MSJ - 18

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

This case presents a facial, programmatic challenge to the approval of the Screens Amendment in which GHCC brings procedural claims under NFMA, NEPA, and the ESA. Such programmatic, procedural claims are immediately ripe for review, irrespective of future site-specific implementing actions. *See EDC*, 36 F.4th at 869–71.

## II.    The Forest Service Violated NFMA by Failing to Hold an Objection Process.

Forest Service regulations obligate the agency to hold an objection process for a plan amendment, *see generally* 36 C.F.R. Part 219, Subpart B, *unless* the plan amendment was "proposed" by the USDA Secretary or Under Secretary of Natural Resources. 36 C.F.R. § 219.51(b) ("[Plan Amendments] proposed by the [Secretary] or the [Under Secretary] are not subject to the procedures set forth in this section. A decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture."). The Screens Amendment was not proposed by either official; accordingly, the agency repeatedly advised that the Screens Amendment would be subject to an objection process. At the 11th hour and without any prior notice, the agency abruptly reversed course and claimed that the Screens Amendment was not subject to the objection process because the Under Secretary signed the final decision. This bait-and-switch violates the NFMA planning regulations.

### 1.    Region 6 of the Forest Service—Not the Under Secretary— Proposed the Screens Amendment and Advised the Public that the Amendment is Subject to the Objection Process.

Under the planning regulations, the determining factor as to whether a plan amendment is subject to the objection process is whether or not the amendment was "proposed" by the

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2775*

Secretary or Under Secretary.[19] The Screens Amendment was proposed by Region 6 of the

Forest Service, not either of the Department-level officials. *See* AR33591 ("The USDA Forest

Service Pacific Northwest Region [Region 6] has released a proposal to amend forest plans on

six national forests in eastern Oregon[.]"); *see also* AR33601 (denoting the Pacific Northwest

Region of the Forest Service as the proposal-making entity).

Accordingly, as required by 36 C.F.R. § 219.52(a), the Forest Service disclosed "in the

appropriate NEPA documents" that the Screens Amendment was subject to an objection process.

*See* AR33602; AR33746 (notices of public comment period); *see also id.* (explaining the form

and content of public comments that must be submitted in order to file an objection); AR33591

(same).[20]

Critically, the Forest Service announced the appointment of Ochoco National Forest

Supervisor Shane Jeffries as the responsible official. AR33602; AR33414; 33214. This

designation set up the framework for the objection process, with the objection reviewing officer

at the regional level or level of the chief. *See* 36 C.F.R. § 219.56(e).

### 2.     The Forest Service's Failure to Hold an Objection Process Violates the Plain Language of the Planning Regulations.

The Forest Service abruptly reversed course with the final decision (on the eve of the

presidential transition). The Under Secretary assumed the role of responsible official and the DN

---

[19] A "proposal" exists under NEPA "at that stage in the development of an action when an agency subject to [NEPA] has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." 40 C.F.R. § 1508.23; *see also* 36 C.F.R. § 220.4(a) (Forest Service regulations mirroring the CEQ definition of "proposal").

[20] *See also* AR33536, 33539, 33540, 33600, 33608 (papers of record informing public of objection process); AR33746 (85 Fed. Reg. 55,409 (Sept. 8, 2020)).

MEMORANDUM IN SUPPORT OF MSJ - 20

states, citing 36 C.F.R. § 219.51(b): "[T]his plan amendment is not subject to objection

(administrative review) because it is signed by the Under Secretary for Natural Resources and

Environment. As such, this decision is the final administrative determination by the U.S.

Department of Agriculture." AR34762. But this interpretation of 36 C.F.R. § 219.51(b) reads out

of the regulation the prerequisite that to be exempt from the objection process, the amendment

must have been "proposed" by the Under Secretary. This construction of the regulation is not

reasonable and must be rejected.

 "Regulations are interpreted according to the same rules as statutes, applying traditional

rules of construction." *Minnick v. Comm'r of Internal Revenue*, 796 F.3d 1156, 1159 (9th Cir.

2015). When construing a statute, courts should "avoid any statutory interpretation that renders

any section superfluous," a "canon that holds true, as well, for interpretations of language within

a single section." *Tulelake Irrigation Dist. v. U.S. FWS*, 40 F.4th 930, 936 (9th Cir. 2022)

(citations omitted). The Forest Service's reading of 36 C.F.R. § 219.51(b) would render the first

sentence superfluous. The Forest Service's reading also would render 36 C.F.R. § 219.52

superfluous. *See Maracich v. Spears*, 570 U.S. 48, 65 (2013) ("It is necessary and required that

an interpretation of a phrase of uncertain reach is not confined to a single sentence when the text

of the whole statute gives instruction as to its meaning."). That subsection requires the Forest

Service to alert the public that a plan amendment will be subject to the objection process—as the

agency did here. If the Under Secretary could simply sign a decision they did not propose,

thereby avoiding the objection process, the requirement to alert the public to an objection process

would be unnecessary (and confusing, as discussed below).

MEMORANDUM IN SUPPORT OF MSJ - 21

Instead, a proper reading of the regulation harmonizes both sentences of 36 C.F.R. § 219.51(b): The first sentence stipulates that the exception to the objection process is available only where a plan amendment is proposed by the Under Secretary, and the second sentence confirms that a decision by the Secretary or Under Secretary in this context (*i.e.*, where the action was proposed by the Secretary or Under Secretary) is not subject to higher review.

The one case to construe a similar regulatory provision is consistent with this reading. In *Wild Virginia v. United States Forest Service*, the Fourth Circuit considered whether the applicant for the permit or the Under Secretary reviewing the application was the relevant "proponent" for purposes of the objection regulation.[21] 24 F.4th 915 (4th Cir. 2022). The court held that "a proposal, for purposes of the exception, does not mean the application triggering action by the Forest Service but, rather, how the Forest Service decides to act in response to that application." *Id.* at 927. Given this distinction, the objection process exemption was properly satisfied in that case. *See id.* ("But, significantly, "projects and activities proposed by . . . the Under Secretary, Natural Resources and Environment, are not subject to the predecisional review process. **This exception** applies in this case." (citing 36 C.F.R. § 218.13(b)) (emphasis added). That case thus confirms that an action proposed and decided by the Under Secretary is exempt from the objection process—which is not the case here.

Equitable considerations also counsel in favor of finding the Forest Service's failure to hold an objection process unlawful. By repeatedly representing to the public that the Screens

---

[21] *Wild Virginia* addressed the Forest Service's regulations addressing the objection process for project-level decisions, as opposed to the regulations addressing plan-level decisions at issue here. *Compare* 36 C.F.R. Part 218 *with* 36 C.F.R. Part 219 Subpart B. The relevant language of the regulations, however, is the same. *Compare* 36 C.F.R. § 218.13(b) *with* 36 C.F.R. § 219.51(b).

MEMORANDUM IN SUPPORT OF MSJ - 22

Amendment would be subject to an objection process, the Forest Service created a reliance

expectation. As discussed, every public source specifically advised the public of an objection

period; no mention of the Under Secretary's involvement—or exemption from the objection

process—was made until the final decision. *Cf. Wilderness Soc'y v. Rey*, 180 F. Supp. 2d 1141,

1148 (D. Mont. 2002) ("Simply having the Undersecretary . . . sign a record of decision of the

Forest Service does not diminish the fact that the record of decision is a decision of the Forest

Service. To hold otherwise defies common sense . . . The notion that a signature by the

Undersecretary transforms the action from Forest Service business to the business of some other

agency is mystical legal prestidigitation.").[22]

      The agency's decision to "change horses midstream" had practical consequences, as the

Final EA included a bevy of new information and analysis, which the public never had the

opportunity to address, including a whole new alternative developed in consultation with the Nez

Perce Tribe. *See* AR34513; AR34519 (Standard with Exceptions Alternative). Exempting the

Screens Amendment from the promised objection process meant that the conservation groups,

Tribes, other agencies, and members of the general public who had commented on the Draft EA

were foreclosed from reviewing and engaging with the Forest Service over the new information

and analysis. The failure to hold an objection process, and cutting of further review and debate

over the Screens Amendment, was unlawful.

---

    [22] *Rey* dealt with the internal review process in place before the objection process, which
was required by the Appeals Reform Act, Pub. L. 102-381, Title III, § 322, Oct. 5, 1992, 106
Stat. 1419, 16 U.S.C. § 1612, but the underlying equitable considerations are similar.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

**III.    The Forest Service Violated NEPA by Failing to Prepare an EIS.**

Not only did the Forest Service short-circuit the administrative process under NFMA by failing to hold an objection process, the agency failed to meaningfully engage with the issues under NEPA by preparing only an EA. The Screens Amendment required an EIS because its environmental effects "may" be significant. "In reviewing an agency's decision not to prepare an EIS . . . this court [must] determine whether the agency has taken a 'hard look' at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Barnes v. U.S. Dep't of Transp.,* 655 F.3d 1124, 1132 (9th Cir. 2011) (citation omitted). In challenging an agency decision not to prepare an EIS, plaintiffs need not prove that significant environmental effects will occur; they need only raise a "substantial question" that they might. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 864–65 (9th Cir. 2005); *EDC*, 36 F.4th at 878–79.

CEQ regulations set forth the criteria for the agencies to consider when determining whether an action will significantly affect the environment and consequently requires a full EIS. 40 C.F.R. § 1508.27. An agency must consider "both context and intensity." *Id.* Context refers to the setting and circumstances of the proposed action, including "society as a whole (human, national), the affected region, the affected interests, and the locality." *Id.* § 1508.27(a). Intensity "refers to the severity of impact" and requires analysis of ten specific factors. *Id.* § 1508.27(b). Meeting just one of these "intensity factors" may be sufficient to require an agency to prepare an EIS. *Ocean Advocates*, 402 F.3d at 865.

MEMORANDUM IN SUPPORT OF MSJ - 24

Here, the agency summarily dismissed the significance of the Screens Amendment, despite the fact that multiple intensity factors weigh in favor of an EIS. In particular, the decision to replace the 21-inch Rule with a nonbinding guideline that permits cutting large trees across eight million acres is highly controversial, the effects of the Screens Amendment are highly uncertain due to it being a nonmandatory guideline, and the Amendment may affect threatened and endangered aquatic species. The Forest Service failed to provide a convincing statement of reasons that the impacts of the Screens Amendment would be insignificant.

### A.    The Screens Amendment Is Highly Controversial.

A proposal is highly controversial, mandating preparation of an EIS, when (1) "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor"; or (2) there is "a substantial dispute [about] the size, nature, or effect of the major Federal action." 40 C.F.R. § 1508.27(b)(4); *Nat'l Parks & Conserv. Ass'n. v. Babbitt,* 241 F.3d 722, 736 (9th Cir. 2001). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI casts serious doubt upon the reasonableness of an agency's conclusions." *Id.* at 736 (citations omitted). The burden is then placed on the agency to "come forward with a well-reasoned explanation demonstrating why those responses disputing the EA's conclusions do not suffice to create a public controversy based on potential environmental consequences." *Id.* (citations omitted).

A recent Ninth Circuit case examining the "controversy" factor in the context of a forest project is *Bark v. United States Forest Service,* 958 F.3d 865, 868 (9th Cir. 2020). In *Bark*, the Forest Service proposed using variable density thinning to address wildfire concerns on the

MEMORANDUM IN SUPPORT OF MSJ - 25

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Mount Hood National Forest. The plaintiffs, through expert opinions and articles submitted

during the administrative process, raised questions about the efficacy of the proposed thinning

treatments to reduce fire severity and risk. Because "the effects analysis in the EA did not engage

with the considerable scientific and expert opinion," the Ninth Circuit found the Forest Service's

decision not to prepare an EIS arbitrary and capricious. *Id.* at 871.

Here, as in *Bark*, the Forest Service was aware of, but insufficiently addressed the high

level of controversy and scientific debate surrounding the decision to allow logging of trees over

21 inches on Eastside Forests. The public controversy surrounding the Screens Amendment can

be put simply: it is highly controversial to roll back a 25-year-old legal standard protecting large

trees on eight million acres of national forestland. The underlying *scientific* controversies

surrounding the need for, and environmental effects of, the decision are complex, but no less

substantial, and can generally be described as falling into two categories: 1) the overarching

debate over what the Eastside Forests historically looked like from a vegetation composition and

fire severity/interval standpoint (*i.e.*, what is "HRV"); and 2) the debate over whether cutting

trees ≥21 inches will move the forests towards this historical state, making them more "resilient"

in the future (*i.e.*, the effects of the Screens Amendment on HRV). As further discussed below,

these two issues are central to the purpose, need, and effects of the Amendment itself, and are

therefore at the crux of the significance determination under NEPA.

The agency superficially acknowledged areas of substantial scientific debate. Yet the

agency entirely failed to meaningfully engage with these "important aspects of the problem" and

instead, concluded that the effects of the Screens Amendment "are not scientifically

MEMORANDUM IN SUPPORT OF MSJ - 26

controversial." AR34765. *State Farm*, 463 U.S. at 43. The DN states that "the vast body of literature relevant to this project is very much aligned with the proposed change to management policy." *Id*. In fact, while the agency demonstrably *desires* and repeatedly *portends* that this alignment exists, the administrative record shows otherwise.

### 1.    Controversy Over the Historical Condition of Eastside Forests

Substantial scientific controversy exists over the purpose and need for the Screens Amendment. The lynchpin of the Forest Service's stated need for the Screens Amendment is the notion that there are more large trees of certain species (specifically, shade-tolerant species like grand and white fir) than historically existed on the landscape (in other words, current conditions have departed from the HRV). Accordingly, the agency contends the 21-inch Rule is preventing the agency from managing the Eastside Forests to reach HRV because it restricts the cutting of such large trees. But the agency knew that this contention was scientifically controversial, as reflected in the Science Forum and reiterated through expert comments.

In fact, the Forest Service itself described the Science Forum as an "open discussion about the science underlying" the Screens Amendment, in which "the first three speakers presented highlights" from the agency's science findings and "additional speakers offered broader or differing perspectives."[23] In the Forum, several scientists supporting the agency's perspectives presented their data and analysis relating to historical conditions on Eastside Forests. These scientists urged the conclusions that the current ecological state of the Eastside

---

[23] *See* "Eastside Screens Public Workshops," https://www.fs.usda.gov/detail/r6/landmanagement/?cid=fseprd730557; *see also* AR32151 at 13:10 ("we get there is a whole host of science out there . . . there are lots of different perspectives that are related to old and large trees").

MEMORANDUM IN SUPPORT OF MSJ - 27

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

Forests was out of sync with historical conditions, that the 21-inch Rule was "inconsistent with resistant historical conditions and dynamics," and that removal of the Rule was needed to make forests more "resilient" to climate change, fire and invasive species. AR32362, 32151 (video recording). As the "differing perspectives," Drs. Hanson, DellaSala, and Law presented contrary data and analyses demonstrating that large trees are not causing forests to be "out of sync" with historical conditions, and that the protection of large trees (*i.e.*, the 21-inch Rule) is needed in almost all cases for fire resistance, carbon storage in the face of climate change, and habitat. *See e.g.*, AR32256, 32250, 32290.

As the Forest Service acknowledged, "[t]hree panels, each with three or four scientists, presented a range of scientific evidence illustrating *complex and sometimes contrary results.*" AR33047. The Science Forum, therefore, was itself indicative of the high level of debate and scientific controversy surrounding the historical composition of the Eastside Forests.

Despite the admitted controversy daylighted at the outset of the Amendment process, the Forest Service moved forward with a Draft EA (rather than an EIS) that neither cited nor discussed the evidence provided by Drs. Hanson, DellaSala, or Law. *See* AR33213–387 (no mention or citations to Hanson, DellaSala, or relevant Law publications). Plaintiffs responded to the Draft EA by, *inter alia*, submitting expert reports further explaining and elucidating the scientific controversy and conflicting evidence, including that presented in the Science Forum, and requesting an EIS. *See supra* pp. 11–12.

For example, the DellaSala/Baker report explained that "some researchers and the agency [] falsely conclude that Eastside forests were predominately open park-like pine forests, when, in

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

fact, fire regimes and forest structure and composition were much more complex;" and "[d]enser, closed canopy forests were more prevalent, and shade-tolerant trees were more common . . . than acknowledged in the EA." AR33930 (citing Hessburg et al. (2007), Baker (2012), Williams and Baker (2012)).[24] The report explains in detail the problems with major studies the agency relies on to support its decision and highlights the scientific debate. *See* AR33944 (critiquing, *inter alia*, Johnston (2017), Johnston et al (2018), Merschel et al (2014), (2019) and pointing out how other data sources (Baker (2012), Hessburg et al (2007), others) made contrary findings regarding the historical presence of grand firs.).[25]

    As in *Bark,* "this dispute is of substantial consequence" because the scientific evidence presented directly counters the entire premise underlying the need for the Screens Amendment— that "[f]orests that historically experienced frequent fire have become more dense . . . and the trees that make up these forests have shifted away from species that are well-adapted to fire and other disturbances like insect attacks." AR34511 (Final EA, "Need for Change"). And yet, as in *Bark*, the Forest Service's response to the "considerable contrary scientific and expert opinion," was to "reiterate its conclusions . . . and [] not engage with the substantial body of research cited by [Plaintiffs]." 958 F.3d at 871. Indeed, in the DN and FONSI, the agency pretended this controversy did not exist in order to make conclusions of non-significance. *See* AR34765 (no controversy because "the vast body of literature relevant to this project is very much aligned with

---

[24] *See also id.* (citing Hessburg, *et al.* 2007 and Baker 2017 and explaining the agency relied on limited fire-scar samples from a small set of unrepresentative stands, which causes incorrect conclusions about fire return intervals and misrepresentations about the occurrence and ecological importance of mixed- and high-severity fires.

[25] *Contra* AR33240 (Final EA relying on these studies specifically to explain alleged shift in species composition from historical conditions).

MEMORANDUM IN SUPPORT OF MSJ - 29

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

the proposed change to management policy" and "[t]he disturbance and vegetation literature show overwhelming and abundant evidence for a vast and demonstrated change in forest density and species composition that impacts how disturbances interact with the landscape").

Similarly, the Final EA attempts to avoid engaging with the contrary science by making unsupported, unequivocal statements and dropping footnotes attempting to dismiss the contrary evidence. *See* AR34560 (Footnote 11 discussing scientific debate in multiple publications regarding historical/present species composition within Eastside Forests); AR34558 (Footnote 9 acknowledging and discussing scientific debate in multiple publications over historical fire severity in the Eastside Forests). But burying substantial published scientific debate over core issues in a couple of footnotes does not satisfy NEPA. *See Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989)(NEPA "ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts."); *See also Or. Wild v. BLM,* No. 6:14-CV-0110-AA, 2015 U.S. Dist. LEXIS 32584, at *23 (D. Or. Mar. 14, 2015) (BLM failed to meet its burden of showing in FONSI that there was no legitimate controversy where scientific reports and comments showed otherwise). Where, as here, a high level of controversy exists and has been presented clearly to the agency, an EIS is required. *Babbitt*, 241 F.3d at 736.

## 2.    Controversy Over the Effects of the Screens Amendment

The second area of significant controversy is over the environmental *effects* of removing the 21-inch Rule and how those effects compare to the other alternatives, as analyzed in the EA and DN/FONSI. *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172, 1182

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

(9th Cir. 1982) (where a substantial dispute exists as to the effect of the action, the action is controversial and an EIS is required).

The Forest Service concluded that the Screens Amendment's impacts would be insignificant, drawing principally from the results of the FVS model. *See, e.g.*, AR33229 ("Analysis Methods"; FVS model used to describe different outcomes between alternatives); 34543–44 (new guideline "continues to increase large trees on the landscape while also outperforming the Current Management Alternative for all other indicators"), 34544 (Table 3, summarizing effects to vegetation indicators as demonstrated by FVS model).

Scientists, the Nez Perce Tribe, and members of the public, however, raised substantial criticisms of the use of the FVS model as the primary method the agency used to analyze and compare the effects of the alternatives, arguing that it was unreliable and inaccurate. For example, the DellaSala/Baker report questioned the validity, accuracy, and sensitivity of the model to predict differences between the alternatives. *See* Ex. 4 (AR33943). Drs. Franklin, Seager, and Johnson also expressed their "concerns that the average [FVS] model outcomes do not accurately reflect what could potentially happen in post-management stands and projects." Ex. 7 (AR46003). They explained: "[w]e have significant concerns that the modeling results (EA 3.1.6) speak to the landscape level when the management action would be occurring at the stand or project level." *Id.* The Nez Perce Tribe also criticized and questioned the utility of the modeling results to compare alternatives. Ex. 2 (AR48303, 48307). In sum, if the model does not accurately predict the impacts from logging trees ≥21 inches across the landscape, then the agency lacks a rational basis for concluding that the impacts would be insignificant.

MEMORANDUM IN SUPPORT OF MSJ - 31

The controversy surrounding the FVS model and its accuracy and effectiveness at evaluating the difference in effects between the alternatives goes to the very heart of the agency's conclusions and yet, the agency failed to engage with this controversial issue, rendering its analysis insufficient and arbitrary. *See Babbitt,* 241 F.3d at 736; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1044 (D.C. Cir. 2021) (finding controversy where Tribes raised specific criticisms regarding effects which warranted an EIS); *cf. Appalachian Voices v. United States DOI*, No. 20-2159, 2022 U.S. App. LEXIS 3147 (4th Cir. Feb. 3, 2022) (rejecting agency's overreliance on the "magic of statistical modeling").

Here, the Forest Service analyzed a significant management change affecting eight million acres of national forestland, across six different forests, at least 13 counties, and affecting at least four Native American Tribes, including one that expressed significant concerns throughout its substantial involvement in the process. Plaintiffs and others, including the Nez Perce Tribe, presented evidence on the issues that "casts serious doubt on the reasonableness of [the] agency's conclusions," *Blue Mtns.,* 161 F.3d at 1212, but instead of fully exploring the different sides of these critical issues in an EIS, the Forest Service summarily dismissed the evidence and criticism. Here, as in *Bark*, because "the effects analysis in the EA did not engage with the considerable scientific and expert opinion," the Forest Service's decision not to prepare an EIS was arbitrary and capricious. 958 F.3d at 871.

**B.    The Effects of the Screens Amendment Are Highly Uncertain.**

"The environmental effects" of the Screens Amendment also "are highly uncertain or involve unique or unknown risks," and therefore, an EIS is required. *Ocean Advocates,* 402 F.3d

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

at 870 (citing 40 C.F.R. § 1508.27(b)(5)). Because the purpose of an EIS is to "obviate the need for speculation," "[p]reparation of an EIS is mandated where uncertainty may be resolved by further collection of data[.]" *Babbitt*, 241 F.3d at 732 (citations omitted). Here, there is inherently a high level of uncertainty about the effects of replacing a standard with a discretionary guideline to be applied across six national forests. The Forest Service, however, took a contrary view, predicting across-the-board beneficial effects and downplaying uncertainty in order to avoid preparing an EIS and fully disclosing the full range of possible effects. *See* AR34765. But the agency's conclusions lacked a rational basis because they relied on unsupported assumptions.

What will be the scope and scale of large tree logging in the absence of the 21-inch Rule? This question necessarily was at the root of the Forest Service's effects analysis. To answer it, the Forest Service relied principally on the results of its FVS modeling exercise. AR34523; AR34445–56. That analysis, however, was fatally flawed and belied the substantial uncertainty inherent in the analysis of implementing a non-binding guideline. Specifically, the agency assumed that certain constraints on logging would be followed that simply do not square with the letter of the new guideline; legally, none of the constraints the agency used as modeling assumptions are required. Two examples highlight this problem.

First, the Forest Service ran the model for the Screens Amendment (the Old and Large Tree Guideline Alternative) assuming that a series of prescriptions would be followed. In particular, the agency ran the model with a logging prescription that thins the smallest trees first and where "in all modeling scenarios, fire tolerant species were preferred for retention, meaning

MEMORANDUM IN SUPPORT OF MSJ - 33

that a fire tolerant species would need to be significantly smaller than a fire intolerant species (by

5–10 inches) to be removed instead." AR34445. In other words, the model assumes that (a)

logging operations would target the smallest trees first, and that (b) that larger ponderosa pine

and western larch effectively never would be cut. These assumptions led to model outputs

reflecting more restricted old and large tree logging scenarios than actually is required under the

new guideline. As outside scientific experts explained in their comments:

> [t]he average model outcomes do not accurately reflect what could potentially
> happen in post-management stands and projects . . . Specifically managers could
> choose to log old ponderosa pine while retaining young large grand and white fir.
> This would meet the requirements of the amendment and fit within the original
> definition of LOS. We question the trajectory of these model outcomes
> [demonstrating effects], as they assume the intent of managers in two action
> alternatives that have no standards on the constraints, only guidance.

AR46003; *see also All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110, 1114–15

(9th Cir. 2018) (explaining that while the Forest Service must ensure that individual projects

strictly comply with enumerated forest plan "standards," the Forest Service has greater discretion

to "deviate from" a forest plan's non-binding planning "guidelines.").[26]

Second, the Forest Service erroneously assumed that the guideline would be applied

across the entire landscape, when in reality, it is restricted to stands *outside* LOS (Scenario A2).

Of particular consequence, the agency applied the new guideline—and the management

assumptions ascribed to it—to stands *within* LOS under Scenario A1. *See* AR34529 ("In most

stands, the proposed alternatives would allow harvest of a handful of trees over 21 inches dbh in

---

[26] And the notion that in future commercial logging operations, the smallest trees would
be cut first, is farcical; as a general rule, larger trees have higher commercial value. Large and
old trees are often deliberately targeted for cutting or removal during logging. *See* AR20790
(Lindemayer (2014)).

MEMORANDUM IN SUPPORT OF MSJ - 34

addition to trees under 21 inches dbh. This would primarily occur within LOS forest to shift late structure closed forest to late structure open forest.").[27] But the new guideline—by the Forest Service's own admission—does not apply to stands within LOS. AR34756 ("This decision serves to clarify that the new guideline language at Section 2(b) of the eastside screens does not apply to . . . Scenario A when timber harvest occurs within LOS stages that are within or above HRV in a manner that maintains or enhances LOS within that biophysical environment," *i.e.*, Scenario A1). In other words, the Forest Service assumed (and modeled)—without any rational basis—that managers would apply the new guideline (including the artificial prescriptions that are not actually required) in stands where the new guideline does not apply. In fact, within LOS under Scenario A1, the Forest Service only is obligated to maintain or enhance LOS, AR34729; there is no requirement, or even a guideline, to thin smaller trees first or retain fire tolerant species.

From its modeling exercise—and the assumptions therein, which impose stricter conditions on logging than actually are required—the Forest Service concluded that the effects of the of the Screens Amendment would be insignificant. *See, e.g.*, AR34544 (Table 3); AR34756 (concluding that the proposed action "better ensures outcomes on the landscape such as the preservation of old trees"); AR34473 (The number of large grand fir/white fir would decrease, promoting a more fire tolerant species composition over time); AR34567 ("Strategically favoring large, disturbance-resistant trees will likely enhance the longevity of these trees."). But these

---

[27] Under the Eastside Screens, the 21-inch Rule applied to all forest stands under Scenario A—either under A1 and A2. *See supra* p. 5. Although not clearly disclosed in the NEPA documents, the Screens Amendment changed the longstanding interpretation that the 21-inch Rule applied to stands under Scenario A1. *See id.*; AR34531, 34711.

MEMORANDUM IN SUPPORT OF MSJ - 35

conclusions were based on faulty assumptions that misrepresented the reality of the management

regime adopted by the Screens Amendment. Instead, the agency should have "leaned in" to the

inherent uncertainty and prepared an EIS to fully disclose the consequences of the Screens

Amendment. *See Babbitt,* 241 F.3d at 737 (EIS required where uncertainty exists surrounding the

intensity of effects).

> **C.     The Screens Amendment "May" Adversely Affect Endangered or
> Threatened Species.**

The removal of trees ≥21 inches in riparian areas also "may" adversely affect listed

aquatic species and thus, 40 C.F.R. § 1508.27(b)(9) is a third intensity factor weighing in favor

of an EIS.[28] The Forest Service determined that factor (b)(9) did not weigh in favor of an EIS in

two sentences of the FONSI: "I find that the amendment is in compliance with the [ESA] of

1973 as amended. See [ESA] section in the [DN] above." AR34766. The ESA section of the DN,

in turn, notes the consultation process with the USFWS over impacts to *terrestrial* species.

AR34761. The DN is silent, however, as to impacts to listed *aquatic* species. The Forest

Service's (b)(9) conclusion and reasoning fails for three independent reasons.

First, it conflates the governing standards. Under the agency's reasoning, if a project that

caused a significant effect on listed species were compliant with the ESA, no EIS would be

required. That is not the law. 40 C.F.R. § 1508.27(b)(9) asks whether a project "may affect" a

listed species, an inquiry separate and distinct from ESA compliance. *See Or. Wild v. U.S. BLM*,

---

[28] Nine fish species listed as threatened or endangered under the ESA inhabit the Project
Area, and dozens more fish and other aquatic species are designated as Sensitive Species and
Management Indicator Species. AR34595–96 (Table 20).

MEMORANDUM IN SUPPORT OF MSJ - 36

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

No. 6:14-cv-0110-AA, 2015 U.S. Dist. LEXIS 32584, at *28 (D. Or. Mar. 14 2015) (explaining that the ESA and NEPA focus on different inquiries).

Second, the DN does not address impacts to the nine listed aquatic species in the Project area, focusing exclusively on consultation with the USFWS over terrestrial species. The Forest Service thus "failed to consider an important aspect of the problem," a hallmark of arbitrary decisionmaking. *State Farm*, 463 U.S. at 43.

Third, Defendants likely will point to the EA's "no effect" conclusion for aquatic species, AR34594, but the Forest Service did not actually evaluate the impacts of logging trees ≥21 inches in riparian areas and attendant impacts on aquatic species, and instead, simply equated PACFISH/INFISH compliance with "no effect." For all of the reasons described below, *see infra* pp. 39–45, that determination rests on the incorrect assumption that the duty to "not retard attainment of RMOs" under PACFISH/INFISH necessarily means that there would be "no effect" from logging trees ≥21 inches in riparian areas. *See id.* Where the Forest Service's "no effect" conclusion in support of a FONSI rests on an erroneous rationale, factor (b)(9) weighs in favor of preparing an EIS. *See Conserv. Cong. v. U.S. Forest Serv.*, No. CIV. S-13-0832 LKK/DAD, 2013 U.S. Dist. LEXIS 127671, at *44–53 (E.D. Cal. Sept. 6, 2013) (concluding that project involving 534 acres of logging in Northern spotted owl critical habitat would have no effect was based on misreading of the relevant scientific literature).

In sum, at least three intensity factors were present, mandating the need to prepare an EIS. *W. Watersheds Project v. USDA Aphis Wildlife Servs.*, 320 F. Supp. 3d 1137, 1150 (D. Idaho 2018) (three intensity factors combined to require agency to prepare an EIS.).

MEMORANDUM IN SUPPORT OF MSJ - 37

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

**IV.**     **The Forest Service Violated NEPA By Failing to Take a "Hard Look."**

Whether in an EIS or EA, NEPA requires agencies to take a "hard look" at the environmental effects of a proposed action before implementing it. *EDC*, 36 F.4th at 872; *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002) ("hard look" requires analysis of all foreseeable direct, indirect, and cumulative impacts). To take the requisite "hard look," an agency "may not rely on incorrect assumptions or data" in arriving at its conclusion of no significant impacts. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005); *EDC*, 36 F.4th at 872.

Here, the Forest Service relied on unreasonable and unsupported assumptions in analyzing the effects of the Screens Amendment and the other proposed alternatives, including assuming for the purpose of its effects analysis that the new guideline would be applied as a standard, and that consistency with PACFISH/INFISH direction results in "no effect" to aquatic species. These assumptions tainted the analysis in the EA, rendering the agency's conclusions arbitrary and capricious.

**A.**     **The Forest Service Erroneously Assumed that the New Guideline Would Be Applied as a Standard Across the Landscape.**

As discussed above, *see supra* pp. 32–36, in modeling the Screens Amendment's effects, the Forest Service assumed that a series of prescriptions would be followed—resulting in restricted old and large tree logging and selection of certain species of large trees. And yet, the Screens Amendment imposes only non-mandatory guidance in which none of the prescriptions the agency used as modeling assumptions are required. *Id.* This had the consequence of seriously under-representing the Screens Amendment's possible impacts. *Id.*

MEMORANDUM IN SUPPORT OF MSJ - 38

While some predictive assumptions certainly are necessary for forecasting effects, the Forest Service's assumptions here were not grounded in fact. Future logging carried out under the Screens Amendment will subject only to non-binding guidance, but the agency assumed that such logging would be severely curtailed by imposing a series of restrictive conditions in its modeling exercise. Because the modeling assumptions, including but not limited to thinning the smaller trees first and selecting for certain species, were "central to the agency's finding of no significant impact" yet lacked any support, the Forest Service acted arbitrarily and capriciously, and violated NEPA, by failing to take a "hard look" at the likely environmental consequences of the Screens Amendment. *See EDC*, 36 F.4th at 872, 874 (finding an EA arbitrary and capricious where agency relied on multiple unfounded assumptions).

**B.     The Forest Service Erroneously Equated PACFISH/INFISH Consistency with "No Effect."**

The Forest Service also acted arbitrarily and violated NEPA by relying on an incorrect assumption regarding the Screens Amendment's impacts on aquatic species and riparian habitat. The Screens Amendment contains no restrictions on the location of logging activities targeting trees ≥21 inches now authorized, meaning that such logging now is permissible in riparian areas of the Forests, including those areas designated as RHCAs under PACFISH and INFISH. The Forest Service did not actually evaluate the impacts of this change, and instead, simply assumed that compliance with PACFISH/INFISH standards would obviate *all* possible effects to aquatic species that are caused by now-permissible logging of trees ≥21 inches. This is both legally and factually incorrect.

MEMORANDUM IN SUPPORT OF MSJ - 39

Large trees in riparian areas provide essential habitat features for a host of aquatic species, including those listed under the ESA. *See* AR28104–07; *see also* AR28565–615; AR28627; AR30156. These trees provide stream shading, which in turn, mitigates water temperatures. *See id.* When they fall into streams, large trees create large woody debris, which is critically important for a number of essential habitat conditions for fish and aquatic species, like the formation of pools and reduction of channel erosion. *See id.* Removal of large riparian trees indisputably triggers adverse effects to aquatic species, including (but not limited to): Deficits of large woody debris and pool frequency; increases in stream temperature, peak flows, and sediment delivery; decreases in base flows; and reductions in habitat complexity. *See* AR28616–25; AR14781; AR15129.

Despite these facts, the Forest Service did not analyze the Screens Amendment's impacts on aquatic species and riparian habitat at all. Instead, the agency simply noted that under PACFISH/INFISH "treatments cannot retard attainment of [RMOs]." AR34594. From there, the Forest Service assumed that because PACFISH/INFISH standards and guidelines would still be applied at the project level, "a No Effect determination applies to all Threatened and Endangered, R6 Sensitive, and MIS fish species (Table 20) in the analysis area." *Id.*

"Cannot retard attainment of RMOs," and "no effect," however, are simply not synonymous, for two critical reasons. First, the Forest Service's position is that the attainment of RMOs is to be measured at the "watershed scale"; adverse site-specific impacts found not to have watershed-level influence therefore can still be consistent with PACFISH/INFISH. *See, e.g.*, *Or. Wild v. Cummins*, 239 F. Supp. 3d 1247, 1266 (D. Or. 2016) (summarizing Federal

MEMORANDUM IN SUPPORT OF MSJ - 40

Defendants' position: "INFISH consistency is not required allotment-by-allotment or stream-by-stream," but rather, "conclusions related to consistency with INFISH are made at a watershed level"). Second, the Forest Service takes the position that RMOs are targets that are to be met over time, not instantaneously. *See, e.g.*, *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 445 F. Supp. 2d 1186, 1199 (D. Or. 2006), *rev'd in part* 549 F.3d 1211 (9th Cir. 2008) ("The Forest Service argues that treatments within RHCAs that are carefully tailored to enhance riparian conditions over time are allowed under INFISH, even if some short-term negative effects are possible."). Thus, the Forest Service routinely undertakes projects which have acknowledged adverse localized, short-term impacts. *See* AR48168 (referencing the Camp Lick, Ragged Ruby, and Big Mosquito projects on the Malheur, and the Black Mountain and Gap sales on the Ochoco).

Prior to the Screens Amendment, it was unlawful to cut trees ≥21 inches in riparian areas under Scenario A. The Screens Amendment now authorizes such logging. By relying on an incorrect assumption—that "cannot retard attainment of RMOs" equates to "no effect," and thereby failing to take a hard look at impacts to fish and other aquatic species—the Forest Service acted arbitrarily and capriciously and violated NEPA. *See Ctr. for Biological Diversity v. U.S. DOI*, 623 F.3d 633, 642–43, 645–46 (9th Cir. 2010) (agency incorrectly assumed that the environmental consequences of mining operations following a land exchange (the action alternative) would be the same as if the land exchange did not occur (the no action alternative)).

MEMORANDUM IN SUPPORT OF MSJ - 41

**IV.    The Forest Service's Failure to Prepare a Biological Assessment, "No Effect" Conclusion, and Failure to Engage in Section 7 Consultation Violated the ESA.**

To comply with Section 7's procedural mandates, the ESA and its implementing regulations impose a three-step requirement on action agencies like the Forest Service. *See Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985), *overruled on other grounds by Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015).[29] The Forest Service here is in violation of the ESA on two of the three steps with respect to aquatic species.

At **Step 1**, the action agency must inquire into whether any threatened or endangered species "may be present" in the analysis area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c); *Thomas*, 753 F.2d at 763. The Forest Service satisfied this step: In the EA, the Forest Service set forth the nine threatened and endangered aquatic species present within the analysis area. AR34595–96 (Table 20).

At **Step 2**, the action agency must prepare a Biological Assessment to evaluate the possible impacts to threatened and endangered species that may be present in the analysis area. 16 U.S.C. § 1536(c)(1); *see generally* 50 C.F.R. § 402.12(c); 50 C.F.R. § 402.12(k). As *Thomas* instructs: "Once an agency is aware that an endangered species may be present in the area of its proposed action, the ESA *requires it* to prepare a biological assessment to determine whether the proposed action 'is likely to affect' the species and therefore requires formal consultation with the [USFWS]." 753 F.2d at 763 (emphasis added).

---

[29] *Thomas* solely interprets the statutory requirements, as it was handed down prior to the issuance of the ESA implementing regulations. As relevant here, however, the regulations simply confirm the stepwise process set forth by the statute, and so *Thomas* remains instructive.

MEMORANDUM IN SUPPORT OF MSJ - 42

The Forest Service did not prepare a BA for aquatic species, despite the admission that nine threatened or endangered aquatic species are present in the action area. This violates the ESA, as multiple courts have determined. *See Thomas*, 753 F.2d at 763 (agency violated ESA by failing to prepare BA); *All. for the Wild Rockies v. Gassmann*, No. CV-21-105-M-DLC-KLD, 2022 U.S. Dist. LEXIS 93986, at *17–*20 (D. Mont. May 25, 2022) (likelihood of success on merits of claim that agency violated ESA by failing to prepare BA); *Friends of the Clearwater v. Petrick*, No. 2:20-cv-00243-BLW, 2022 U.S. Dist. LEXIS 38690, at *13–*15 (D. Idaho March 2, 2022) (agency violated ESA by failing to prepare BA); *Native Ecosystems Council v. Marten*, CV-18-87-M-DLC, 2020 U.S. Dist. LEXIS 52990, at *17 (D. Mont. Mar. 26, 2020) (same).

At **Step 3**, the action agency must make an effects determination (using the BA) and consult with the Service(s) if the proposed action "may affect" listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; *Thomas*, 753 F.2d at 763. Here, the Forest Service determined that the Amendment would have "no effect" on aquatic species and therefore, did not engage in Section 7 consultation with the Services. The "no effect" conclusion and failure to consult is arbitrary, capricious, and contrary to the ESA.

As discussed above, the Forest Service did not actually evaluate the impacts to listed aquatic species and instead, based its "no effect" determination solely on a flawed syllogism. *See supra* pp. 39–41. As the Forest Service's reasoning goes, because logging pursuant to PACFISH/INFISH "cannot retard attainment" of the RMOs, and because logging projects would still be subject to PACFISH/INFISH standards and guidelines, "a no effect determination applies." AR34594. As the Forest Service is well aware, however, having implemented

MEMORANDUM IN SUPPORT OF MSJ - 43

PACFISH and INFISH for 25 years, "cannot retard attainment" is not the same as "no effect," because the Forest Service claims compliance with PACFISH/INFISH despite a project's localized and short-term impacts.

For purposes of the ESA, however, localized, or stream-specific impacts, "may affect" listed species, given that "'may affect' is a relatively low threshold for triggering consultation. **Any possible effect**, whether beneficial, benign, adverse or of an undetermined character, triggers the requirement." *Karuk Tribe*, 681 F.3d at 1027 (emphasis added) (citing *Lockyer*, 575 F.3d at 1019, in turn quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.* ("*PCFFA v. NMFS*"), 265 F.3d 1028, 1037 (9th Cir. 2001) (holding that it was arbitrary and capricious to disregard "localized" impacts and that assuming away site-specific impacts in a Section 7 consultation contradicts the purpose of the ESA). As well, it cannot be reasonably disputed that short-term impacts "may affect" listed species. *See, e.g.*, *PCFFA v. NMFS*, 265 F.3d at 1037 (arbitrary and capricious to disregard short-term impacts in Section 7 consultation).

Logging activities will continue to occur in riparian areas on the Eastside Forests, with attendant localized and short-term impacts—at the very least. And now, such logging will be permitted to include removal of trees ≥21 inches, triggering effects which were not disclosed or considered. *See generally* AR49268–302 (letters from an expert hydrologist and fisheries biologist detailing the importance of large trees and the significant impacts of their removal in riparian areas). By focusing solely on whether or not future site-specific projects under the Screens Amendment will affect the PACFISH/INFISH long-term, landscape-scale RMOs, the

MEMORANDUM IN SUPPORT OF MSJ - 44

Forest Service asked the wrong question for purposes of Section 7 consultation. Under the ESA, the proper inquiry is whether the Amendment "may affect" listed species and/or critical habitat.

Given that (1) the removal of trees ≥21 inches in riparian zones (and in some upland areas as well) has an outsized impact on the integrity of riparian and aquatic ecosystems, and (2) the "may affect" threshold for Section 7 consultation is low, the Forest Service was required to initiate Section 7 consultation with the USFWS and NMFS. Its failure to do so violates the ESA.

## RELIEF REQUESTED

Vacatur is the presumptive remedy under the APA for violations of NEPA, NFMA, and the ESA. *See* 5 U.S.C. § 706(2) (providing that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"). It is the agency's burden to demonstrate that vacatur should not result. *Cal. Comm'ys Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Because the agency's errors here were "serious," and because there would be no "severe" disruptive consequences of vacatur, this Court should apply the presumptive remedy. *See id.* ("[W]e have only ordered remand without vacatur in limited circumstances.").[30]

## CONCLUSION

For all of the foregoing reasons, GHCC respectfully asks this Court to grant its *Motion for Summary Judgment*, hold unlawful and set aside the Forest Service's EA, DN, and FONSI, and remand to the agency to comply with NFMA, NEPA and the ESA.

---

[30] Plaintiffs reserve the right to address the question of relief in further detail, depending on this Court's ruling on the merits.

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

DATED this 27th day of December 2022.

CRAG LAW CENTER

Meriel L. Darzen, OSB No. 113645,
(503) 525-2725 │ meriel@crag.org
Oliver J. H. Stiefel, OSB No. 135436,
(503) 227-2212 │ oliver@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Fax: (503) 296-5454

**TABLE OF EXHIBITS**

| Exhibit | AR | Author/*Title* |
|---|---|---|
| 1 | 34722–34 | U.S. Forest Service /*1995 Eastside Screens* |
| 2 | 48296–311 | Shannon Wheeler/*Nez Perce Tribe's Comments on the Forest Plans Amendment Forest Management Direction for Large Diameter Trees in Eastern Oregon, Draft Environmental Assessment* |
| 3 | 48133–216 | GHCC, et al./*Comments on the Preliminary Environmental Assessment ("EA") for "Forest Management Direction for Large Diameter Trees in Eastern Oregon"* |
| 4 | 33922–98 | Dominick Dellasalla and William Baker/*Large Trees: Oregon's Bio-Cultural Legacy Essential to Wildlife, Clean Water, and Carbon Storage (and Curricula Vitae)* |
| 5 | 48129–32 | Chad Hanson/*Comments on preliminary EA* |
| 6 | 28200–304 | Dominick DellaSala, et al./*Open Letter to the Forest Service on the Importance of Large, Old Trees and Forests* |
| 7 | 45996–6006 | Jerry Franklin, et al./*An Open Review of the: Proposed Action and Alternatives in the US Forest Service Pacific Northwest Region's Forest Plans Amendment: Management Direction for Large Diameter Trees in Eastern Oregon Environmental Assessment (preliminary, August 2020)* |
| 8 | 43798–800 | Monica Bond/*Comments on preliminary EA* |
| 9 | 44909–10 | Jim Furnish/*Comments on preliminary EA* |
| 10 | 43618–20 | U.S. EPA/*Comments on preliminary EA* |
| 11 | 45182–86 | Oregon Department of Fish and Wildlife/*RE: Forest Management Direction for Large Diameter Trees in Eastern Oregon #58050* |
| 12 | 46981–84 | Eric Quaempts/*Confederated Tribes of the Umatilla Indian Reservation, Re: Forest Management Direction for Large Diameter Trees in Eastern Oregon #58050* |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

## TABLE OF RECORD CITATIONS

| AR | Date | Author/*Title* |
|---|---|---|
| 14333–14382 | 03/30/1993 | NRDC/*Eastside Petition* |
| 14383–14480 | 05/1994 | USFS/*EA for the Continuation of Revised Management Direction for Establishing Riparian, Ecosystem, and Wildlife Standards of Timber Sales* |
| 14481–14491 | 05/20/1994 | USFS/*DN for the Continuation of Revised Management Direction for Establishing Riparian, Ecosystem, and Wildlife Standards of Timber Sales* |
| 14492–14631 | 06/1995 | USFS/*Revised EA for the Continuation of Revised Management Direction for Establishing Riparian, Ecosystem, and Wildlife Standards of Timber Sales* |
| 14632–14641 | 06/051995 | USFS/*Revised DN for the Continuation of Revised Management Direction for Establishing Riparian, Ecosystem, and Wildlife Standards of Timber Sales* |
| 14657–14660 *14659* | 11/14/1995 | John Lowe, R6 Regional Forester/*Letter Regarding Regional Forester Amendment #2 Implementation - UNF Field Trip* |
| 14661–14663 | 11/14/1995 | John Lowe, R6 Regional Forester/*Letter Regarding Regional Forester Amendment #2 Implementation - W-WNF Field Trip* |
| 14700–15003 | 02/24/1995 | USFS, BLM/*EA, DN, FONSI for the Interim Strategies for Managing Anadromous Fish-producing Watersheds in Eastern OR and WA, ID, and Portions of CA* |
| 15036–15243 | 07/28/1995 | USFS/*Inland Native Fish Strategy EA, DN, FONSI* |
| 15308–15374 | 02/1994 | Richard Everett, et al./*Eastside Forest Ecosystem Health Assessment - Executive Summary* |
| 15730–15977 | 08/1994 | Mark Henjum, et al./*Interim Protection for Late-Successional Forests, Fisheries, and Watersheds: National Forests East of the Cascade Crest, Oregon, and Washington Eastside Forests Scientific Society Panel* |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

| 28046–28167 | 08/2020 | Paul Hessburg, et al./*The 1994 Eastside Screens Large Tree Harvest Limit: Review of Science Relevant to Forest Planning 25 Years Later* |
|---|---|---|
| 28168–28182 | 11/05/2020 | David Mildrexler, et al./*Large Trees Dominate Carbon Storage in Forests East of the Cascade Crest in the PNW* |
| 28200–28304 | Undated | Dominick DellaSala, et al./*Open Letter to the Forest Service on the Importance of Large, Old Trees and Forests* |
| 28565–28615 | 1987 | Peter Bisson, et al./*Large Woody Debris in Forested Streams in the Pacific Northwest: Past, Present, and Future* |
| 28616–28625 | 04/1991 | Brendan Hicks, et al./*Long-Term Changes in Streamflow Following Logging in Western Oregon and Associated Fisheries Implications* |
| 28626–28640 | 08/18/1993 | Stephen Ralph, et al./*Stream Channel Morphology and Woody Debris in Unlogged Basins of Western Washington* |
| 28641–28885 | 12/1994 | Jonathan Rhodes, et al./*A Coarse Screening Process for Evaluation of Effects of Land Management Activities on Salmon Spawning and Rearing Habitat in ESA Consultations* |
| 30040–30063 | 04/2013 | David Powell/*Eastside Screens Chronology* |
| 30154–30170 | 06/2014 | Michael Pollack, et al./*Does Riparian Restoration Thinning Enhance Biodiversity? The Ecological Importance of Large Wood* |
| 32032 | 2020 | USFS/*Final Analysis Released: Upcoming Webinars* |
| 33213-33387 | 08/2020 | USFS/*Preliminary EA for Forest Plans Amendment: Forest Management Direction for Large Diameter Trees in Eastern Oregon* |
| 33535–33536 | 08/05/20 | La Grande Observer/*Legal Notice Proof of Ad* |
| 33538–33539 | 08/06/20 | East Oregonian/*Legal Notice Proof of Ad* |
| 33540–33541 | 08/06/2020 | Herald and News/*Legal Notice Order Confirmation for Ad* |

MEMORANDUM IN SUPPORT OF MSJ - D

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

| 33591 | 08/11/2020 | Catherine Caruso/*News Release: Forest Management Direction for Large Diameter Trees in Eastern Oregon, 30-day Public Comment Period Begins* |
| 33600 | 08/11/2020 | The Bulletin/*Legal Notice Classifieds Ads* |
| 33601–33602 | 08/11/2020 | 85 Fed. Reg. 155 (Aug. 11, 2020) - Pacific Northwest Region Oregon; Land Management Plan Amendment; Forest Management Direction for Large Diameter Trees in Eastern Oregon |
| 33605–33606 | 08/12/2020 | Doug Heiken, et al./*Letter Regarding Eastside Screens Amendment Process* |
| 33607 | 08/12/2020 | Ron Wyden and Jeff Merkely/*Letter regarding request to extend to 90-days the public comment period for the draft EA for Eastside Screens* |
| 33608–33609 | 08/12/2020 | Blue Mountain Eagle/*Legal Notice Affidavit of Publication for Plan Amendment* |
| 33619 | 08/18/2020 | Michael Reed for Glenn Casamassa/*Letter regarding delegation of authority for the NEPA analysis and decision regarding the adaption of the 21" standard of the Eastside Screens* |
| 33672–33723 | 08/20/2020 | USFS/*Slideshow: Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington* |
| 33746 | 09/08/2020 | 85 Fed. Reg. 174 (Sept. 8, 2020) - Pacific Northwest Region; Oregon; Land Management Plan Amendment; Forest Management Direction for Large Diameter Trees in Eastern Oregon |
| 33922–33998; 48217–48222; 48107–08 | 2020 | Dominick Dellasalla and William Baker/*Large Trees: Oregon's Bio-Cultural Legacy Essential to Wildlife, Clean Water, and Carbon Storage (and Curricula Vitae)* |
| 34174–34183 | 12/15/2020 | Marisa Meyer, USFWS/*Letter of Concurrence: Forest Plans Amendment: Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington (FWS reference 01EOFW00-2021-I-0117)* |

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

| 34265 | 12/17/2020 | USFS/*Agenda: Public Webinar January 19, 2021 Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington* |
| 34443– 34499 | 01/07/2021 | USFS/*Final Vegetation Report* |
| 34504– 34749 | 01/12/2021 | USFS/*EA for Forest Plans Amendment, Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington* |
| 34750– 34767 | 01/12/2021 | USFS/*DN, FONSI for Forest Plans Amendment, Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington* |
| 43448– 48505 | 10/08/2020 | U.S. EPA/*Comments on preliminary EA* |
| 43448– 48505 | 08/28/2020 | Monica Bond/*Comments on preliminary EA* |
| 43448– 48505 | 09/15/2020 | Jim Furnish/*Comments on preliminary EA* |
| 43448– 48505 | 10/09/2020 | Oregon Department of Fish and Wildlife/*RE: Forest Management Direction for Large Diameter Trees in Eastern Oregon #58050* |
| 43448– 48505 | 09/24/2020 | Jerry Franklin, et al./*An Open Review of the: Proposed Action and Alternatives in the US Forest Service Pacific Northwest Region's Forest Plans Amendment: Management Direction for Large Diameter Trees in Eastern Oregon Environmental Assessment (preliminary, August 2020)* |
| 43448– 48505 | 10/10/2020 | Eric Quaempts/*Confederated Tribes of the Umatilla Indian Reservation, Re: Forest Management Direction for Large Diameter Trees in Eastern Oregon #58050* |
| 43448– 48505 | 10/13/2020 | Chad Hanson/*Comments on preliminary EA* |
| 43448– 48505 | 10/13/2020 | GHCC, et al./*Comments on the Preliminary Environmental Assessment ("EA") for "Forest Management Direction for Large Diameter Trees in Eastern Oregon"* |

MEMORANDUM IN SUPPORT OF MSJ - F

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*

| 43448-48505 | 10/13/2020 | Shannon Wheeler/*Nez Perce Tribe's Comments on the Forest Plans Amendment Forest Management Direction for Large Diameter Trees in Eastern Oregon, Draft Environmental Assessment* |
|---|---|---|
| 49246–49254 | Undated | Nine maps of Adapting the Wildlife Standard of the Eastside Screens |
| 49259–49302 | 06/14/2022 | Crag Law Center/*60-day Notice of Intent to Sue for Violations of the Endangered Species Act: Failure to Initiate Endangered Species Act Consultation Before Approving Forest Plans Amendment - Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington (With Attachments)* |

MEMORANDUM IN SUPPORT OF MSJ - G

## CERTIFICATE OF COMPLIANCE

This brief complies with this Court's Order of October 12, 2022, which provides: "The Parties' briefs may exceed the page and word count limitations set forth in LR 7-2(b)(1) so long as the page lengths are *generally consistent* with the Parties' representations in the Proposed Joint Case Management Schedule." ECF26 (emphasis added). In the Proposed Joint Case Management Schedule, the Parties proposed 40 pages for Plaintiffs' opening brief. *See* ECF23 at 8. This brief is 13,053 words, which corresponds to approximately 42 pages, and is therefore "generally consistent" with the Proposed Joint CMS.

In an abundance of caution, Plaintiffs have also concurrently filed a *Motion to Exceed Word-Count/Page Limits*, to the extent that the terms of the Proposed Joint Case Management Schedule are ambiguous.

_____
Meriel L. Darzen
Of counsel for Plaintiffs

MEMORANDUM IN SUPPORT OF MSJ - H

*Crag Law Center*
*3141 E Burnside St.*
*Portland, OR 97214*
*Tel. (503) 227-2725*