Exhibit 2



**TRIBAL EXECUTIVE COMMITTEE**
P.O. BOX 305 • LAPWAI, IDAHO 83540 • (208) 843-2253

October 13, 2020

**Submitted online at: https://cara.ecosystem-management.org/Public/CommentInput?project=58050**

Shane Jeffries, Forest Supervisor
Ochoco National Forest
3160 NE 3rd Street
Prineville, OR 97754

> *Re:  Nez Perce Tribe's Comments on the Forest Plans Amendment Forest Management Direction for Large Diameter Trees in Eastern Oregon, Draft Environmental Assessment*

Dear Forest Supervisor Jeffries:

On behalf of the Nez Perce Tribe ("Tribe"), thank you for the opportunity to provide comments on the Forest Service's ("Forest") Preliminary Environmental Assessment ("EA") for Forest Management Direction for Large Diameter Trees in Eastern Oregon and proposed amendment to land management for the Deschutes, Fremont-Winema, Malheur, Ochoco, Umatilla, and Wallowa-Whitman National Forests (collectively "Proposal"). Due to the location, scope, scale, and significance of this Proposal and its potential to affect the Tribe's Treaty-reserved rights and resources, the Tribe requested formal Cooperating Agency status in a letter to the Forest dated July 7, 2020, with confirmation of that status received via letter on August 7, 2020. Since early May 2020, the Tribe has provided on-going input and discussions regarding policy and technical concerns with this Proposal.

The Proposal focuses on changing Scenario A of the "Eastside Screens" wildlife standard that prohibits logging of all trees larger than or equal to 21 inches diameter at breast height ("dbh") in areas where late and old structure ("LOS") is below the historic range of variability ("HRV"). The Proposal also includes changes to the snag and green tree retention standards and guidelines under Eastside Screens. The proposed action (old tree and large tree guideline with adaptive management) is to replace the 21-inch standard with a guideline that emphasizes the recruitment of old trees ($\geq$150 years old) and large trees (grand fir, white fir, or Douglas-fir trees $\geq$ 30 inches

Shane Jeffries, Forest Supervisor
October 13, 2020
Page 2

dbh or trees of any other species ≥21 inch dbh) in areas where LOS are below HRV. In addition to the existing management direction, two other action alternatives (old tree standard and adaptive management) are analyzed in the Proposal.

As the Forest is aware, the Proposal spans six national forests, including the Wallowa-Whitman and Umatilla National Forests, that are located within the Tribe's aboriginal territory and are subject to the rights the Tribe reserved, and the United States secured, in its Treaty of 1855.[1] The Proposal also encompasses areas coextensive with the Tribe's area of exclusive use and occupancy, as adjudicated by the Indian Claims Commission,[2] and includes areas of cultural, ceremonial, and economic significance to the Tribe.

The Tribe considers the protection of its Treaty-reserved rights and resources to be a paramount obligation of the Forest when developing and implementing this Proposal. The agency has enforceable obligations to ensure that its actions, including this Proposal, are fully consistent with the Tribe's Treaty and trust responsibilities to the Tribe under other applicable federal laws, executive orders, and departmental regulations implicating the United States' unique relationship with the Tribe.

The Tribe, as a co-manager of its Treaty-reserved resources, plays a leading role in the restoration of fish and other culturally-significant, Treaty-reserved species on national forest lands. For years, the Tribe has collaborated with the Forest, committing thousands of hours of technical expertise and implementing millions of dollars toward habitat restoration on national forest system lands. The Tribe also has a long history of engagement on the management and retention of large and old trees and associated wildlife species including most recently on the Lower Joseph Creek Project and the Draft Blue Mountain Forest Plan. Both projects sought to amend existing Forest Plan direction to allow harvest of large diameter trees, but the Tribe objected to those proposed changes because neither provided adequate protection for Treaty-reserved wildlife and other resources important to the Tribe.

As the Tribe cautioned in its July 7, 2020, letter, we perceived the Forest's schedule for the development, tribal and public engagement, and completion of this Proposal as too aggressive and unnecessarily expedited given the universal challenges posed by the COVID-19 health crisis and the Forest's own policies recommending that non-urgent proposals be postponed or developed in a manner sensitive to the constraints posed by the pandemic. The Tribe therefore asked the agency to provide the Tribe and others with more than a 30-day comment period to facilitate a robust and transparent review. The Tribe was therefore pleased with the Forest's decision to extend the public comment period to October 13, 2020.

The Tribe also requested cooperator status because we viewed the Proposal as potentially affecting the Tribe's Treaty-reserved rights and felt cooperator status would not only provide the Forest with access to the Tribe's unique knowledge and expertise, but would reinforce the agency's

---

[1] Treaty with the Nez Perces, June 11, 1855, 12 Stat. 957.
[2] *Nez Perce Tribe v. United States*, Docket #175, 18 Ind. Cl. Comm. 1.

Shane Jeffries, Forest Supervisor
October 13, 2020
Page 3

government-to-government responsibilities to provide the Tribe with full and meaningful pre-decisional access to the Proposal, as required under executive orders, agency regulations, and policies related to consultation and coordination with Indian tribes.

Following a careful review of the Proposal, the Tribe does not support the Forest's proposed action or any of the alternatives. While the Tribe appreciated the opportunity to engage as a cooperator on the Project beginning in mid-summer, the Forest had already completed the proposed action and alternatives by that time; thus, the Tribe had no involvement in their development. Given the Forest's stated commitment to honoring the Tribe's Treaty rights and other interests, the Tribe was surprised and deeply disappointed to see that the Proposal fails to acknowledge the Tribe's Treaty or perform the required NEPA evaluation of the Proposal's impacts on the Tribe's Treaty-reserved rights and resources within the Wallowa-Whitman and Umatilla National Forests. The Tribe also identified several other significant concerns with the alternatives and environmental effects.

Given these material omissions, the Proposal is fundamentally flawed and requires substantial revision. As explained in the attached comments, the Tribe has developed its own alternative containing a standard that reflects the Forest's obligations to protect the Tribe's Treaty rights and resources. As you will see, the Tribe fully supports management of LOS and recognizes, through this new proposed alternative, that in some limited circumstances removal of specific large trees to achieve management objectives is justified and desirable. As a Cooperating Agency, the Tribe is fully prepared to help the Forest refine and analyze this new alternative which fully meets the purpose and need of the Proposal while also providing the necessary protections to the Tribe's Treaty rights and resources. We also look forward to working with the Forest to address the Tribe's other comments regarding the Proposal.

Finally, the Tribe requests formal consultation with the Forest's deciding official before the agency makes any final decision on the Proposal. Thank you for the opportunity to comment on the Proposal. You are welcome to contact Marie Baheza, at (208) 843-2253 to schedule a consultation, or Mike Lopez, Nez Perce Tribe Staff Attorney, at (208) 843-7355 with any questions or concerns.

Sincerely,

Shannon F. Wheeler
Chairman

**NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLANS AMENDMENT "FOREST MANAGEMENT DIRECTION FOR LARGE DIAMETER TREES IN EASTERN OREGON" WHICH WOULD MODIFY PLANNING DIRECTION REGARDING WILDLIFE STANDARDS KNOWN AS THE "EASTSIDE SCREENS" OR THE "21-INCH RULE"**
October 13, 2020

### 1. TRIBAL RIGHTS AND INTERESTS WITHIN THE PROPOSAL AREA

Since time immemorial, the Tribe has occupied and used over 13 million acres of lands now comprising north-central Idaho, southeast Washington, northeast Oregon, and parts of western Montana. Tribal members engaged in fishing, hunting, gathering, and pasturing livestock across their vast aboriginal territory, and these activities still play a major role in the culture, religion, subsistence, and commerce of the Tribe.

In 1855, the United States entered into a Treaty with the Tribe.[3] In this Treaty, the Tribe explicitly reserved, and the United States secured, among other guarantees, a permanent homeland as the well as "the right of taking fish at all usual and accustomed places in common with citizens of the Territory; and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed lands."[4]

This Proposal would be applied to large swaths of land within the Tribe's ceded territory as well as areas of the Tribe's exclusive use and occupancy, as adjudicated by the Indian Claims Commission. Significant portions of the lands and waters of the Wallowa-Whitman and Umatilla National Forests are part of the vast territory ceded by the Tribe, over which the Tribe has Treaty-reserved rights. These national forest system lands and waters provide irreplaceable habitat for Tribal Treaty-reserved resources, including Spring/Summer Chinook salmon, Endangered Species Act ("ESA") threatened steelhead, big game species, species of spiritual and cultural significance, and native plants used for food, fiber, and medicine.

The Tribe is an active co-manager of Treaty-reserved resources on federal lands as evidenced by our long history of engagement with numerous federal land management agencies, including the Forest Service. As a manager, the Tribe has devoted substantial time, effort, and resources to the recovery and co-management of Treaty-reserved resources within its Treaty territory.

### 2. GENERAL COMMENTS

#### a. No Acknowledgement or Analysis of Treaty Rights

The Proposal failed to disclose and fully analyze the direct, indirect, and cumulative effects of the proposed amendment on the Tribe's Treaty rights or Treaty-reserved resources, including economic impacts or benefits to Tribal members.

---

[3] Treaty of June 9, 1855 with the Nez Perces, 12 Stat. 957.
[4] *Id.* at Article III.

All executive agencies of the United States are subject to the federal trust responsibility to recognize and uphold treaty reserved rights.[5] Forest Service Manual ("FSM") 1563.8b states that the Forest Service "shall administer lands subject to off-reservation treaty rights in a manner that protects Indian tribes' rights and interests in the resources reserved under treaty." Further, FSM 1563.03 directs the Forest Service, among other responsibilities, to "[i]mplement Forest Service programs and activities consistent with and respecting Indian treaty and other reserved rights and fulfills the Federal Government's legally mandated trust responsibilities with Indian tribes."

The 1990 Wallowa-Whitman National Forest Land and Resource Management Plan contains a standard on page 4-46 requiring the Forest to "[r]ecognize the hunting and fishing rights of the Indian tribes in habitat management activities." The Forest Plan contains another standard on page 4-19 requiring the Forest to "[c]onsider and appropriately provide for the ceded land rights and privileges of the ... Nez Perce Indian Tribes, under the treaties of 1855 in all Forest activities."

In addition, the Umatilla Forest Plan on page 4-93 provides that "[t]he ceded land rights and privileges of the...Nez Perce ... under the treaties of 1855 (U.S. Laws, Statutes, etc., 1855a, 1855b, 1855c), will be appropriately provided for in Forest activities."

In the unlikely event that the agencies believe Indian treaty rights are not a mandatory environmental effects consideration under NEPA, the D.C. District Court opinion in the ongoing case of *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers* provided a reminder, in passing within the opinion, that consideration of impacts on Indian tribal treaty rights is an agency "obligation" under NEPA.[6]

To fully meet your Treaty and trust responsibilities as well as obligations under the Forest Plan, the Forest must substantially revise the EA to include an acknowledgement and evaluation describing how the agency upholds these legal obligations in the context this Proposal. There is currently no acknowledgement of the Tribe's Treaty anywhere in the EA or analysis of the impacts of the Proposal on the Tribe's Treaty rights. To ensure federal compliance with the Tribe's treaties, the Forest must examine the impacts of the Proposal on Tribal resources and, if necessary, develop an alternative that maximizes protection and enhancement of those resources. By failing to adequately analyze impacts to or protect Treaty rights, a substantial likelihood exists that the agency, through its action, may impermissibly interfere with or harm the Tribe's Treaty rights. The Forest's responsibility to the Tribe, as enumerated by federal statutes, cases, and the Forest Service's own policies, is "to protect 'to the fullest extent possible' the tribal treaty rights, and the resources on which those rights depend."[7]

---

[5] *See United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707 (1987); *United States v. Mitchell*, 463 U.S. 206, 225 (1983); *Seminole Nation v. United States*, 316 U.S. 286, 296-97 (1942).
[6] *Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 440 F.Supp.3d 1, 11 (D.D.C. 2020), *citing Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 255 F.Supp.3d 101, 132-34 (D.D.C. 2017).
[7] *Klamath Tribes v. Forest Service*, 24 Ind. Law Rep. 3017 (D. Or. 1996).

### b. Compliance with 2012 Planning Rule

The Proposal is inconsistent with the 2012 Forest Planning Rule, as Amended[8] in at least five instances:

1) The Planning Rule calls for the solicitation and incorporation of "native knowledge"[9] during forest planning but the Tribe sees little evidence of that requirement being met as part of the Proposal.
2) By not holding a formal public scoping period, the Forest failed to provide early notice to the public of which substantive requirements of 36 CFR 219.8 through 36 CFR 219.11 are likely to be directly related to the amendment. The lack of a formal public scoping period has significantly curtailed tribal and public involvement and transparency.
3) The Forest failed to identify the full range of substantive resource values that are directly related to the plan direction being added or changed by this Proposal. This indicates that the Forest has taken an artificially narrow view of the potential impacts of allowing the removal of large diameter trees to a wide range of forest processes and resources. The Proposal identifies only three substantive resources including System Drivers 36 CFR 219.8(a)(1)(iv), Wildland Fire 36 CFR 219.8(a)(1)(v), and Species-specific Conservation 36 CFR 219.9(b)(1), but fails to identify Ecological Integrity 36 CFR 219.8(a)(1)(ii) and (iii), Ecosystem Diversity 36 CFR 219.9(a)(2)(i)(ii), Aesthetic Values CFR 219.10(a)(1), or Habitat Conditions for Fish, Wildlife and Plants used by the public CFR 219.10(a)(5).
4) The Proposal fails to provide sufficient analysis of fish, wildlife, and plant species to determine if substantial adverse impacts to any specific species would require the responsible official to treat said species as a Species of Conservation Concern ("SCC") under the requirements of the Planning Rule. In fact, no analysis or discussion of this planning rule requirement was included in the Proposal for fish, wildlife, or plant species. For example, Section 3.5.2.3 of the EA states that "...impacts to individual species will be more appropriately assessed at the project level" which is contrary to the direction contained in the Planning Rule. Clarifying language provided in 2016 states that "the 2012 rule does not give a responsible official the discretion to amend a plan in a manner contrary to the 2012 rule by selectively applying, *or avoiding altogether* substantive requirements within §§219.8 through 219.11 that are directly related to the changes being proposed."[10]
5) The Proposal fails to use the best available scientific information ("BASI") as required under 36 CFR 219.3 for key resource areas. While some portions of the analysis (Vegetation (EA section 3.1) and Social and Economic Resources (EA section 3.2)) appear to have been well researched with the analysis grounded in the scientific literature, the same rigor was not applied to other key resource areas (Wildlife (EA section 3.4), Botany (EA section 3.5), or Cumulative Effects (EA section 3.6)). Surprisingly, there has been little or no attempt to evaluate the effects of this Proposal on the critically important resource areas of fire ecology or climate change.

---

[8] National Forest System Land Management Planning, 81 Fed. Reg. 90723 (December 15, 2016).
[9] 36 C.F.R. § 219.4(a)(3)
[10] National Forest System Land Management Planning, 81 Fed. Reg. 90723 (December 15, 2016) (emphasis added).

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES        3

### c. Compliance with NEPA

The Proposal is "Significant" under both the National Forest Management Act ("NFMA") and the National Environmental Policy Act ("NEPA") and therefore requires further environmental analysis and disclosure of effects through the development of an Environmental Impact Statement ("EIS"). The use of an EA is inadequate for such a sweeping forest plans amendment affecting late and old structure across six national forests.

A decision of this scope, scale, and ecological magnitude needs to be made at the Regional level. This proposal would amend management direction on six individual national forests within Region 6 of the U.S. Forest Service so delegation of this decision to a single Forest Supervisor is highly unusual and inappropriate. We reiterate our previous request that the Regional Forester be the designated responsible official for this Proposal.

## 3. SPECIFIC COMMENTS

### a. Purpose and Need

As rationale to support the proposed changes to existing wildlife standards of the Eastside Screens, the EA repeatedly states that the existing policy direction would limit the ability to apply active management to restore forest resiliency and enhance the sustainability of LOS and other forested habitats. There are, however, many existing tools that managers can employ to reduce fuel loads and improve fire resiliency without logging large diameter trees (for example, pre-commercial thinning, logging of smaller diameter trees, prescribed fire, and/or shrub removal). In very limited instances, large tree removal may be desired, but the changes proposed under this EA are not well justified nor do they provide sufficient protections for LOS-dependent species.

The purpose and need is narrowly focused on changing the 21-inch diameter cap under Scenario A of the Eastside Screens Amendment. The EA states that 1) "[s]cientific research, ongoing monitoring of restoration treatments and natural disturbances, and practical experience implementing the 21-inch standard demonstrate a need to change policy to better conserve large and old trees and to adapt stands to future climate and disturbance regimes"[11] and 2) that "[a] variety of empirical studies and science syntheses demonstrate that protection of all trees greater than 21 inches prevents restoration of historical conditions and conditions that are likely to maintain old trees into the future (Johnston in review, Lindsay and Johnston 2020, Merschel et al. 2019, Johnston et al. 2018, Johnston 2017, Stine et al. 2014);"[12] however, there is little evidence in the EA to support these statements. There is a lack of information from the cited references, "ongoing monitoring of restoration treatments..."[13] and projects that amended the 21-inch diameter cap. The Forest Service needs to demonstrate clear and concise evidence to support a change to the 21-inch diameter cap.

---

[11] EA at 7.
[12] EA at 7-8.
[13] EA at 7.

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES                              4

The purpose and need is further muddled by the vegetation analysis which shows that under current management, the amount of open LOS forest in both dry and moist forest groups has increased since implementation of the amendment.[14] If this is the case, then what is the problem? The EA needs to clearly describe that despite the trend toward Eastside Screen goals there are issues with Eastside Screens that limit achieving desired trajectories of LOS forests. Such issues would have come to light if the Forest had performed a full assessment of the Eastside Screens direction, not just Scenario A (21-inch diameter limit). Information from a full assessment would provide the decision makers a clear picture of what is working and what is not, and to propose changes, if any, based on that assessment. Amending just one part of the Eastside Screens is suspect considering there is no clear rationale in the EA for doing so. A full assessment would also help develop an appropriate range of alternatives and provide a basis to develop clear, concise objectives for which to build a meaningful adaptive management component. The EA also states that "…implementation of the Eastside Screens is inconsistent across the region"[15] yet it fails to explain the inconsistencies. Providing such information may help support the purpose and need, identify alternatives, and develop adaptive management.

The Tribe believes that the Forest missed an opportunity to evaluate other components of the Eastside Screens Amendment that may be limiting restoration and maintenance of LOS forests. Considering the wealth of science since 1995 about forest ecosystems and management, such as soils-based management (see Craigg et al. 2015[16]), it would be reasonable to evaluate the entire Eastside Screens and assess whether or not the intent is being met across and within these Forests.

### b. Range of Alternatives

The Forest did not analyze a reasonable range of alternatives for the Proposal. The vegetation analysis results show that none of the action alternatives substantively improves protection and retention of large diameter trees beyond the current management direction. We argue that the alternatives described in EA sections 2.2, 2.3, and 2.4 all substantively weaken protections for the retention of old trees and development of late and old structure. Furthermore, comparison of the alternatives is difficult because there is no baseline or reference from which to compare the results, for example a 1.5 percent increase in basal area of fire tolerant species under Alternatives 2 (Old Tree and Large Tree Guideline with Adaptive Management, Proposed Action) and 3 (Old Tree Standard Alternative) is difficult to interpret without a reference point. Is 1.5 percent significant? Does it meet the desired trajectory?

The "Adaptive Management" alternative would remove all diameter or age class protections for all tree species so would effectively eliminate any protections for late and old structural characteristics required by many wildlife species. All of the proposed new alternatives would replace the existing management standard with a guideline, which is unreasonable. A standard can still provide management flexibility depending on how it is crafted.

---

[14] EA at 31.
[15] EA at 9.
[16] Craigg, T. L., Adams, P. W., & Bennett, K. A. (2015). Soil Matters: Improving Forest Landscape Planning and Management for Diverse Objectives with Soils Information and Expertise. *Journal of Forestry, 113*(3), 343-353. https://academic.oup.com/jof/article/113/3/343/4599661.

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES      5

We formally request that the Forest add another alternative that would still meet the purpose and need identified in the EA while safeguarding the Tribe's Treaty-reserved rights and ensuring protection of old growth forest communities and dependent fish, wildlife, and plant species. Initial details of such an alternative are outlined below. The Tribe is willing and able to assist the Forest in fully developing and analyzing this new alternative as part of an expanded EIS effort.

Specifically, replace the existing Standard with the following Wildlife Standard:

> Management activities within and outside old forest stands shall retain and recruit old trees ($\geq$ 150 years, regardless of dbh) and large trees ($\geq$ 21 inches dbh). Exceptions where individual old, large, or legacy trees may be removed or destroyed in LOS forests found to be outside the historic range of variability (HRV) for one or more biophysical environments (i.e., warm, dry forests; moist forests, etc.) would include situations where:
> - Tree(s) need to be removed to favor hardwood species, such as aspen or cottonwood, or other special plant habitats like wet meadows.
> - Late-seral grand fir or white fir are competing (within the canopy drip line) with early-seral species, such as ponderosa pine.
> - Tree(s) need to be removed to reduce danger/hazard trees located within one average tree length along roads and in developed sites.
> - Trees removed for personal use pursuant to Tribal Treaty gathering rights. Additionally, in watersheds not meeting snag density and diversity desired conditions (as determined by a snag analysis by habitat type), manager should consider creating snags.

As a cooperator, the Tribe is fully prepared to assist the Forest in fully evaluating this new Wildlife Standard as a reasonable alternative that fully meets the purpose and need of the Proposal and honors the Tribe's Treaty-reserved rights and allows forest stand management flexibility while providing necessary LOS for dependent plant and wildlife species.

### c. Adaptive Management Alternatives

The Tribe has concerns about the adaptive management component in two of the action alternatives. In the EA, the adaptive management component is ill-defined and lacks a clear objective. With such a narrow focus on changing the 21-inch diameter limit, the Tribe is unclear where the proposed adaptive management component fits. Does the Forest expect adaptive management as proposed to solve the issues with the Eastside Screens Amendment, or to solely inform the Forests whether or not changes to the diameter limit is working and for what purpose? Part of the challenge to describe LOS and create an adaptive management component is that the amendment only changes one part of the Eastside Screens Amendment, and there might be an expectation that this one part will fix the whole. As proposed, the adaptive management component should tell the impact of changing Scenario A and whether or not it is a true limiting factor in achieving LOS.

The Tribe recognizes the value of management flexibility with the Adaptive Management alternative, but as proposed, it does not provide protections for key wildlife and plant resources of

importance to the Tribe and its membership. There is also a tremendous amount of trust that needs to be in place for its success, not to mention commitment by the Forest. Plus, it needs to include additional ecosystem indicators such as recruitment of LOS across the landscapes and/or impacts to focal species (as defined in the 2012 planning rule). The analysis should include effectiveness monitoring from projects that occurred under the 21-inch rule and those that were amended. Identification of one or more Focal Species for monitoring impacts of this plan amendment may be warranted (36 CFR 219.19).

The adaptive management alternative also does not clearly articulate how the new dbh guideline of 30 inches for grand fir and Douglas-fir was established. This number appears arbitrary and capricious with no clear justification in science. To move from 21 inches to 30 inches is a substantial increase that needs to be clearly grounded in BASI. There also needs to be clear justification for stripping large tree protections from Douglas-fir. We first encountered a revised diameter limit of 30 inches in the Draft Blue Mountain Forest Plan,[17] but it was only applied to grand fir, not Douglas-fir, which is a valuable, long-lived, moderately fire-resistant species. Why the change? What new science can justify this shift?

A key assumption for the adaptive management alternatives is that the monitoring is carried out in a way that allows changes in the availability of large and old trees to be detected in a timely fashion so that adaptive management occurs before the viability outcome of any MIS, R6 Sensitive Species, or Species of Conservation Concern is reduced.[18] The EA fails to include both spatial and temporal scale in the adaptive management alternatives. Monitoring should be scaled both spatially and temporally to the patterns or processes of the response variable, recognizing that patterns often vary with the scale at which a study is conducted. Processes and populations vary in time and space, therefore monitoring should be designed and conducted at the scale(s) that encompasses the appropriate variation. Given the variety of factors that might influence a response variable, monitoring should be designed to incorporate as much of the variation resulting from those factors as possible. Spatially, this requires sampling at the appropriate scale to detect a biologically meaningful response should one occur. For example, effects may manifest at the landscape level but be obscured at the stand scale, or vice versa. Temporally, the most obvious solution is to conduct studies over a long enough time to detect change if one is occurring. With respect to LOS, the adaptive management component as proposed may not be able to detect change for quite some time.

The Tribe requests that implementation and effectiveness monitoring should be common to all alternatives.

### d. Affected Environment and Environmental Consequences

Overall, the Forest's effect analysis was incomplete with regard to existing condition and trend of social and environmental attributes that could be impacted by the Proposal, namely, Treaty rights and environmental justice, watershed hydrology, fire, climate change, and soil. The analysis also fails to adequately evaluate impacts to vegetation, wildlife, and plants. In many instances the

---

[17] Final EIS Volume 1, Chapter 3, Land Management Plans for the Malheur, Umatilla, and Wallowa-Whitman National Forests, page 199.
[18] EA at 82.

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES        7

document fails to provide science-based analysis and rational for the conclusions drawn. Direction in the 2012 forest planning rule[19] requires the BASI be used for analysis and proposal development but there is little evidence of this throughout the EA.

### e. Environmental Justice

Presidential memorandum accompanying Executive Order 12898 cites the NEPA process as an opportunity for agencies to address the environmental injustice of disproportionate impacts. The CEQ also published guidance for environmental justice analyses to determine any disproportionately high and adverse human health or environmental effects to low-income, minority, and tribal populations. One of these principles is to "recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed action."[20]

Currently, the EA does not include sufficient economic analysis of the impact of the Proposal on the Tribal economy and the health and welfare of its people. The socioeconomic analysis should include economic factors unique to the Tribe and its Treaty rights and resources beyond what is contained in Section 3.2.3.5.2 of the EA. The subsistence economy of the Tribe relies heavily on the lands and resources of the national forests in unique ways from other forest users. Moreover, input should be directly solicited from Tribal people as to what resources and resource values are important to their individual cultures so that those values can be appropriately analyzed. For example, firewood gathering is an important socioeconomic use of the national forests that may be impacted by this Proposal, but discussion of that resource is minimal. As another example, Table 19 describing the "ordinal rankings across benefit types"[21] could certainly use input from cultural knowledge holders. Finally, elk and deer hunting are significant components of food security for tribal families and yet these resources are only generally discussed and then only in terms of recreational hunting.

The EA speaks to the value of gathering and incorporating traditional ecological knowledge in forest planning[22] yet this Proposal fails to do so. The accelerated timeline and lack of opportunity for public engagement has effectively disenfranchised Nez Perce people from having meaningful input into important management changes within their Treaty territory.

The Forest should also examine the impacts of the Proposal on the rights and resource values of all other tribes within who's aboriginal homeland this Proposal would be implemented.

### f. Fire

The synthesis includes lengthy discussion of wildland fire within the context of the Eastside Screens Amendment, yet the EA does not include it in the analysis. The Tribe requests that the Forest use BASI to evaluate fire effects from the proposed alternatives.

---

[19] 36 C.F.R. § 219.3.
[20] Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 7629 (February 11, 1994).
[21] EA at 66.
[22] EA at 63-64.

### g. Climate Change

The analysis failed to disclose and fully analyze the direct, indirect, and cumulative effects of the proposed amendment on carbon sequestration and climate change. The Tribe does not understand why 27 pages of the EA[23] was devoted to Social and Economic Resources but there was no section devoted to carbon sequestration and climate change despite the fact that it was identified as one of the key "system drivers" directly related to the amendment.[24] Climate change was also discussed extensively in the Forest's own report on the Eastside Screens website[25] yet the EA does not include a robust analysis of this critical issue.

This deficiency should be remedied through the development of an EIS. The 2012 Planning Rule requires that climate change be considered in all aspects of planning (including plan amendments). Large, old trees represent significant carbon storage and removing them from the landscape could have meaningful climate impacts, yet there is no analysis of this potential impact or comparison across alternatives.

The Forest identifies a need to change the 21-inch rule to adapt stands to future climate and disturbance regimes, yet future climate(s) are not incorporated into the analysis. A limitation of the forest vegetation simulation ("FVS") analysis is that it assumes growing conditions, tree physiology, and silvicultural rules would not change during the 25-year analysis window. This is problematic because tree populations adapted to sites under current climate may become maladapted as changes in climate occur. Research shows that climate warming will cause shifts in climates currently occupied by ponderosa pine and Douglas-fir, [26] western larch,[27] and other tree species and habitats[28] such that they may experience adaptation and migration lags over the

---

[23] EA Section 3.2.
[24] EA Section 2.7.
[25] U.S. Forest Service, *The 1994 Eastside Screens Large-Tree Harvest Limit*, https://www.fs.usda.gov/treesearch/pubs/60635 (last visited September 29, 2020).
[26] Rehfeldt, G. E., Jaquish, B. C., López-Upton, J., Sáenz-Romero, C., St Clair, J. B., Leites, L. P., & Joyce, D. G. (2014a). Comparative genetic responses to climate for the varieties of *Pinus ponderosa* and *Pseudotsuga menziesii*: realized climate niches. *Forest Ecology and Management, 324*, 126-137. https://www.fs.fed.us/rm/pubs_other/rmrs_2014_rehfeldt_g001.pdf; Rehfeldt, G. E., Leites, L. P., Bradley St Clair, J., Jaquish, B. C., Sáenz-Romero, C., López-Upton, J., & Joyce, D. G. (2014b). Comparative genetic responses to climate in the varieties of *Pinus ponderosa* and *Pseudotsuga menziesii*: clines in growth potential. *Forest Ecology and Management, 324*, 138-146. https://www.fs.fed.us/rm/pubs_other/rmrs_2014_rehfeldt_g002.pdf; Rehfeldt, G. E., Jaquish, B. C., Sáenz-Romero, C., Joyce, D. G., Leites, L. P., Bradley St Clair, J., & López-Upton, J. (2014c). Comparative genetic responses to climate in the varieties of *Pinus ponderosa* and *Pseudotsuga menziesii*: reforestation. *Forest Ecology and Management, 324*, 147-157. https://www.fs.fed.us/rm/pubs_other/rmrs_2014_rehfeldt_g003.pdf.
[27] Rehfeldt, G. E., & Jaquish, B. C. (2010). Ecological impacts and management strategies for western larch in the face of climate-change. *Mitigation and Adaptation Strategies for Global Change, 15*(3), 283-306. https://www.fs.fed.us/rm/pubs_other/rmrs_2010_rehfeldt_g001.pdf.
[28] Rehfeldt, G. E., Crookston, N. L., Saenz-Romero, C., & Campbell, E. M. (2012). North American vegetation model for land-use planning in a changing climate: a solution to large classification problems. *Ecological Applications, 22*(1), 119-141. https://www.fs.fed.us/rm/pubs_other/rmrs_2012_rehfeldt_g001.pdf; Rehfeldt, G. E., Leites, L. P., Joyce, D. G., & Weiskittel, A. R. (2018). Role of population genetics in guiding ecological responses to climate. *Glob Chang Biol, 24*(2), 858-868.; Plant Species and Climate Profile Predictions http://charcoal.cnre.vt.edu/climate/species/

next 20 to 40 years. These lags have the potential to confound management direction, outcomes, and adaptive decision making with respect to late and old structure forests. The Tribe strongly encourages the Forest to take a hard look at conditions under a range of climate scenarios with respect to LOS forests for each alternative.

### h. Soil Quality

The EA is incomplete because it does not include impacts to soil quality. Under the NMFA, all Forests are required to assess the impacts of management actions to ensure that they "will not produce substantial and permanent impairment of the productivity of the land."[29] The FSM directs soil resource management to focus on ecological functions with an objective of maintaining or improving soil quality on NFS lands "to sustain ecological processes and function so that desired ecosystem services are provided in perpetuity."[30] The FSM 2550.5 defines soil quality as "the capacity of a specific kind of soil to function, within natural or managed ecosystem boundaries, to sustain plant and animal productivity, maintain or enhance water and air quality, and support human health and habitation and ecosystem health." The FSM identifies six soil functions: soil biology, soil hydrology, nutrient cycling, carbon storage, soil stability and support, and filtering and buffering. In order to provide multiple uses and ecosystem services in perpetuity, these six soil functions need to be active and effectively working. Because the Proposal has the potential to change management direction across six national forests, the Tribe requests that the Forest describe soil conditions and evaluate impacts to soil quality under each alternative.

### i. Vegetation

The vegetation analysis failed to evaluate impacts to understory vegetation, changes in site conditions, and Treaty-reserved resources.

The analysis also lacks context for which to compare the results. The EA should include baseline conditions such as percent of forest outside of LOS conditions by biophysical environment. Without baseline numbers, the Tribe has difficulty assessing the alternatives and impacts to other resources. For example, the results show that there will be an increase of 1.5 percent in basal area of fire tolerant species under Alternative 2 and 3 in comparison to the current amendment. Without context, the Tribe has difficulty understanding if this increase is significant or sufficient to meet the desired trajectory over time or to provide LOS in perpetuity for wildlife, habitat, and Treaty-reserved resources.

The vegetation analysis only factored in one type of management action (density reduction via thinning). Thinning may not promote other key features of large, old trees that require long periods of time to develop.

Is the analysis restricted to areas outside of LOS; if not, the EA may have overestimated the effects of the action alternatives across the Forest. This missing information makes evaluating impacts difficult. The analysis is not spatially explicit, lacks reference points, and the analysis parameters do not match the alternatives which makes comparing and contrasting the proposed alternatives

---

[29] 16 U.S.C. § 1604(g)(3)(c).
[30] FSM 2550.2.

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES    10

difficult. For example, the Old and Large Tree Guideline (proposed action) states that "[o]ld trees are defined as having visual characteristics that suggest an age ≥ 150 years"[31] yet the FVS modeling was constrained to "[n]o removal of trees older than 250 years" [32] without diameter restrictions. There is no explanation in the EA as to why the Forest chose 250 years instead of 150 years nor why there were no diameter limits modeled because this makes the results inadequate and do not reflect the proposed action. The Tribe finds the modeling inconsistent with the alternatives in the EA. Furthermore, there are issues with the adaptive management alternatives that the Forest did not incorporate thresholds to trigger an adaptive response.

The EA also failed to account for changes in climate—see climate change section—and did not incorporate BASI regarding defining old and large trees. The EA states that the definition of LOS under the Eastside Screens amendment is "old" science, yet the vegetation analysis and range of alternatives still relies on the "old" definition (i.e. trees ≥ 21" dbh). The analysis relied on the same "old" science.

### j. Wildlife

The analysis failed to disclose and fully analyze the direct, indirect, and cumulative effects of the proposed amendment on old-growth dependent wildlife species. In general, this entire section makes declarative, conclusory statements without justification, rational argument, literature citations, or other meaningful discussion. The Forest is required to describe its analysis and the underlying science in sufficient detail that the public can follow the logic applied in reaching the conclusions of that analysis.

The Wildlife section[33] narrowly focuses on three individual management indicator or sensitive species (fisher, northern goshawk, and white-headed woodpecker) yet there are 14 sensitive species within the Proposal areas and an undisclosed number of management indicator species.

Appendix D includes a list of wildlife species which identifies 16 species as dependent on LOS, yet there is no formal analysis of direct, indirect, and cumulative effects to those species. Great gray owl, flammulated owl, little brown Myotis, goshawk, pine martin, and pileated woodpecker are just six LOS-dependent species that will likely be significantly impacted by changes in how large trees are managed across this landscape yet they are not analyzed in any meaningful way. There is no "crosswalk" or other analysis of Management Indicator Species (such as primary cavity nesters) and how each alternative may affect species populations and habitat components. Many of these species hold cultural significance for Tribal members, yet there is a clear expectation that LOS communities will be managed in such a way that those populations persist and thrive on the landscape. The Tribe cannot make meaningful comparisons of the alternatives offered given the current lack of data and analysis.

Unfortunately, no information is presented quantifying the overall (%) change in habitat value or the distribution of remaining habitat in the Proposal area for many LOS-associated species. The Tribe, therefore, has difficulty evaluating the impact of the proposed habitat changes on

---

[31] EA at 11.
[32] EA at 22.
[33] EA at 72

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES    11

populations of these species, including their persistence and distribution in the Proposal area. Moreover, monitoring data (of species populations or habitats) has either not been presented as part of the EA (or the draft wildlife specialist report) or simply does not exist.

More specifically, no analysis has been completed to determine if substantial adverse impacts to any specific wildlife species would require the responsible official to treat said species as a SCC under the requirements of the Planning Rule (see comment 2(b)(4) above). For example, four LOS-dependent wildlife species known to occur within the plan areas were thoroughly evaluated by the Nez Perce-Clearwater National Forest and found to meet the criteria as SCCs (fisher, mountain quail, harlequin duck, and white-headed woodpecker). [34] While site-specific analysis would have to be completed, the fact that the Nez Perce-Clearwater National Forest (which has similar dryland forest types) found those species had significant conservation concerns indicates that there is a high likelihood that they would also be found eligible for SCC designation within the current Proposal area. A full evaluation must be completed for all eligible wildlife species so that, if necessary, appropriate plan components can be developed to ensure their continued persistence in the Proposal area.

The EA failed to show how implementing the Eastside Screens has impacted meadows and wetlands, i.e. the inability of Eastside Screens to address management concerns. What percentage of the area is not meeting LOS? The EA also failed to discuss canopy cover impacts under each alternative with respect to big game security and vulnerability.

### k. Snags and Large Woody Debris

The analysis failed to disclose and fully analyze the direct, indirect, and cumulative effects of the proposed amendment on the critically important wildlife habitat components provided by standing dead trees (snags) and large woody debris.

Section 3.4.1.1 of the EA displays data that shows no significant change in snags greater than 20-inch dbh since 1997. This indicates that current management direction is generally maintaining the availability of large snags across the landscape. After presenting current data on snag habitat, the document then fails to provide meaningful analysis on whether forests are meeting current snag standards, guidelines, or goals and what direct, indirect or cumulative the effect each alternative will have on meeting those goals, if implemented. The EA also fails to provide a comparison to the historic availability of snags or how each alternative might quantitatively impact snag availability in the future.

Logic assumes that if an alternative allows the removal of specific large diameter live trees that may affect the availability of future large snags. Such an analysis was not conducted but is a necessary and important evaluation of wildlife habitat values under any new management direction. Furthermore, there is no analysis of how each alternative will or will not contribute to meeting existing Forest Plan standards or guidelines for snag habitat. A similar argument can be made for the availability of large woody debris within LOS communities. This habitat component

---

[34] Letter from Region 1 Regional Forester dated December 6, 2019, a copy of which is attached hereto.

NEZ PERCE TRIBE'S COMMENTS ON THE FOREST PLAN AMENDMENT FOR LARGE DIAMETER TREES     12

is especially important for soil health and specific LOS-dependent species such as pine martin and fisher. These are significant inadequacies in the draft EA and should be addressed.

### l. Rare Plants

The analysis failed to disclose and fully analyze the direct, indirect, and cumulative effects of the proposed amendment on rare plant species. More specifically, no analysis has been completed to determine if substantial adverse impacts to any specific plant species would require the responsible official to treat said species as a SCC under the requirements of the Planning Rule (see comment 2(b)(4) above). For example, the clustered lady's-slipper and Douglas' clover which are known to occur within the Proposal area were both found to meet the criteria as SCCs after a thorough evaluation by the Nez Perce-Clearwater National Forest which contains similar dryland forest types.[35]

At least nine LOS-associated species of moss, liverwort, fungi, or vascular plant contained in Appendix A should be evaluated for SCC concerns: *Blepharostoma arachnoideum, Schistidium cinclidodonteum, Tortula mucronifolia, Rhizopogon alexsmithii, Arabis crucisetosa, Botrychium pumicola, Cypripedium fasciculatum, Listera borealis,* and *Trifolium douglasii.* Those evaluations must be completed for all eligible plant and fungi species so that, if necessary, appropriate plan components can be developed to ensure their continued persistence in the planning area.

In addition, the EA fails to fully evaluate the impacts of the Proposal on plant and fungi species considered culturally important to the Tribe, including huckleberries, various *Lomatium* spp., and edible mushrooms. This Proposal must be designed and evaluated in ways which are sensitive to species such as these. The EA currently affords little opportunity to evaluate impacts to these resources. Development of an EIS would provide an opportunity to incorporate native knowledge into a more robust analysis of alternatives on these culturally important resources.

### m. Cumulative Effects Analysis

The Cumulative Effects analysis is entirely inadequate. The EA states that "there are no significant cumulative effects, only slight changes and indicators as described above."[36] This cursory and conclusory statement about cumulative effects fails comply with NEPA and its implementing regulations requiring the agency to identify and evaluate the past, present, and reasonable foreseeable future actions. The development of an EIS would afford the opportunity to fully articulate the cumulative effects of this Proposal.

---

[35] Letter from Region 1 Regional Forester dated December 6, 2019.
[36] EA at Section 3.6.