Exhibit 12

**Confederated Tribes** *of the*
**Umatilla Indian Reservation**
Department of Natural Resources
Administration

46411 Timíne Way
Pendleton, OR 97801

www.ctuir.org    ericquaempts@ctuir.org
Phone 541-276-3165  Fax: 541-276-3095



October 13, 2020

Shane Jeffries, Forest Supervisor,
Ochoco National Forest,
3160 NE Third Street,
Prineville, OR 97754

Delivered electronically to SM.FS.EScreens21@usda.gov and through https://cara.ecosystem-management.org/Public/CommentInput?project=58050

**Re: Forest Management Direction for Large Diameter Trees in Eastern Oregon #58050**

The Confederated Tribes of the Umatilla Indian Reservation (CTUIR) Department of Natural Resources (DNR) provides the following comments on the proposed revision of the *Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales (Eastside Screens)*. The Eastside Screens were developed in anticipation of a more comprehensive regulatory effort that unfortunately has not occurred in the intervening 25 years. Given the complexity of the issue and the relatively short period of time proposed for review of the Environmental Assessment, the CTUIR DNR requests that the Forest Service undertake this regulatory effort through an Environmental Impact Statement (EIS). The comments below are intended to inform the path the Forest Service takes in this effort.

**CTUIR Treaty of 1855 & Federal Trust Responsibility Background**
The CTUIR is a federally-recognized Indian tribe, with a reservation in Northeast Oregon and ceded, aboriginal, and usual and accustomed areas in Oregon, Washington, Idaho, and other Northwest states. In 1855, predecessors to the CTUIR—ancestors with the Cayuse, Umatilla, and Walla Walla Tribes—negotiated and signed the Treaty of 1855 with the United States. The Treaty is a contract between sovereigns and is "the supreme Law of the Land" under the United States Constitution. In the Treaty the CTUIR ceded millions of acres of land to the federal government, and in exchange received assurances that various pre-existing tribal rights would be protected, and our interests would be respected, in perpetuity. A paramount objective in the Treaty was protecting and maintaining our tribal First Foods—water, fish, big game, roots, berries, and other plants—and the habitats and environmental conditions that support and sustain them, then, now, and forever. This remains a paramount objective of the CTUIR. These habitats would be affected by your proposed rule.

The Forest Service, and all federal agencies, have a duty to honor and uphold the Treaty of 1855 and all Indian treaties and to act as stewards and trustees to ensure that the terms and commitments of such treaties can be fulfilled. In implementing federal laws and adopting rules pursuant to them, the Forest Service can and should always remain attentive to how such laws and rules impact treaty-based obligations; the laws, rules, and treaties must be read in tandem to ensure they are mutually supportive and reinforcing. Rules and regulations that diminish the United States' ability to honor and uphold Indian treaties and related Trust Responsibility to tribes should not be adopted.

CTUIR DNR Letter to Shane Jeffries
Subject: Revision of Eastside Screens Rule
October 13, 2020
Page 2 of 4

The Treaty of 1855 explicitly guarantees to the CTUIR and its members the right of "taking fish" and of hunting and gathering. Associated with these rights is the implicit, concurrent assurance that there will be fish to take, game to hunt, and plants to gather—all will exist—and that the habitats and environmental conditions that support and sustain them will exist. Without those habitats, the Treaty becomes an empty promise. The lands and waters necessary for the existence of these Treaty resources must also be protected and maintained. Water is the first of the tribal First Foods. Implicit in the Treaty Right to fish is the right to water—clean, available water necessary to effectuate tribal fishing rights—and protection of the lands associated with providing that water.

**Eastside Screens & Their Unintended Results**
The Eastside Screens planning rule has been in place since the mid-1990s. Specifically the 21-inch rule was an attempt to move forests to maintain larger diameter-at-breast-height (DBH) trees and provide some semblance of old growth characteristics in Eastern Oregon forests. The relevant portion of the rule states:

> Outside of [late and old structural stages LOS], many types of timber sale activities are allowed. The intent is still to maintain and/or enhance LOS components in stands subject to timber harvest as much as possible, by adhering to the following standards:
>
> > a) Maintain all remnant late and old seral and/or structural live trees ≥ 21-inch dbh that currently exist within stands proposed for harvest activities.
>
> [From the Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales, Regional Forester's Forest Plan Amendment #2.]

The Eastside Screens were established as one of several temporary land management provisions designed to protect water resources and wildlife habitats. As noted above, this temporary effort was never amended in favor of a more appropriate, permanent solution which has resulted now in an effort to revise the 21-inch rule and provide forest managers more flexibility to address overcrowded stands of trees now deemed a wildfire hazard.

While the Eastside Screens and 21 inch rule has resulted in larger diameter trees within Eastside forests, the underlying canopy trees for the most part have not been proactively and sustainably managed due to three primary factors; a) litigation, b) poor market conditions resulting from an overabundance of cheap timber from other sources, making many local and regional timber sales uneconomic, and c) underfunded/understaffed Forest Service programs without the resources to implement the large, landscape scale projects needed to address forest-wide overstocking problems. These three factors, combined with a history of aggressive fire suppression, have resulted in grossly over-stocked forests exhibiting species mix and structure ripe for disease, insect outbreaks, and catastrophic fire, particularly in drought conditions. Amending the Eastside Screen rule in the short term could make timber sales economical, but it merely exacerbates the overall problem.

---

**Treaty June 9, 1855 ~ Cayuse, Umatilla and Walla Walla Tribes**

CTUIR DNR Letter to Shane Jeffries
Subject: Revision of Eastside Screens Rule
October 13, 2020
Page 3 of 4

When forest management is constrained to maintain all trees over 21-inches DBH, stands should be managed by removing smaller trees to maintain consistency with its site potential. When foresters are required to maintain any trees 21-inches DBH and above all of the stocking potential is tied up in 21-inch DBH or larger trees which limits how much regeneration can be allowed take place if a healthy forest is the goal. When a stand reaches its potential trees begin to slow growth, show signs of stress, get infected with disease or insect and eventually die. This process coupled with over a century of fire suppression contributes to fuel loading and wildfire risk. There are thousands of examples in the arid west of forest stands that have been impacted from over stocking.

**CTUIR Management Visions**
The CTUIR DNR supports keeping large trees on the landscape. In the absence of normative fire regimes, stands must be managed to maintain health and vigor that provide healthy forests and provide many of the First Foods required to secure the Tribe's health and culture. We have developed our First Foods River and Upland Visions, attached, to explicitly identify a vision for properly functioning floodplain and upland landscapes and ensure healthy, resilient, and dynamic ecosystems capable of providing First Foods that sustain the continuity of the Tribe's culture.

Our Upland Vision is based on four fundamental touchstones, including:

1. Soil Stability (physical and chemical);
2. Hyrdologic Function – water capture, storage, and safe release;
3. Landscape Pattern; and
4. Biotic Integrity.

In the Upland Vision you will find sections on "Dry Conifer Forest" and "Moist Conifer Forest" as they relate to primarily biotic integrity, landscape pattern, and hydrologic function. It is our hope this information will assist in the development of appropriate standards to replace or enhance the Eastside Screens.

**Conclusion**
The current proposal will alter rules governing the management of approximately 10 million acres, but does not clearly identify and define what metrics will be used to evaluate whether or not to retain old-growth trees on the landscape. Consequently, protection of old growth devolves into a management option rather than an enforceable standard. Because of the scope and scale of this issue, and the current ambiguity of the proposal, the CTUIR recommends the Forest Service engage in an EIS process to correct perceived shortcomings of the existing rule with specific metrics that can be communicated, managed, and enforced. Providing funding for staff implementation of this rule change, appropriate coordination with the CTUIR, conservationists, and forest product industries, will be necessary to make implementation effective to our mutual benefit.

CTUIR DNR Letter to Shane Jeffries
Subject: Revision of Eastside Screens Rule
October 13, 2020
Page 4 of 4

Finally, in the time of COVID 19 when many staff are working remotely and in-person meetings are practically impossible, 60 days is a very short turn around particularly during fire season to adequately review the complexities of this rule-change and the comment should be extended to 90 days.

The CTUIR DNR looks forward to working with the Forest Service in the development of this rules to best manage the forests in our aboriginal use lands and ensure that management guidance and decisions take into account impacts to the Forest Service's trust responsibility and treaty-protected resources. This proposed rule does not seem to have taken either of those into account. If you have any questions regarding these comments or wish to schedule meetings to discuss these comments, please contact Audie Huber, Intergovernmental Affairs Coordinator, at 541-429-7228 or AudieHuber@ctuir.org.

Respectfully,

Eric Quaempts, Director
Department of Natural Resources

Enclosure:  CTUIR DNR First Foods Upland Vision,
            CTUIR DNR Umatilla River Vision

---

**Treaty June 9, 1855 ~ Cayuse, Umatilla and Walla Walla Tribes**