TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

HAYLEY A. CARPENTER, CA Bar # 312611
TYLER M. ALEXANDER, CA Bar # 313188
ANTHONY D. ORTIZ, DC Bar # 978873
Trial Attorneys
Natural Resources Section
Wildlife & Marine Resources Section
150 M St. NE
Washington, D.C. 20002
Phone:  (202) 305-0242 (Carpenter)
           (202) 305-0238 (Alexander)
           (202) 307-1147 (Ortiz)
hayley.carpenter@usdoj.gov
tyler.alexander@usdoj.gov
anthony.d.ortiz@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, an Oregon non-profit corporation; **OREGON WILD**, an Oregon non-profit corporation; **CENTRAL OREGON LANDWATCH**, an Oregon non-profit corporation; **SIERRA CLUB**, a California non-profit corporation; **GREAT OLD BROADS FOR WILDERNESS**, a Montana non-profit corporation; and **WILDEARTH GUARDIANS**, a New Mexico non-profit corporation,<br><br>          Plaintiffs, | Case No. 2:22-CV-00859-HL<br><br><br>**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

v.


**HOMER WILKES**, in his official capacity as Undersecretary for Natural Resources and Environment; **GLENN CASAMASSA**, in his official capacity as Regional Forester for Region 6; and the **UNITED STATES FOREST SERVICE**,

Federal Defendants,

And

**AMERICAN FOREST RESOURCE COUNCIL; EASTERN OREGON COUNTIES ASSOCIATION**,

Defendant-Intervenors.

## MOTION

Under Federal Rule of Civil Procedure 56(a) and Local Rule 56-1, Federal Defendants cross-move this Court for summary judgment on all claims brought by Plaintiffs. These claims allege that Federal Defendants violated the National Forest Management Act, National Environmental Policy Act, Endangered Species Act, and the Administrative Procedure Act in issuing the Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington Forest Plans Amendment. In compliance with Local Rule 7(a), the Parties made a good faith effort to resolve these disputes but were unable to do so.

The Ninth Circuit has endorsed the use of Rule 56 motions for summary judgment in reviews of agency administrative decisions under the Administrative Procedure Act. *See, e.g.*, *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). Under Rule 56, "[t]he moving party is entitled to summary judgment as a matter of law where . . . there are no genuine issues of material fact in dispute." *Id.* at 1472. Because the role of the Court under the Administrative Procedure Act is not to "find facts" but to review the Administrative Record to determine whether the federal agencies considered the relevant factors and reached conclusions that were not arbitrary and capricious, there can be no genuine issue of material fact, and summary judgment is the appropriate resolution of this case.

In support of this cross-motion, Federal Defendants submit the following memorandum in support, the Revised Administrative Record lodged on December 9, 2022, ECF No. 37, and any argument that may be presented in Court. As Federal Defendants will show, the Amendment satisfies all statutory requirements and enjoys strong scientific support. The Court should grant judgment in favor of Federal Defendants on all claims, dismiss this action with prejudice, and grant any other such relief that is appropriate.

**MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

I.    INTRODUCTION..................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................2

    A.    Background of the Eastside Screens ...................................................2

        1.    Ecosystem Standard....................................................................4

        2.    Wildlife Standard........................................................................4

        3.    Riparian Standard .......................................................................6

    B.    Changing Conditions in the Eastside Forests.....................................6

    C.    Eastside Screens Amendment .............................................................7

III.    LEGAL BACKGROUND...................................................................................11

    A.    NFMA.................................................................................................11

    B.    NEPA..................................................................................................12

    C.    APA ....................................................................................................12

    D.    ESA.....................................................................................................13

IV.    ARGUMENT......................................................................................................14

    A.    Plaintiffs' Speculative Arguments Reveal that Plaintiffs' Facial Challenge to the Amendment is Not Justiciable. ..........................................................14

    B.    The Eastside Screens Amendment was not Subject to the Administrative Objection Process. .............................................................15

        1.    The Department did not violate its regulations by not providing an administrative objection period for the Eastside Screens Amendment.................16

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL                                                    iv

2.      Neither equitable considerations nor the *Wild Virginia* ruling weigh in favor of granting judgment to Plaintiffs on this Claim. ...............................................22

C.      After Completing an EA, the Forest Service Reasonably Found the Amendment Had No Significant Environmental Effects. ........................................................24

1.      The Body of Scientific Literature Supports the Forest Service; Some Dissent Does Not Make the Amendment "Highly Controversial." .............................26

i.      The Forest Service reasonably found that a rigid 21-inch rule inhibits forest recovery.....................................................................................................28

ii.      The Forest Service's vegetation analysis confirms the Amendment will not have significant environmental effects. ...........................................................33

2.      The Amendment Does Not Threaten "Highly Uncertain" or "Unique or Unknown Risks."...........................................................................................34

3.      The Amendment Does Not Authorize Timber Harvest in Riparian Areas And So Has No Impacts on Listed Aquatic Species. ..............................................36

D.      The Forest Service complied with NEPA by taking a hard look at the mandatory nature of the Eastside Screens Amendment guidelines and at the potential impacts to aquatic species and riparian habitat.....................................................37

1.      The Forest Service was correct in assuming that the Eastside Screens Amendment guidelines would be mandatory....................................................38

2.      The Forest Service correctly assumed that continued compliance with PACFISH and INFISH ensured that the Eastside Screens Amendment would have no effect on aquatic species.................................................................39

E.    The Forest Service More Than Satisfied its ESA Obligations and the Record Supports its "No Effect" Determination for Aquatic Species..............................42

    1.    The Forest Service Met its Obligations Under Section 7 of the ESA..............43

    2.    The Record Supports the Forest Service's "No Effect" Finding....................43

F.    The Forest Service Discharged its Tribal Trust Obligations Through the NEPA Process. ..................................................................................................................48

V.    CONCLUSION.................................................................................................49

# <u>TABLE OF AUTHORITIES</u>

Cases                                                                      Page(s)

*All. for the Wild Rockies v. Savage*,
897 F.3d 1025 (9th Cir. 2018) .................................................................48

*Am. Wild Horse Campaign v. Bernhardt*,
    963 F.3d 1001 (9th Cir. 2020) .........................................................28, 32

*B.R. v. Garland*,
    26 F.4th 827 (9th Cir. 2022) ...................................................................39

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) ...................................................................................25

*Bark v. Northrop*,
    No. 3:13-CV-00828-AA, 2016 WL 1181672 (D. Or. Mar. 25, 2016)....................................34

*Bark v. U.S. Forest Serv.*,
    958 F.3d 865 (9th Cir. 2020) ...................................................................31

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ....................................................25, 26, 32

*Carattini v. Salazar*,
    No. CIV–09–489–D, 2010 WL 4568876 (W.D. Okla. Nov. 3, 2010)....................................49

*Cascadia Wildlands v. Williams*,
    251 F. Supp. 3d 1349 (D. Or. 2017)..........................................................32

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...................................................................................14

*Conservation Cong. v. U.S. Forest Serv.*,
    No. 2:16–cv–00864–MCE–AC, 2018 WL 2427640 (E.D. Cal. May 30, 2018) .....................37

*Defs. of Wildlife v. Flowers*,
    414 F.3d 1066 (9th Cir. 2005) .................................................................45

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ...................................................................33

*Forest Guardians v. U.S. Forest Serv.*,
    329 F.3d 1089 (9th Cir. 2003) .................................................................... 11, 30

*Friends of Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.*,
    528 U.S. 167 (2000) ......................................................................................... 14

*Friends of Rapid River v. Probert*,
    427 F. Supp. 3d 1239 (D. Idaho 2019) ............................................................. 46

*Friends of Santa Clara River v. U.S. Army Corps of Eng'r*,
    887 F.3d 906 (9th Cir. 2018) ............................................................................ 47

*Friends of the River v. U.S. Army Corps of Eng'rs*,
    870 F. Supp. 2d 966 (E.D. Cal. 2012) .............................................................. 13

*Greenpeace Action v. Franklin*,
    14 F.3d 1324 (9th Cir. 1992) ............................................................................ 31

*Gros Ventre Tribe v. United States*,
    469 F.3d 801 (9th Cir. 2006) ............................................................................ 48

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) ............................................................................ 11

*Idaho Wool Growers Ass'n v. Vilsack*,
    816 F.3d 1095 (9th Cir. 2016) .......................................................................... 28

*In. Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) .................................................................... 30, 32

*Karuk Tribe of Cal. V. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) .................................................................... 45, 46

*Klamath-Sisiyou Wildlands Ctr. v. U.S. Fish & Wildlife Serv.*,
    No. 1:20-cv-00952-AA, 2022 WL 4599259 (D. Or. Sep 30, 2022) ........................ 47

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................... 14, 15

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) .................................................................................... 25, 33

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) .......................................................................... 34

*Native Ecosystems Council v. U.S. Forest Serv.*,
  418 F.3d 953 (9th Cir. 2005) ................................................................. 38, 39, 42

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) ................................................................. 25, 26, 30

*Native Ecosystems Council v. Weldon*,
  697 F.3d 1043 (9th Cir. 2012) ................................................................. 11, 34

*Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*,
  966 F.3d 893 (9th Cir. 2020) ................................................................. 47

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
  241 F.3d 722 (9th Cir. 2001) ................................................................. 25

*Navajo Nation v. U.S. Dep't of Interior*,
  No. CV-03-00507-PCT-GMS, 2018 WL 6506957 (D. Ariz. Dec. 11, 2018) ......................... 49

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) ................................................................. 12

*Ohio Forestry Association v. Sierra Club*
  523 U.S. 726 (1998) ................................................................. 15, 35

*Pac. Rivers Council v. Thomas*,
  30 F.3d 1050 (9th Cir. 1994) ................................................................. 13, 45

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................. 12

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  776 F.3d 971 (9th Cir. 2014) ................................................................. 25

*Sierra Forest Legacy v. Sherman*,
  646 F.3d 1161 (9th Cir. 2011) ................................................................. 30

*State of Cal. v. Block*,
  690 F.2d 753 (9th Cir. 1982) ................................................................. 32

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................. 14

*Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.*,
  100 F.3d 1443 (9th Cir. 1996) ................................................................. 46, 47

*All. for the Wild Rockies v. Savage,*
209 F. Supp. 3d 1181 (D. Mont. 2016) ................................................47

*The Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) ................................................passim

*Tri-Valley CARES v. U.S. Dep't of Energy,*
671 F.3d 1113 (9th Cir. 2012) ................................................43, 44

*U.S. Forest Serv.,*
451 F.3d 1005 (9th Cir. 2006) ................................................37

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
435 U.S. 519 (1978) ................................................12, 23

*Wasco Prods. v. Southwall Techs., Inc.,*
435 F.3d 989 (9th Cir. 2006) ................................................2

*Wild Va. v. U.S. Forest Serv.,*
24 F.4th 915 (4th Cir. 2022) ................................................23, 24

*WildEarth Guardians v. Provencio,*
923 F.3d 655 (9th Cir. 2019) ................................................35

Statutes

5 U.S.C. § 706(2)(A) ................................................12

7 U.S.C. § 2202 ................................................19

7 U.S.C. § 6961(b) ................................................17, 18

7 U.S.C. § 6961(c)(1) ................................................18, 19

16 U.S.C. § 475 ................................................2

16 U.S.C. § 528 ................................................2

16 U.S.C. § 1531(b) ................................................13

16 U.S.C. § 1536 ................................................45

16 U.S.C. § 1536(a)(2) ................................................13

16 U.S.C. § 1536(c)(1) ................................................13

16 U.S.C. § 1604(a) ................................................28

16 U.S.C. § 1604(e)(1) .................................................................................................11

16 U.S.C. § 1604(f)(4) .................................................................................................12

16 U.S.C. § 1604(f)(5) .................................................................................................27

42 U.S.C. § 4321-4370m-12 ........................................................................................12

42 U.S.C. § 4332(C) ...............................................................................................20, 24

42 U.S.C. § 4332(E) .....................................................................................................25

Code of Federal Regulations

7 C.F.R. § 2.12 .............................................................................................................18

7 C.F.R. § 2.20(a)(2)(ii) ..........................................................................................18, 19

36 C.F.R. § 218.1-218.16 ............................................................................................24

36 C.F.R. § 218.13(b) ..................................................................................................24

36 C.F.R. § 218.3(a) .....................................................................................................20

36 C.F.R. § 219.13(a) ...................................................................................................12

36 C.F.R. § 219.15(d)(3) .........................................................................................36, 38

36 C.F.R. § 219.16(c)(1) .........................................................................................22, 23

36 C.F.R. § 219.16(d) .............................................................................................22, 23

36 C.F.R. §219.50-219.62 ...........................................................................................24

36 C.F.R. § 219.51(b) .............................................................................................passim

36 C.F.R. § 219.51(d) .............................................................................................22, 24

36 C.F.R. § 219.52 .......................................................................................................21

36 C.F.R. § 219.56(e) ..................................................................................................19

36 C.F.R. § 219.60 .......................................................................................................18

36 C.F.R. § 219.7(a) .....................................................................................................27

36 C.F.R. § 220.4(a)................................................................................20

36 C.F.R. § 220.4(e)(2)............................................................................8

40 C.F.R. § 1501.6..................................................................................12

40 C.F.R. § 1502.1..................................................................................12

40 C.F.R. § 1508.23 ...............................................................................20

40 C.F.R. § 1508.27................................................................................25

40 C.F.R. § 1508.27(b)(5).......................................................................34

40 C.F.R. § 1508.27(b)(9).......................................................................36

40 C.F.R. § 1508.9..................................................................................12

40 C.F.R. § 1508.9(a)..............................................................................25

40 C.F.R. § 1508.9(b).............................................................................25

50 C.F.R. § 402.01..................................................................................14

50 C.F.R. § 402.12..................................................................................45

50 C.F.R. § 402.14..................................................................................45

50 C.F.R. § 402.14(a)-(b)........................................................................14

Federal Register

77 Fed. Reg. 21,162-01 (Apr. 9, 2012) ........................................ 12, 17, 24

51 Fed. Reg. 19,926 (June 3, 1986).………………………………………...45

85 Fed. Reg. 48,500 (Aug. 11, 2020)........................................................9

## ACRONYMS KEY

| | |
|---|---|
| APA | Administrative Procedure Act |
| DN/FONSI | Decision Notice / Finding of No Significant Impact |
| dbh | diameter at breast height |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| FWS | U.S. Fish & Wildlife Service |
| HRV | Historic Range of Variability |
| INFISH | Inland Native Fish Strategy |
| LOS | Late Old Structure |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| NMFS | National Marine Fisheries Service |
| PAC | Protected Activity Center |
| PACFISH | Pacific Anadromous Fish Strategy |
| RHCA | Riparian Habitat Conservation Area |
| RMO | Riparian Management Objective |

# I.   <u>INTRODUCTION</u>

Plaintiffs' challenge to the Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington ("Eastside Screens Amendment" or "Amendment") amounts to a repudiation of modern forestry science and, if successful, a dangerous roadblock to protecting our national forest lands from climate change.  The 1994 Interim Management Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales ("Eastside Screens") was meant to set *short-term* restrictions to protect large trees until the Forest Service issued new science-informed management direction.  The Eastside Screens Amendment is that management direction: the Amendment replaces an inflexible prohibition on cutting trees over 21-inches in diameter with a nuanced guideline that provides needed management flexibility while remaining staunchly protective of old and large trees.  Not only is the Amendment's new guideline protective, it is critical for restoring ecological conditions that will maintain old trees into the future.  In particular, the Amendment preferences retention of fire tolerant tree species and enables the Forest Service to remove faster-growing, fire intolerant tree species that are currently over-represented on the landscape and tend to out-compete fire tolerant species for space and resources.

Driven by climate change, the threat of catastrophic wildfire, long-term drought, and other disturbances on the National Forests has increased dramatically over the past three decades. Because of past fire suppression, the National Forests in eastern Oregon and southeastern Washington are denser and contain a higher proportion of fire intolerant tree species than they contained historically.  The combination of increased disturbances and changed forest and climactic conditions has resulted in tree mortality and habitat destruction.  The weight of scientific consensus counsels the Forest Service to mitigate these threats by actively managing

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                           1

forests to favor more historically prevalent, fire tolerant species. But that change is impossible if the Forest Service cannot cut any competing fire intolerant species over 21 inches in diameter.

In addition to bringing management of the Eastside Forests into the twenty-first century, the Eastside Screens Amendment complies with the National Forest Management Act ("NFMA"), the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the Endangered Species Act ("ESA"). Federal Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment, and grant judgment to Federal Defendants on Plaintiffs' claims.

## II.    FACTUAL BACKGROUND[1]

### A.    Background of the Eastside Screens

This case concerns the National Forests on the east side of the Cascade Mountain Range in Oregon and Washington, including the Colville, Deschutes, Malheur, Ochoco, Umatilla, Wallowa-Whitman, and Fremont-Winema National Forests ("Eastside Forests"). AR14383.[2] Congress has instructed the Forest Service to manage these lands under the principles of multiple use and sustained yield, balancing ecological concerns, recreational uses, and the need for timber production. 16 U.S.C. §§ 475, 528.

---

[1] Plaintiffs include argument in their Factual Background section, much of which does not appear in their Complaint. *Compare* Pls.' Am. Compl. ("Compl.") ¶¶ 208-253, ECF No. 12, *with* Pls.' Mem. In Supp. of Summ. J. ("Pls.' Br.") 2-14, ECF No. 41; *see, e.g.* Pls.' Br. 8-9, 9 n.12 (contending that Federal Defendants unlawfully omitted the NEPA scoping process for the Amendment, when this argument does not appear in the Amended Complaint). These arguments are not properly before the Court. *Wasco Prods. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings." (citation omitted)).

[2] Defendants lodged the Administrative Record on October 17, 2022, and a Revised Administrative Record on December 9, 2022. ECF Nos 29, 37. Citations to the Record are denoted as AR[bates number].

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    2

The Forest Service adopted the Eastside Screens in 1994 in response to Congressional concerns about the loss of old and large trees in the Eastside Forests.  AR34508.  The Eastside Screens amended the forest plans for the eight Eastside Forests to establish a set of management policies for approximately 7,8676,951 acres of National Forest land.  AR34510.  The purpose of the Eastside Screens was "to preserve those components of the landscape—old forest abundance, wildlife habitat in late and old structural stages, and riparian areas—which new information suggests is vitally important to certain species of wildlife and fish and to the overall vegetative structure of the forest."  AR14385.  The Eastside Screens were meant to provide a short-term preservation of status quo numbers of old and large trees until the agency developed long-term direction.  AR14384 (the Eastside Screens 1994 Environmental Assessment ("EA") stating that "Region 6 of the Forest Service has a short-term need to maintain future management options for consideration in the Eastside EIS.")  Despite this intention, the Eastside Screens remained in place, unchanged—except for a minor amendment in 1995, AR14484, 14632-41, and the replacement of the interim riparian standard with the more rigorous PACFISH and INFISH, as explained in detail below—until the 2021 Amendment.

The Eastside Screens established a screening process for proposed timber harvest projects to prevent the removal of old and large trees.  AR14383, 14405-31.  Plaintiffs' case focuses almost exclusively on one of the standards established by the Eastside Screens: the prohibition on cutting any tree over 21 inches in diameter at breast height ("dbh") in certain circumstances.  Pls.' Br. 4-6, 24-45.  Because this diameter limit was based solely on size, it only protected old trees to the extent those trees were over 21 inches dbh; in other words, the diameter limit used large size as an imperfect proxy for old age.  Old trees are important because they "maintain[] a legacy of species genetics and provid[e] ecosystems with long-lived structure with demonstrated

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    3

resistance to disturbance." AR34524 (citations and footnote omitted). Old trees are also "more drought resistant in the absence of intense competition from other trees." AR34524-25. Large trees, which "are not necessarily old . . . do not have the same genetic or physiological characteristics as old trees," but "can enhance ecological function . . . particularly where old trees may be lacking." AR34525. Thus, the Eastside Screens' diameter limit standard rigidly preserved all large trees with the intent of maintaining old trees and their associated ecological benefits in the short term. AR14384.

Under the Eastside Screens, proposed timber sales are screened under three standards: an ecosystem standard, a wildlife standard, and a riparian standard. AR14482-84.

### 1.    Ecosystem Standard

The Eastside Screens ecosystem standard requires the Forest Service to compare current conditions of a proposed timber sale area and the existing stands of late and old structure ("LOS")[3] trees with the historical range of variability ("HRV"), which is "the historical pattern and abundance of structural states within watersheds, using pre-settlement (1800-1900) condition as a reference point." AR14386; AR34723-24 (text of the standard). The Eastside Screens identify two types of LOS forest: Multi-strata with Large Trees, which refers to LOS with multiple levels of canopy, and Single Strata with Large Trees, which refers to LOS with a single level of canopy. AR34729.

### 2.    Wildlife Standard

Under the Eastside Screens wildlife standard, the Forest Service imposes certain harvesting restrictions according to whether the condition of a sale area is within the HRV for

---

[3] Forest is considered LOS "where a minimum number of large trees per acre (tpa) is reached." AR34451.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    4

LOS forest.  AR34729-34.  The wildlife standard includes the only management directive

changed by the Eastside Screens Amendment: the prohibition on cutting trees over 21 inches dbh

in certain contexts.  AR34753, 34729-30.  The wildlife standard divides a proposed timber

harvest into two scenarios: Scenario A applies when the LOS forest is below HRV, and Scenario

B applies when LOS forest is at or above HRV.  AR34729.  Within Scenario A, applicable

standards are further divided based on whether the proposed harvest would be within or outside

of an LOS stand.  AR34729-30.  The following chart summarizes the scenarios:

|  | Scenario A1 | Scenario A2 | Scenario B |
|---|---|---|---|
| HRV Status / Whether Proposed Harvest is in LOS | Any one type of LOS Forest (multi or single canopy) is below HRV / Proposed harvest is within LOS | Any one type of LOS Forest (multi or single canopy) is below HRV / Proposed harvest is outside of LOS | Both types of LOS are at or above HRV / Proposed harvest is either within or outside of LOS |
| Timber Harvest Constraints | Harvest is allowed to either: (1) maintain or enhance LOS, or (2) manipulate one type of LOS to move stands into the LOS stage that is HRV-deficient. 21-Inch rule does not apply.[4] | 21-Inch rule applies. | Harvest may occur, but LOS conditions may not fall below HRV |

AR34729-34.  The Eastside Screens Amendment only alters the portion of the wildlife

standard that applies to Scenario A2 and the snag (upright, dead trees) retention standard

---

[4] Plaintiffs claim that pre-Amendment, the 21-inch limit applied to Scenario A1, Pls.' Br. 5, 10-11, but this is incorrect.  The 21-inch limit is first mentioned only for situations in which proposed harvest is located outside of LOS (Scenario A2).  AR34729 (the language of the wildlife standard, wherein the 21-inch limit is stated for the first time after the prefatory clause "[O]utside of LOS . . .").  The Forest Service, however, acknowledges that individual Forests have implemented the Eastside Screens differently over the past 25 years.  AR34509.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                        5

(by strengthening it).  AR34729-30, 34753.  The wildlife standard includes other requirements unchanged by the Amendment, including requirements regarding connectivity between LOS forest, maintaining downed logs, and supporting goshawk (a sensitive bird species) habitat.  AR34729-34.

### 3.    Riparian Standard

The Inland Native Fish Strategy ("INFISH") and Pacific Anadromous Fish Strategy ("PACFISH") are two sets of standards for aquatic species habitat that replaced the Eastside Screens riparian standard in 1994 (PACFISH) and 1995 (INFISH).[5]  AR34508.  Both PACFISH and INFISH contain standards to achieve Riparian Management Objectives ("RMOs") and only apply to projects within Riparian Habitat Conservation Areas ("RHCAs") or projects outside the RHCAs that would degrade the condition of RHCAs.  AR14717, AR14742, AR15052, AR15056.  RMOs establish habitat parameters that define fish habitats and serve as indications against which goals can be measured.  AR14744.  PACFISH and INFISH prohibit projects that would hinder attainment of RMOs where the riparian area goal is to support characteristics of healthy watersheds, riparian areas, and associated fish habitats.  AR14831-32, 15056.  INFISH and PACFISH also prohibit harvest of all trees—regardless of diameter—in RHCAs with two limited exceptions.  AR14838, 15062.

### B.    Changing Conditions in the Eastside Forests

In 2020, the Forest Service began the process of amending the Eastside Screens.

---

[5] PACFISH provides management direction for anadromous fish-producing watersheds on Federal lands in eastern Oregon, Washington, Idaho, and portions of California.  AR14709. INFISH provides management direction to protect habitat and populations of resident native fish within watersheds on 22 National Forests in eastern Oregon, eastern Washington, Idaho, western Montana, and portions of Nevada not covered by PACFISH.  AR15037.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    6

AR34649-50.  The Forest Service initiated the Amendment because "[s]cientific research and over 20 years of on-the-ground experience implementing the 21-inch standard demonstrate[d] a need to change policy to better adapt forest conditions to current disturbance regimes and expected climate-induced changes including longer fire seasons, larger areas burned and increased risk of insect and disease mortality in forests."  AR34511.  The Forest Service found that "[a] variety of empirical studies and science syntheses demonstrate that protection of all trees greater than 21 inches prevents restoration of conditions that are most likely to maintain old trees into the future."  AR34512.

As a result of decades of fire suppression, forests that historically experienced frequent fires have become denser relative to the HRV and have shifted away from fire tolerant tree species to faster-growing, fire intolerant tree species.[6]  AR34511.  In the face of climate change and drought, this increased density and altered stand composition exacerbates the risk of severe wildfire, threatening old and large trees.  AR34563, 65.  The Eastside Screens' 21-inch limitation has prevented the Forest Service from restoring the ecological integrity of these landscapes and moving them toward the HRV by cutting larger fire intolerant trees.  AR34511-12.

## C.    Eastside Screens Amendment

The Forest Service went above and beyond public notice requirements to include the public, tribal governments, and other governmental entities in the development of the

---

[6] In their factual background section, Plaintiffs argue that grand and white fir, fire intolerant tree species, were "dominant species" in "large areas" of the Eastside Forests.  Pls.' Br. 8.  Plaintiffs' only support for this statement is a chart from the Amendment EA that identifies percentages of potential vegetation zones for the Eastside Forests.  *Id.* (citing AR34526).  Critically, Plaintiffs omit that potential vegetation zones describe species stratification "**in the absence of disturbance**."  AR34525 (emphasis in original).  The historical frequent and mixed fire regimes of the Eastside Forests would have killed many of the grand and white fir historically, AR34560, greatly reducing the utility of the potential vegetation zones measure as a measure of historic species composition of the Eastside Forests.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                           7

Amendment.  The Forest Service complied with NEPA's scoping requirements by holding three

extensive public forums, and conducting over 40 meetings with key counties, states, tribal

governments, interest groups, and other organizations that asked for more time with the Forest

Service planning team.  AR32115, 33024-51; *see* 36 C.F.R. § 220.4(e)(2) ("no single scoping

technique is required or prescribed").  Although Plaintiffs protest that the Forest Service

provided scheduled days and agendas for the forums beforehand, Pls.' Br. 8-9, it is unclear how

public comment would have been better served by forums that were not scheduled for a

particular day or time, or were not conducted with an agenda.  In fact, the Forest Service met

with all presenters (including non-Forest Service presenters) for the first forum, the Scientific

Forum, beforehand, and none voiced concerns over the agenda.  AR33048.[7]  In addition to the

Science Forum, the Forest Service also held a Partner Technical Workshop and an

Intergovernmental Technical Workshop.  AR32854, AR32778, AR32505, AR32427.[8]

   The Forest Service issued the Preliminary EA, or draft EA, in August 2020.  AR33213-

33387.  The agency proposed replacing the 21-inch rule with a guideline that would protect and

promote old trees and generally retain large trees, but would allow for cutting of fire intolerant

trees larger than 21 inches dbh in specified circumstances.  AR33223–24.  The Preliminary EA

explicitly assumed that the 21-inch limitation would not apply in Scenario A1 for all action

alternatives.  AR33240; *see also supra* n.4.  The Forest Service also explicitly assumed that,

under the no-action or Current Management Alternative, individual Forests would continue to

_____

[7] In discussing the Scientific Forum, Plaintiffs overestimate disagreement within the scientific
community regarding the historical species composition of Eastside Forests and the need to
remove larger fire intolerant trees from the landscape.  *See* Pls.' Br. 9; see *infra* Section IV.C.
[8] Although the Forest Service inadvertently and unfortunately held the Intergovernmental
Technical Workshop on the National Indian Day holiday, Amicus Party the Nez Perce Tribe had
ample opportunity to shape the Amendment at weekly interdisciplinary planning team meetings,
at which the Tribe participated as a Cooperating Agency.  AR49255, AR33166-68, AR33575-76.
*Greater Hells Canyon Council, et al. v. Wilkes, et al.*

apply the 21-inch limitation to Scenario A1 in an uneven manner.  *Id.*  These assumptions were clear and transparent, and the Forest Service made them to ensure its analysis disclosed the highest degree of impact the Amendment could have.

Following the issuance of the Preliminary EA, the Forest Service issued a notice in the Federal Register opening a 30-day comment period for the proposed Amendment.  AR 33601-02; 85 Fed. Reg. 48,500 (Aug. 11, 2020).  The Forest Service held two public webinars to provide an overview of the Preliminary EA, AR33767, and extended the comment period by 60 days upon multiple requests.  AR33766.  Overall, 3,300 letters, of which 336 were unique, were submitted during the comment period, AR34650, including Plaintiffs' comment and an attached report and letter, AR48133-216.  Any actual scientific disagreement relevant to Plaintiffs' claims is discussed below in Section IV.C, but it bears noting that Plaintiffs greatly exaggerate the negativity of public comments.  Pls.' Br. 11-12.  For instance, Drs. Franklin, Johnson, and Seager expressed in their comment that they generally supported an effort to amend the 21-inch rule.  AR48118 ("Overall, we support the effort to decrease the barriers to restoration of dry forests (e.g., dry pine and mixed conifer forest types that were dominated by frequent fire) in eastern Oregon.").  Regarding this comment letter and others that expressed deeper concerns, the Amendment's "interdisciplinary team carefully considered each letter. As a result of comments received, the team analyzed a new alternative [in the Final EA] and completed additional resource reviews and analyses."  AR34650; AR34513.

In December 2020, the Forest Service issued a biological assessment pursuant to Section 7 of the ESA that found that the Amendment "May Affect, but is Not Likely to Adversely Affect" the ESA-listed species of the gray wolf and Spalding's catchfly and the ESA-proposed species of the wolverine.  AR33999-34026.  The U.S. Fish & Wildlife Service ("FWS")

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    9

transmitted a Letter of Concurrence that concurred with the Forest Service's ESA findings. AR34162-34173.

The Final EA and the Decision Notice / Finding of No Significant Impact ("DN/FONSI") were issued in January 2021.  AR34504-34749, AR34750-67.  The decision changed only one standard in the Eastside Screens: the 21-inch limitation applicable to Scenario A2 and the related 21-inch dbh snag language.  AR34753.  The new guideline language is as follows:

> Outside of LOS, many types of timber sale activities are allowed.  The intent is still to maintain and/or enhance a diverse array of LOS conditions in stands subject to timber harvest as much as possible, by adhering to the following plan components: **Managers should retain and generally emphasize recruitment of old trees and large trees, including clumps of old trees**. Management activities should first prioritize old trees for retention and recruitment.  If there are not enough old trees to develop LOS conditions, large trees should be retained, favoring fire tolerant species where appropriate.  Old trees are defined as having external morphological characteristics that suggest an age ≥ 150 years. **Large trees are defined as grand fir or white fir ≥ 30 inches dbh or trees of any other species ≥ 21 inches dbh.** Old and large trees will be identified through best available science.  Management activities should consider appropriate species composition for biophysical environment, topographical position, stand density, historical diameter distributions, and spatial arrangements within stands and across the landscape in order to develop stands that are resistant and resilient to disturbance.

AR34753-54 (emphasis added).  As discussed in detail below in Section IV.B, the Forest Service did not hold an administrative objection period for the Amendment because it was proposed by the Under Secretary for Natural Resources and Environment under 36 C.F.R. § 219.51(b).

Plaintiffs filed their Complaint in June 2022, ECF No. 1, and then an Amended Complaint in August 2022, Compl.  Plaintiffs' Amended Complaint has three claims.  The First Claim alleges that the Forest Service should have prepared an EIS under NEPA.  Compl. ¶¶ 208-231.  The Second Claim contends in Count One that the Forest Service should have held an objection period under the NFMA planning regulations, and in Count Two that the Forest

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    10

Service failed to go through the proper procedure for amending a forest plan under NFMA.[9]
Compl. ¶¶ 233-247.  Plaintiffs' Third Claim alleges that the Forest Service failed to consult
properly on the Amendment under the ESA.  Compl. ¶¶ 248-253.

### III.    LEGAL BACKGROUND

#### A.    NFMA

"NFMA and its implementing regulations provide for forest planning and management
by the Forest Service on two levels: (1) forest level and (2) individual project level."  *Native
Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  The Forest Service first
develops a forest plan containing "broad, long-term plans and objectives for the entire forest."
*Id*.  These plans "must provide for multiple uses" of forest resources.  *Idaho Sporting Cong., Inc.
v. Rittenhous*e, 305 F.3d 957, 961 (9th Cir. 2002) (citing 16 U.S.C. § 1604(e)(1)).  The agency
then implements the forest plan through site-specific projects.  *Weldon,* 697 F.3d at 1056.
"While NFMA requires that the proposed site-specific actions be consistent with the governing
Forest Plan, the Forest Service's interpretation and implementation of its own forest plan is
entitled to substantial deference."  *Id*. (citing *Forest Guardians v. U.S. Forest Serv*., 329 F.3d
1089, 1097 (9th Cir. 2003)).  The Forest Service may amend forest plans, and those "[p]lan
amendments may be broad or narrow," 36 C.F.R. § 219.13(a), ranging from project-specific to
forest-wide, National Forest System Land Management Planning, 77 Fed. Reg. 21,162-01,
21,268 (Apr. 9, 2012) ("Management Planning").  *See also* 16 U.S.C. § 1604(f)(4) (authorizing
forest plans to be amended "in any manner whatsoever").

---

[9] Plaintiffs do not argue Claim Two, Count Two in their summary judgment brief, Pls.' Br. 18-
45, and thus this Count is waived.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    11

B.    **NEPA**

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA imposes procedural rather than substantive requirements. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

NEPA's implementing regulations provide that an agency may prepare an EA, as the Forest Service prepared for the Eastside Screens Amendment, to determine whether a proposed federal action will have a significant impact. 40 C.F.R. § 1508.9 (2020). If the agency finds that the proposed action will have no significant impact, it issues a DN/FONSI, and the NEPA process is completed. 40 C.F.R. § 1501.6. If the agency concludes in the EA that there is a significant effect from the proposed project, the federal agency must prepare an EIS analyzing and disclosing these effects through a consideration of alternatives. 40 C.F.R. § 1502.1.

C.    **APA**

Challenges to agency action are reviewed under the APA. A court may set aside an agency action only if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal citation omitted). This is especially true in the context of management of National Forests, for "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands." *The Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008) (en banc).

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    12

### D.    ESA

The ESA was enacted "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Under ESA Section 7(a)(2), each federal agency must ensure that any action it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any listed species or result in the destruction or adverse modification of the species' designated critical habitat. 16 U.S.C. § 1536(a)(2). In fulfilling this obligation, each agency is required to "use the best scientific and commercial data available." *Id.* Under ESA Section 7, an action agency, like the Forest Service here, first inquires with the FWS whether any listed or proposed-to-be-listed species "may be present" in the proposed action area. *Id.* 1536(c)(1). If so, the action agency may prepare a biological assessment to determine whether the identified species "is likely to be affected by such action." *Id.* If the action agency independently determines that the action will have "no effect" on listed species or critical habitat, the agency has no further obligations under the ESA. *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered."); *Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 972 (E.D. Cal. 2012) (same). If, however, an agency determines that its actions "may affect" a listed species or its critical habitat, the agency must consult informally or formally with either FWS or the National Marine Fisheries Service ("NMFS"), depending on the species at issue. 50 C.F.R. §§ 402.01, 402.14(a)-(b).

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    13

# IV.    ARGUMENT

## A.    Plaintiffs' Speculative Arguments Reveal that Plaintiffs' Facial Challenge to the Amendment is Not Justiciable.

To have standing to sue "a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical[.]"  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Env't Services (TOC), Inc.*, 528 U.S. 167, 180-181 (2000)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565 n.2 (1992)).

As revealed in their briefing, Plaintiffs' alleged injuries are "conjectural or hypothetical" in the absence of a challenge to a Forest Service project proposing to harvest large trees. *Summers*, 555 U.S. at 493.  Plaintiffs speculate that future projects may lack protective prescriptions the Forest Service included when it modeled the effect of the Amendment, Pls.' Br. 33-34, or may harvest large trees in riparian areas in a manner harmful to protected species.  Pls.' Br. 37, 43-45.  But because Plaintiffs have not challenged a project with those features, these injuries are not "certainly impending."[10]  *Clapper*, 568 U.S. at 41 (rejecting speculation and assumptions that future communications would be intercepted by the government).  Alleging that future projects implementing the Amendment will "some day" harm Plaintiffs' interests does not suffice.  *Lujan*, 504 U.S. at 564.

---

[10] Indeed, some of the projects Plaintiffs mention in their declarations have not even undergone NEPA analysis yet.  Plaintiffs will have an opportunity to participate in that process and, if dissatisfied, seek judicial review.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    14

For this same reason, Plaintiffs' claims are also unripe.  In *Ohio Forestry Association v. Sierra Club*, the Supreme Court examined ripeness in the context of a challenge to portions of a forest plan that "do[] not give anyone a legal right to cut trees[] nor . . . abolish anyone's legal authority to object to trees being cut."  523 U.S. 726, 733 (1998).[11]  The Court held that those claims were unripe and that the reviewing court would benefit from "further factual development[,]" such as through a challenge to an implementing project, where the Forest Service must "focus upon a particular site, propose a specific harvesting method, prepare an environmental review, permit the public an opportunity to be heard, and (if challenged) justify the proposal in court."  *Id.* at 734; *accord id.* at 736-37.  So too here.  This Court would be better served by considering Plaintiffs' challenge to the Amendment in the factual context of a specific project.  Plaintiffs' speculative concerns about how the Amendment may be implemented may never manifest, and so reviewing Plaintiffs' claims "now may turn out to have been unnecessary."  *Id.* at 736.

Plaintiffs' speculation as to how the Amendment will be implemented shows that Plaintiffs lack an imminent injury in fact, and so lack standing.  Alternatively, in the absence of a challenged implementing project, Plaintiffs' speculative claims are not ripe for review.  The Court may dismiss Plaintiffs' Complaint for one (or both) of these reasons.

B.    **The Eastside Screens Amendment was not Subject to the Administrative Objection Process.**

Even if considered, each of Plaintiffs' claims fail.  Plaintiffs' Second Claim (Count One)—alleging that the U.S. Department of Agriculture (the "Department") was required to

---

[11] The Court contrasted this with portions of a plan that may "go forward without any additional consideration"—such as a change in a plan that "allow[s] motorcycles into a bird-watching area"—which the court implied may proceed immediately.  *Id.* at 738-39.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    15

provide an administrative objection process for the Amendment—represents an attack on the authority vested in the Under Secretary for Natural Resources and Environment ("Under Secretary") of the Department to directly manage our national forests.  *See* Compl. ¶¶ 233-241. Reflecting this vested authority, Departmental regulations allow the Under Secretary to make a *final* determination, foregoing the usual administrative objection process, for plans, plan amendments, or plan revisions that the Under Secretary "propose[s]."  36 C.F.R. § 219.51(b). Although sparingly used, this final determination authority is critical for allowing the agency to act nimbly in facing the many challenges threatening the health of our national forests.  Plaintiffs attempt to undermine this lawful exercise of authority by unreasonably narrowing the definition of "proposed" to exclude any decision signed by the Under Secretary if it happens to have been first introduced or identified by another department official.  This interpretation runs counter to the plain meaning of the regulation and to case law interpreting its language.  Therefore, the Court should grant summary judgment to Federal Defendants on Plaintiffs' Second Claim, Count One.

    1.      <u>**The Department did not violate its regulations by not providing an administrative objection period for the Eastside Screens Amendment.**</u>

Plaintiffs allege that the Forest Service violated Departmental regulations by exempting the Eastside Screens Amendment from the predecisional objection process.  Pls.' Br. 19-23.  The Department's regulations, however, provide that "[p]lans, plan amendments, or plan revisions proposed by the Secretary of Agriculture or the Under Secretary . . . are not subject to the [objection] procedures," but rather, "constitute[] the final administrative determination of the [Department]."  36 C.F.R. § 219.51(b).  Although the Under Secretary was identified as the Responsible Official in the Final EA, AR34505, and in the DN/FONSI, AR34751, Plaintiffs and Amicus Party the Nez Perce Tribe argue that the objection process nevertheless applies because

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.        16

the Ochoco National Forest Supervisor was listed as the Responsible Official in an initial notice

and the Amendment's Preliminary EA, and thus, the Eastside Screens Amendment was not

"proposed," only signed, by the Under Secretary.  Pls.' Br. 20 (citing AR33602, AR33414,[12] and

AR33214); Amicus Br. 12-13, ECF No. 52.  That argument lacks merit.

The Department expressly contemplated, and decided not to subject, Secretarial officer

decisions to administrative objections when it promulgated the regulations establishing the forest

planning objection process.  *See* 36 C.F.R. § 219.51(b).  As the rule's accompanying preamble

explains:

> *Comment: Secretary decisions subject to administrative review.* Some respondents
> felt decisions made by the Secretary or the Under Secretary for Natural Resources
> and Environment affecting the Forest Service should be subject to administrative
> review.
>
> *Response:* Land management plan decisions made by the Secretary or Under
> Secretary for Natural Resources and Environment have never been subject to appeal
> or objection. The Department chooses not to change this approach. The Agency
> anticipates that approvals of plans, plan amendments, or plan revisions by the
> Secretary or Under Secretary will continue to be rare occurrences.

Management Planning, 77 Fed. Reg. at 21,247-48 (emphasis added).

The Department's determination to exclude decisions made by the Secretary or Under

Secretary from the objection process is consistent with the Department's overall statutory and

regulatory system of management and oversight of the National Forest System.  The Under

Secretary is a Senate-confirmed, presidentially-appointed officer.  *See* 7 U.S.C. § 6961(b).

Congress directed that he or she be delegated "those functions under the jurisdiction of the

Department that are related to natural resources and environment."  *Id*. § 6961(c)(1).

---

[12] AR33414 is a page within a scientific review of the 1994 Eastside Screens diameter harvest
limit, and this page does not list the Ochoco National Forest Supervisor, or any other personnel,
as the Responsible Official for the Eastside Screens Amendment.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                          17

Accordingly, the Secretary—to whom "all functions" of "all other officers, and of all agencies and employees, of the Department" have been transferred, *see* Reorganization Plan No. 2 of 1953, § 1(a), 67 Stat. 633, *confirmed by* Anti-Disruption Reorganization Act, Pub. L. No. 98-532, 98 Stat. 2705 (1984)—has delegated the duties of "[p]rotect[ing], manag[ing], and administer[ing] the national forests" to the Under Secretary.  7 C.F.R. § 2.20(a)(2)(ii).

The regulations exempting the Under Secretary's decisions from the objection process provide that: "Nothing in this subpart restricts the Secretary of Agriculture from exercising any statutory authority regarding the protection, management, or administration of [National Forest System] lands."  36 C.F.R. § 219.60.  And elsewhere the Department's delegation regulations reinforce the point that the Secretary and Under Secretary may always exercise authority they have delegated to other officials: "No delegation of authority by the Secretary or a general officer contained in this part shall preclude the Secretary or general officer from exercising any of the authority so delegated."  7 C.F.R. § 2.12.  Plaintiffs' and Amicus's interpretation of the regulations is untenable because—contrary to the statutory and regulatory delegations described above—it would disqualify both the Under Secretary and the Secretary from making final decisions in the first instance on forest plan approvals, amendments, or revisions if any other official had first identified or introduced the amendment.

Plaintiffs' and Amicus's crabbed reading of the word "proposed" in the objection regulations is insupportable because—contrary to the statutory and regulatory delegations described above—it would disqualify both the Under Secretary and the Secretary from making final decisions in the first instance on forest plan approvals, amendments, or revisions if any other official had first identified or introduced the amendment.  That consequence follows from Plaintiffs' and Amicus's argument because, under the regulations, objections to a decision must

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    18

be reviewed by an official at "the next higher administrative level."  36 C.F.R. § 219.56(e).  But the only official at a higher administrative level than the Under Secretary is the Secretary, and if the Secretary were to serve as the reviewing official for a decision signed by the Under Secretary, the Under Secretary's decision would no longer be "final," in contravention of 36 C.F.R. § 219.51(b).

Even if the Secretary could review objections to the Under Secretary's decisions through some process not found in the regulations, subjecting the Under Secretary's decision to Secretarial review would essentially prevent the Secretary from delegating final decision-making authority to the Under Secretary.  Doing so would conflict with the statute and regulation conferring upon the Under Secretary, without limitation, "those functions" of the Department related to natural resources, including the authority to "manage" and "administer the national forests."  7 U.S.C. § 6961(c)(1); 7 C.F.R. § 2.20(a)(2)(ii).

Plaintiffs' and Amicus's interpretation also would have absurd consequences for the Secretary, to whom the regulation on which Plaintiffs rely, 36 C.F.R. § 219.51(b), also applies. The Secretary is the cabinet official exercising full "supervision and control" over the Department.  7 U.S.C. § 2202.  But the objection process cannot apply to the Secretary because there is no one to serve as a "reviewing officer" over his decisions.  *See* 36 C.F.R. 219.56(e).  As with decisions by the Under Secretary, the Secretary's decisions are also "final" for the Department.  36 C.F.R. § 219.51(b).

In addition to conflicting with statutory and regulatory delegations of decision-making authority, Plaintiffs' and Amicus's narrow reading of "proposed" contradicts the plain meaning of the term "proposed" in other, analogous regulations.  *See* Pls.' Br. 20-23; Amicus Br. 12-13. Specifically, NEPA's implementing regulations apply to "proposals" for "major Federal

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                      19

actions."  42 U.S.C. § 4332(C).  A "proposal" exists under NEPA when a federal agency "has a

goal and is actively preparing to make a decision on one or more alternative means of

accomplishing that goal and the effects can be meaningfully evaluated."  40 C.F.R. § 1508.23

(2020); *see also* Pls.' Br. 20, n.19 ("36 C.F.R. § 220.4(a) (Forest Service regulations mirroring

the Council on Environmental Quality's definition of 'proposal').").  In other words, whether an

idea can be deemed a "proposal" has nothing to do with who originated the idea, but, rather,

whether the idea is sufficiently developed to permit the meaningful weighing of alternatives and

impacts.  That broader understanding of "proposal," irrespective of the origin of an idea, is also

found in the Forest Service Handbook: "When the Forest Service accepts an external proponent's

proposal (like a powerline or ski resort) it becomes an Agency proposal to authorize the action."

FOREST SERV., HANDBOOK 1909.15, ch. 10, § 11.2 (2012).  The broader interpretation is also

consistent with the Department's analogous regulations governing administrative objections to

Forest Service projects and permits, which refer to "proposals made below the level of the

Chief," or by the Chief himself, 36 C.F.R. § 218.3(a), and do not distinguish proposals based on

which official *originally conceived of* the proposed activity.

Attempting to sidestep this plain reading of 36 C.F.R. § 219.51(b), Plaintiffs advance an

internally inconsistent, and unavailing argument based on the canon of construction against

superfluity.  *See* Pls.' Br. 21-22.  First, Plaintiffs argue that Federal Defendants' reading of 36

C.F.R. § 219.51(b) renders the regulation's first sentence superfluous.  Pls.' Br. 21.  Although

unexplained, it seems Plaintiffs' argument is that, under Federal Defendants' reading, the

meaning of "proposed by" in the first sentence of the regulation—"[p]lans, plan amendments, or

plan revisions proposed by the Secretary of Agriculture or the Under Secretary for Natural

Resources and Environment are not subject to the [objection] procedures"—is the same as the

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    20

meaning of "decision by" in the second sentence of the regulation—"[a] decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture."  36 C.F.R. § 219.51(b).  However, Federal Defendants' interpretation of the regulation does not render the first sentence superfluous because "decision by" in the second sentence merely confirms that decisions signed by the Secretary or Under Secretary are fully encompassed within the meaning of "proposed" in the first sentence.  *Id.*  This reasoning is much like Plaintiffs' characterization of their own interpretation of the regulation: "the second sentence *confirms* that a decision by the Secretary or Under Secretary in this context . . . is not subject to higher review."  Pls.' Br. 22 (emphasis added).  Thus, Plaintiffs' argument is at least as damaging to their own interpretation as to Federal Defendants'.  Further, if wielded equally against Plaintiffs' reading, the canon against superfluity would counsel that "decided by" in the second sentence must have a different meaning than "proposed" in the first sentence.  36 C.F.R. § 219.51(b).  This reading of the regulation would result in the second sentence directly supporting the finality—signifying the lack of an objection period—of an Under Secretarial decision like the Amendment.

Second, Plaintiffs contend that Federal Defendants' reading of 36 C.F.R. § 219.51(b) renders 36 C.F.R. § 219.52 superfluous.  Pls.' Br. 21.  Subsection 219.52 requires the Responsible Official for a proposed forest plan, plan amendment, or plan revision to give notice to the public if the decision is subject to the administrative objection procedures.  Plaintiffs argue that the notice requirement in Subsection 219.52 "would be unnecessary" if decisions by the Under Secretary were final and not subject to the objection process.  Pls.' Br. 21.  This argument overlooks the fact that the overwhelming majority of Forest Service decisions regarding forest plans are not made by the Under Secretary or Secretary and thus are subject to the administrative

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    21

objection period.  For those decisions, the notice provisions set forth in Subsection 219.52 are

necessary.  Nothing in Federal Defendants' interpretation of Subsection 219.51(b) renders

Subsection 219.52 superfluous.

**2.** **Neither equitable considerations nor the *Wild Virginia* ruling weigh in favor of granting judgment to Plaintiffs on this Claim.**

Plaintiffs contend that equitable considerations compel the Court to grant judgment in

their favor because the Forest Service's early notice that there would be an objection period

"created a reliance expectation."  Pls.' Br. 23.  Amicus makes a similar argument, asserting that

the greater context of public notice regulations amounts to a requirement that the Forest Service

alert the public during or before the comment period if the Under Secretary or Secretary become

the responsible official.  Amicus Br. 13-15.  To the contrary, 36 C.F.R. § 219.51(d) explicitly

sets forth notice requirements applicable when, as here, a plan amendment is not subject to

objection: "[w]hen a plan, plan amendment, or plan revision is not subject to objection under this

subpart, the responsible official shall include an explanation with the signed decision document."

Here, as Plaintiffs seem to concede, Federal Defendants satisfied this single notice requirement

by including an explanation that the Amendment was not subject to objection in the signed

decision document.  *See* Pls.' Br. 21 (citing the DN/FONSI, AR34762).  Plaintiffs have not

pointed, and cannot point, to any other notice requirement that applies to a Secretarial or Under

Secretarial decision.[13]  Even if the Court were sympathetic to Plaintiffs' equitable arguments, it

---

[13] Nor can Amicus.  Amicus claim that, taken together, 36 C.F.R. § 219.51(b), 36 C.F.R. § 219.16(d), and 36 C.F.R. § 219.16(c)(1) amount to a requirement that "the Forest Service must provide public notice, prior to the last comment period, whenever the [Department] Under Secretary proposes a land management action, assume[d] the role of responsible official for a land management proposal, or changes the type, number, or nature of the public participation opportunities."  Amicus Br. 15.  The cited regulations provide no such requirement.  Subsection 219.51(b) does not set forth such a requirement, as explained in detail above.  Subsection

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                        22

would be outside the APA's scope of review for this Court to require more notice than the

regulations require. *Vermont Yankee Nuclear Power Corp. v. Nat'l Resources Defense Council,*

*Inc.*, 435 U.S. 519, 524 (1978) (noting reviewing courts should not "engraft[] their own notion of

proper procedures upon agencies entrusted with substantive functions by Congress.").

The Fourth Circuit recently held that Federal Defendants' interpretation of "proposed" as

encompassing decisions signed by the Secretary or Under Secretary, is correct. *See Wild Va. v.*

*U.S. Forest Serv.*, 24 F.4th 915, 927 (4th Cir. 2022). In *Wild Virginia*, a company applied to the

Forest Service to build a pipeline on National Forest System land. *Id.* at 922-23. The Forest

Service did not hold an objection period for its decision to authorize the pipeline because the

Under Secretary signed the decision. *Id.* at 926-27. Plaintiffs there argued that the authorization

should have been subject to the administrative objection process because "[the pipeline

company], not the Under Secretary for Natural Resources and Environment, 'proposed' the

Pipeline project." *Id.* at 927. In discussing this case, Plaintiffs here conveniently omit the Fourth

Circuit's holding that the *Wild Virginia* plaintiffs' "interpretation of the term 'proposed' as it is

used in the exception . . . is too narrow and ignores the broader regulatory scheme." *Id.*[14] As

---

219.16(d) requires the Department's public notice to identify the responsible official for a
decision and to set forth the future opportunities for public participation. 36 C.F.R. § 219.16(d).
The Forest Service fully complied with these requirements in its announcement of the opening of
the comment period in the Federal Register. AR33601-02 (naming the responsible official and
explaining the planned public participation opportunities). Subsection 219.16(c)(1) merely
requires that notice be provided in the Federal Register when the Secretary or Under Secretary is
the responsible official. 36 C.F.R. § 219.16(c)(1). This requirement was also satisfied by the
announcement of the comment period in the Federal Register. AR33601-02.
[14] In *Wild Virginia*, the objection regulations at issue were those in Section 218, which apply to
project or permit decisions, while the Section 219 regulations at issue here apply to forest plan
adoptions, amendments, and revisions. *See* 36 C.F.R. §§ 218.1-218.16; §§ 219.50-219.62. But
in both cases, the regulations use identical language to exempt decisions "proposed" by the
Secretary or Under Secretary from the objection process. 36 C.F.R. § 218.13(b); 36 C.F.R. §
219.51(b).

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*

Plaintiffs note, the Court further explained "that a proposal, for purposes of the exception, does not mean the application triggering action by the Forest Service but, rather, how the Forest Service decides to act in response to that application." *Id.*  However, the Court goes on to explain that "[t]here is no distinction based on the *source* of the project's application." *Id.* (emphasis added).  Accordingly, because the Under Secretary signed the decision document authorizing the pipeline, "the proposal was not subject to the predecisional review process." *Id.* (citations omitted).  The same result should follow here, where the Under Secretary—though not the genesis—was the ultimate decisionmaker.  Such a reading aligns with the Department's contemporaneous interpretation set out in the regulation's preamble quoted above that focuses on the "decision" and "approvals," not who had an idea first.  *See* Management Planning, 77 Fed. Reg. at 21,247.

In sum, the Secretary properly delegated final decision-making authority regarding forest plan amendments to the Under Secretary, and no authorities cited by Plaintiffs support disqualifying either of those officials from "propos[ing]" and approving matters such as the Eastside Screens Amendment without an objection period.  The Court should grant summary judgment to Federal Defendants on Claim Two, Count One.

### C.    After Completing an EA, the Forest Service Reasonably Found the Amendment Had No Significant Environmental Effects.

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Before preparing an EIS, however, an agency may first prepare an EA, a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                      24

1233, 1238–39 (9th Cir. 2005) (quoting 40 C.F.R. §§ 1508.9(a), (b) (2000)) (alterations in original). If, after preparing an EA, the agency concludes that the proposed action will not have significant environmental effects, the NEPA process ends with a FONSI. *Id.*

That is what the Forest Service did here, preparing a thorough EA for the Eastside Screens Amendment and finding no significant environmental effects. AR34504-749 (EA); AR34763-67 (DN/FONSI). Because that conclusion "required a high level of technical expertise," this Court's deference to the agency must be "at its highest." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)). The Forest Service's FONSI must be upheld so long as it is "fully informed and well-considered." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal citation omitted). Put differently, this Court's review is limited to "whether the agency has taken a hard look at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)(cleaned up).

Under NEPA's implementing regulations, whether a proposed action has significant environmental effects turns on the action's "context and intensity." 40 C.F.R. § 1508.27 (2019). Plaintiffs argue that the Forest Service erred in declining to prepare an EIS because three regulatory intensity factors are present here: (1) that the amendment is "highly controversial"; (2) that the amendment has "highly uncertain" environmental effects; and (3) that the amendment may impair endangered or threatened aquatic species. *See id.*; *see also* Pls.' Br. 24-37. But the record shows that the Forest Service reviewed the scientific literature and reasonably found that

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    25

the Amendment was neither highly controversial nor its impacts uncertain and—because it does

not alter the limitations on timber harvest in riparian areas under PACFISH and INFISH—that

the Amendment would have no impacts on riparian species.  The Forest Service thus did not

need to prepare an EIS.

### 1.    The Body of Scientific Literature Supports the Forest Service; Some Dissent Does Not Make the Amendment "Highly Controversial."

Under NEPA, "[a] project is highly controversial if there is a substantial dispute [about]

the size, nature, or effect of the major Federal action rather than the existence of opposition to a

use." *Native Ecosystems Council*, 428 F.3d at 1240 (quoting *Blue Mountains Biodiversity

Project*, 161 F.3d at 1212) (internal quotation marks omitted).  "Controversial" is modified by

"highly," and the Ninth Circuit has explained that "[s]imply because a challenger can cherry pick

information and data out of the administrative record to support its position does not mean that a

project is highly controversial or highly uncertain."  *Id.*

As documented in the record, the Forest Service reviewed hundreds of scientific papers,

finding that the weight of scientific opinion supports the Forest Service's conclusions that: (1)

stand composition has shifted towards densely stocked stands of fire-intolerant species, and (2)

the Forest Service needs to move forward with treatments—including removing some large

trees—to mitigate the negative impacts of climate change-driven wildfire and other disturbances

like drought, insects, and disease.  *See, e.g.*, AR34511-12 (need for change section in EA citing

recent literature on forest health in eastern Oregon and southeastern Washington).  Plaintiffs,

citing a handful of outlier scientific papers, argue that each conclusion is "highly controversial."

Pls.' Br. 25-32.  These arguments lack merit.

Plaintiffs go wrong from the start when they argue that updating 25-year-old forest

management direction is inherently controversial.  Pls.' Br. 26.  Planning documents are not

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.          26

insulated by the passage of time.  Just the opposite: forest plans should be amended regularly to

reflect the latest science and data.  *See* 16 U.S.C. § 1604(f)(5) (forest plans are to "be revised . . .

from time to time . . . but at least every fifteen years."); 36 C.F.R. § 219.7(a) ("A plan must be

revised at least every 15 years.").  And the Eastside Screens were explicitly intended to provide

only "interim management direction."  AR14394.  The Amendment preserves the parts of the

Eastside Screens that have worked well and makes changes where scientific advancement has

revealed shortcomings.  *See* AR34511-12; *see also, e.g.*, AR34560-61 (scientific literature shows

past forest management practices have "increased proportions of fire-intolerant trees");

AR34611-13 (management under the Eastside Screens led to a decline in high quality habitat for

some species).[15]  This satisfies the Forest Service's obligations under the NFMA.  *The Lands*

*Council*, 537 F.3d at 988-89 ("In developing and maintaining each plan, the Forest Service is

required to use 'a systematic interdisciplinary approach to achieve integrated consideration of

physical, biological, economic, and other sciences.'" (quoting 16 U.S.C. § 1604(a))).

Plaintiffs' criticisms of the Forest Service's analysis never find surer footing.  First, the

Forest Service's conclusion that Eastside Forests have departed from historical conditions and

need treatments—including removing large trees where incompatible with resiliency

objectives—is based on the best available science.  A handful of dissenting papers does not make

that conclusion "highly controversial."  *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001,

---

[15] Throughout their brief, Plaintiffs exaggerate the impact of the Amendment, which largely
preserves the management direction under the Eastside Screens but allows for more flexibility
following 25 years of management experience and scientific development.  *See* AR34753-54
(describing change from the Eastside Screens standard to the new guideline), AR34756 ("the
proposal does not change the ecosystem standard of the Eastside Screens"), *see also, e.g.*,
AR34528 (discussing recent literature on climate change and the trend of Eastside Forests
toward fire intolerant species), AR34530-31 (discussing how fire suppression has caused stands
to depart from historical conditions and decreased fire resilience), AR34562 (discussing how
species composition has shifted away from insect and disease resilience).

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    27

1011 (9th Cir. 2020) (rejecting the plaintiffs' "expert opinions" that were based on "speculation"

and not supported by existing research).  Second, the Forest Service prepared an exhaustive

vegetation analysis in the EA that shows "how changing the 21-inch dbh harvest prohibition

would affect species composition, old trees, large trees, and forest structure."  AR34523; *see also*

AR34443-99 (vegetation analysis); AR34523-44 (vegetation section of EA).  Plaintiffs' criticism

of the Forest Service's method goes nowhere on APA review.  *See Idaho Wool Growers Ass'n v.*

*Vilsack*, 816 F.3d 1095, 1108 (9th Cir. 2016) ("The Forest Service is owed greater-than-average

deference as it relates to its choice of technical methodologies.").

          i.    <u>The Forest Service reasonably found that a rigid 21-inch rule inhibits</u>
              <u>forest recovery.</u>

There is broad scientific consensus that Eastside Forests have departed from historical

conditions and so are imperiled by uncharacteristic wildfire and other disturbances.  *See, e.g.*,

AR34511-12 (citing the body of scientific literature showing departed conditions), AR34524

("Fire intolerant tree growth has increased density (trees per acre) . . . making forests more likely

to die when a wildfire, drought, or other natural disturbances occur"), AR34563 ("The increased

density and change in structure in these forests can clearly increase the severity of a wildfire"),

AR34528-31 (citing literature showing that, absent management, forests will continue to shift

toward less fire resilience).  The Forest Service is implementing treatments to address these

conditions, but the strict 21-inch rule under the Eastside Screens hampered that process, and

repetitive project-specific amendments to forest plans to remove the 21-inch rule were

inefficient.  AR34753; *see also id.* (explaining that the District of Oregon "ruled that the Forest

Service should consider the cumulative impacts of its decisions to amend the 21-inch standard").

So the Forest Service embarked on a process to update the Eastside Screens.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                         28

In deciding how to "adapt[] the 21-inch standard to incorporate 25-years of science and experience," the Forest Service engaged the public—including Plaintiffs—by holding multiple public fora to incorporate suggestions and feedback. *See* AR32115-16 (listing early public participation opportunities). The Forest Service also held over 40 meetings with county, state, and tribal governments, as well as interest groups and other nongovernmental entities. AR33205-51 (early engagement activity summary). This included a Science Forum to allow experts to express their views, AR32203-32361, as well as meetings with each of the Science Forum presenters, AR33048 (discussing pre-forum conference calls). Throughout the process, the Forest Service reviewed and considered all public comments. *See, e.g.*, AR33813-911 (summarizing comments), AR34295-99, AR34362-70, AR34404-42, AR34500-03, AR34768-77 (summarizing response to public comments). The public participation process was a success; the Forest Service made numerous changes to the Final EA in response to public comments, including analyzing a new alternative. AR34513 (listing changes).

The Forest Service's analysis also included an exhaustive literature review considering papers published over the last 25 years and every published paper submitted with comment letters. AR33781-800 (spreadsheet summarizing review of literature submitted with comments); *see also, e.g.*, AR34542-43 (discussing literature on carbon emissions and storage); AR34557-61 (discussing body of scientific literature on fire regimes in Eastside Forests); AR34567-68 (discussing literature on fire, insect, and disease mortality); AR388-401 (citations for disturbance analysis). In short, the Forest Service engaged the public at every opportunity and thoroughly considered materials submitted by commenters. At the conclusion of that process, the Forest Service reasonably concluded that "[t]he effects of forest management policy change proposed in

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    29

this project are not scientifically controversial."  AR34765.  NEPA requires nothing more.
*Native Ecosystems Council*, 428 F.3d at 1239.

Plaintiffs identify nothing the agency missed.  Instead, they argue that the mere presence
of some disagreement over whether removing some large trees is necessary to achieve resilience
renders the decision "highly controversial."  *See* Pls.' Br. 27-30.  But an action is only "highly
controversial" where "evidence . . . casts *serious doubt* upon the reasonableness of an agency's
conclusions."  *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of
Interior*, 751 F.3d 1054, 1069-70 (9th Cir. 2014) (citation omitted) (emphasis added).  That a
handful of scientists disagree with the scientific consensus—which is overwhelming, as
documented in the EA—does not undermine the Forest Service's conclusions within its realm of
expertise.  *See The Lands Council*, 537 F.3d at 993 (courts are at their "'most deferential' when
the agency is 'making predictions, within its [area of] special expertise." (quoting *Forest
Guardians*, 329 F.3d at 1099) (alterations in original)); *Sierra Forest Legacy v. Sherman*, 646
F.3d 1161, 1182 (9th Cir. 2011) ("The mere presence of expert disagreement does not violate
NEPA because 'experts in every scientific field routinely disagree.'" (citation omitted)).

That the Forest Service held a forum that presented all viewpoints does not mean that all
viewpoints are valid or suggest a genuine controversy.  *See* Pls.' Br. 27-28; AR34765
(explaining that "a few papers" by Plaintiffs' experts do not demonstrate controversy where
"[t]he disturbance and vegetation literature show overwhelming and abundant evidence for a vast
and demonstrated change in forest density and species composition . . . as documented in the
vegetation and disturbance analyses"); AR34371-401 (disturbance analysis); AR34443-99
(vegetation report).  Nor is this case like *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 870-71 (9th
Cir. 2020).  There, in responding to comments citing critical articles, the Forest Service "drew

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    30

general conclusions such as that '[t]here are no negative effects to fuels from the Proposed

Action treatments.'" *Id.* at 871.  Here, the Forest Service prepared substantial analyses, citing

the best available science—including many papers cited by Plaintiffs—and explained why some

of the evidence submitted by Plaintiffs was either irrelevant or unreliable.  AR34557-61; *see also*

AR34557 n.9 (explaining that some papers submitted by Plaintiffs focus on Western states rather

than the more discrete area at issue and use questionable methodology); AR34560 n.11

(explaining that some of Plaintiffs' papers use methods that were shown to be unreliable by later

papers).  Those explanations satisfy NEPA.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324,

1334-35 (9th Cir. 1992) (a project is not highly controversial "whenever qualified experts

disagree . . . [or else] the environmental assessment process would be meaningless.").

        Plaintiffs also cite comments on the draft EA, arguing that they show substantial

disagreement with the Forest Service's approach.  Pls.' Br. 28-29.  First, these are comments on

a *draft* analysis; the Final EA incorporated changes in response to comments.  AR34513.

Second, not all the comments Plaintiffs cite even oppose the decision.  *See, e.g.*, AR48118-28

(offering suggestions to improve the effects analysis but stating that "[o]verall, we support the

effort to decrease the barriers to restoration of dry forests" and "young large trees that have

grown over 21" dbh since fire suppression now put the old trees at risk."); AR45182-86 (offering

recommendations for the draft EA but stating that the Oregon Department of Fish and Wildlife

"is supportive of revising the 21-inch Rule, including the Proposed Action's intent to preserve

old and large trees and address forest health and restoration on multiple scales.").

        Third, the "expert report" Plaintiffs submitted is neither peer-reviewed nor published.

Indeed, many of its conclusions are unsupported and contradicted by published papers.  *Compare*

AR33928 (unsupported argument that species composition of large trees is unimportant),

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    31

AR33931 (unsupported conclusion that "large shade-tolerant trees provide significant natural bet-hedging against potentially unexpected future disturbances that could easily remove or significantly reduce pines over large areas"); *with* AR34563 (discussing studies showing composition shift to shade-tolerant species "that are not as resistant to fire"), AR34563-65 (discussing studies showing how climate change and altered stand composition and density have decreased fire resilience); *see also Am. Wild Horse Campaign*, 963 F.3d at 1011 (rejecting expert reports that lacked supporting research). Fourth, mere opposition does not make the Forest Service's decision "highly controversial." *Cascadia Wildlands v. Williams*, 251 F. Supp. 3d 1349, 1362 (D. Or. 2017) ("That [plaintiffs] and others disagree with [an agency's] ultimate determination of no significant impact does not render the proposed action highly controversial." (citing *Blue Mountains Biodiversity Project*, 161 F.3d at 1212)).

Plaintiffs argue the Forest Service should have discussed Plaintiffs' experts' viewpoints in more detail. Pls.' Br. 29-30. But the Forest Service provided its reasons for rejecting them and instead following the body of scientific literature. AR34557-61. NEPA requires no more. *See In Def. of Animals*, 751 F.3d at 1072 (upholding EA where agency responded to critical comments "by directing the reader to sections of the EA which addressed [the issue] and provided citations to various studies"); *State of Cal. v. Block*, 690 F.2d 753, 773 (9th Cir. 1982) (even in an EIS, an agency need not "set forth at full length the views with which it disagrees." (citation omitted)).

In sum, this Court is not the referee in a "battle of the experts," *Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010), but must defer to the Forest Service's reliance "on the reasonable opinions of its own qualified experts." *Marsh*, 490 U.S. at 378. Here, the record

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                           32

makes plain that the agency's conclusion is deeply supported by the science and not "highly controversial."

> ii.   _The Forest Service's vegetation analysis confirms the Amendment will not have significant environmental effects._

As summarized in the EA, the Forest Service prepared a vegetation analysis that examined the effects of each alternative.  AR34523-44; _see also_ AR34443-99 (vegetation analysis).  The vegetation analysis used a qualitative assessment to analyze a range of potential outcomes based on the disturbance, succession, and management assumptions.  AR34523-24.  The analysis synthesized current landscape conditions, the dynamics of each vegetation metric, professional knowledge of forest management, and monitoring data.  _Id._  The Forest Service also used Forest Inventory and Analysis plots to describe existing landscape conditions and how those landscapes have changed over time.  _Id._  Finally, the Forest Service used the data it compiled for Forest Vegetation Simulator modeling, which supported and enhanced the vegetation analysis.  _Id._; _see also_ AR34402-03 (describing model).  These techniques satisfy NEPA.  _The Lands Council_, 537 F.3d at 992 ("we defer to the Forest Service as to what evidence is, or is not, necessary to support [its] analyses.").

Plaintiffs ignore most of this analysis, instead narrowly focusing on criticisms of the Forest Service's Vegetation Simulator model that were raised in comments on the draft EA.  Pls.' Br. 30-32.  As discussed above, the Forest Service considered and responded to all comments, which were used by the agency to enhance the analysis.  _See_ AR34514 (showing the Final EA "Highlighted effects at the stand scale for the vegetation analysis to help compare differences between alternatives").  While Plaintiffs disagree with the Forest Service's choice of model, that choice is entitled to the highest deference.  _See Native Ecosystems Council_, 697 F.3d at 1051 ("A court generally must be 'at its most deferential' when reviewing scientific judgments

_Greater Hells Canyon Council, et al. v. Wilkes, et al._
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                      33

and technical analyses within the agency's expertise under NEPA." (citation omitted)); *Bark v. Northrop*, No. 3:13-CV-00828-AA, 2016 WL 1181672, at *12 (D. Or. Mar. 25, 2016) ("it is well settled that an agency's choice of methodology is wholly within its discretion and should not be disturbed on judicial review." (citing cases)).  As long as the agency "support[s] its conclusions with studies that the agency deems reliable," *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (citing *The Lands Council*, 537 F.3d at 988), the Court may not disturb the Forest Service's findings.  The analysis in the vegetation report—which explains that the Forest Vegetation Simulator model is state-of-the-art and "is regularly used by the Forest Service for vegetation project planning and analysis" to support qualitative analyses—satisfies that requirement.  AR34445-46.

### 2.    The Amendment Does Not Threaten "Highly Uncertain" or "Unique or Unknown Risks."

NEPA's implementing regulations identify "highly uncertain" impacts or "unique or unknown risks" as an intensity factor that may favor an EIS.  40 C.F.R. § 1508.27(b)(5) (2019). As described above, the Forest Service prepared a full analysis of the effects of each alternative. Based on that analysis, as well as "past experience with project-specific amendments and best available science used by the interdisciplinary team," the Forest Service reasonably concluded that the Amendment does not have highly uncertain effects.  AR34765; *see also The Lands Council*, 537 F.3d at 992 ("We have approved forest plans when they are 'based on the current state of scientific knowledge.'" (citation omitted)).

Plaintiffs again brush past nearly all the Forest Service's analysis, arguing only that the Forest Service erred when it included prescriptions consistent with moving the forests toward the HRV in its modeling.  Pls.' Br. 33-36.  Plaintiffs argue that forest managers approving future projects may not follow those prescriptions, and so the modeling was flawed.  *Id.*  As discussed

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    34

above, this speculation about how future projects may be implemented is why Plaintiffs' claims are unripe in the absence of an approved project that realizes their fears. *See Ohio Forestry Ass'n*, 523 U.S. at 734. And again, Plaintiffs exaggerate the Amendment's differences from the Eastside Screens. The Amendment is not a sea change, but a small step to allow the Forest Service to treat stands without repetitive amendments to forest plans. AR34541, 34544, 34753. The Forest Service reasonably modeled management practices that would be enabled or allowed by each alternative, but the differences were incremental because most of the Eastside Screens, including the need to move the landscape toward HRV, remain unchanged. AR34457-60 (discussing current management practices as inputs in the analysis); AR34753 ("The intent is still to maintain and/or enhance a diverse array of LOS conditions in stands subject to timber harvest as much as possible"). Plaintiffs' bare speculation that forest management will dramatically shift to the detriment of large and old trees does not suffice on APA review; "rely[ing] on the mere existence of potential problems as evidence of significant uncertainty [is] a tactic that does not pass muster." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 674 (9th Cir. 2019).

Plaintiffs are also wrong in arguing that the Forest Service may ignore guidelines in forest plans to prioritize timber production over retaining large and old trees. *See* Pls.' Br. 33-34 & n.26; *contra* AR34517 ("If large trees are not increasing in number with appropriate composition, the Regional Forester will impose the Age Standard Alternative across the whole analysis area or by national forest or potential vegetation zone."). While not as inflexible as forest plan standards, "[a] guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, *so long as the purpose of the guideline is met.*" 36 C.F.R. § 219.15(d)(3) (emphasis added). The amended guideline's purpose is to "[m]aintain and increase

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    35

old and late structure forest.  Favor fire tolerant species where appropriate."  AR34753; *see also* AR34516 ("Managers should retain and generally emphasize recruitment of old trees and large trees, including clumps of old trees.").  Site-specific projects that implement the Amendment and include removal of large trees may only move forward where doing so moves stand composition toward HRV and protects adequate late structure.  *See, e.g.*, AR34512 ("A variety of empirical studies and science syntheses demonstrate that protection of all trees greater than 21 inches prevents restoration of conditions that are most likely to maintain old trees into the future.").

The Forest Service prepared a full analysis of the effects of the Amendment and reasonably found none to be significant.  Plaintiffs' bare speculation that future site-specific projects will not conform to that analysis—or that the Forest Service will not abide by the guideline—does not mean the Amendment is highly uncertain or create unknown risks.

### 3.    The Amendment Does Not Authorize Timber Harvest in Riparian Areas and So Has No Impacts on Listed Aquatic Species.

In determining whether a proposal's impacts are significant, NEPA's implementing regulations require agencies to assess "the degree to which the action may adversely affect" ESA-listed species or critical habitat.  40 C.F.R. § 1508.27(b)(9) (2019).  The FWS "identified the listed and proposed threatened or endangered species and their critical habitats that may be present on each Forest in the planning area," and the Forest Service prepared a biological assessment that found the Amendment would have no adverse effects on listed species or their critical habitat.  AR34761; AR33999-4026.  FWS concurred in that analysis.  AR34162-73.  The Forest Service's conclusion that impacts to protected species did not rise to the level of significance requiring an EIS is thus supported by the record.  *See EPIC v. U.S. Forest Serv.*, 451 F.3d 1005, 1012 (9th Cir. 2006) (rejecting argument that "*any* impact to a listed species requires an EIS" and affirming Forest Service's FONSI based, in part, on findings after ESA consultation

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    36

(emphasis in original)); *Conservation Cong. v. U.S. Forest Serv.*, No. 2:16–cv–00864–MCE–AC, 2018 WL 2427640, *15 (E.D. Cal. May 30, 2018) (upholding FONSI where biological assessment confirmed no likely adverse effects).

Plaintiffs argue that the Forest Service erred in concluding that PACFISH and INFISH—not the Amendment—regulate timber harvest in riparian areas and so the Forest Service's conclusion that there would be no impacts on aquatic species is arbitrary and capricious. Pls.' Br. 37. This argument is discussed in detail below. But in short: the Amendment does not alter the objectives, goals, standards, and guidelines under PACFISH and INFISH and so "[a]ll management direction would remain the same" within riparian areas. AR34594-96. For this reason, the Forest Service properly concluded that the Amendment would not impact ESA-listed aquatic species.

> **D.**    **The Forest Service complied with NEPA by taking a hard look at the mandatory nature of the Eastside Screens Amendment guidelines and at the potential impacts to aquatic species and riparian habitat.**

Plaintiffs contend that the Forest Service incorrectly assumed, first, that the Eastside Screens Amendment guidelines would be mandatory, and second, that continued compliance with PACFISH and INFISH meant that the Amendment would not affect aquatic species. Pls.' Br. 38-41. Plaintiffs claim that these assumptions amount to a failure to take a "hard look" at the Amendment's impacts in violation of NEPA. *Id.* But the record demonstrates both assumptions are correct and well-founded. Therefore, though the "hard look" standard prohibits the Forest Service from "rely[ing] on incorrect assumptions," the Forest Service did not do so here and fully complied with its NEPA hard look obligations. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005).

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    37

1.    <u>**The Forest Service was correct in assuming that the Eastside Screens Amendment guidelines would be mandatory.**</u>

Plaintiffs aver that the Eastside Screens Amendment's restrictions on timber harvest are discretionary rather than mandatory and that the Forest Service violated NEPA by assuming that the Amendment's guideline would be mandatory in the EA's modeling.  Pls.' Br. 10, 33-34, 38-39; AR34445 (discussing modeling of Amendment impacts).  However, the Forest Service correctly assumed that the Amendment's guideline, which includes various restrictions on timber harvest, would be mandatory.

Plaintiffs' argument hinges on their fundamental misunderstanding of the nature of forest plan guidelines.  While Plaintiffs assume, but do not explain why, the language of the Amendment's guideline allegedly renders it "non-mandatory" and "non-binding," Pls.' Br. 38, 39, they fail to reckon with the Forest Service's 2012 Planning Regulations, which define "guideline" as "a *constraint* on project and activity decisionmaking that allows for departure from its terms, so long as the purpose of the guideline is met."  36 C.F.R. § 219.15(d)(3) (emphasis added).

Although Plaintiffs fail to mention the 2012 planning regulations at all in their hard look argument, they may argue in response that the planning regulations' guideline definition could allow the agency to circumvent the Amendment guideline's restrictions so long as the purpose of the guideline is met.  *See* 36 C.F.R. § 219.15(d)(3).  This argument, however, would fail.  Specifically, the planning regulations' guideline definition does not permit any meaningful circumvention of the Amendment's guidelines because the purpose of the guideline that replaces the 21-inch diameter limit standard is to "[m]aintain and increase old and late structure forest" and "[f]avor fire tolerant species where appropriate."  AR34753.  As these purposes are protective in nature and directly support the timber harvest restrictions that Plaintiffs worry are

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                          38

discretionary—thinning small diameter trees first, and favoring removal of fire-intolerant

species, Pls.' Br. 39—it is difficult to imagine a scenario wherein the restrictions of the

Amendment's guideline could be disregarded while the purpose of the guideline would still be

met.[16] And there is certainly no basis for arguing that the Forest Service should have modeled

the impacts of the Amendment using the speculative assumption that agency personnel would

not follow the guidelines when implementing projects.[17] *B.R. v. Garland*, 26 F.4th 827, 836 (9th

Cir. 2022) ("This court applies a presumption of regularity . . . and will presume '[i]n the

absence of clear evidence to the contrary . . . that public officers discharge their duties.'"

(citation omitted)).

Because the Forest Service *correctly* assumed that the logging restrictions included in the

Eastside Screens Amendment's guideline would be mandatory, the Forest Service took the

required "hard look" at the Amendment's impacts. *See Native Ecosystems Council*, 418 F.3d at

964.

> **2.      The Forest Service correctly assumed that continued compliance with PACFISH and INFISH ensured that the Eastside Screens Amendment would have no effect on aquatic species.**

Plaintiffs contend that the Forest Service incorrectly assumed that continued

application of PACFISH and INFISH meant that the Eastside Screens Amendment would

---

[16] Although only argued in the subsection title of Plaintiffs' brief, it seems that Plaintiffs contend that the Forest Service also incorrectly assumed in its modeling that the Amendment's guideline would be applied in Scenario A1. Pls.' Br. 38 (subsection title), 34-35 (Plaintiffs' more detailed discussion of this alleged assumption). However, and as discussed more fully above in Section II.A.2 the Forest Service did not assume that the Amendment's guideline would apply to Scenario A1. AR34531 ("Analys[i]s for the [selected alternative] . . . assume[s] subpart 1 of Scenario A (section 6(d)(1)) is interpreted to allow harvest of a 21-inch dbh tree where the intent of the ecosystem standard and Scenario A wildlife standard are met, including no net loss of LOS from respective biophysical environments.")

[17] If the Forest Service failed to follow the guideline in implementing a particular project, Plaintiffs would have the ability to challenge that project.

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                          39

not affect aquatic species.  Pls.' Br. 39-41.  This argument fundamentally misunderstands the impact of both the Eastside Screens and the Amendment to management of riparian areas.  Neither the Eastside Screens' rigid prohibition on cutting any tree over 21 inches dbh nor the Amendment's more flexible guideline govern timber harvest in riparian areas.  In those areas, the more restrictive PACFISH and INFISH, which ensure protection of aquatic species, continue unaltered.  AR34594 ("The PACFISH and INFISH objectives, goals, standards and guides would not be changed."); AR34606 ("Aquatic and riparian species habitats are protected through the guidance of the PACFISH/INFISH strategies and will not change under this amendment.").

For example, the first standard in PACFISH and INFISH is an outright prohibition on timber harvest in RHCAs, except under limited circumstances such as for salvage harvest after a catastrophic event, or when the harvest is "to acquire desired vegetative characteristics where needed to attain [RMOs]."  AR15062; *see also* AR14838.  This blanket prohibition is plainly stronger and more protective than a diameter-based limit on timber harvest.  As this prohibition is unchanged with the adoption of the Amendment, the Amendment's changed approach to diameter has no impact on timber management in RHCAs.

Plaintiffs imply that the Amendment will lead to a loss of large trees in RHCAs, resulting in a decline in the quality of aquatic habitat (as measured by changes in stream temperature, decrease in large woody debris, etc).  Pls.' Br. 40.  However, PACFISH and INFISH, in addition to prohibiting timber harvest in RHCAs, also include Riparian Management Objectives ("RMOs") that directly pertain to the aquatic habitat quality measures with which Plaintiffs are concerned.  These features include *numerical* objectives

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    40

for pool frequency, water temperature, bank stability, lower bank angle, large woody debris, and width depth ratio.  AR15059.  None of these RMOs were changed by the adoption of the Amendment, and they speak much more directly to the aquatic habitat metrics that Plaintiffs care about than a change in the diameter limit guideline.  Correspondingly, it was reasonable for the Forest Service to consider that, under the unchanged PACFISH and INFISH, harvest and other "treatments cannot retard attainment of [RMOs]" when determining that the Amendment would have "no effect" on aquatic species.  AR34594.

Furthermore, Plaintiffs' argument that the Forest Service's "no effect" determination was completely reliant on the statement "treatments cannot retard attainment of [RMOs]" ignores the broader context of the Agency's analysis and disregards how protective the unchanged PACFISH and INFISH objectives, goals, and standards continue to be for aquatic species.  *See* Pls.' Br. at 41.  Notably, the Forest Service explained that the Amendment would have no effect on aquatic species for the following primary reasons: 1) PACFISH and INFISH objectives, goals, and standards would not be changed; 2) all management direction would remain the same within RHCAs for all six national forests; 3) PACFISH and INFISH have similar goals to the Amendment with regard to allowing vegetation treatments within RHCAs only for the purpose of maintaining habitat that supports populations of well-distributed native and desired non-native plant, vertebrate, and invertebrate populations; and 4) goals within PACFISH and INFISH strategies focus on ecological processes and functions under which riparian and aquatic ecosystems developed.  AR34594.  Thus, Plaintiffs' sole focus on the RMOs is incorrect.  The agency issued its no effect finding because the Amendment will not impact or undo the stronger protections of PACFISH and INFISH.  *Id.*

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    41

Plaintiffs levy two complaints against PACFISH and INFISH—"that the attainment of RMOs is . . . measured at the 'watershed scale'" and "RMOs are targets that are to be met over time, not instantaneously," Pls.' Br. 40-41 (citations omitted)—but these complaints are misplaced. If Plaintiffs have a substantive issue with how PACFISH and INFISH compliance is measured, a suit challenging the Eastside Screens Amendment is not the place to raise it. As discussed above, PACFISH and INFISH are so restrictive as to render meaningless the diameter limits in the Eastside Screens and in the Amendment in terms of effects to aquatic species. Therefore, Plaintiffs' claim rises or falls on whether the Amendment *changed* PACFISH and INFISH compliance, not whether PACFISH and INFISH are appropriate in and of themselves. The Forest Service plainly determined, and Plaintiffs do not challenge, that PACFISH and INFISH compliance will not change with adoption of the Eastside Screens Amendment, AR34594, and thus, Plaintiffs' claim fails.

In sum, the stringent protections of aquatic habitat imposed by PACFISH and INFISH were not altered by the Amendment, and the Forest Service thus reasonably concluded that the Amendment would have no effect on aquatic species. *See* AR34594.

## E.    The Forest Service More Than Satisfied its ESA Obligations and the Record Supports its "No Effect" Determination for Aquatic Species.

Despite the record's clear support for the Forest Service's conclusion that the Eastside Screens Amendment would have "no effect" on aquatic species, Plaintiffs argue that this Court should nonetheless vacate the agency's determination and ignore the deference to which it is entitled. Pls. Br. at 43-45; *see The Lands Council*, 537 F.3d at 987 ("Review under the arbitrary and capricious standard 'is narrow, and [we do] not substitute [our] judgment for that of the agency.'" (citation omitted)). The Court should reject Plaintiffs' argument and uphold the Forest Service's well-reasoned "no effect" determination, as both the record and the law establish that

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                                    42

there was no "clear error in judgment*." Tri-Valley CARES v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012) ("An agency will have acted arbitrarily and capriciously only when 'the record plainly demonstrates that [the agency] made a clear error in judgment.'" (citation omitted)).

### 1.      The Forest Service Met its Obligations Under Section 7 of the ESA.

The Forest Service consults when appropriate. Here, the agency determined that the gray wolf, Spalding's catchfly, and wolverine may be affected by the Amendment, prepared a biological assessment, and informally consulted with FWS.  AR33999-34026, AR34162-34173. Plaintiffs do not challenge that finding.  That the agency did not include the aquatic species in that biological assessment does not render their ESA compliance invalid because they reasonably determined that the Amendment would have "no effect" on these species and thus no further analysis was required for aquatic species.  As explained below, the Forest Service more than supported its findings for aquatic species.

### 2.      The Record Supports the Forest Service's "No Effect" Finding.

Plaintiffs' argument rests on the assumption that the Forest Service was required to prepare a biological assessment to support its "no effect" finding for aquatic species.  But the Forest Service expressly considered aquatic species and made its findings in the Final EA and DN/FONSI.  As the Forest Service found, aquatic species would not be affected by the Amendment because it does not change the riparian standards set forth in PACFISH and INFISH, as explained above.  AR34594, AR34606, AR34761, AR34766 (finding that the Amendment was fully compliant with the ESA), AR34764 ("For this project, there are no known long-term adverse effects or cumulative effects to resources such as wildlife, botany, water quality, fisheries, recreation, or cultural resources. . . [and] no substantial adverse

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    43

effects nor a lessening of protections to known or potential wildlife or botanical species of conservation concern are expected.").

The Forest Service's conclusion is supported by a plain reading of the Amendment and the riparian standards set by PACFISH and INFISH. As stated above, the Amendment only revised the portion of the Wildlife Standard applicable to Scenario A2 of the Eastside Screens and the corresponding snag retention requirements. *See* AR34753-54. And the riparian standards under PACFISH and INFISH remain unchanged and still staunchly protect aquatic habitat, as explained above. AR14838, AR15062. PACFISH and INFISH provide stronger protection that the 21-inch standard. *See, e.g.* AR14834, AR15059 (setting RMOs as described above). Thus, the Court should uphold the agency's reasoned conclusion, as it does not constitute a clear error in judgment. *Tri-Valley CAREs*, 671 F.3d at 1124.

Plaintiffs incorrectly argue that the Forest Service was required to automatically prepare a biological assessment for the Amendment to meet its ESA requirements. Pls.' Br. 42-45. As a threshold matter, the Forest Service did prepare a biological assessment, examining the potential impacts to species that may be affected by the Amendment, as explained above. However, if Plaintiffs mean that, in that biological assessment, the Forest Service was required to indulge in a "make-work" exercise of analyzing the potential (non) impacts to aquatic species, their argument fails. The ESA's consultation requirements are not triggered unless and until the agency determines that a proposed action may affect a listed species. In the ESA consultation process, the agency proposing the relevant action (referred to as the "action agency") must determine whether its action "may affect" a listed species or its designated critical habitat, 50 C.F.R. § 402.14, but consultation is not required if the agency "determines its action will have 'no effect'

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                    44

on a listed species or critical habitat." *Karuk Tribe of Cal. V. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *see also* 50 C.F.R. § 402.12; *Pac. Rivers Council*, 30 F.3d at 1054 n.8 ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered.").  Indeed, the Ninth Circuit has long recognized that the determination of possible effects is the action agency's responsibility and that the action agency "makes the final decision on whether consultation is required." *Defs. of Wildlife v. Flowers*, 414 F.3d 1066, 1070 (9th Cir. 2005) (quoting 51 Fed. Reg. 19926, 19949 (June 3, 1986)).

Here, the Forest Service satisfied any and all applicable ESA requirements by including an analysis of the impacts of the Amendment on aquatic species in the Project's NEPA documentation.  AR34594-96.  The Final EA and DN/FONSI reflect the agency's reasoned determination; thus, the agency was not required to include these species in its biological assessment or consult with the Services under Section 7 of the ESA after it determined that there would be "no effect" on aquatic species.  16 U.S.C. § 1536; 50 C.F.R. § 402.14.  In fact, when the agency made its "no effect" determination, its ESA requirements ended with respect to aquatic species.  *Pac. Rivers Council*, 30 F.3d at 1054 n.8.

Plaintiffs' remaining arguments are similarly unsupported.  For one, Plaintiffs claim that the Amendment will authorize timber harvest activities that will have localized and short-term impacts on aquatic species is incorrect.[18]  The Amendment's change to the 21-inch standard does

---

[18] Plaintiffs' sole support for this proposition is material attached to Plaintiffs' 60-day Notice of Intent to Sue for Violations of the ESA that was submitted after the agency decision.  Pls' Br. 44.  *See* AR49268–302.  It is well-established that this post-decisional information is an improper consideration when determining the propriety of an agency's action.  *See Sw. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) ("[C]onsideration of extra-record evidence to determine the correctness . . . [or] wisdom of the agency's decision is not

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                                45

not authorize timber harvest in riparian areas—these areas must still apply PACFISH and

INFISH—and future projects must conduct project-level NEPA and ESA consultation and

comply with RMOs.  AR14638 (PACFISH), AR14748 (INFISH).  It bears repeating that

PACFISH and INFISH maintain stronger protections for riparian areas than the 21-inch standard.

*See supra* Sections IV.C.3, IV.D.2.  Therefore, any future timber harvest activities affecting the

RHCAs will still apply these higher protections and would still be subject to project-level

consultation before authorization.  Thus, because there are no changes to INFISH and PACFISH,

there would be no localized or short-term impacts from the Amendment.

Plaintiffs cite to no evidence that the Amendment will have any short-term or long-term

effects on ESA listed species.[19]  The Forest Service analyzed the likelihood of riparian areas

being affected by the Amendment, including its effect on ESA-listed species.  *See* AR34594-96

(findings of the Amendment's effect on aquatic threatened or endangered fish species),

AR34597, AR34606 (effect on the aquatic species of spotted wild frog), AR34624-27 (analysis

of plant species, including for the aquatic habitat).  Thus, after considering the aquatic species in

_____

permitted."); *see also Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1264 (D. Idaho 2019*), aff'd in relevant part*, 816 F. App'x 59 (9th Cir. 2020) (striking a declaration submitted by plaintiffs because it represented "opinions and interpretations of requirements within [a] Forest Plan," which "suggest[ed] what the [agency] should have done in this case").

[19]  Plaintiffs' cited cases simply do not support the argument that the Amendment "may affect" ESA-listed species. Unlike the record in the present case, Plaintiffs' cases contain direct record evidence of the potential effects of the agency's actions.  *See Karuk Tribe of Cal.*, 681 F.3d at 1029 (the record contained evidence that suction dredge mining activities "may affect" the ESA listed coho salmon as follows: kill or indirectly increase the mortality of the salmon, kill smaller invertebrates that the salmon feed upon, destabilize streambeds, disturb temperatures, displace juvenile salmon, and combine with a multitude of factors to harm the salmon); *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*, 265 F.3d1028, 1037 (9th Cir. 2001) (evidence in the administrative record showed that approved timber projects in riparian reserves would have impacts that would manifest within less than 10 years, and NMFS did not dispute these effects).

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    46

the action area, the agency fulfilled its ESA obligation when it issued its "no effect" finding.

*Klamath-Sisiyou Wildlands Ctr. v. U.S. Fish & Wildlife Serv.*, No. 1:20-cv-00952-AA, 2022 WL

4599259, at *13 (D. Or. Sep 30, 2022) ("[I]f the action agency—here, BLM—finds 'that its

action will have no effect on listed species or critical habitat' even within the 'action area,' it

need not consult with the expert agencies—here, FWS.").

The Ninth Circuit has upheld agencies' "no effect" determinations even where a listed

species may be present in or around the action area. *See Sw. Ctr. for Biological Diversity*, 100

F.3d at 1446-49 (upholding the agency's "no effect" determination despite it conflicting with a

FWS-policy providing that "agency actions within one mile of a Mexican Spotted Owl Protected

Activity Center ['PAC'] . . . may affect the [o]wl" because, even though the project was within

one mile of a PAC, the agency's finding was not "so implausible that it could not be ascribed to a

difference in view or the product of agency expertise") (citation omitted); *Nat'l Fam. Farm Coal.

v. U.S. Env't Prot. Agenc*y, 966 F.3d 893, 924 (9th Cir. 2020) (upholding the agency's "no

effect" determination for a pesticide registration despite its conclusion that protected species

"would be exposed to potentially harmful chemicals," because a "recognition of exposure is not

a recognition that [the project] 'may affect' protected species," rather, it is "a recognition that

[the agency] did what the ESA requires it to do: assess risks to determine whether the exposure

would have 'any possible effect'") (citation omitted); *Friends of Santa Clara River v. U.S. Army

Corps of Eng'r*, 887 F.3d 906, 924 (9th Cir. 2018) (upholding the agency's "no effect"

determination on the endangered steelhead trout populations, noting that the Court "may not

substitute [its] scientific judgment for that of the agency") (citation omitted); *All. for the Wild

Rockies v. Savage*, 209 F. Supp. 3d 1181, 1191 (D. Mont. 2016) (upholding finding of "no

effect" where the Forest Service concluded that the "Project would have no measurable effect on

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                47

bull trout"), *rev'd in part on other grounds* 897 F.3d 1025 (9th Cir. 2018). Therefore, the Forest

Service appropriately concluded that the Amendment would have "no effect" on aquatic species.

F.    **The Forest Service Discharged its Tribal Trust Obligations Through the NEPA Process.**

Finally, amicus curiae Nez Perce Tribe implies that the United States breached its trust

obligations to consult with Indian tribes. Am. Br. 3-5. Not so. The Tribe has identified no

treaty or statute applicable here. *See Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th

Cir. 2006) (tribes "cannot allege a common law cause of action for breach of trust that is wholly

separate from any statutorily granted right" (citation omitted)). Without more specific

authority,[20] the Forest Service discharges its trust responsibility by complying with its

regulations providing for public participation. *Id.* ("unless there is a specific duty that has been

placed on the government with respect to Indians, [the government's general trust obligation] is

discharged by [the government's] compliance with general regulations and statutes not

specifically aimed at protecting Indian tribes." (citations omitted)). As detailed above, that

included meaningful opportunities to participate in the NEPA process, including through

consultation and the Tribe's status as a cooperating party. The Forest Service satisfied its

obligations to the Tribe.

---

[20] The Executive Order the Tribe identifies "is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law by a party against the United States, its agencies, or any person." Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments). Courts have recognized this Order does not create judicially enforceable rights. *See, e.g.*, *Navajo Nation v. U.S. Dep't of Interior*, No. CV-03-00507-PCT-GMS, 2018 WL 6506957, at *4 (D. Ariz. Dec. 11, 2018), *rev'd on other grounds*, 996 F.3d 623 (9th Cir. 2021); *Carattini v. Salazar*, No. CIV–09–489–D, 2010 WL 4568876, at *8 (W.D. Okla. Nov. 3, 2010). *Greater Hells Canyon Council, et al. v. Wilkes, et al.*

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary

Judgment and grant Federal Defendants' Cross-Motion for Summary Judgment.

Respectfully submitted this 10th day of February, 2023.

<div style="margin-left: 50%;">

s/        *Hayley A. Carpenter*
HAYLEY A. CARPENTER
TYLER M. ALEXANDER
ANTHONY D. ORTIZ
Trial Attorneys
Natural Resources Section
Wildlife & Marine Resources Section
150 M St. NE
Washington, D.C. 20002
Phone: (202) 305-0242 (Carpenter)
(202) 305-0238 (Alexander)
(202) 307-1147 (Ortiz)
hayley.carpenter@usdoj.gov
tyler.alexander@usdoj.gov
anthony.d.ortiz@usdoj.gov

*Counsel for Federal Defendants*

</div>

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Mem. in Supp. of Summ. J.                                                    49