Caroline Lobdell (OSB #021236)
Aaron Bruner (OSB #133113)
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119-327
Portland, Oregon 97219
Email: clobdell@wrlegal.org
Email: abruner@wrlegal.org
Phone: (503) 768-8500

*Counsel for Defendant-Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL, OREGON WILD, CENTRAL OREGON LANDWATCH, SIERRA CLUB, GREAT OLD BROADS FOR WILDERNESS**, and **WILDEARTH GUARDIANS**, | Civil No. 2:22-cv-00859-HL |
| Plaintiffs, | **CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BY DEFENDANT-INTERVENORS AMERICAN FOREST RESOURCE COUNCIL AND EASTERN OREGON COUNTIES ASSOCIATION** |
| v. | |
| **HOMER WILKES**, in his official capacity as Undersecretary for Natural Resources and Environment; **GLENN CASAMASSA**, in his official capacity as Regional Forester for Region 6; and the **UNITED STATES FOREST SERVICE**, | **Oral Argument Set for May 1, 2023 at 1:30 p.m. Before the Honorable Magistrate Judge Andrew D. Hallman** |
| Defendants, | |
| **AMERICAN FOREST RESOURCE COUNCIL**, an Oregon non-profit association, and **EASTERN OREGON COUNTIES ASSOCIATION**, an unincorporated association, | |
| Defendant-Intervenors. | |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  FACTUAL BACKGROUND ............................................................................... 3

III.  LEGAL BACKGROUND .................................................................................... 7

    A.  Standing. ................................................................................................... 7

    B.  National Forest Management Act. ........................................................... 9

    C.  National Environmental Policy Act. ...................................................... 11

    D.  Endangered Species Act. ....................................................................... 13

IV.  STANDARD OF REVIEW ............................................................................... 15

V.  ARGUMENT .................................................................................................... 16

    A.  Plaintiffs Lack Article III Standing ....................................................... 16

        1.  Plaintiffs Fail to Show A Likelihood of Imminent Injury, Causation, or Redressability. ................................................................. 16

        2.  Alternatively, Plaintiffs' Claims Are Unripe. ............................ 19

    B.  The Forest Service Complied with NEPA. ............................................ 20

        1.  The Purpose and Need Statement for the Eastside Screens Amendment Is Reasonable. ........................................................... 20

        2.  The Forest Service Took A "Hard Look" At Likely Effects. ................... 21

        3.  Plaintiffs Fail to Demonstrate That the Eastside Screens Amendment Has Highly Controversial or Highly Uncertain Effects, Such That An EIS Was Required. ...................................... 25

    C.  The Forest Service Complied with the ESA. ......................................... 30

    D.  The Forest Service Complied with NFMA. ........................................... 32

VI.  CONCLUSION ................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ..................................................................................... 19

*Allen v. Wright*,
    468 U.S. 737 (1984) ....................................................................................... 8

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
    273 F.3d 1229 (9th Cir. 2001) ...................................................................... 32

*Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ................................................................................. 16, 30

*Bark v. U.S. Forest Service*,
    958 F.3d 865 (9th Cir. 2020) ........................................................................ 25

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ........................................................... 11, 12, 13

*Cellnet Commc'ns, Inc. v. FCC*,
    149 F.3d 429 (6th Cir. 1998) ........................................................................ 25

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ....................................................................................... 17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................. 8, 17

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ...................................................................... 11

*Davis v. Fed. Election Comm'n*,
    554 U.S. 724 (2008) ................................................................................. 8, 17

*Earth Island Inst. v. U.S. Forest Serv.*,
    697 F.3d 1010 (9th Cir. 2012) ...................................................................... 15

*Earthlink, Inc. v. FCC*,
    462 F.3d 1 (D.C. Cir. 2006)............................................................... 16, 24, 30

*Fla Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ..................................................................................... 15

*Forest Guardians v. U.S. Forest Serv.*,
   329 F.3d 1089 (9th Cir. 2003) ........................................................... 24

*Friends of Payette v. Horseshoe Bend Hydroelectric Co.*,
   988 F.2d 989 (9th Cir. 1993) ............................................................. 13

*Friends of Southeast's Future v. Morrison*,
   153 F.3d 1059 (9th Cir. 1998) ........................................................... 20

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) ............................................................. 12

*Hunt v. Washington State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ............................................................................ 8

*Idaho Conservation League v. Mumma*,
   956 F.2d 1508 (9th Cir. 1992) ........................................................... 10

*Idaho Sporting Congress v. Thomas*,
   137 F.3d 1146 (9th Cir. 1998) ........................................................... 12

*Jones v. Gordon*,
   792 F.2d 821 (1986) ........................................................................... 13

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
   681 F.3d 1006 (9th Cir. 2012) ...................................................... 14, 31

*LaFlamme v. FERC*,
   852 F.2d 389 (9th Cir. 1988) ........................................................ 12, 13

*Lathan v. Brinegar*,
   506 F.2d 677 (9th Cir. 1974) ............................................................. 21

*League of Wilderness Defenders/Blue Mts. Biodiversity Proj. v. Connaughton*,
   2014 WL 6977611 (D. Or. Dec. 9, 2014) ............................................ 5

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...................................................................... 8, 17

*Marsh v. Or. Natural Res. Council*,
   490 U.S. 360 (1989) ........................................................................... 16

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) ........................................................... 11

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) ................................................................... 10

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) ................................................................. 26

*Native Ecosystems Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) ................................................................. 10

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
    241 F.3d 722 (9th Cir. 2001) ........................................................... *passim*

*Newton Cnty. Wildlife Ass'n v. Rogers*,
    141 F.3d 803 (8th Cir. 1998) ................................................................... 14

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    117 F.3d 1520 (9th Cir. 1997) ................................................................. 12

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ........................................................... 10, 11, 19, 20

*Pacific Rivers Council v. Thomas*,
    30 F.3d 1050 (9th Cir. 1994) ................................................................... 14

*Roberston v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ................................................................................. 11

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ................................................................... 15

*Selkirk Conservation Alliance v. Forsgren*,
    336 F.3d 944 (9th Cir. 2003) ................................................................... 24

*Sierra Club v. Forest Serv.*,
    843 F.2d 1190 (9th Cir. 1988) ................................................................. 26

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ................................................................................... 8

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ................................................................................... 17

*Steel Co. v. Citizens for a Better Envt.*,
    523 U.S. 83 (1998) ................................................................................... 16

*Sw. Ctr. for Biological Diversity v. United States Forest Serv.*,
   100 F.3d 1443 (9th Cir. 1996) ................................................................. 14

*The Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................... 16, 24, 30

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ................................................................................. 7

*W. Fuels-Ill., Inc. v. ICC*,
   878 F.2d 1025 (7th Cir. 1989) ............................................................... 25

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................... 16

*Wetlands Action Network v. U.S. Army Corps of Eng'rs*,
   222 F.3d 1105 (9th Cir. 2000) ............................................................... 13

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ................................................................................. 8

*Wild Virginia v. U.S. Forest Serv.*,
   24 F.4th 915 (4th Cir. 2022) ............................................................ 34, 35

*WildEarth Guardians v. Provencio*,
   923 F.3d 655 (9th Cir. 2019) ................................................................. 13

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................... 16

**Statutes**

5 U.S.C. § 706 ............................................................................................ 15

5 U.S.C. § 706(2)(A) ................................................................................. 15

7 U.S.C. § 6961(a) ..................................................................................... 33

16 U.S.C. § 475 ........................................................................................... 9

16 U.S.C. § 1536(a)(2) ........................................................................ 13, 30

16 U.S.C. § 1536(b)(3)(A) ......................................................................... 15

16 U.S.C. § 1536(c)(1) ............................................................................... 14

16 U.S.C. § 1604(i) ................................................................................................ 10

42 U.S.C. §§ 4321-4370f .................................................................................... 10

**Regulations**

7 C.F.R. § 2.20 ...................................................................................................... 33

36 C.F.R., Part 218 .............................................................................................. 35

36 C.F.R. § 219.50 ............................................................................................... 34

36 C.F.R. § 219.51(b) ..................................................................................... 33, 34

36 C.F.R. § 219.56(e) ........................................................................................... 34

40 C.F.R. § 1508.9(a)(1) ...................................................................................... 11

40 C.F.R. § 1508.27 ............................................................................................. 11

40 C.F.R. § 1508.27(b) ................................................................................... 12, 26

40 C.F.R. § 1508.27(b)(4) .................................................................................... 20

50 C.F.R. § 402.13 ............................................................................................... 14

50 C.F.R. § 402.14 ............................................................................................... 14

50 C.F.R. § 402.13(a) ..................................................................................... 14, 15

50 C.F.R. § 402.14(a)-(b) ............................................................................... 14, 15

50 C.F.R. § 402.13(c) ........................................................................................... 15

50 C.F.R. § 402.14 ............................................................................................... 30

50 C.F.R. § 402.14(a) ........................................................................................... 14

50 C.F.R. § 402.14(g) ........................................................................................... 15

50 C.F.R. § 402.14(h) ........................................................................................... 15

**Federal Register**

51 Fed. Reg. 19,926 (June 3, 1986) ..................................................................... 14

84 Fed. Reg. 44,976 (Aug. 27, 2019) ........................................................................ 14

85 Fed. Reg. 43,304 (July 16, 2020) ......................................................................... 11

87 Fed. Reg. 23,453 (Apr. 20, 2022) ........................................................................ 11

87 Fed. Reg. 24,851 (Apr. 27, 2022) .......................................................................... 6

**Other Authorities**

*Strengthening the Nation's Forests, Communities, and Local Economies*,
   Exec. Order No. 14072 ........................................................................................... 6

## CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and L.R. 56-1, Defendant-Intervenors American Forest Resource Council and Eastern Oregon Counties Association respectfully move for summary judgment in their favor on the claims asserted by Greater Hells Canyon Council, et al., in their First Amended Complaint, ECF No. 12. As demonstrated through the supporting legal memorandum below, Defendant-Intervenors' declarations (ECF Nos. 20, 21), the filings of Federal Defendants U.S. Forest Service, et al., and the administrative record (ECF Nos. 28, 36), Plaintiffs are not entitled to relief under the National Environmental Policy Act, Endangered Species Act, National Forest Management Act, and the Administrative Procedure Act.

The Court should therefore grant summary judgment to Defendant-Intervenors and Federal Defendants and deny Plaintiffs' request for declaratory relief, vacatur, injunctive relief, or any other relief. Pursuant to L.R. 7-1(a)(1), the parties conferred but were unable to resolve the dispute.

# I.      INTRODUCTION

In 1993, the U.S. Department of Agriculture, Forest Service, issued a letter providing direction to forest supervisors of the Eastside Forests[1] regarding late seral or "old-growth" forests. AR 14405-06. This letter established what are now referred to as the "Eastside Screens," a set of interim guidelines for how to design forest treatment projects and timber sales to promote the retention of old-growth trees. *Id.* As the Forest Service gathered additional data and experience, and received public input on its approach, the agency continued to re-authorize this interim direction and modified the Eastside Screens over time. After nearly 30 years, the 2021 Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington ("Eastside Screens Amendment") represents the Forest Service's determination to take a more comprehensive approach that will continue to maintain or increase old and large trees on these landscapes, provide greater efficiency and flexibility to the agency as it manages these forests, and promote forest health and resiliency across the Eastside Forests.

Plaintiffs, a coalition of environmental groups, allege that in adopting the Eastside Screens Amendment the Forest Service violated procedural requirements under the National Environmental Policy Act, Endangered Species Act, National Forest Management Act, and Administrative Procedure Act. In particular, Plaintiffs present unsubstantiated claims that the Eastside Screens Amendment will have significant environmental impacts that the Forest Service failed to adequately consider and that are highly controversial or uncertain. However, Plaintiffs do not have Article III standing, nor are their claims ripe for review, given the case law surrounding programmatic land use decisions and Plaintiffs' failure to plausibly demonstrate a

---

[1] *See, e.g.*, AR 14383 ("For the purposes of this interim direction, the Eastside Forests are the Colville, Deschutes, Fremont, Malheur, Ochoco, Okanogan, Umatilla, Wallowa-Whitman and Winema National Forests.").

likelihood of imminent or actual injury stemming from the Eastside Screens Amendment. What is more, the current scientific consensus wholly contradicts Plaintiffs' claims of controversy and uncertainty.

Underlying their claims of procedural error, Plaintiffs' chief thematic contention is a simple one: the Eastside Screens Amendment replaces the so-called "21-inch rule" established by the interim direction with a less protective "guideline." The implication is that old and large trees will now be protected only to the extent the Forest Service chooses. However, such contention is overly simplistic and shows that Plaintiffs do not fully appreciate the history of the 21-inch rule, how the rule has actually been implemented, and how a rigid application of the rule (along with decades of fire suppression) has exacerbated the risks of severe wildfire devastating the very old growth forests Plaintiffs say they wish to protect.

The American Forest Resource Council ("AFRC") and Eastern Oregon Counties Association ("EOCA") intervened in this case to defend the Eastside Screens Amendment because land management science compelled a change. By all accounts, the Eastside Screens Amendment will provide equal *or improved* protections for old and large trees and improve forest health and resilience to wildfire on forest lands across eastern Oregon and eastern Washington. AFRC's mission includes advocating for land management that fosters "forest health and resistance to fire, insects, and disease" on public timberlands like those at issue here. Declaration of Andy Geissler ("Geissler Decl.") ¶ 4. AFRC supports the Eastside Screens Amendment as a "vast improvement" over the status quo, *id.* ¶ 10, which over the last two decades has necessitated numerous "project-specific amendments to forest plans" to accomplish necessary forest health projects. *Id.* ¶ 7. Additional forest health projects would have benefitted from the enhanced flexibility afforded by project-specific plan amendments, but that process

took time and was an inefficient, piecemeal approach to land management, hence the need for the Eastside Screens Amendment. EOCA likewise supports the Eastside Screens Amendment because it will foster forest resiliency on public timberlands that "make up a significant percentage of" the member counties' land base. Declaration of Barry Shullanberger ¶ 8. *See also id.* ¶ 11 (applauding the Eastside Screens Amendment, which will "increas[e] forest resilience to insect and disease outbreaks and uncharacteristic wildfires," while also "providing safe and effective locations for fire suppression efforts").

Defendant-Intervenors therefore urge the Court to uphold this important agency action, which is wholly lawful and supported by a robust record.

## II.    FACTUAL BACKGROUND

The origination of the Eastside Screens dates back to the early 1990s and was dictated in part by a unique political process. AR 34508-09. At that time, House Speaker Tom Foley (Washington) and Senator Mark Hatfield (Oregon) requested the formation of an interagency panel to complete a scientific evaluation "of the sustainability of eastern Oregon and Washington forests." AR 34508. The report produced by the panel was called the Eastside Forests Ecosystem Health Assessment, or the "Everett Report." *Id.* Among other issues, the Everett Report discussed old-growth forests and noted that old-growth abundance and distribution in some areas of the Eastside Forests presented a "cause for concern." AR 14405-06. In response, the Forest Service asked the panel to develop interim policies—which would become the Eastside Screens—that would eventually need to be replaced "within 12-18 months" after more formal landscape evaluations could be conducted in response to the findings of the Everett Report. AR 34509. At the same time, political and legal pressure from environmental groups led to the

establishment of a lower-end size limit of 21 inches, which was arrived at via negotiations with

environmental advocacy groups who had sued the Forest Service. *Id.*

The Eastside Screens at the outset revolved around the idea of historical range of

variability ("HRV") and straightforwardly sought to maintain or increase old-growth trees in

areas where it was believed old tree numbers were below HRV. AR 14407. Through the initial

screening process, the Forest Service would "screen" vegetation management projects and timber

sales for potential impacts to riparian, ecosystem, and wildlife resources. *Id.* Over time, the

Forest Service has re-authorized and modified the screens. However, the 21-inch rule and the

Eastside Screens were always intended to be an interim, *i.e.*, temporary, rule:

> The interim nature of this decision and the need to protect options led to the
> formulation of the alternatives. The interim standards themselves were developed
> to be conservative in their approach to protecting habitats i.e. they did not attempt
> to establish protection at the minimum level. This approach was taken to provide
> the flexibility necessary to look at a wide range of options when establishing more
> permanent standards after the Eastside Assessment is completed.

AR 14479.

As early as 2003, the Forest Service recognized that the Eastside Screens presented

management challenges, including those resulting from the 21-inch rule. A letter dated June 11,

2003, from then-Regional Forester Linda Goodman, noted that "screens direction, including the

21-inch diameter limitation, is limiting the ability to meet the screens objectives of providing

LOS [Late Old Structure] stands." AR 14683. Regional Forester Goodman noted that more

flexibility was sorely needed:

> Previous interpretations that site specific Forest Plan amendments were not
> allowed except in rare cases (Regional Forester's letters on screens, October 2 and
> December 23, 1993), coupled with a nine-year body of practical experience,
> suggests a need for more flexibility in the implementation of screens direction.
> Some flexibility in implementing 21" diameter limitations, harvest under Scenario
> A, and connectivity corridors, is appropriate.

AR 14685.

As a result, some national forests have modified this standard through the use of site-specific land use plan amendments. AR 34512 (noting 38 project-specific amendments to the Eastside Screens, with 24 specific to the 21-inch rule standard). "In practice over the past several decades, site-specific diameter limits have been applied" ranging from 28-inch to 35-inch diameter limits for Douglas-fir, grand fir and white fir. AR 34516. The Eastside Screens Amendment seeks to move away from the use of site-specific plan amendments[2] and is based heavily on the agency's experience as well as the use of 25-year outlook modeling using the Forest Vegetation Simulator ("FVS"). AR 34516. The FVS modeling was designed to assess how changing the 21-inch rule would affect species composition, old trees, large trees, and forest structure.[3] AR 34523.

The Forest Service's analysis makes several key assumptions that undergird its decision:

- Disturbances in eastern Oregon and southeastern Washington landscapes help maintain ecosystem function and promote small and large-scale change in vegetation and processes.
- Climate change will increase the extent of disturbances including fire, insects, disease, and drought.
- Species composition will continue to shift toward fire intolerant species like grand fir and white fir.
- Because of their current abundance, these less fire tolerant species will comprise an increasing component of large trees on the landscape (Johnston et al. 2017).
- The current trend toward closed, dense forest structure will continue.
- Trees will become increasingly vulnerable to mortality.
- The total area affected by timber harvest will remain stable under all alternatives while the prescriptions within treated stands would change to some extent.

---

[2] The Forest Service also cites, as part of its rationale, a 2014 District Court decision rejecting the use of a site-specific amendment to the 21-inch rule to address a forest-wide issue. AR 34509; AR 34512. *See League of Wilderness Defenders/Blue Mts. Biodiversity Proj. v. Connaughton*, 2014 WL 6977611, at *27-30 (D. Or. Dec. 9, 2014).
[3] The FVS simulations assumed treatments at levels far beyond annual averages in order to better understand potential impacts. AR 34529.

AR 34527-44. These predictions and assumptions are extensively supported.

Overstocked conditions are not exclusive to Eastside Forests, nor are the recommendations to address them. The Intergovernmental Panel on Climate Change ("IPCC") has recognized that on a global scale, "a sustainable forest management strategy aimed at maintaining or increasing forest carbon stocks, while producing an annual sustained yield of timber, fibre or energy from the forest, will generate the largest sustained mitigation benefit." AR 27029. Harvest and forest regeneration are an essential part of a sustainable management strategy and "can help maintain active carbon sinks by maintaining a forest-age class distribution that includes a share of young, actively growing stands." *Id.* The Biden Administration has recognized that "the primary threats to forests, including mature and old-growth forests, include climate impacts, catastrophic wildfires, insect infestation, and disease"—not logging. *Strengthening the Nation's Forests, Communities, and Local Economies*, Exec. Order No. 14072, 87 Fed. Reg. 24,851, 24,851 (Apr. 27, 2022). The Administration has made it a priority to reduce the threat of catastrophic wildfires "using active, science-based forest management." *Id.* at 24,852.

The Forest Service's intentions match these widely accepted views and are clearly articulated in the Environmental Assessment ("EA"):

> The purpose and need of the Eastside Screens has not changed, but 25 years of learning from science and experience demonstrate that this early definition of late and old structure forest (LOS) did not adequately account for species composition or age and does not fully support landscape restoration and resiliency efforts. We are currently lacking forests across the analysis area that are open, multi-aged, and fire resistant with old-growth trees while late structure forests with less fire resistant trees are overabundant.

AR 34523. In addition to the agency's experience, dozens of studies cited in the EA support the Forest Service's conclusion that many Eastside Forests are currently overcrowded and highly conducive to disturbance by wildfire, insects, and disease. *See* AR 34557-62.

By contrast, Plaintiffs' preference to retain old trees (full stop), regardless of landscape-level factors such as species composition and fire resistance, misses the forest for the trees. The Forest Service believes that under such a strategy, *i.e.*, continuing under a rigid application of the 21-inch standard, it would be "impossible to restore stands to historical conditions or conditions that would be resistant to current and future conditions without cutting some fir larger than 21-inches (Johnston et al. 2021)." AR 34544.

The modest changes to the 21-inch rule adopted by the Eastside Screens Amendment are thus designed to provide the flexibility that has long been needed to improve LOS conditions. The modest changes will do so by adopting species-specific standards across the Eastside Forests that will be easier to understand and by providing for some flexibility in the application of the 21-inch rule that practical experience indicated was previously lacking. In effect, at a landscape level, the revised rule will better protect old trees by moving LOS forests toward healthier and more balanced species compositions that will improve resilience to various types of disturbance.

### III. LEGAL BACKGROUND

#### A. Standing.

Article III of the United States Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies[,]'" *Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III" and thus "'are appropriately resolved through the judicial process,'"

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

To establish the "irreducible constitutional minimum of standing[,]" a plaintiff must allege (1) an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." *Defenders of Wildlife*, 504 U.S. at 560-61 (internal quotation marks and citations omitted). "The party invoking federal jurisdiction bears the burden of establishing standing—and, at the summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411-12 (2013) (citations, internal quotations omitted). "[A] plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation and internal quotation marks omitted).

Significantly, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Defenders of Wildlife*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)). For example, Plaintiffs must typically "submit affidavits or other evidence showing, through specific facts" not only that that specific environmental harm is being threatened, "but also that one or more of Plaintiffs' members would thereby be "directly" affected apart from their "'special interest' in th[e] subject." *Id.* at 563 (citing *Sierra Club v. Morton,* 405 U.S. 727 (1972)). *See generally Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

**B.      National Forest Management Act.**

The Forest Service manages the National Forest System ("NFS") pursuant to several

authorities. Congress first delegated authority to the Forest Service to administer NFS lands via

the Forest Service Organic Administration Act of 1897. The Organic Act provides for the

designation of NFS lands "to improve and protect the forest . . . , or for the purpose of securing

favorable water flows, and to furnish a continuous supply of timber for the use and necessities of

citizens of the United States." 16 U.S.C. § 475. The Act also vests the Forest Service with

authority to "make such rules and regulations" as necessary to regulate the "occupancy and use"

of the forests, and to preserve them from destruction. *Id.* § 551.

In 1960, Congress passed the Multiple-Use Sustained-Yield Act ("MUSYA"), which

affirmed and clarified the Forest Service's broad management mandate, providing that "the

national forests are established and shall be administered for outdoor recreation, range, timber,

watershed and fish purposes." *Id.* § 528. MUSYA also directs the Forest Service to "administer

the renewable surface resources of the national forests for multiple use and sustained yield of the

several products and services obtained therefrom." *Id.* § 529. MUSYA defines "multiple use" in

part as the "management of all the various renewable surface resources of the national forests so

that they are utilized in the combination that will best meet the needs of the American people."

*Id.* § 531(a). And "sustained yield" means that "the several products and services" of the national

forests must be provided "in perpetuity" and "without impairment of the productivity of the

land." *Id.* § 531(b). Congress noted that in meeting this mandate, "some land will be used for less

than all of the resources," and also emphasized that management for multiple uses does not

require "the combination of uses that will give the greatest dollar return or the greatest unit

output." *Id.* § 531(a).

With the National Forest Management Act of 1976 ("NFMA"), Congress directed the Forest Service to develop "one integrated plan" for each unit of the NFS, and to assure that such plans "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with [MUSYA]." *Id.* §§ 1604(e), (f). Pursuant to that direction, the Forest Service established a system of staged decision-making. *See* 16 U.S.C. §§ 1600 *et seq.* At the first stage, the agency develops a land and resource management plan ("LRMP" or "forest plan") for each unit in the NFS, which sets forth "broad, long-term plans and objectives for the entire forest." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). Like a zoning ordinance, a forest plan defines management areas and guides Forest Service actions within those areas. While forest plans establish management goals and broad standards and guidelines, they generally do not authorize any particular on-the-ground action. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998).

At the second stage, the Forest Service proposes, analyzes, and approves project-level decisions—for example, by deciding to harvest timber or authorize grazing in a particular area. *See id.* at 729. No proposed site-specific project may go forward until it has been found consistent with the forest plan, 16 U.S.C. § 1604(i), and subjected to the appropriate level of environmental review and public participation under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f, and other applicable laws. *See, e.g.*, *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1511-12 (9th Cir. 1992). The agency's decision to authorize a project is then subject to judicial review pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706. However, the Forest Service's interpretation of its forest plan is entitled to substantial deference. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). Additionally, courts have declined to adjudge the legality of a forest plan that does

not authorize site-specific activities on the basis that such plans may not yet be ripe for review. *See Ohio Forestry Ass'n*, 523 U.S. at 728.

C.     **National Environmental Policy Act.**

NEPA requires that federal agencies assess the impact of major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008). NEPA's purpose is twofold: (1) to ensure agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public. *Roberston v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Ctr. for Biological Diversity*, 538 F.3d at 1185.

Under NEPA, if the applicable regulations do not categorically require the preparation of an Environmental Impact Statement ("EIS"), then an agency typically prepares an EA. *See Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000). The EA "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact [FONSI]." 40 C.F.R. § 1508.9(a)(1).[4] "If there is a substantial question whether an action 'may have a significant effect' on the environment, then the agency must prepare an [EIS]." *Ctr. for Biological Diversity*, 538 F.3d at 1185 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998)).

Determining whether an action will have a significant effect on the environment requires the agency to consider both "context" and "intensity." 40 C.F.R. § 1508.27; *see also Nat'l Parks*

---

[4] All citations are to the 2019 version of the Council on Environmental Quality's ("CEQ") NEPA regulations. CEQ modified the NEPA regulations on July 16, 2020, then rescinded some of those modifications on April 20, 2022. 85 Fed. Reg. 43,304 (July 16, 2020); 87 Fed. Reg. 23,453 (Apr. 20, 2022). In approving the Eastside Screens Amendment, the Forest Service relied on the prior version of the CEQ regulations, 40 C.F.R. §§ 1500-1508 (2019).

& *Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001). "Context . . . delimits the scope of the agency's action, including the interests affected." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731. Intensity refers to the "severity of impact." 40 C.F.R. § 1508.27(b). In considering intensity, the agency must consider, among other things, the "degree to which the effects on the quality of the human environment are likely to be highly controversial" or "highly uncertain or involve unique or unknown risks." *Id.*

In the NEPA context, "highly controversial" has a specific meaning. An action is "controversial" only when "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor or there is a substantial dispute about the size, nature, or effect of the . . . action." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (quotations and citations omitted). *See also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1539 (9th Cir. 1997); *LaFlamme v. FERC*, 852 F.2d 389, 397 (9th Cir. 1988). A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI,[5] casts *serious doubt* upon the reasonableness of an agency's conclusions.

> Although a court should not take sides in a battle of the experts, it must decide whether the agency considered conflicting expert testimony in preparing its FONSI, and whether the agency's methodology indicates that it took a hard look at the proposed action by reasonably and fully informing itself of the appropriate facts.

*See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (citations omitted). *See also Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, at 1150 (9th Cir. 1998); *Blue Mountains*, 161 F.3d at 1212. NEPA then places the burden on the agency to come forward with a "well-reasoned explanation" demonstrating why those responses disputing the EA's conclusions "do not suffice

---

[5] *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1334 (9th Cir. 1992) (holding that a party may not establish controversy post hoc, when at the time of the agency's action no controversy existed).

to create a public controversy based on potential environmental consequences." *LaFlamme*, 852 F.2d at 401 (citing *Jones v. Gordon*, 792 F.2d 821, 829 (1986)). "[M]ere opposition alone is insufficient to support a finding of controversy." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019).

A project's effects may be "highly uncertain" where an agency lacks any real knowledge about the effects or fails to investigate potential environmental effects entirely. *See, e.g.*, *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731-36 (finding an EA deficient where it determined the effects of increased water traffic on Glacier Bay cetaceans were "unknown" but likely obtainable and helpful); *Blue Mountains*, 161 F.3d at 1213 (noting failure to investigate potential effects). Even where intensity of effects is deemed highly uncertain, courts have found that agency plans to mitigate those effects may be sufficient to circumvent the need for preparation of an EIS. *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000); *Friends of Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir. 1993). "If significant measures are taken to 'mitigate the project's effects, they need not completely compensate for adverse environmental impacts.'" *Wetlands Action Network*, 222 F.3d at 1121 (quoting *Friends of Payette*, 988 F.2d at 993).

### D. Endangered Species Act.

Section 7 of the Endangered Species Act ("ESA") requires that federal agencies, in consultation with the U.S. Fish and Wildlife Service and National Marine Fisheries Service ("the Services"), ensure that any actions authorized, funded or carried out are not likely to jeopardize the continued existence of any listed species or result in the destruction or modification of their critical habitat. 16 U.S.C. § 1536(a)(2).

The Services first promulgated joint regulations interpreting the Section 7(a)(2) consultation process in 1986. 51 Fed. Reg. 19,926 (June 3, 1986).[6] Under that process, to determine if Section 7(a)(2) applies, a federal agency makes an initial determination of whether its proposed action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14(a). An effects determination considers only those consequences that are a direct result of the proposed action and which are reasonably certain to occur. *Id.* § 402.17(a), (b). Where the Services conclude that an ESA-listed species may be present in an area affected by major construction activity, it may ask the action agency to prepare a Biological Assessment ("BA"). 16 U.S.C. § 1536(c)(1). However, a finding of "no effect" obviates the need for Section 7 consultation altogether. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) ("[I]f the agency determines that a particular action will have no effect on an endangered or threatened species, the consultation requirements are not triggered. *See also Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012); *Sw. Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1447 (9th Cir. 1996); *Newton Cnty. Wildlife Ass'n v. Rogers*, 141 F.3d 803, 810-11 (8th Cir. 1998). If the federal agency determines that its actions "may affect" listed species or critical habitat, it must engage in consultation with the Services. 50 C.F.R. §§ 402.13, 402.14.

Consultation may proceed in either of two ways: informal or formal. Informal consultation is a process comprising all discussions and correspondence between the Services and the action agency in order to determine whether formal consultation is necessary. 50 C.F.R.

---

[6] The Services amended their regulations related to ESA Section 7 in 2019. See 84 Fed. Reg. 44,976 (Aug. 27, 2019) (effective Oct. 28, 2019). *See also Ctr. for Biological Diversity v. Haaland*, No. 19-cv-05206-JST, (N.D. Cal. Nov. 16, 2022, Dkt. # 198) (district court's amended order remanding without vacatur the 2019 ESA rules). While the 2019 revisions are now under reconsideration, they did not alter the longstanding consultation framework.

§ 402.13(a). If an action agency determines, with the concurrence of the consulting agency, that the action "is not likely to adversely affect" the listed species or critical habitat, the consultation process is terminated, and formal consultation is not necessary. 50 C.F.R. § 402.13(c).

If either the action agency or consulting agency determines that the proposed action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. 50 C.F.R. §§ 402.13(a); 402.14(a)-(b). Formal consultation concludes with the issuance of a Biological Opinion ("BiOp") by the consulting agency assessing the likelihood of jeopardy to the species and whether the proposed action will result in destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.14(g), (h).

## IV.    STANDARD OF REVIEW

Section 706 of the APA, 5 U.S.C. § 706, governs judicial review of agency decisions. The APA imposes a deferential standard of review, which limits the court's determination to whether the agency acted in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citing 5 U.S.C. § 706(2)(A)). Under the arbitrary and capricious standard, courts "do not substitute [their] judgment for that of the agency." *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012). Review is limited to the administrative record before the agency decision-maker. *Fla Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985).

A decision may be found "arbitrary and capricious" under the APA only if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*) (internal quotations omitted), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 129 (2008). If the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court must uphold the agency's action. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983).

The court must generally be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *See Balt. Gas & Elec. Co.*, 462 U.S. at 103. The judicial branch should not "act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *McNair*, 537 F.3d at 988. The Court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" *Id.* at 993 (quoting *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006)). And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* at 1000 (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

## V.    ARGUMENT

### A.    Plaintiffs Lack Article III Standing.

#### 1.    Plaintiffs Fail to Show A Likelihood of Imminent Injury, Causation, or Redressability.

Standing is a "threshold question in every federal case," *Warth v. Seldin*, 422 U.S. 490, 498 (1975), because it implicates the Court's jurisdiction. *See Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 88 (1998). As stated at the outset, Plaintiffs bear the burden of establishing

standing. *Clapper*, 568 U.S. at 411-12. And at the summary judgment stage, bare allegations regarding standing do not suffice. Rather, Plaintiffs must establish "by affidavit or other evidence specific facts" satisfying Article III's standing requirements. *Id.* at 412 (citation and internal quotation marks omitted). Moreover, Plaintiffs must do so for each claim on which they seek relief. *Davis*, 554 U.S. at 734.

Plaintiffs have not carried their burden in this case—they have not established the three elements that constitute the "irreducible constitutional minimum of standing," namely injury in fact, causation and redressability. *Defenders of Wildlife*, 504 U.S. at 560-61. Plaintiffs' claims of injury at this stage are both unsupported and "speculative," given that the Eastside Screens Amendment is programmatic in nature and does not directly approve any site-specific projects or set amounts of timber harvest.

First, Plaintiffs fail to show injury because, as discussed extensively above, the Eastside Screens Amendment's modest changes will provide benefits (not harm) to old growth forests over the long-term by promoting forest conditions and tree species that are more resistant to the increasing threat of wildfire. Second, Plaintiffs fail to show that any such injury would be attributable to the Eastside Screens Amendment itself, versus any site-specific projects subsequently authorized by the Forest Service. *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983). Because the Eastside Screens Amendment *"*at most authorizes—but does not mandate or direct—the [injury] that [Plaintiffs] fear," Plaintiffs' injury allegations "are necessarily conjectural" and therefore do not support standing. *Clapper*, 568 U.S. at 412*. See also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) ("[T]he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the

challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.").

Second, although Plaintiffs raised general concerns in both their complaint and summary judgment motion regarding specific projects approved (or in the process of approval) pursuant to the Eastside Screens Amendment, and requested injunctive relief against such projects, Plaintiffs have failed present any facts or evidence showing that the amendment or such projects will cause Plaintiffs harm. Pls.' Br. at 14 (noting at least three projects implementing the Eastside Screens Amendment already have been approved, including the South Warner project on the Fremont-Winema, and the Cliff Knox Project and Neighbor Project on the Malheur). Nor do Plaintiffs provide evidence of such harm, as required by Article III standing jurisprudence, specific to each of their claims—*e.g.*, harms traceable to the alleged legal violations regarding old growth viability under NFMA, aquatic species under the ESA, or any other significant environmental impacts supposedly unconsidered in the agency's NEPA analysis.

Lastly, Plaintiffs do not explain how a decision by this Court would redress any of these speculative harms. Even absent the Eastside Screens Amendment, the Forest Service is likely to pursue at least some of these important forest health projects under existing site-specific land use plans at the forest level and/or through other procedural means. *See* AR 34753 (explaining that before adopting the Eastside Screens Amendment, the Eastside Forests completed numerous "project-specific amendments to the Eastside Screens," which was "an inefficient process requiring repetitive analysis"). What the Forest Service cannot and should not do is nothing, as the status quo will leave the Eastside Forests unnecessarily and uncharacteristically vulnerable to destructive wildfire and other disturbances.

## 2.    Alternatively, Plaintiffs' Claims Are Unripe.

Alternatively, the Court should decline to find that Plaintiffs' claims are justiciable at this time, given significant concerns over whether their claims are ripe for review. The "basic rationale" for the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967). An assessment of whether a particular case is ripe involves an assessment of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* "The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive—postimplementation litigation." *Ohio Forestry Ass'n*, 523 U.S. at 735.

In *Ohio Forestry Association*, the Supreme Court found that a forest plan was not yet ripe for review, given it did "not give anyone a legal right to cut trees[] nor . . . abolish anyone's legal authority to object to trees being cut." *Id.* at 733. The Court held that "further factual development" was necessary and that the legal review would only be ripe when the agency engaged in site-specific decisionmaking that would "focus on a particular site" and "propose a specific harvesting method." *Id.* Like the forest plan in *Ohio Forestry Association,* the Eastside Screens Amendment does "not command anyone to do anything or to refrain from doing anything," and its broad-scale planning objectives "do not create adverse effects of a strictly legal kind." *Id.* Plaintiffs' overly general claims of harm are a direct result of a lack of ripeness that make precise consideration of Plaintiffs' claims difficult at this point in time:

> [R]eview of the . . . claims regarding logging and clearcutting now would require time-consuming judicial consideration of the details of an elaborate, technically based plan, which predicts consequences that may affect many different parcels of land in a variety of ways, and which effects themselves may change over time.

> That review would have to take place without benefit of the focus that a particular logging proposal could provide.

*Id.* at 736. Even though it may "be easier, and certainly cheaper, to mount one legal challenge against the Plan now, than to pursue many challenges to each site-specific logging decision to which the Plan might eventually lead . . . . the Court has not considered this kind of litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe." *Id.* at 734-35.

Because the Eastside Screens Amendment is akin to a programmatic decision, and because Plaintiffs will have ample opportunity to review and challenge forest management projects approved pursuant to the Eastside Screens Amendment, the Court should decline to hear the case at this time.

**B.      The Forest Service Complied with NEPA.**

**1.      The Purpose and Need Statement for the Eastside Screens Amendment Is Reasonable.**

Plaintiffs assert, somewhat obliquely, that the Forest Service improperly defined the "purpose and need" for the Eastside Screens Amendment because, in Plaintiffs' estimation, the need for the Eastside Screens Amendment is controversial. Pls.' Br. at 27. *See also id.* at 26 (describing two "controversial" issues at the heart of the purpose and need for the Eastside Screens Amendment). But the purpose and need statement in an EA has never been held subject to the controversy provision of 40 C.F.R. § 1508.27(b)(4). Moreover, whereas the NEPA regulations require that *an EIS* include a statement of purpose and need, *id.* § 1502.13, for an EA, the regulations require only "brief discussions of the need for a proposal." *Id.* § 1508.9(b). Further, reviewing courts afford agencies "considerable discretion" to define the purpose and need of a project, *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir.

1998), with the agency's definition evaluated under a reasonableness standard. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 1070. Preparation of an EA "necessarily calls for judgment, and that judgment is the agency's." *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974). Plaintiffs' criticism of the agency's reasonable purpose and need for the Eastside Screens Amendment thus is without merit.

### 2.    The Forest Service Took A "Hard Look" At Likely Effects.

The only changes made to the screening process by the Eastside Screens Amendment are to the interim wildlife standards. AR 34520. These include changes to: (1) the 21-inch rule standard, and (2) the treatment of snags, green tree replacements and down logs. *Id.* Plaintiffs do not appear to challenge the latter, but rather focus on changes to the 21-inch rule. Plaintiffs' concerns are overblown, however, and do not properly account for the context in which this change has been made. In short, the changes to the 21-inch rule are minimal and, if anything, expand limitations on timber harvest by now emphasizing the preservation of "old" trees *in addition to* "large" trees. *Compare* AR 34729 (EA), *with* 34753 (Decision Notice/FONSI).

To fully appreciate the minimal (but important) changes to the 21-inch rule, the Court must consider the context of the screening process. As discussed above, the Eastside Screens involve consideration of interim standards for riparian, ecosystem, and wildlife resource values. The change to the 21-inch rule revises only one part of the interim wildlife standard, namely the so-called Scenario A2, Section 6(d)(2). AR 34753-54. The wildlife standard is divided into two separate Scenarios, A and B. AR 34729-34. Under Scenario B, Section 6(e), where late and old structural stages ("LOS")[7] are within or above the HRV, timber harvest may occur but is limited

---

[7] For the purposes of the standard, LOS can be either "Multi-strata with Large Trees" or "Single Strata with Large Trees." AR 34508 (n.1).

by the conservation of LOS conditions. AR 34733. Under Scenario A, which is applicable to

areas whenever any one type of LOS falls below the HRV, the Eastside Screens provide that

there should be "NO NET LOSS OF LOS" from that environment. AR 34729. This continues to

be true under the Eastside Screens Amendment. AR 34756. In fact, under the Amendment, the

Scenario A1 language at Section 6(d)(1) remains exactly the same for areas within LOS. *See* AR

34729; AR 34573.

Outside of LOS, under Scenario A2, Section 6(d)(2), some limited changes were adopted.

First, the Eastside Screens Amendment replaced the words "plan standards" with "plan

components" (change indicated below with <u>underline</u>):

> Outside of LOS, many types of timber harvest activities are allowed. The intent is
> still to ***maintain and/or enhance a diverse array of LOS conditions in stands
> subject to timber harvest as much as possible***, by adhering to the following plan
> <u>components</u>:

AR 34753 (emphasis added). *Cf.* AR 34729-30 (prior language). However, the Forest Service

must still maintain or enhance LOS conditions "as much as possible," language that is

unchanged from prior version. Second, the agency has added significant sideboards on the

harvest of old growth in areas outside of LOS under Scenario A via changes to Section

6(d)(2)(a), which added the following language regarding the retention of old and large trees:

> Managers should ***retain and generally emphasize recruitment of old trees and
> large trees***, including clumps of old trees. Management activities should ***first
> prioritize old trees*** for retention and recruitment. ***If there are not enough old
> trees to develop LOS conditions, large trees should be retained, favoring fire
> tolerant species where appropriate***. Old trees are defined as having external
> morphological characteristics that suggest an age $\geq$ 150 years. Large trees are
> defined as grand fir or white fir $\geq$ 30 inches dbh or trees of any other species $\geq$ 21
> inches dbh. Old and large trees will be identified through best available science.
> Management activities should consider appropriate species composition for
> biophysical environment, topographical position, stand density, historical
> diameter distributions, and spatial arrangements within stands and across the
> landscape in order to develop stands that are resistant and resilient to disturbance.

AR 34753-54 (emphases added).

Relative to the existing standard, the Amendment language technically *expands* the limit on timber harvest by now emphasizing preservation of "old" trees in addition to "large" trees—while defining old trees as those having "visual characteristics that *suggest* an age ≥ 150 years"—without having to confirm the age through taking a core sample (how foresters would normally determine age). And the new "exceptions" created to the 21-inch rule would be limited to grand fir and white fir up to 30 inches, given that trees of "any other species" retain the 21-inch standard.[8] AR 34753. Ultimately, the Forest Service expects the effect of these changes to be minimal, with no change in the amount or acreage of timber volume harvested. AR 34529-30.

Over the long term, however, forest conditions and resiliency are expected to improve. The Forest Service anticipates old trees "would be maintained" and mortality rates for old trees will decrease. AR 34538. Carbon storage will increase. AR 34542-23. Reducing canopy cover in overcrowded forest stands will increase the heterogeneity of forest stands. AR 34540-41. The risks of disturbances from wildfire, insects and disease will be reduced. AR 34566-69. Risks of habitat loss will decrease for LOS-associated species. *Compare* AR 34613, *with* AR 34616.

It is anticipated that these effects will be gradual, given that the changes are primarily designed to grant flexibility toward reducing overstocked stands of grand and white fir, and given low levels of existing and anticipated management activities. *See* AR 34586 ("This may increase project efficiency but will not necessarily lead to greater harvest volumes."); AR 34756

---

[8] Between the draft and final EAs, the Forest Service made a significant concession regarding harvest of Douglas-fir trees. Under the draft EA, the "large" tree definition required Douglas-fir trees to be greater than 30 inches in diameter at breast height, while in the final EA, a large Douglas-fir tree was defined as anything over 21 inches in diameter at breast height. AR 33223. This conservative modification eliminated some additional flexibility and expanded the large tree definition, making it no different than the existing Eastside Screens diameter at breast height for Douglas-fir.

("Outside of LOS, this proposal would not substantially change where or how much project level management occurs because fewer trees over 21 inches dbh exist in these areas, . . . However, the proposed action does give managers increased ability to consider tree species composition in developing management approaches, and it enables managers to better address uncharacteristicly [sic] dense forests in areas with young, fast-growing trees.").

As discussed above, this analysis was based in part on the Forest Service's open-source FVS model, a narrative description of which is found at AR 34402-03. Plaintiffs challenge the reliability of the FVS model without any basis. Pls.' Br. at 31 (challenging the conclusion that large trees will continue to increase across the landscape). The agency's reliance on modeling is not arbitrary given that: (1) this is exactly what has occurred over the last 25-30 years; and (2) trees will continue to grow across the landscape to larger sizes. AR 34535 ("Late structure forest has increased since 1995 on all six national forests. This is an absolute increase, with most of the late structure gained in closed canopy forest.").

Further, agencies are granted particular deference in areas involving a high level of agency technical expertise. *McNair*, 537 F.3d at 993; *see also Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003). Courts are typically at their "most deferential" when the agency is "making predictions, within its [area of] special expertise, at the frontiers of science." *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003) (citations omitted). In the Ninth Circuit, courts will conclude that an agency acted arbitrarily and capriciously "only when the record plainly demonstrates that the Forest Service made a clear error in judgment." *McNair*, 537 F.3d at 994. Other circuits agree that a "particularly deferential review" is appropriate for an "agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable." *EarthLink*, 462

F.3d at 12 (quotation omitted); *see Cellnet Commc'ns, Inc. v. FCC*, 149 F.3d 429, 441 (6th Cir. 1998); *W. Fuels-Ill., Inc. v. ICC*, 878 F.2d 1025, 1030 (7th Cir. 1989).

The beneficial impacts of the Eastside Screens Amendment on forest conditions and resiliency is well-supported by the record. *See, e.g.*, AR 34523-44 (discussing anticipated impacts on forest vegetation in the EA); AR 34445-46 (discussing the agency's use of the FVS model in the project's Vegetation Report). Given the Forest Service's detailed and well-supported analysis of anticipated effects, it begs credulity to conclude that the Eastside Screens Amendment will negatively impact old growth trees or that the agency failed to take a "hard look" at environmental effects pursuant to NEPA. The Court should defer to the Forest Service's technical and silvicultural determinations made in the context of how best to manage the Eastside Forests, a land management undertaking involving a high level of agency expertise.

> **3.** **Plaintiffs Fail to Demonstrate That the Eastside Screens Amendment Has Highly Controversial or Highly Uncertain Effects, Such That An EIS Was Required.**

Plaintiffs spend considerable time seeking to undermine the Forest Service's assessment of the science that selective harvest of grand and white fir will improve the health and resiliency of Eastside old growth forests. In arguing that the Eastside Screens Amendment has effects that are highly controversial, Plaintiffs rely significantly on *Bark v. U.S. Forest Service*, 958 F.3d 865 (9th Cir. 2020). Pls.' Br. at 25-26, 29, 32. But *Bark* is inapposite—the case involved facts specific to the science supporting "variable density thinning" on a site-specific project located on the Mt. Hood National Forest, facts that do not resemble those before the Court.

Moreover, unlike *Bark*, where the court concluded the agency "did not engage" with the science regarding variable density thinning, 958 F.3d at 871, here agency experts considered all applicable science, including that submitted by Plaintiffs and other members of the public, and

even held a Science Forum for an open discussion on the topic. *See, e.g.*, AR 32203-353 (slides from May 2020 Science Forum); AR 32153-88 (closed captioning transcript of Science Forum). Forest Service experts considered the scientific literature submitted as part of the public comment process and provided feedback on that science. AR 33781-800. The EA explained that the Eastside Screens warranted an amendment because that approach to land management had been eclipsed by the passage of time and did not "incorporate the current best available science." AR 34555. *Cf.* Pls.' Br. at 26 (suggesting without basis that it was per se controversial to revisit the Eastside Screens, even though that approach was decades old and outdated, simply because it was "a 25-year-old legal standard"). The EA discussed forest species composition in relation to applicable land management tools. AR 33531-33. The EA also responded to comments about the relationship between thinning and an increased "risk of higher severity fire," explaining that "the full body of science on this issue is clear and compelling," and directing readers to the relevant supporting science. AR 34564. These examples are by no means exhaustive as the record is replete with evidence of the agency's thorough examination of the science supporting the Eastside Screens Amendment.

Ultimately, Plaintiffs have not raised "substantial questions" regarding the effects of the Eastside Screens Amendment such that an EIS would be required under NEPA. 40 C.F.R. § 1508.27(b) (assessing "degree to which the effects on the quality of the human environment are likely to be highly controversial"). Instead, it is abundantly clear that Plaintiffs' disagreement constitutes merely "an opposition to a use," which cannot be equated with the NEPA term of art "highly controversial." *See, e.g.*, *Sierra Club v. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005). The Court also should refrain from "tak[ing] sides in a battle of experts," *Nat'l Parks & Conservation*

*Ass'n*, 241 F.3d at 736 (citations omitted), and instead defer to the Forest Service's expert determination by upholding the Eastside Screens Amendment.

> **a.      *Plaintiffs' claims of controversy are vague and contradicted by the scientific consensus.***

Plaintiffs' claims of controversy rely primarily on views expressed by DellaSala, Law, and Hanson, that current overstocked stands invaded by shaded tolerant fir species are normal and consistent with the HRV. Pls.' Br. at 28-29. As a result, they argue, high-severity fire was also normal and should be accepted. But Hanson's findings have been widely contradicted, and the DellaSala and Baker paper Plaintiffs cite for validation on these issues is a non-peer-reviewed position paper created in response to the Eastside Screens Amendment that is not representative of scientific consensus. *See* AR 33922. In short, these views have been thoroughly debunked and were adequately addressed by the EA. *Supra* Section II, IV.B.2; Defs.' Mem. at 26-33. More recent scientific scholarship has only strengthened the consensus view that current conditions represent unnatural disturbance risks that must be corrected.

Fire scientists in particular have criticized Hanson's work as misleading and likely to delay vital work needed to protect wildlife and local communities, and improve forest resiliency to wildfire. According to Crystal Kolden, professor of wildfire science at the University of California Merced, "I and my colleagues are getting really tired of the type of activism that pretends to be science and in fact is just self-serving garbage." R. Sabalow & D. Kasler, *Self-serving garbage: wildfire experts escalate fight over saving California forests*, SACRAMENTO BEE (Oct. 17, 2021). Such strong language is a rarity in scientific circles. But three recent articles in the journal *Ecological Applications* indicate that widespread consensus exists that more active management is required to avoid destruction of overstocked forests like those on the Eastside that are at moderate to high risk of suffering from catastrophic fire. *Id.*

Keala Hagmann, a research ecologist at the University of Washington, has noted that at least 111 scientists have co-authored at least 41 scientific papers that call for more active management to restore the nation's forests. Sabalow & Kasler, *supra*. Some of these scientific papers directly rebut Hanson's and his colleagues' arguments that thinning is not necessary or does not work. Hagmann notes in particular that long-term fire exclusion across western North America has led to the loss of open-canopy forests of mature and old conifers and hardwoods. R. K. Hagmann, ECOLOGICAL APPLICATIONS 31(8) (2021).[9] "As climate continues to warm . . . . recapturing the once extensive influence of the low- and moderate-severity fires that shaped and maintained these ecosystems for millennia requires a paradigm shift . . . to [strategies] favoring fire-adapted forests and communities." *Id.* at 23.

Susan Prichard, a University of Washington fire ecologist and lead author of one of the recent articles that rebut Hansen's positions, compares Hanson and his allies to early climate change deniers, making "it seem as if there was a scientific debate when in reality an overwhelming majority of scientists insisted climate change was a pressing threat." Sabalow & Kasler, *supra*. Prichard's findings indicate that:

> Concerns about forest thinning and other forms of active management are sometimes based on the assumption that contemporary conditions and fire regimes in dry pine and mixed-conifer forests are not substantially departed from those maintained by uninterrupted fire regimes. This perspective does not accurately reflect the breadth and depth of scientific evidence documenting the influence of over a century of fire exclusion. Support for the suggestion that ecological departures associated with fire exclusion are overestimated has repeatedly failed independent validation by multiple research groups.

---

[9] For the Court's convenience, note that the referenced article is attached to the Declaration of James Johnston, PhD. (ECF No. 58) at pages 29-62, lodged in support of Dr. Johnston's proposed amicus brief (ECF No. 57-1).

S. Prichard, et al., *Adapting western North American forests to climate change and wildfires: 10 common questions*, at 8, ECOLOGICAL APPLICATIONS 31(8) (2021) (citations omitted).[10]

Active management—of which thinning is just one part—is thus a critical component of restoring forest resilience to wildfire, particularly in light of the fact that high severity fires are "less heterogeneous and more extensive" than historically and that fire frequency, extent, and severity are only likely to increase. *Id.* at 4-8; *see also* P. Hessburg, et al., *Wildfire and climate change adaptation of western North American forests: a case for intentional management*, ECOLOGICAL APPLICATIONS 31(8) (2021) ("[A] preponderance of evidence suggests that proactive management can prepare many landscapes for future wildfires and the maintenance work they can provide. This would also reduce emphasis on high-maintenance solutions and the overarching and increasingly burdensome role of wildfire suppression and its expenditures.").[11]

### b. The Effects of the Eastside Screens Amendment Are Not "Highly Uncertain."

Plaintiffs assert that the Forest Service's use of the FVS model was "fatally flawed" and thus the effects of the Eastside Screens Amendment are highly uncertain. Pls.' Br. at 33-35. Plaintiffs' arguments on this issue are brief and hard to follow. Apparently, they object to the assumption that no trees over 21 inches could be cut under Scenario A1 of the Current Management (i.e., prior Eastside Screens standard). *Id.* Plaintiffs have not made a credible showing that the effects of the Eastside Screens Amendment are highly uncertain or that the assumptions made as part of the FVS modeling were unreasonable, including for the reasons discussed above regarding the robust FVS model. The Current Management was assumed under Scenario A to never allow harvest of trees equal to or greater than 21 inches (despite the fact that

---

[10] This article also is attached to the Johnston Declaration. ECF No. 58, at 80-109.
[11] This article also is attached to the Johnston Declaration. ECF No. 58, at 63-79.

*some* of these trees could actually be harvested under Scenario A1); by contrast, all the alternatives were assumed to allow some harvest of 21-inch trees. AR 34531. This was "done intentionally to better highlight the potential impacts of the various alternatives," not as a nefarious attempt to obscure impacts. AR 34529.

That Plaintiffs' allegations lack merit is particularly true because of the high degree of deference afforded an agency's use of scientific modeling, which involves a high level of agency technical expertise. A reviewing court must generally be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expert judgment. *Balt. Gas & Elec. Co.*, 462 U.S. at 103. The judicial branch should not "act as a panel of scientists that instructs the [agency] . . . , chooses among scientific studies . . . , and orders the agency to explain every possible scientific uncertainty." *McNair*, 537 F.3d at 988. The Court should also "conduct a 'particularly deferential review' of an 'agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable.'" *Id.* at 993 (quoting *Earthlink*, 462 F.3d at 12). Here, the agency's predictive judgments are reasonable and should be left undisturbed.

## C.    The Forest Service Complied with the ESA.

The Forest Service satisfied its obligations pursuant to the ESA's Section 7 consultation requirements even without engaging in consultation with the National Marine Fisheries Service regarding effects on aquatic species. The very purpose of consultation is to ensure that federal agency actions are "not likely to jeopardize the continued existence of any listed species or result in the destruction or modification of critical habitat." 16 U.S.C. § 1536(a)(2). Thus, formal consultation is required only where an agency action "may affect" listed species. 50 C.F.R. § 402.14. Where an agency reasonably determines that there will be "no effect" on listed species,

the consultation requirements are not triggered. *See, e.g., Karuk Tribe*, 681 F.3d at 1027. Here, the Forest Service reasonably concluded the Eastside Screens Amendment would have "no effect" on aquatic species because of the substantial protections provided to such species under existing aquatic standards. The Eastside Screens Amendment will not alter those standards or otherwise affect aquatic species in any way, and Plaintiffs have asserted no colorable evidence to the contrary.

Currently, the Inland Native Fish Strategy ("INFISH") and Pacific Anadromous Fish Strategy ("PACFISH") operate in place of the riparian screen. AR 34508. INFISH and PACFISH provide goals, objectives, and standards and guidelines for managing forests in riparian areas and have themselves been subject to consultation. AR 14726 (PACFISH); AR 15039 (INFISH). The standards ensure that projects will achieve Riparian Management Objectives ("RMOs") for all projects within Riparian Habitat Conservation Areas ("RHCAs"),[12] and largely prohibit harvest of all trees within RHCAs. AR 14717, 14742, 15052, 15056, 14838, 15062. Those standards and guidelines set by PACFISH and INFISH for protecting RHCAs will not change under the Eastside Screens Amendment. AR 34749 ("This amendment does not change any portion of those documents or the guidance therein."). AR 34631.

Plaintiffs argue, however, that the Forest Service "erroneously equated" PACFISH and INFISH consistency with a determination of "no effect." However, modification of the 21-inch rule simply does not have any effect on timber harvest in riparian areas if, as Plaintiffs concede, riparian treatment is already governed by PACFISH and INFISH, which rather than limiting the size of trees harvested within RHCAs instead prohibit timber harvest altogether in RHCAs, with two minor exceptions. AR 14838.

---

[12] E.g., AR 14834-36 (defining RHCAs for PACFISH).

Again, the Eastside Screens Amendment does not modify or eliminate any RMOs or standards and guidelines in PACFISH and INFISH. Because no changes are expected to these existing standards under PACFISH and INFISH, it was reasonable for the Forest Service to determine that the programmatic Eastside Screens Amendment would have "no effect" on aquatic species. The consultation agencies agreed. AR 34650. Moreover, the Forest Service may conduct site-specific consultations with the Services for potential effects on aquatic species at the project level, as necessary. AR 34608. Plaintiffs do not appear to argue or present any evidence whatsoever that the three timber sales cited in their brief (and approved pursuant to the Eastside Screens Amendment) involve inappropriate removal of large or old trees in riparian areas. Pls.' Br. at 14.

Lastly, even assuming *arguendo* that the Court were to find a violation of the ESA's consultation requirement, any relief awarded to Plaintiffs would necessarily be limited to removal of large trees in riparian areas where aquatic species are actually determined to be present. *See, e.g.*, *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243-44 (9th Cir. 2001) (finding FWS improperly regulated grazing allotments along streams where listed species were not shown to occur and which were "merely capable of supporting" a protected species). But on the facts of this case, the Forest Service did not violate the ESA's consultation requirement, and this Court should so hold.

### D.    The Forest Service Complied with NFMA.

Defendant-Intervenors agree with, and incorporate by reference, the sound arguments of Federal Defendants on the issue of the Forest Service's compliance with applicable NFMA procedures in adopting the Eastside Screens Amendment. Defs.' Cross-Mot. Summ. J. and Mem. Supp. (ECF No. 56) ("Defs.' Mem.") at 15-24.

In sum, Plaintiffs complain that they anticipated but did not receive an administrative

objection process, which would have been the case if the Eastside Screens Amendment had been

signed by the Ochoco National Forest Supervisor, rather than by the Under Secretary. AR 34767

(Under Secretary's signature on the Decision Notice/FONSI). *See also* AR 34751 (identifying

the Under Secretary as the "Responsible Official" for the final decision); AR 34762 (explaining

that by law, the decision was "not subject to objection"). Defendant-Intervenors, who also were

participants in the public NEPA process, were similarly situated. *See, e.g.*, Geissler Decl. ¶ 10

(explaining that the Forest Service did not select the alternative preferred by the American Forest

Resource Council). But as Federal Defendants point out, Defs.' Mem. at 16, on rare occasion the

agency acts under the authority of 36 C.F.R. § 219.51(b), pursuant to which a decision of the

Under Secretary constitutes the agency's final determination and hence is not subject to the

administrative objection process.

Plaintiffs may not like it, but that is the law. Congress authorized the Secretary of

Agriculture "to establish in the Department the position of Under Secretary of Agriculture for

Natural Resources and Environment." 7 U.S.C. § 6961(a). Congress further required that the

Secretary "shall delegate to the Under Secretary . . . those functions under the jurisdiction of the

Department that are related to natural resources and environment . . . ." *Id.* § 6961(c)(1). The

Secretary did so, 7 C.F.R. § 2.20, and the Under Secretary's delegated authority includes that of

managing the national forests. *Id.* § 2.20(a)(2)(ii). Plaintiffs do not challenge the Under

Secretary's delegated authority. They instead assert entitlement to an objection process. But the

law neither provides for nor allows for one.

Plaintiffs' argument that the Under Secretary's decision should be subject to this extra

layer of administrative review because the Under Secretary did not "propose" the idea is contrary

to the plain reading and context of the regulatory scheme. The purpose and scope of the pre-decisional administrative review process is designed to provide an extra layer of review for certain decisions made at a level below that of the Secretary and Under Secretary. 36 C.F.R. § 219.50 ("This process gives an individual or entity an opportunity for an independent Forest Service review and resolution of issues *before the approval of a plan*, plan amendment, or plan revision."). However, Part 219 clearly establishes that a decision of the Under Secretary with respect to managing the national forests is a "final administrative determination" of the Department of Agriculture. 36 C.F.R. § 219.51(b). It would make little sense for such a final decision to then be subject to a "pre-decisional administrative review process." Nor would it make sense in the context of 36 C.F.R. § 219.56(e), which identifies reviewing officers as limited to the "official having authority and responsibility to review an objection filed under this subpart." Reading these two sections together, it is clear the regulations make no allowance for review of a decision made by the Under Secretary. 36 C.F.R. § 219.56(e).

Plaintiffs cite *Wild Virginia v. U.S. Forest Serv.*, 24 F.4th 915 (4th Cir. 2022), for the proposition that a proposal and decision are different, and therefore that decisions of the Under Secretary and Secretary may be subject to pre-decisional review if they did not originally conceive of the idea. However, *Wild Virginia* concluded exactly the opposite, i.e., that there is "no distinction based on the source" of a particular project. 24 F.4th at 926-27. That case involved consideration of an interstate natural gas pipeline originally proposed to the agency by the pipeline developer and approved by the Forest Service via final decision of the Under Secretary. *Id.* In response to Plaintiffs' argument (the same as in this case) that the decision was not "proposed" by the Under Secretary in such circumstances, the Fourth Circuit found that the Under Secretary's direct approval of a proposal constitutes a final decision regardless of its

origination. *Id.* ("The Under Secretary . . . signed the ROD . . . . Therefore, the proposal was not subject to the predecisional review process."). Even if the Court agrees with Plaintiffs' reading of *Wild Virginia*, which it should not, the Court may distinguish the case given that decision interpreted a similar, but not identical, review process for project-level decisions under 36 C.F.R., Part 218.

In short, although Plaintiffs wish they had been afforded another bite at the administrative process apple, the law does not allow for it on the facts of this case, not for Plaintiffs, Defendant-Intervenors, nor anyone else involved in the public process resulting in the Eastside Screens Amendment.

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, and grant summary judgment in favor of Federal Defendants and Defendant-Intervenors.

DATED: February 21, 2023

/s/ Aaron Bruner
Aaron Bruner (OSB #133113)
Caroline Lobdell (OSB #021236)
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119-327
Portland, Oregon 97219
Email: clobdell@wrlegal.org
Email: abruner@wrlegal.org
Phone: (503) 768-8500

## <u>CERTIFICATE OF SERVICE</u>

I, Aaron Bruner, hereby certify that, on February 21, 2023, I caused the foregoing to be

served upon counsel of record through the Court's electronic service system.

Dated this 21st day of February, 2023.

<div align="center" style="margin-left:40%">

<u>/s/ Aaron Bruner</u>
Aaron Bruner

</div>