IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PENDLETON DIVISION

GREATER HELLS CANYON
COUNCIL, an Oregon nonprofit
corporation; OREGON WILD, an Oregon
nonprofit corporation; CENTRAL
OREGON LANDWATCH, an Oregon nonprofit
corporation; SIERRA CLUB, a
California nonprofit corporation; GREAT
OLD BROADS FOR WILDERNESS, a
Montana nonprofit corporation; and
WILDEARTH GUARDIANS, a New
Mexico nonprofit corporation,

        Plaintiffs,

   v.

HOMER WILKES, in his official capacity
as Undersecretary for Natural Resources and
Environment; GLENN CASAMASSA, in
his official capacity as Regional Forester for
Region 6; and the UNITED STATES
FOREST SERVICE,

        Defendants,

   and

AMERICAN FOREST RESOURCE
COUNCIL; EASTERN OREGON
COUNTIES ASSOCIATION,

        Defendant-Intervenors.

Case No. 2:22-cv-00859-HL

**FINDINGS AND
RECOMMENDATION**

PAGE 1 – FINDINGS AND RECOMMENDATION

Oliver J. Stiefel
Meriel L. Darzen
Crag Law Center

       Attorneys for Plaintiffs,

Tyler McVeigh Alexander
Anthony Dolendo Ortiz
Hayley A. Carpenter
Environmental and Natural Resources Division
United States Department of Justice

       Attorneys for Defendants,

Aaron E. Bruner
Caroline Lobdell
Western Resources Legal Center

Julie A. Weis
Haglund Kelley LLP

       Attorneys for Defendant-
       Intervenors,

_____

HALLMAN, United States Magistrate Judge:

    Plaintiffs, a group of six environmental organizations, challenge the United States Forest

Service's ("Service") decision to amend the Eastside Screen's 21-inch standard, which prohibits

logging large trees in six national forests east of the Cascade Mountains. Plaintiffs claim that this

decision violated the National Environmental Policy Act ("NEPA"), the National Forest

Management Act ("NFMA"), and the Endangered Species Act ("ESA"). The Service and

Defendant-Intervenors, American Forest Resource Council and the Eastern Oregon Counties

Association (collectively, "Defendants"), disagree and ask this Court to reject Plaintiffs'

challenges. This matter now comes before the Court on all parties' cross-motions for summary

judgment. Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF 41; Defs.' Mot. Summ. J. ("Defs.' Mot."),

ECF 56; Def.-Intervs.' Mot. Summ. J. ("Intervs.' Mot."), ECF 62. The Court heard oral

PAGE 2 – FINDINGS AND RECOMMENDATION

argument on the parties' motions on May 1, 2023, and the parties subsequently filed

supplemental briefing. Defs.' Suppl. Br. ("Defs.' Br."), ECF 89; Def.-Intervs.' Suppl. Br.

("Intervs.' Br."), ECF 91; Pls.' Suppl. Br. ("Pls.' Br."), ECF 94. For the reasons discussed below,

Plaintiffs' motion should be GRANTED in part and the Service's and Defendant-Intervenors'

motions should be DENIED.

## BACKGROUND

In 1994, the Forest Service adopted the Revised Continuation of Interim Management

Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales, which is a

set of protective standards known as the "Eastside Screens" or "Screens." AR14492–631. "The

Eastside Screens . . . are a set of interim riparian, ecosystem, and wildlife standards for timber

sales applicable to [six national forests] east of the Cascade Mountains: Colville, Deschutes,

Malheur, Ochoco, Umatilla, Wallowa-Whitman, and Fremont-Winema National Forests"

(collectively, "eastside forests"). AR 14383; *League of Wilderness Defs. v. Connaughton*, No.

12-02271-HZ, 2014 WL 6977611, at *2 (D. Or. Dec. 9, 2014). The Eastside Screens were meant

to provide a series of short-term management standards to maintain the status of the eastside

forests until a thorough environmental impact statement ("EIS") could be conducted leading to

thorough, long-term standards. AR14384. Despite this intention, the Eastside Screens remained

in place for almost 30 years.

The Eastside Screens establish a screening process for proposed timber harvest projects

to prevent the removal of old and large trees in at least 6.3 million acres of the eastside forests.

AR14383, 14405-31; Defs.' Br. 13. Although the Eastside Screens impose a variety of standards,

Plaintiffs' case focuses almost exclusively on one of the standards established by the Eastside

Screens: the prohibition on cutting certain trees greater than or equal to 21 inches in diameter at

breast height ("dbh")—also known as "large trees". AR 34515. This is known as the 21-inch rule.

Specifically, the 21-inch rule directs the Service to retain all large trees outside of late and old structure stands ("LOS"). The Service classifies an area as LOS when the minimum number of large trees per acre is reached. AR 34451. Outside of areas where the minimum number of large trees per acre has been reached, this section of the Screens prevents the logging of large trees. AR 34515. The 21-inch rule states:

> Outside of LOS, [t]he intent is still to maintain and/or enhance LOS . . . by adhering to the following standards: a) Maintain all remnant late and old seral and/or structural live trees ≥ 21-inch dbh that currently exist within stands proposed for harvest activities.

AR 34515 (Section 6(d)(2) (and 6(d)(2)(a)) of the current Screens) (italics removed).

The Screens remained in place, largely unchanged, until the Service amended the 21-inch rule in 2021. In the face of a century of fire suppression, the eastside forests shifted to more shade-dominant species that are more competitive but less resistant to fire and disease. AR 34511–52. This shift increased the occurrence of catastrophic wildfire and disease. Because of this forest composition shift, the Service's approach to forest management changed from a drive to protect all large trees to a greater desire to maintain more historical forest structures that are more resilient to fire and disease. AR 34511. This new approach centers around slowing forest transition away from less dense stands with drier species to denser stands with more shade species. AR 34512.

For these reasons, the Service approved the Forest Plans Amendment to Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington, known as the Screens Amendment (or, the "Amendment"). The purpose of the Amendment was to provide greater management flexibility to cut certain fire-prone large trees.

PAGE 4 – FINDINGS AND RECOMMENDATION

AR 34511–52. It was intended to produce stands more resilient to fire and disease by slowing

species composition shifts away from historical conditions. *Id.*

Specifically, the Screens Amendment changed the 21-inch standard into a guideline that

favors the retention of not only large trees but fire-resistant tree species as well. It states:

> Outside of LOS, . . . [t]he intent is still to maintain and/or enhance a diverse array
> of LOS conditions in stands subject to timber harvest as much as possible, by
> adhering to the following plan components: Managers should retain and generally
> emphasize recruitment of old trees and large trees, including clumps of old trees.
> Management activities should first prioritize old trees for retention and
> recruitment. If there are not enough old trees to develop LOS conditions, large
> trees should be retained, favoring fire tolerant species where appropriate. Old
> trees are defined as having external morphological characteristic that suggest an
> age ≥ 150 years. Large trees are defined as grand fir or white fir ≥ 30 inches dbh
> or trees of any other species ≥ 21 inches dbh. Old and large trees will be identified
> through best available science. Management activities should consider appropriate
> species composition for biophysical environment, topographical position, stand
> density, historical diameter distributions, and spatial arrangements within stands
> and across the landscape in order to develop stands that are resistant and resilient
> to disturbance.

AR 34753–54 (italics removed).

When developing the Amendment, the Service held three public forums and two

technical workshops—one public forum specifically discussed the science supporting the

decision. AR 32115, 33024–51, 32778, 32505, 32472. The Service also met with groups and

stakeholders to discuss the condition of eastside forests. AR 33048. These scoping procedures

led to a draft Environmental Assessment ("EA") in August 2020, which proposed an

Amendment that would generally retain large trees but allow the cutting of fire-prone trees in

certain circumstances. AR 33240.

After the draft EA was published, the Service extended the 30-day public comment

period to 90 days and received 3,300 letters in response, 336 of which were unique. AR 34650.

After analyzing these comments, the interdisciplinary team included a new alternative in the final

EA and completed additional resource reviews and analyses. AR 34650, 34513. The Service also conducted a biological assessment that found the Amendment may affect but is not likely to adversely affect the ESA-listed species, the gray wolf and Spalding's catchfly, and the ESA-proposed species, the wolverine.

The Service did not conduct a biological assessment of any of the aquatic endangered species throughout this forest because the Service found the Amendment would not affect those aquatic species. AR 34594. The Service based this no effect determination on the fact that two separate aquatic habitat standards remained unchanged. These two aquatic species and habitat standards are the Inland Native Fish Strategy ("INFISH") and Pacific Anadromous Fish Strategy ("PACFISH"), which are two sets of standards for aquatic species habitat that replaced the Eastside Screens riparian standard by 1995, referred to collectively as PACFISH.[1] AR34508. PACFISH only allows harvesting of any trees, regardless of diameter, in riparian areas for salvage harvests or "to acquire desired vegetative characteristics where needed to attain Resource Management Objectives." AR 15062. The Screens Amendment did not change or alter the requirements of PACFISH, and the Service therefore concluded that there would be no impact on aquatic species.

In January 2021, the Service released its decision notice and Finding of No Significant Impact ("FONSI") along with its final EA. AR 34750, 34762. Earlier in the administrative process, the Service stated it would hold an objection period before approving the Screens Amendment. *See* AR 33599 (noting that "[t]he EA is subject to Forest Service regulation 36 CFR

---

[1] PACFISH and INFISH apply to different areas of eastside forests. AR14709; AR15037. Given that the standards are the same, at least for the purposes of this discussion, this Court will refer to PACFISH.

§ 219, Subpart B, known as the administrative review, or objection, process.").[2] Despite that statement, the undersecretary to the Department of Agriculture signed the final EA and issued the Amendment without holding an objection period. AR 34505.

Plaintiffs initiated this action after the final decision. Plaintiffs challenge the Service's decision to approve the Screens Amendment and allege that its decision violated NFMA, NEPA, and the ESA. First Amend. Compl. ("FAC"), ECF 12. Specifically, Plaintiffs allege:

- Claim 1: The Service violated NEPA when it (1) failed to prepare an Environmental Impact Statement ("EIS") despite the significance of the project; and (2) failed to take a hard look at the impact of the project. *Id.* at ¶¶209-231.

- Claim 2: The Service violated NFMA when (1) it did not hold the planned and standard objection process for administrative decisions; and (2) failed to prepare an EIS for a significant change to a forest plan. *Id.* at ¶¶232-47.

- Claim 3: The Service's finding of "no effect on aquatic species" was arbitrary and capricious and in violation of the ESA. *Id.* at ¶¶248-53.

The Court allowed American Forest Resource Council and Eastern Oregon Counties Association to join as Defendant-Intervenors and the Nez Perce Tribe and Prof. James Johnson to appear as Amici Curiae. This matter now comes before the Court on all parties' cross-motions for summary judgment, which address the merits of Plaintiffs' claims and whether Plaintiffs' claims are ripe. Those arguments are addressed in detail below.

---

[2] The Council on Environmental Quality promulgates uniform regulations implementing NEPA that are binding on all federal agencies. 42 U.S.C. § 4342; 40 C.F.R. §§ 1500 et seq. The Service relied on the 2019 version of the CEQ regulations when approving the Screens Amendment. *See* 40 C.F.R. §§ 1500–1508 (2019). Thus, all citations are to the 2019 version of the regulations and not the 2020 version.

## LEGAL STANDARDS

I.    **Standards of Review**

A.    **Summary Judgment**

The APA limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party"). The scope of review is normally limited to "the administrative record in existence at the time of the [agency] decision and [not some new] record that is made initially in the reviewing court." *Lands Council v. Powell*, 395 F.3d 1019, 1029 (9th Cir. 2005) (citation omitted).

A motion for summary judgment may be used to seek judicial review of agency administrative decisions within the limitations of the APA. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471–72 (9th Cir. 1994). Generally, the court should grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (alteration in original) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)). "Thus, the usual standard set forth in Rule 56(c) does not apply." *Scholl v. Mnuchin*, 494 F. Supp. 3d 661, 673 (N.D. Cal. 2020) (citations omitted). Still, "summary judgment is an appropriate mechanism for

deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770.

###    B.    The Administrative Procedure Act

The Administrative Procedure Act governs all claims in this case, 5 U.S.C. §§ 701–706 (APA). Under the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be [:](A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedures required by law[.]" 5 U.S.C. § 706(2). Under this standard, an "agency must examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). There are four ways an agency's action could be arbitrary and capricious: (1) the agency overlooks an important aspect of a problem, (2) the agency's decision is contrary to the evidence, (3) the agency's decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, or (4) the agency's decision is contrary to the governing law. *Lands Council*, 395 F.3d at 1026 (citing *State Farm*, 463 U.S. at 43)*.*

In deciding whether the agency's action complied with the APA, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta–Mendota Water Auth. v. Jewell,* 747 F.3d 581, 601 (9th Cir. 2014) (internal quotation marks omitted). The court's "inquiry must be thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.* (internal quotation marks omitted). "Where the agency has relied on relevant evidence such that a reasonable mind might accept as adequate to support a conclusion, its

decision is supported by substantial evidence." *Id.* (internal quotation marks and brackets omitted). "Even if the evidence is susceptible of more than one rational interpretation, the court must uphold the agency's findings." *Id.* (internal quotation marks omitted). The Ninth Circuit has endorsed summary judgment motions as "an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *City & Cnty. of San Francisco,* 130 F.3d at 877 (quoting *Occidental Eng'g Co.,* 753 F.2d at 770).

## II.     Substantive Law

### A.     National Forest Management Act

NFMA outlines a two-step process for forest planning. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 897 (9th Cir. 2002). First, the Service must develop a land resources management plan (a forest plan). *Id.* The forest plan is then implemented at individual project sites. *Id.* All projects, including timber sales, must be consistent with the forest plan. *Id.*

The Forest Service can amend a forest plan in "any manner whatsoever." 16 U.S.C. § 1604(f)(4). But NFMA requires the Service to promulgate regulations for the development, revision, and amendment of forest plans. 16 U.S.C. § 1604(g). Under 36 C.F.R. ¶¶ 219.50–219.62 the Service must provide an "objection process" when amending forest plans.

### B.     Endangered Species Act

Congress enacted the ESA in 1973 in order "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species[.]" 16 U.S.C. § 1531(b). The ESA obligates federal agencies "to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).

As relevant here, the ESA requires the Service to consult the United States Fish and Wildlife Service and the National Marine Fisheries Service "before engaging in any discretionary action that may affect a listed species or critical habitat." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012). "[M]ay affect is a relatively low threshold[;] . . . *Any possible effect,* whether beneficial, benign, adverse or of an undetermined character, triggers the requirement." *Id.* at 1027 (citation and quotations omitted). While Plaintiffs bear the burden of showing that the action "'may affect' listed species or critical habitat, the burden is not a heavy one. Essentially, [plaintiffs] need to show only that *an* effect on listed species or critical habitat is plausible." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012) (emphasis added).

### C.    National Environmental Policy Act

NEPA has two main aims. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council,* 462 U.S. 87, 97 (1983). First, NEPA requires government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (internal quotation marks omitted). "Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts." *Id*; *Citizens Comm. to Save Our Canyons v. U.S. Forest Serv.,* 297 F.3d 1012, 1021 (10th Cir. 2002).

NEPA is a procedural statute that requires federal agencies to take a "hard look" at the environmental consequences of their decisions. *Westland Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004); *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1078 (9th Cir. 2002) (noting that, under NEPA, federal agencies must take a hard look at both the direct and cumulative impacts of the project). The hard look requirement includes "a complete discussion

of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172.

"In reviewing an agency's finding that a project has no significant effects, courts must determine whether the agency has met NEPA's hard look requirement, 'based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant.'" *Bark v. United States Forest Serv*., 958 F.3d 865, 869 (9th Cir. 2020) (citing *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014)). The Agency must "take the requisite hard look, [and] 'may not rely on incorrect assumptions or data' in arriving at its conclusion of no significant impacts." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt*., 36 F.4th 850, 872–73 (9th Cir. 2022) (citing *Native Ecosystems Council v. U.S. Forest Serv*., 418 F.3d 953, 964 (9th Cir. 2005)).

NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (2019). Agencies consider two broad factors to determine whether an action may "significantly affect" the environment: "context" and "intensity." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citing 40 C.F.R. § 1508.27). Context delimits the scope of the agency's action, including the interests affected. *Id.* (citing *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001)). Intensity refers to the "severity of impact." A project's "intensity" must be analyzed within its broader context to determine its significance. 40 C.F.R. § 1508.27(a). The regulations identify ten factors that agencies should consider in evaluating intensity ("intensity factors"). 40 C.F.R. § 1508.27(b)(1)–(10) (listing factors).

An agency may prepare an EA to determine whether the effects of an action will be significant, and if not, the agency may prepare a FONSI and forego preparation of an EIS. *See* 40

C.F.R. §§ 1501.3, 1501.4(c), (e), 1508.9, 1508.13 (2019). The EA itself is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)). A plaintiff raising a NEPA claim need only raise substantial questions as to whether a project may have a significant effect to trigger the requirement for an EIS; the plaintiff need not show that significant effects will in fact occur. *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005); *Bark*, 958 F.3d at 868.

## DISCUSSION

### I.    Ripeness

Defendants argue that Plaintiffs' claims are not ripe for judicial review because they are based on speculation about how the Screens Amendment will be implemented in individual projects. Defs.' Mot. 14-15. Defendants argue that Plaintiffs' general challenge to the Amendment is not ripe, and that the Amendment must be challenged at the site-specific level. *Id.* at 15. Plaintiffs respond that their challenges to the Amendment are judiciable because they are procedural challenges that will not get any riper. Pls.' Resp. and Reply 5–9, ECF 75. The Court agrees with Plaintiffs, finding their claims are procedural and thus ripe for review.

Substantive challenges to forest plans can be unripe for three reasons: (1) plan amendments do not cause substantive hardship to the plaintiffs until forest plans are implemented at the site-specific level; (2) judicial intervention when the plan amendment occurs can inappropriately interfere with further project implementation; and (3) courts can benefit from further factual development of the substantive application of the forest plan. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). But procedural challenges are different. *Id.*

at 737. "When [a plaintiff is] injured by a failure to comply with . . . a procedure[, they] may complain of that failure at the time the failure takes place, for the claim can never get riper." *Id*.

The distinction between a substantive and procedural challenge to a forest plan amendment has been consistently upheld in the Ninth Circuit. For example, when a plaintiff brings a NEPA or other procedural challenge to a resource management plan, that claim is ripe for review at the time of the procedural violation. *Kern*, 284 F.3d at 1070–71 (finding a NEPA challenge that the agency should have prepared an EIS when updating a resource management plan was ripe for review). Thus, "a procedural injury is complete after [a Land Resource Management Plan] has been adopted, so long as it is traceable to some action that will affect the plaintiff's interests." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1179 (9th Cir. 2011); *e.g.*, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1084 (9th Cir. 2015) ("Cottonwood does not argue for a particular substantive result but rather alleges that the Forest Service failed to comply with the procedural requirements of the ESA when it declined to reinitiate consultation.").

Plaintiffs are bringing procedural challenges to the Screens Amendment. FAC ¶¶ 233–247 (alleging the Service violated NFMA's objection period procedure); *id.* at ¶¶ 208–231 (alleging the Service violated NEPA by failing to prepare an EIS and take a hard look); *id*. at ¶¶ 248–53 (alleging the Service violated the ESA when it failed to prepare a biological assessment and engage in Section 7 Consultation for aquatic endangered species). All these challenges are procedural and are ripe when the alleged procedural failure occurs. Accordingly, this Court finds

that Plaintiffs' claims are ripe and the Service's motion for summary judgment on those grounds should be DENIED.[3]

## II.   Objection Period (Claim 2, Count 1)[4]

Plaintiffs argue that the Service violated NFMA when it did not hold the planned and standard objection process for administrative decisions. Pls.' Mot. 20–23. Defendants respond that the Service complied with 36 C.F.R. § 219.51(b) because the undersecretary signed the final EA as the Responsible Official. Defs.' Mot. 16 (citing AR 34505). This Court agrees with Plaintiffs and concludes that the Service's decision to forgo the objection process violated NFMA.

As a threshold matter, this Court recognizes that Magistrate Judge Clarke has previously addressed the *same* challenge to the *same* decision, albeit one brought by a different plaintiff in a different case. In *Blue Mountains Biodiversity Project v. Wilkes et al.*, 1:22-cv-01500-CL, the plaintiff brought suit against the Service and several of its officers and employees, asserting in part that "[t]he Service violat[ed] 36 C.F.R. § 219.51(b) by forgoing the objection process after announcing it in observance of 36 C.F.R. § 219.52 . . . ." *Id*. The Service moved to dismiss. *Id*. Judge Clarke denied the motion, concluding that the Service violated NFMA by failing to hold the relevant objection period. He concluded:

---

[3] Defendants argue in passing that these procedural violations "will not cause imminent harm in specific forests and project areas." Defs.' Reply and Resp. 1, ECF 80. But Plaintiffs have identified nine site-specific projects that will implement the Screens Amendment and declared that these projects will affect their use and enjoyment of the land because of the Amendment. Plaintiffs' claims are justiciable.

[4] In Claim 2, Count 2, Plaintiffs allege that the Service's failure to prepare an EIS violated NFMA as well NEPA. FAC ¶¶242-247 (citing 36 C.F.R. § 219.13(b)(3), which states that "a proposed amendment that may create a significant environmental effect [under NEPA] and thus requires preparation of an [EIS] is . . . a significant change in the plan for the purposes of . . . NFMA[.]"). Plaintiffs do not argue this claim in their motion, however, and this claim is moot given this Court's recommended disposition of the NEPA claim.

> In sum, the Under Secretary's signature on a decision notice does not exempt a lower ranking official's proposed plan amendment from the objection process. If the Under Secretary wishes to exempt a proposed plan amendment under Section 219.51(b), the Under Secretary must be involved with the proposal before signing a decision notice.

*Id.* Judge Clarke's Findings and Recommendation was referred to United States District Judge Aiken, *id.*, and the Service submitted objections.

Judge Clarke's Findings and Recommendation, which have not yet been adopted, are not binding on this Court. Nevertheless, this Court has independently reviewed Judge Clarke's Findings and Recommendation, along with the parties' briefing in this case, and adopts the reasoning and conclusion in its entirety. This Court agrees that, based on the plain language of Section 219.51(b), the undersecretary's signature on a decision notice does not exempt a lower ranking official's proposed plan amendment from the objection process. Accordingly, this Court finds that the Service violated NFMA by failing to hold the required objection period, and summary judgment should be GRANTED to Plaintiffs and DENIED to the Service and Intervenors on Claim 2, Count 1.[5]

---

[5] In reaching this conclusion, this Court relies solely on its interpretation of the applicable regulations, and not the equitable concerns of the parties. However, this Court recognizes the specific concerns of Amicus, the Nez Perce Tribe. Amicus argues that the failure to hold the proper objection period was particularly problematic because of the federal government's trust duty to the tribe and this decision's substantial effect on the tribe. *See* Exec. Order 13175, Consultation and Coordination with Indian Tribal Governments, 65 Fed. Reg. 67,249, 250 (Nov. 6, 2000) (charging executive departments and agencies with "establish[ing] regular and *meaningful* consultation and collaboration with tribal officials" that ensures "timely input by tribal officials in the development of regulatory policies that have tribal implications."); *Cobell v. Norton*, 240 F.3d 1081, 1086 (D.C. Cir. 2001) ("The federal government has substantial trust responsibilities toward Native Americans. This is undeniable. Such duties are grounded in the very nature of the government-Indian relationship."). Because the Service violated the specific duty to hold an objection period, Amicus argues that the Service also violated its trust obligations to the Nez Perce Tribe. *Cf. Gros Ventre Tribe v. United States*, 469 F.3d 801, 810 (9th Cir. 2006) (stating the government's general trust obligations are discharged through compliance with general regulations and statutes). While this Court recognizes these concerns, it declines to address this issue because it is was not pleaded as a claim for relief.

III.    **Endangered Species Act (Claim 3)**

Plaintiffs claim that the Service's finding of "no effect on aquatic species," and its

resulting failure to prepare a biological assessment, was arbitrary and capricious and in violation

of the ESA. Specifically, Plaintiffs argue that the logging large trees either outside of or within

riparian conservation areas but in compliance with PACFISH will still affect riparian habitat and

endangered species. Pls.' Mot. 39–41.[6] The Service responds that its "no effect" determination

on aquatic endangered species is supported because PACFISH regulates logging in riparian

areas, provides a stronger standard than the current 21-inch rule, and remains unchanged. AR

34594; Defs.' Mot. 39. This Court agrees with Plaintiffs and concludes that the Service's "no

effect" determination was arbitrary and capricious.

While the Service is correct that PACFISH imposes a stronger standard on riparian

logging overall, that does not equate to the Amendment having no effect on aquatic species. In

the objection process and in this proceeding, Plaintiffs have provided a plausible basis to

conclude that the Amendment may affect aquatic species. Plaintiffs assert that there are certain

instances where logging is allowed under PACFISH but limited by the current 21-inch standard,

which is why the Service has had to amend the 21-inch standard in riparian areas. *See, e.g.*, AR

32017–18; *Blue Mountains Biodiversity Project v. Pence*, 22 F. Supp. 2d 1136 (D. Or. 1998).

Moreover, the logging of large trees right outside of riparian areas could affect aquatic species.

AR 48168 (asserting that "aquatic habitat is vulnerable to loss of large trees in [riparian

conservation areas] and *from upslope logging*."). In response to these concerns, the Service

simply reiterated that "all riparian management policy will remain unchanged." AR 34433.

---

[6] The parties further dispute whether the Service was required to prepare a biological assessment
for aquatic species notwithstanding the no-effect finding. Pls.' Mot. 42. It is unnecessary for this
Court to reach this issue given its recommended disposition of this claim.

When faced with these plausible effects, the Service cannot disregard these effects and solely rely on the overall stronger protection of PACFISH to conclude that the Amendment would not affect aquatic species.

To be sure, the Service's no-effect determination is entitled to deference, and the Court will not substitute its scientific determination for that of the agency. *Friends of Santa Clara River v. U.S. Army Corps. Of Eng'r*, 887 F.3d 906, 924 (9th Cir. 2018) (holding the Service's no effect determination based on copper runoff levels not exceeding background levels was entitled to deference); *Nat'l Fam. Farm Coal. v. U.S. Envtl. Prot. Agency*, 966 F.3d 893, 923 (9th Cir. 2020) (using risk quotients to conclude the agency action would not affect ESA-listed species). But the Service must still make scientific determinations for this Court to defer to, which means analyzing the actual effects of the Screens Amendment in riparian areas—however limited those effects might be. Instead, the Service assumed that the Amendment would not affect any logging that could impact aquatic species because of the stronger PACFISH standard. The record refutes this assumption, rendering the decision arbitrary and capricious. *Organized Vill. of Kake v. U.S. Dep't of Agric.,* 746 F.3d 970, 974 (9th Cir. 2014) (stating agency actions are arbitrary and capricious when they overlook an important aspect of a problem or are contrary to the evidence).

In sum, the record does not support the Service's assumption that the Screens Amendment would have no effect on listed aquatic species. Thus, this Court concludes that the Service violated the ESA when it failed to conduct a biological assessment for aquatic species. Plaintiff's motion for summary judgment on Claim 3 should be GRANTED and Defendants' motions should be DENIED.

**IV.    Environmental Impact Statement (Claim 1, Count 1)**

Plaintiffs argue that the Amendment will have a significant effect on the environment because of (1) its significant context; (2) the uncertain outcome of changing a standard into a guideline across six national forests; (3) the controversial science supporting the decision; and (4) the adverse effect on endangered aquatic species. Pls.' Mot. 24–42; Pls.' Br. 2.[7] This Court addresses each factor in turn and concludes that the Amendment is significant under NEPA, requiring an EIS.

**A.    Context**

Plaintiffs argue the context of the Amendment, which affects a large, diverse region, weighs in favor of significance. Pls.' Br. 2. Defendants respond that this Amendment's large geographic scope is irrelevant to NEPA significance because the acreage of logging across these forests is projected to stay the same. Defs.' Br. 13. The Court finds the context of the Amendment is massive in terms of scope and setting, and the intensity factors must be viewed within this context.

"Context simply delimits the scope of the agency's action, including the interests affected." *In Def. of Animals*, 751 F.3d at 1068 (citation omitted); *see Ocean Advocs.*, 402 F.3d

---

[7] Plaintiffs did not argue the precedential factor under 40 C.F.R. § 1508.28 and the Court does not consider that factor. Regardless, this Court notes that the Amendment changes the planning protections for large trees across six national forests, affecting all the individual logging projects involving large trees outside of LOS for years to come. This change would be a binding adjustment to the forest plans of six national forests that would affect all later forest projects dealing with large trees outside of LOS. Thus, there is at least some basis to conclude that this Amendment would be precedential. *Cf. Or. Wild v. Bureau of Land Mgmt.*, 6:14-CV-0110-AA, 2015 WL 1190131, at *9 (D. Or. Mar. 14, 2015) (stating "[g]enerally, this factor is insufficient on its own to demonstrate a significant environmental impact *unless* the approval of the project is binding on future decisions regarding other actions.") (emphasis added); *Barnes*, 655 F.3d at 1140 ("EAs are *usually* highly specific to the project and the locale, thus creating no binding precedent for future actions.") (emphasis added).

at 865 ("Context refers to the setting in which the proposed action takes place[.]"). Context

provides an overall scope to judge the significance of a project in light of the intensity factors.

*Am. Wildlands & Native Ecosystems Council v. U.S. Forest Serv.*, 1999 U.S. Dist. LEXIS 22243,

*17 (analyzing the context within which the significance analysis takes place); *Oregon Wild v.*

*United States*, 107 F. Supp. 3d 1102, 1112 (D. Or. 2015) (concluding an EIS was not required in

part "[i]n light of the relatively small percentage of . . . acreage that will be affected . . .").

Agencies should consider several scales when analyzing the context in which its significance

analysis takes place, including "society as a whole, the affected region, the affected interests, and

the locality." 40 C.F.R. § 1508.27(a). Because context provides the backdrop for the significance

analysis, there is no categorical rule that large federal projects are always significant, but on

average large projects are more likely to be significant. *Tomac v. Norton*, 433 F.3d 852, 862

(D.C. Cir. 2006). In other words, the larger the scope and setting of a project, and the greater the

context, the less intense the project must be to be significant.

Context is given short shrift in many cases because most EAs pertain to the standard

context of a localized project. *Bark v. United States Forest Serv*., 393 F. Supp. 3d 1043, 1054–55

(D. Or. 2019) (reversed on other grounds) (discussing generally truncated context analysis);

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1140 (9th Cir. 2011) ("EAs are *usually* highly

specific to the project and the locale . . . ."); *see, e.g.*, *Ohio Env't Council v. U.S. Forest Serv*.,

21-04380, 2023 U.S. Dist. LEXIS 56032, at *22–23 (S.D. Ohio Mar. 30, 2023) (rejecting the

plaintiff's argument that the logging project's size or context warranted an EIS because of "the

small size of the Project and its adherence to the . . . Forest Plan"). For these more typical

projects, much of the context analysis only centers around whether the Service acted in an

arbitrary or capricious manner by failing to analyze the context of the decision at a particular

scale. *See, e.g.*, *Blue Mountains Biodiversity Project v. Jeffries*, 22-35857, 2023 WL 4308647, at

*6 (9th Cir. July 3, 2023) (holding the Service's EIS analysis was not arbitrary and capricious

when it "extensively analyzed various local impacts.").[8]

But when important contextual issues are at play, courts must take them into account

because significance is based on both a project's "context and intensity" and "[s]ignificance

varies with the setting of the proposed action." 40 C.F.R. § 1508.27; *e.g.*, *Am. Wildlands &*

*Native Ecosystems Council*, 1999 U.S. Dist. LEXIS 22243, at *17 (stating the context of a

decision affecting a discrete mountain range emphasizing wildlife preservation was especially

important); *Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 553 (W.D. Pa. 1997) (ordering an EIS

where *the magnitude of the project* combined with intensity factors raised substantial questions).

The size of the project and its impacts on old growth are factors the Court can consider when

determining the context of a logging and forest restoration project. *Kettle Range Conservation*

*Group v. U.S. Forest Serv.*, 21-00161-SAB, 2023 WL 4112930, at *11 (E.D. Wash. June 21,

2023) (finding the project significant because its context "create[d] uncertain risks to old-growth

forests and the wildlife dependent on them."); *Curry*, 988 F. Supp. at 553.

If there were ever a forest management decision where context should be considered, it is

this decision. The Screens Amendment directly affects how large trees will be managed across

---

[8] Indeed, this Court has reviewed numerous challenges to the Service's use of EA's for various
forest restoration projects. Those projects measure in the thousands – not millions – of acres.
*E.g.*, *Gassmann*, 2023 WL 4172930, at *1 (29,180 acre forest restoration project); *Blue*
*Mountains Biodiversity Project v. Trulock*, No. 2:21-CV-01033-HL, 2023 WL 3645966, at *20
(D. Or. Apr. 27, 2023), *recommendation referred and not adopted* (40,000 acre project); *All. for*
*the Wild Rockies v. Lannom,* 21-51-M-DLC-KLD, 2023 WL 4059856, at *2 (D. Mont. Mar. 31,
2023) (10,000 acre project); *Friends of the Clearwater v. Probert*, 21-00189-CWD, 2022 WL
2291246, at *1 (D. Idaho June 24, 2022) (49,565 acre project); *All. for the Wild Rockies v.*
*United States Forest Serv.*, 504 F. Supp. 3d 1162, 1168 (E.D. Wash. 2020) (50,200 acres). This
Court was unable to locate any cases addressing the utilization of an EA for a forest plan or
forest plan amendment of this size and magnitude.

six national forests and 7.8 million acres of federal land. Defs.' Br. 13 (citing AR 34510). The region affected and the locality of the project is massive; as a matter of fact, the context is greater than any ranger district or national forest, affecting 7.8 million acres across Oregon and Washington. And the interests at stake directly pertain to which large trees can be cut across this vast acreage. The context of this decision is significant across multiple scales of analysis. *See* 40 C.F.R. § 1508.27(a). To put the size of this decision into perspective, it affects more than 15,000 times the acreage of the *Curry* project that the Western District of Pennsylvania considered significant and 200 times the acreage of the *Kettle Range* decision the Eastern District of Washington considered significant. *Curry*, 988 F. Supp. at 551; *Kettle Range*, 2023 WL 4112930, at *1.

　　Defendants' argument that the size of the Amendment is irrelevant misses the mark. While the Amendment does not change raw board feet projections across these forests, it changes how the Service will determine which large trees can be cut across this vast landscape, and both the geographic size of a decision and the effects on large trees are important to the context analysis. *Curry*, 988 F. Supp. at 551; *Kettle Range*, 2023 WL 4112930, at *1. It is undisputed that the Amendment affects a vast acreage or that large trees play an important role across this landscape. It is also undisputed that this Amendment is a permanent change to the standard.[9] Because of the project's significant context, members of the public submitted 3,300 letters during public comment, AR 43650, six separate environmental NGOs sued over this

---

[9] This Court notes that one of the main reasons that the Service was able to utilize an EA for the creation of the Eastside Screens was because the Service represented that it would only be an 18-month intermediate standard that would be replaced by an EIS-supported permanent standard. *Prairie Wood Prods. v. Glickman*, 971 F. Supp. 457, 461, 463–64, 468 (D. Or. 1997). Because the Screens were only going to last 18 months, the court assumed only 50,000 acres of logging would occur under the original Screens. That same logic cannot be relied on here because the Screens Amendment is a permanent change to the standard that affects all six national forests.

PAGE 22 – FINDINGS AND RECOMMENDATION

decision, two NGOs signed on as defendant intervenors, a Native American tribe and a group of 12 forestry professors submitted amicus materials, and the small Pendleton courthouse was uncharacteristically packed from interested parties during oral argument. Tr. 3, ECF 93. Simply put, the Amendment is massive in terms of scope and setting, and the intensity factors must be viewed in light of this context when determining whether there are substantial questions about the need to prepare an EIS.

### B.     Uncertainty

Turning to the intensity factors under 40 C.F.R. § 1508.27(b), Plaintiffs argue there is a high level of uncertainty in how the Screens Amendment will affect the environment. Plaintiffs argue that replacing a rigid guideline with a flexible standard will lead to inherent uncertainty. They also argue that the application of the guideline was modeled throughout the forest, but the Amendment only has the guideline apply to stands outside LOS, creating additional uncertainty as to its impact. Pls.' Mot. 32–36. In response, Defendants challenge these assertions and dispute that the Amendment will have highly uncertain effects. Defs.' Mot. 34-36. This Court concludes that Plaintiffs have raised substantial questions as to the Amendment's highly uncertain environmental effects.

"Where the environmental effects of a proposed action are highly uncertain or involve unique or unknown risks, an agency must prepare an EIS." 40 C.F.R. § 1508.27(b)(5); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 731 ("An agency must generally prepare an EIS if the environmental effects of a proposed agency action are highly uncertain"). "[A]n EIS is mand[atory] where uncertainty [or speculation] may be resolved [or prevented] by further collection of data . . . [because] the purpose of an EIS is to [avoid] the need for speculation."

*Ocean Advocates*, 402 F.3d at 870 (holding the agency should conduct an EIS to clear up speculation regarding increases in oil tanker traffic in the EA).

There is substantial uncertainty here because the Screens Amendment replaces a clear and binding forest plan standard, the 21-inch rule, with a more flexibly worded guideline. The change to a guideline is significant. The Ninth Circuit has held "a guideline does not impose a mandatory constraint on project planning and activity in the way a standard does." *All. For the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1113 (9th Cir. 2018). "The Forest Service must strictly comply with a forest plan's 'standards,' which are considered binding limitations, but it may deviate from the forest plan's 'guidelines,' so long as the rationale for deviation is documented." *Id*. With a guideline, the project or activity must "comp[ly] with applicable guidelines as set out in the plan" *or* be "designed in a way that is as effective in achieving the purpose of the applicable guidelines." 36 C.F.R. § 219.15(d)(3). Thus, the shift from a standard to a non-binding guideline increases the Services' flexibility by removing the bright-line, 21-inch rule, increasing uncertainty of future large tree management.

The more flexible language in the Amendment and its purpose increases the uncertainty of management applications and reduces future judicial and public oversight. *See In re Big Thorne Project*, 857 F.3d 968, 974 (9th Cir. 2017) (stating discretionary or aspirational language like "where possible" prevented judicial review of an agency decision). Here, the language shifted from a clear-cut standard against logging trees greater than or equal to 21 inches with the more discretionary language that the Service "should" prioritize old and large trees for retention and recruitment. AR 34753. Also, because the Amendment is a guideline, the service only has to demonstrate that its purpose is met. The guideline's purpose is vaguer than the 21-inch rule, merely stating that the Service should "[m]aintain and increase old and late structure forest [and]

favor fire tolerant species where appropriate." AR 34516. This vague language provides more flexible and uncertain management applications than the 21-inch rule by reducing judicial and public oversight of future logging decisions. *See In re Big Thorne Project*, 857 F.3d at 974.

The Service recognizes that this increased flexibility will lead to a wider range of potential outcomes. The Service stated that the entire purpose of the Amendment is to give managers greater flexibility at site-specific levels to achieve desired species outcomes. AR 34544. Indeed, the Service stated in its vegetative effects summary that the Amendment "greatly enhances management flexibility and so could result in the widest range of potential outcomes." *Id*. Allowing for the widest range of possible outcomes breeds uncertainty. Because of this increased flexibility and reduction in future judicial oversight, it becomes more uncertain how this new guideline will be applied across the eastside forests, especially through changes in administration and the variable motivations at play for each logging project. This uncertainty supports the need for an EIS.

Another source of uncertainty is the disagreement as to whether the Amendment will apply inside LOS stands. Pls.' Resp. and Reply 4 (arguing that the 21-inch rule applies in and outside of LOS); Defs.' Mot. 5 n.4. The Court is unable to resolve this issue given the conflicting evidence and arguments on both sides. Nevertheless, "[a] plaintiff raising a NEPA claim need only raise substantial questions as to whether a project may have a significant effect to trigger the requirement for an EIS; the plaintiff need not show that significant effects will in fact occur." *All. For the Wild Rockies v. Gassmann*, No. CV 21-105-M-DLC, 2023 WL 4172930, at *29 (D. Mont. June 26, 2023) (citing *Ocean Advocs.*, 402 F.3d at 865; *Bark*, 958 F.3d at 868). Thus, the dispute as to whether the rule will apply inside LOS stands adds weight to the uncertainty and supports the need for an EIS.

Further, Defendants' position on the importance of this Amendment highlights uncertainty by pointing in two directions. For example, Defendant Intervenors state the Amendment is "extremely important" because "it is impossible to restore stands" by shifting species compositions across 7.8 million acres of federal land without "cutting some fir larger than 21 inches." Def.-Intervs.' Br. 9. But Defendants also state that "the Amendment minimally alters the status quo" and will not have a significantly beneficial effect on these forests. *Id.* at 11. The Court finds these seemingly contradictory conclusions uncertain at best, especially when considering the permanent reduction in judicial and public oversight this new flexible guideline creates and the vast, diverse area the Amendment applies to.

Finally, a look back at the creation of the Eastside Screens illustrates the inherent uncertainty in this process. The Service created the Screens as an interim management policy to preserve and protect large and old-growth trees while the Service conducted an EIS to create permanent management standards. AR 14492–631; *Glickman*, 971 F. Supp. at 461–62. While the Screens have been beneficial in many ways to protect large trees, two of the main assumptions supporting the Eastside Screens demonstrate the uncertainty involved in these large-scale management decisions: first, the Screens became more than an 18-month interim standard, remaining in place for 29 years. And second, over those decades, the Service came to realize the Screens were hindering its ability to prevent shifts in species composition that were making forests more vulnerable to fire and disease. The history of the very standard the Service is attempting to update through the Screens Amendment demonstrates the inherent level of uncertainty involved in a management decision of this scale.[10]

---

[10] The Court agrees that decisions to preserve and protect forests are less likely to be significant. *Glickman*, 971 F. Supp. at 467–68 (finding original interim standard not significant in part because it would protect forest resources); *cf. Blue Mountains Biodiversity Project*, 2023 WL

In sum, there is substantial uncertainty as to how the Forest Service will apply the Amendment's flexible and vaguely worded guidelines across millions of acres of federal land and whether the Amendment will create an important shift in species composition or minimal alteration to the status quo. This Court concludes that Plaintiffs have raised substantial questions as to the Amendment's highly uncertain environmental impacts.

### C.    Controversy

Plaintiffs next argue that their experts submitted substantial scientific evidence establishing a controversy over two aspects of the Screens Amendment: the historical conditions of these six forests and the effects of the Amendment. Pl.'s Mot. 25–32. Plaintiffs also argue the Service failed to effectively engage with this evidence. *Id.* Defendants dispute both points, arguing that the body of scientific literature supports the Service's decision and that it engaged with and addressed Plaintiffs' contrary scientific arguments. Defs.' Mot. 26-34. This Court agrees with the Service and does not find the Screens Amendment scientifically controversial.

"A project is highly controversial if there is a substantial dispute about the size, nature, or effect of the major Federal action rather than the existence of opposition to a use. A substantial dispute exists when evidence casts serious doubt upon the reasonableness of an agency's conclusions. Mere opposition alone is insufficient to support a finding of controversy." *Bark*, 958 F.3d at 870 (alterations and citations omitted)*. In *Bark*, the plaintiff demonstrated a "substantial dispute" when they produced more than ten expert sources that showed the Service's conclusions

---

3645966, at *20 n.14 (D. Or. Apr 27, 2023) (finding the beneficial impact of preserving and protecting forest resources did not make a single logging project significant). But the Service cannot rely on this intended beneficial impact alone to issue a FONSI when it is permanently amending logging standards for large trees across six national forests. 40 C.F.R. § 1508.27(b)(1). There is inherent uncertainty when designing management prescriptions of this size, even when they are well-intentioned and supported by the current science of the day. *See Glickman*, 971 F. Supp. at 467–68.

were in dispute, and the Service failed to "engage with [any of the plaintiffs] considerable contrary scientific and expert opinion[s]." *Id.*

In contrast, expert opinions not sufficiently supported by research or reports that do not directly contradict the Service's findings do not create a controversy. *Am. Wild Horse Campaign v. Bernhardt*, 963 F.3d 1001, 1011 (9th Cir. 2020). The "Service's consideration and application of the [contradictory evidence plaintiffs point to] in its NEPA documentation [will] defeat [the plaintiff's] attempt to characterize the . . . Project's impacts as . . . controversial." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1243 (9th Cir. 2005). It is only when a plaintiff offers compelling, contrary scientific evidence that is not effectively explained away by the record that a scientific controversy exists. *See Bark*, 958 F.3d at 870. The Court is not to "take sides in a battle of the experts." *Native Ecosystems*, 428 F.3d at 1243.

Here the Service reviewed hundreds of scientific papers and found "the vast body of literature relevant to this project is very much aligned with the proposed change to management policy." AR 34765. Plaintiffs cite contrary scientific articles and argue that those articles demonstrate a scientific controversy. Pls.' Mot. 28–30. Plaintiffs' articles include Baker (2012), Baker (2017), Hessburg et al. (2007), and Williams and Baker (2012). However, the Service effectively explained in its EA how these limited contrary scientific findings did not undercut the much larger body of scientific research supporting the Service's decision. AR 34557 n.9 (stating Williams and Baker (2012) analyzed all western states—not just Oregon—and its methods have been challenged); AR 34560–61 (citing a later Hessburg scientific article that summarized recent scientific literature showing fire suppression has led to a "dramatic increase in density of shade-tolerant trees . . . ."); AR 34560 (stating the methodology used by Williams and Baker (2012),

Baker (2017), and Baker and Williams (2018) has likely overestimated tree density from 24% to 667%).

The Service has effectively addressed the limited scientific support presented by Plaintiffs and explained why the articles cited by Plaintiffs do not create a significant dispute over this Project's effects. Thus, this case differs from *Bark* where the Service failed to engage with the "considerable contrary scientific and expert opinion" that the plaintiffs presented. 958 F.3d at 870.

Plaintiffs also point to the scientific forum where their experts argued that the proposed amendments were not supported by the science. However, the evidence presented at the forum does not establish any more convincing contrary evidence. Two of the three slides Plaintiffs point to do not have citations, and unsupported expert opinions do not establish a controversy. AR 32256, 32250; *Am. Wild Horse Campaign*, 963 F.3d at 1011. Two of the three slides cited also do not establish a controversy because they are related to aspects of the project that are not in dispute. AR 32250, 32290 (discussing the importance of large trees for a number of factors, including wildlife habitat and carbon sequestration). The Service also considered the evidence presented on all sides during the scientific forum in its analysis of the Screens Amendment. AR 32203–32361 (scientific forum); AR 33048 (discussing pre-forum conference calls with all experts, including dissenters). Thus, the evidence presented at the forum does not make this decision scientifically controversial.

Plaintiffs also argue it was highly controversial for the Service to use the Forest Vegetation Simulator ("FVS") model to assess the impact of the Screens Amendment. Pls.' Resp. and Reply 27. The Service utilized FVS as additional support for the conclusion that hard diameter limits can hinder managers' ability to achieve desired species outcomes and protect

forests from changes in fire regimes. AR 34509 (stating how the current 21-inch rule limits managers' ability to protect forests from changing fire regimes). However, the FVS model is just one of the sources of scientific information the Service relied on to determine the Amendment's effects on the landscape. AR 34523. The Service has wide discretion when determining its models, and the FVS model is commonly used and scientifically supported. *Growers Ass'n v. Vilsack,* 816 F.3d 1095, 1108 (9th Cir. 2016) ("The Forest Service is owed greater-than-average deference as it relates to its choice of technical methodologies . . . ."); AR 34445–46 (stating the Service regularly uses the FVS model and describing the science supporting its application). Thus, the Service's use of the FVS model was not highly controversial.[11]

In sum, the Court finds there is not a substantial scientific dispute about the historical conditions of the eastside forests or the fact that hard diameter limits can constrain managers' ability to achieve desired species outcomes and protect eastside forests from changing fire regimes. Thus, this Court does not consider the controversy surrounding the Screens Amendment as one of the intensity factors.

### D.    Effect on Aquatic Species

Finally, Plaintiffs argue that the Amendment is significant because it may adversely affect aquatic species by removing large trees in riparian areas. Pls.' Mot. 36. In response, Defendants assert the Amendment will not adversely affect any aquatic species because

---

[11] Plaintiffs also assert that the assumptions underlying the FVS model "do not accurately reflect what could potentially happen in post-management stands and projects." Pls.' Mot. 31 (citing AR 46003). Specifically, Plaintiffs take issue with the model's assumption that the guidelines would be followed, that certain small trees would be cut first to reach a certain density, and that the guideline would not apply to logging inside LOS. Pls.' Resp. and Reply. 31-34. These arguments challenge the *uncertain* assumptions the FVS modeling is based on rather than the scientific validity of FVS modeling itself. Thus, this argument is better considered in the uncertainty factor than the scientific controversy factor.

PACFISH remains unchanged. Defs.' Mot. 39-42. This Court concludes that the impact on aquatic species is an intensity factor that the Court must consider.

Another significance factor is "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." 40 C.F.R. § 1508.27(b)(9). "A project need not jeopardize the continued existence of a threatened or endangered species to have a 'significant' effect" for the purposes of NEPA. *Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1282 (D. Or. 2013).

As discussed above, Plaintiffs have raised plausible concerns that the Amendment may result in large tree removal in and around riparian areas. *See supra* Section III. Although PACFISH regulates the large majority of logging of all trees in riparian areas, the Service did not analyze the smaller effect the Screens Amendment can have on logging in riparian areas, and because this effect remains unanalyzed, the Court has to conclude it may have some effect on these species. *Id.* The degree of this possible impact would be insufficient on its own to establish the need for an EIS, but it is a factor the Court considers. *Cf. Oregon Wild*, 2015 WL 1190131, at *10 ("[T]he degree of impact to the spotted owl might not be great enough, on its own, to require more study. However, this factor, combined with the others, requires an EIS.").

### E.    Conclusion

Plaintiffs have raised substantial questions as to whether the Screens Amendment was significant and warranted an EIS. The highly uncertain effects of this project, when considered in light of its massive scope and setting, raise substantial questions about whether this project will have a significant effect under NEPA. This intensity factor alone is sufficient to require the preparation of an EIS. *Ocean Advocs.*, 402 F.3d at 865 ("[O]ne of [the intensity] factors may be

sufficient to require preparation of an EIS in appropriate circumstances."). Additionally, Plaintiffs have shown that the Screens Amendment may adversely impact endangered species. Thus, this Court concludes that the Service violated NEPA when it failed to prepare an EIS. Summary judgment should be GRANTED to Plaintiffs and DENIED to Defendants on Claim 1, Count 1.

## IV.    Hard Look under NEPA (Claim 1, Count 2).

Plaintiffs argue the Service failed to take the requisite "hard look" at the environmental effects of the Amendment in two ways: First, it assumed that the guidelines would be imposed as a standard. Second, it assumed that consistency with PACFISH direction results in a "no effect" to aquatic species. FAC ¶¶ 227–228; Pls.' Mot. 38.[12] Each argument is addressed in turn.

### A.    Hard Look at Screens as a Guideline

Plaintiffs argue that the Service's assumption that the guidelines would be followed was unreasonable and unsupported. Pls.' Mot. 38. In response, Defendants assert that "[b]ecause the Forest Service *correctly* assumed that the logging restrictions included in the [] Amendment's guidelines would be mandatory, the [] Service took the required 'hard look' at the Amendment's impacts." Defs.' Mot. 39 (emphasis in original).

The fundamental flaw with the Service's position is that the Screens Amendment guidelines are not mandatory. *See supra* Section IV(B). Because the guidelines in the Screens Amendment are not mandatory, the Service incorrectly assumed that they will always be followed. Instead, to take the requisite "hard look," the Service was required to analyze how changing a standard to a guideline would affect the environment instead of incorrectly assuming

---

[12] In their complaint, Plaintiffs allege that the Service failed to take a hard look at numerous impacts of the Amendment. FAC ¶¶ 227–230. In their Motion for Summary Judgment, however, Plaintiffs only address aquatic species issues.

guidelines are mandatory. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964

(9th Cir. 2005) ("[t]o take the required 'hard look' at a proposed project's effects, an agency may

not rely on incorrect assumptions."). Even if the Service could assume that the guideline's

purpose – that "[m]anagers should retain and generally emphasize recruitment of old trees and

large trees" – would be followed, the Service cannot assume that the specific requirements of the

guidelines would be mandatory. Doing so was an unreasonable and unsupported assumption that

violated NEPA's hard look requirement. Accordingly, summary judgment should be GRANTED

to Plaintiffs and DENIED to Defendants on Claim 1, Count 2.

### B.    Hard Look at the Effect on Aquatic Species

Plaintiffs next challenge the Service's assumption that, because PACFISH remains in

place, the Screens Amendment would have no impact on aquatic species. Pls.' Mot. 39. As

discussed above, it was incorrect for the Service to conclude that amending the Screens would

not affect logging in riparian areas and thus aquatic endangered species. *See supra* Section III.

Because of this incorrect assumption, the Service failed to take a hard look at the impact of the

Screens Amendment on aquatic species. *Native Ecosystems Council*, 418 F.3d at 964.

In sum, this Court concludes that the Service failed to take a "hard look" at Amendment's

change from a standard to a guideline and on its impact on aquatic species. Summary judgment

should be GRANTED to Plaintiffs and DENIED to Defendants on Claim 1, Count 2.

### VI.    Remedy

Finally, the parties dispute the appropriate remedy if the Court finds that the Service

acted unlawfully. Defs.' Br. 17–20; Pls.' Br. 11-19. This Court concludes that vacatur is the

appropriate remedy and the Service should be ordered to prepare an EIS.

As an initial matter, this Court recommends ordering the Forest Service to prepare an EIS

for this Amendment because the Service's "proffered reasons for its FONSI are arbitrary and

capricious, and the evidence in a complete administrative record demonstrates that the project or

regulation may have a significant impact." *Ctr. for Biological Diversity v. Nat'l Highway Traffic*

*Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008). For reasons set forth above, the context of

this project and its highly uncertain effects warrant an EIS. No further reasoning or analysis on

remand will change the significance of the Amendment. The Service should therefore be ordered

to prepare an EIS for the Screens Amendment.

Turning to vacatur, "[a]lthough not without exception, vacatur of an unlawful agency

action normally accompanies a remand." *All. for the Wild Rockies*, 907 F.3d at 1121. "When

equity demands, however, the regulation can be left in place while the agency reconsiders or

replaces the action, or to give the agency time to follow the necessary procedures." *Id* (citation

omitted). Whether agency action should be vacated hinges on "how serious the agency's errors

are and the disruptive consequences of an interim change that may itself be changed." *Cal.*

*Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (*per curiam*) (citation and

internal quotation marks omitted). The Court considers three factors when determining the

seriousness of an agency's errors: the possibility of environmental harm, whether the agency

could offer better reasoning on remand, and the scope of the errors. *WildEarth Guardians v.*

*Steele*, 545 F. Supp. 3d 855, 884 (D. Mont. 2021).

Here, the EA and FONSI should be vacated. Vacatur is the assumed remedy when a

remand is issued, and the Services' multiple errors in this case are serious. *Oregon Nat. Desert*

*Ass'n v. Zinke*, 250 F. Supp. 3d 773, 774 (D. Or. 2017) (finding NEPA errors serious because

they contravened NEPA's two purposes). The Court recognizes that vacatur would be disruptive

to current projects. But the Service can look to interim site-specific amendments while conducting an EIS for the large-scale Screens Amendment, reducing the disruptive nature of vacating the Amendment. *See Lands Council v. Martin,* 529 F.3d 1219, 1227 (9th Cir. 2008) (upholding a site-specific amendment to the Screens because the Service provided a rational explanation supported by the record for geographically limiting the forest plan amendment). For these reasons, the EA and FONSI should be vacated.

Finally, Defendants argue that if vacatur is ordered, the Court should only vacate the 21 inch-rule Amendment and leave intact the parts of the EA and FONSI that relate to the snag and green tree amendments, which replaced Sections 4(a) and 4(a)(1) of the Eastside Screens, AR34754-55, and were not challenged. Defs.' Br. 19. Although Defendants do not cite any authority for this Court to vacate only part of an agency's EA and FONSI, their underlying arguments are well-taken. "[W]hen equity demands, [a] regulation can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995). Here, the "necessary procedures" the Service must follow are unrelated to the snag and green tree amendments. Although the Court recommends vacating the EA and FONSI in their entirety, the snag and green tree retention portions of the Amendment should be left in place while the Service prepares an EIS.

## RECOMMENDATION

This Court recommends the following with respect to the parties' cross-motions for summary judgment:

1.  Plaintiffs' Motion for Summary Judgment, ECF 41, be GRANTED on the following claims: Claim 1, Count 1 (NEPA): Failure to Prepare an EIS; Claim 1, Count 2 (NEPA): Failure to Take a Hard Look; Claim 2, Count 1 (NFMA):

Failure to Hold an Administrative Objection Process; Claim 3 (ESA): Failure to Engage in Consultation;

2. Plaintiffs' Claim 2, Count 2 (NFMA): Failure to Prepare an EIS should be DENIED as moot; and

3. The Service's Motion for Summary Judgment,  ECF 56, should be DENIED, and the Defendant-Intervenors' Motion for Summary Judgment, ECF 62, should be DENIED.

The Court recommends the following relief:

1. A declaration that the Service violated NEPA by failing to conduct an EIS or taking a hard look at the effect of the Screens Amendment as a guideline and on aquatic species, NFMA by failing to hold the objection period, and the ESA by failing to address the effects of the Amendment on aquatic species;

2. An injunction requiring the Service to prepare an EIS for the Screens Amendment;

3. An injunction vacating the EA and FONSI; and

4. An order allowing the Service to maintain the snag and green tree retention portions of the Amendment, which replaced Sections 4(a) and 4(a)(1) of the Eastside Screens, while the Service prepares an EIS.

### SCHEDULING ORDER

The Findings and Recommendation will be referred to the Honorable Ann Aiken, United States District Judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to de novo consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.

DATED this 31st day of August, 2023.

ANDREW HALLMAN
United States Magistrate Judge