TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

HAYLEY A. CARPENTER, CA Bar # 312611
TYLER M. ALEXANDER, CA Bar # 313188
ANTHONY D. ORTIZ, DC Bar # 978873
Trial Attorneys
Natural Resources Section
Wildlife & Marine Resources Section
150 M St. NE
Washington, D.C. 20002
Phone:  (202) 305-0242 (Carpenter)
        (202) 305-0238 (Alexander)
        (202) 307-1147 (Ortiz)
hayley.carpenter@usdoj.gov
tyler.alexander@usdoj.gov
anthony.d.ortiz@usdoj.gov

*Attorneys for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| **GREATER HELLS CANYON COUNCIL**, an Oregon non-profit corporation; **OREGON WILD**, an Oregon non-profit corporation; **CENTRAL OREGON LANDWATCH**, an Oregon non-profit corporation; **SIERRA CLUB**, a California non-profit corporation; **GREAT OLD BROADS FOR WILDERNESS**, a Montana non-profit corporation; and **WILDEARTH GUARDIANS**, a New Mexico non-profit corporation, <br><br> Plaintiffs, | Case No. 2:22-CV-00859-HL <br><br><br> **FEDERAL DEFENDANTS' OBJECTIONS TO THE FINDINGS AND RECOMMENDATION [ECF No. 97]** |

v.

**HOMER WILKES**, in his official capacity
as Undersecretary for Natural Resources and
Environment; **GLENN CASAMASSA**, in
his official capacity as Regional Forester for
Region 6; and the **UNITED STATES
FOREST SERVICE**,

Federal Defendants,

And

**AMERICAN FOREST RESOURCE
COUNCIL; EASTERN OREGON
COUNTIES ASSOCIATION**,

Defendant-Intervenors.

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND ......................................................................................................... 1

III.  LEGAL BACKGROUND ........................................................................................... 4

      A.    NFMA ............................................................................................................ 4

      B.    NEPA ............................................................................................................. 4

      C.    ESA ............................................................................................................... 5

IV.   STANDARD OF REVIEW ......................................................................................... 5

V.    ARGUMENT .............................................................................................................. 6

      A.    The Findings and Recommendation lacks any discussion of standing, which
            Plaintiffs lack because they have not tied their alleged procedural injury to
            concrete actions affecting their interests ..................................................... 6

      B.    The Findings and Recommendation erred in holding that the Forest Service
            was required to provide a pre-decisional objection process for the
            Amendment ................................................................................................... 9

      C.    The Findings and Recommendation erroneously concluded that the Forest
            Service's determination that the Screens Amendment would have "no effect
            on aquatic species" violated the ESA .......................................................... 14

      D.    The Findings and Recommendation's determination that the Forest Service
            should have prepared an EIS rests on an improper mistrust of the agency
            and misunderstanding of the Amendment's impacts ................................... 17

            1.    Context .............................................................................................. 18

            2.    Intensity: Species ............................................................................. 22

            3.    Intensity: Uncertainty ...................................................................... 23

      E.    The Findings and Recommendation erred in concluding that the Forest
            Service failed to take a hard look at the impacts of implementing a guideline
            or at the Amendment's impacts to aquatic species ..................................... 29

      F.    Regarding remedy, the Findings and Recommendation improperly ordered
            preparation of an EIS and improperly vacated the Amendment ................... 30

VI.   CONCLUSION .......................................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allied-Signal, Inc. v. United States Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................. 34

*Animals v. U.S. Dep't of Interior*,
    751 F.3d 1054 (9th Cir. 2014) ................................................................. 19

*B.R. v. Garland*,
    26 F.4th 827 (9th Cir. 2022) ............................................................. 25, 30

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) .................................................................................. 18

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ................................................................. 19

*Blue Mountains Biodiversity Project v. Pence*,
    22 F. Supp. 2d 1136 (D. Or. 1998) .......................................................... 16

*Cal. Cmtys. Against Toxics v. United States EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................................. 32, 34

*City of Las Vegas v. F.A.A.*,
    570 F.3d 1109 (9th Cir. 2009) ................................................................. 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .................................................................................. 8

*Colan v. Mesa Petroleum Co.*,
    951 F.2d 1512 (9th Cir. 1991) ................................................................... 5

*Conservation Congress v. U.S. Forest Serv.*,
    720 F.3d 1048 (9th Cir. 2013) ................................................................. 17

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ................................................................... 7

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ................................................................. 31

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993) ................................................................................ 28

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
    451 F.3d 1005 (9th Cir. 2006) ........................................................... 22, 23

*Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC),*
  528 U.S. 167 (2000)................................................................................................ 7

*Fund for Animals, Inc. v. Rice,*
  85 F.3d 535 (11th Cir. 1996) ................................................................................ 23

*Greater Yellowstone Coal. v. Flowers,*
  359 F.3d 1257 (10th Cir. 2004) ............................................................................ 23

*Idaho Sporting Cong. v. Rittenhouse,*
  305 F.3d 957 (9th Cir. 2002) .................................................................................. 4

*In re Big Thorne Project v. United States Forest Serv.,*
  857 F.3d 968 (9th Cir. 2017) ................................................................................ 26

*Lamie v. United States Tr.,*
  540 U.S. 526 (2004).............................................................................................. 12

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ................................................................ 17, 24, 25

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton,*
  No. 3:12-cv-02271-HZ, 2014 WL 6977611 (D. Or. Dec. 9, 2014)...................... 35

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Pena,*
  No. 3:12-cv-02271-HZ, 2015 WL 1567444 (D. Or. Apr. 6, 2015) ........................ 31

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)................................................................................................ 9

*Marsh v. Oregon Nat. Res. Council,*
  490 U.S. 360 (1989).............................................................................................. 18

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ................................................................................ 19

*Nat'l Wildlife Fed'n v. Espy,*
  45 F.3d 1337 (9th Cir. 1995) ................................................................................ 31

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ................................................................................ 30

*Native Ecosystems Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) .............................................................................. 18

*Native Ecosystems Council v. Weldon,*
  697 F.3d 1043 (9th Cir. 2012) ................................................................................ 4

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
  523 U.S. 726 (1998)................................................................................................ 8

*Pac. Rivers Council v. Thomas,*
  30 F.3d 1050 (9th Cir. 1994) .................................................................................. 5

*Pac. Rivers Council v. U.S. Forest Serv.*,
   942 F. Supp. 2d 1014 (E.D. Cal. 2013) .......................................................... 32, 34

*Prairie Wood Products v. Glickman*,
   971 F. Supp. 457 (D. Or. 1997) ...................................................................... 20, 21

*Reno v. Flores*,
   507 U.S. 292 (1993) ............................................................................................... 29

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ................................................................................................. 4

*Safari Club Int'l v. Haaland*,
   31 F.4th 1157 (9th Cir. 2022) .............................................................................. 13

*San Luis & Delta-Mendota Water Auth. v. Locke*,
   776 F.3d 971 (9th Cir. 2014) ................................................................................ 18

*Sierra Forest Legacy v. Sherman*,
   646 F.3d 1161 (9th Cir. 2011) ................................................................................ 7

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013) ............................................... 31, 32, 33, 34

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) .................................................................................................. 7

*Surfrider Foundation v. Dalton*,
   989 F. Supp. 1309 (S.D. Cal. 1998) ..................................................................... 22

*Tomac v. Norton*,
   433 F.3d 852 (D.C. Cir. 2006) ........................................................................ 21, 22

*United States v. Raddatz*,
   447 U.S. 667 (1980) .................................................................................................. 5

*United States v. Reyna-Tapia*,
   328 F.3d 1114 (9th Cir. 2003) ................................................................................ 6

*United States v. Salerno*,
   481 U.S. 739 (1987) ........................................................................................... 29, 30

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978) ............................................................................................ 4, 12

*W. Watersheds Project v. Bureau of Land Mgmt.*,
   552 F. Supp. 2d 1113 (D. Nevada 2008) ............................................................. 22

*Wild Va. v. U.S. Forest Serv.*,
   24 F.4th 915 (4th Cir. 2022) ................................................................................ 11

*WildEarth Guardians v. Conner*,
   920 F.3d 1245 (10th Cir. 2019) ........................................................................... 21

*WildEarth Guardians v. Steele,*
  545 F. Supp. 3d 855 (D. Mont. 2021) ............................................................... 32

*Wilderness Soc'y v. Rey,*
  622 F.3d 1251 (9th Cir. 2010) .......................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................................................ 17

**Statutes**

16 U.S.C. § 1536(a)(2) ...................................................................................... 5

28 U.S.C. § 636(b) ............................................................................................ 5

42 U.S.C. § 4332(2)(E) ..................................................................................... 18

42 U.S.C. § 4332(C) .......................................................................................... 18

42 U.S.C. §§ 4321-4370m-12 ............................................................................ 4

**Regulations**

36 C.F.R. § 219.13(a) ........................................................................................ 4

36 C.F.R. § 219.15(d)(3) ................................................................................... 25

36 C.F.R. § 219.51 ............................................................................................ 9

36 C.F.R. § 219.51(b) ........................................................................ 9, 11, 12, 13, 14

36 C.F.R. § 219.56(e) ........................................................................................ 13

40 C.F.R. § 1501.6 ............................................................................................ 4

40 C.F.R. § 1508.27 (2019) ............................................................................... 19

40 C.F.R. § 1508.27(b)(5) ................................................................................. 24

40 C.F.R. § 1508.27(b)(9) (2019) ...................................................................... 22

40 C.F.R. § 1508.9 (2020) ................................................................................. 4

7 C.F.R. § 2.20(a)(2)(ii) ..................................................................................... 13

**Other Authorities**

77 Fed. Reg. 21,162-01 (Apr. 9, 2012) ............................................................... 4

77 Fed. Reg. 21,247 (Apr. 9, 2012) .............................................................. 12, 13

77 Fed. Reg. 21,268 (Apr. 9, 2012) ................................................................... 4

## I.    <u>INTRODUCTION</u>

At the heart of this case lies the Forest Service's Amendment to the Eastside Screens—a long overdue update to management of the forests on the Eastside of the Cascade Mountains, based on noncontroversial advances in forestry science over the last 30 years.  *See* Findings and Recommendation ("FR") 27-30, ECF No. 97.  Magistrate Judge Hallman's Findings and Recommendation recognizes the sound scientific underpinning of the Amendment, *id.*, but strays from the law and administrative record in concluding that: (1) Plaintiffs' facial challenge to the Amendment is justiciable; (2) the Amendment should have been subject to the Forest Service's predecisional administrative objection process; (3) the Amendment violated the Endangered Species Act ("ESA") by not properly contemplating impacts to aquatic species; (4) the Amendment should have been analyzed in an Environmental Impact Statement ("EIS"); (5) the Amendment's Environmental Assessment ("EA") failed to take a hard look at certain environmental impacts; and (6) that the Amendment should be almost completely vacated while an EIS is prepared.  This Court should reject these faulty conclusions and allow the Amendment to remain in place.

## II.    <u>BACKGROUND</u>

This case concerns National Forests on the east side of the Cascade Mountain Range in Oregon and Washington, including the Deschutes, Malheur, Ochoco, Umatilla, Wallowa-Whitman, and Fremont-Winema National Forests ("Eastside Forests").  AR14383.  The Forest Service amended the Forest Plans for each of the Eastside Forests and adopted a set of management policies—the Eastside Screens—in 1994.  AR34508.  The Eastside Screens were meant to provide a short-term preservation of status quo numbers of old and large trees until the

agency developed long-term direction.  AR14384.  Despite this intention, the Eastside Screens remained in place, mostly unchanged, until the 2021 Amendment at issue.

The Eastside Screens established a screening process for proposed timber harvest projects.  AR14383, 14405-31.  Plaintiffs' case focuses almost exclusively on one of the standards established by the Eastside Screens: the categorical prohibition on cutting any tree over 21 inches in diameter at breast height ("dbh") in most circumstances.  Pls.' Mem. in Supp. of Mot. for Summ. J. ("Pls.' Br.") 4-6, 24-45, ECF No. 41.  In 2020, the Forest Service began the process of amending the Eastside Screens.  AR34649-50.  The Forest Service initiated the Amendment because "[s]cientific research and over 20 years of on-the-ground experience implementing the 21-inch standard demonstrate[d] a need to change policy to better adapt forest conditions to current disturbance regimes and expected climate-induced changes including longer fire seasons, larger areas burned and increased risk of insect and disease mortality in forests."  AR34511.

The Final EA and the Decision Notice / Finding of No Significant Impact ("DN/FONSI") for the Amendment was issued in January 2021.  AR34504-34749, AR34750-67.  The decision changed only one standard in the Eastside Screens: the 21-inch limitation applicable only to Scenario A2[1] and the related 21-inch dbh snag language.  AR34753.  The new guideline language is as follows:

> Outside of LOS [Late and Old Structure], many types of timber sale activities are allowed.  The intent is still to maintain and/or enhance a diverse array of LOS conditions in stands subject to timber harvest as much as possible, by adhering to the following plan components: **Managers should retain and generally emphasize recruitment of old trees and large trees, including clumps of old trees**. Management activities should first prioritize old trees for retention and recruitment.  If there are not enough old trees to develop LOS conditions, large

---

[1] The Eastside Screens scenarios are explained succinctly in a table in Federal Defendants' Summary Judgment Brief.  *See* Defs.' Br. 5.

trees should be retained, favoring fire tolerant species where appropriate. Old trees are defined as having external morphological characteristics that suggest an age ≥ 150 years. **Large trees are defined as grand fir or white fir ≥ 30 inches dbh or trees of any other species ≥ 21 inches dbh.** Old and large trees will be identified through best available science. Management activities should consider appropriate species composition for biophysical environment, topographical position, stand density, historical diameter distributions, and spatial arrangements within stands and across the landscape in order to develop stands that are resistant and resilient to disturbance.

AR34753-54 (emphasis added).

Plaintiffs filed their Complaint in June 2022, ECF No. 1, and then an Amended Complaint in August 2022, ("Compl."), ECF No. 12. Plaintiffs' Amended Complaint has three claims. The First Claim alleges that the Forest Service should have prepared an EIS under the National Environmental Policy Act ("NEPA"). *Id.* ¶¶ 208-231. The Second Claim consists of two counts and contends in Count One that the Forest Service should have held an objection period under the National Forest Management Act ("NFMA") planning regulations, and in Count Two that the Forest Service failed to go through the proper procedure for amending a forest plan under NFMA. *Id.* ¶¶ 233-247. Plaintiffs' Third Claim alleges that the Forest Service failed to consult properly on the Amendment under the ESA. *Id.* ¶¶ 248-253. The Court granted a motion to intervene on the side of Federal Defendants by American Forest Resource Council and Eastern Oregon Counties Association. ECF No. 27. The Nez Perce Tribe and forestry science professor James Johnston filed amicus briefs. ECF Nos. 52, 83-1.

The parties cross-moved for summary judgment. ECF Nos. 41, 56, 62. On August 31, 2023, Judge Hallman issued a Findings and Recommendation recommending that Plaintiffs' motion be granted, Federal Defendants' and Defendant-Intervenors' motions be denied, and the Amendment be vacated and enjoined except as to the portions of the Amendment concerning green tree and snag retention. FR 35-36.

### III.    LEGAL BACKGROUND

#### A.    NFMA

"NFMA and its implementing regulations provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). The Forest Service first develops a forest plan containing "broad, long-term plans and objectives for the entire forest." *Id*. These plans "must provide for multiple uses" of forest resources. *Idaho Sporting Cong. v. Rittenhous*e, 305 F.3d 957, 961 (9th Cir. 2002) (citing 16 U.S.C. § 1604(e)(1)). The agency then implements the forest plan through site-specific projects. *Weldon,* 697 F.3d at 1056. The Forest Service may amend forest plans, and those "[p]lan amendments may be broad or narrow," 36 C.F.R. § 219.13(a), ranging from project-specific to forest-wide, National Forest System Land Management Planning, 77 Fed. Reg. 21,162-01, 21,268 (Apr. 9, 2012) ("Management Planning").

#### B.    NEPA

Congress enacted NEPA, 42 U.S.C. §§ 4321-4370m-12, to establish a process for federal agencies to consider the environmental impacts of major federal actions. *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978). NEPA imposes procedural rather than substantive requirements. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA's implementing regulations provide that an agency may prepare an EA, as the Forest Service prepared for the Eastside Screens Amendment, to determine whether a proposed federal action will have a significant impact. 40 C.F.R. § 1508.9 (2020). If the agency finds that the proposed action will have no significant impact, it issues a DN/FONSI, and the NEPA process is completed. 40 C.F.R. § 1501.6.

C.      <u>ESA</u>

Under ESA Section 7(a)(2), each federal agency must ensure that any action it authorizes,

funds, or carries out is not likely to jeopardize the continued existence of any listed species or

result in the destruction or adverse modification of the species' designated critical habitat.  16

U.S.C. § 1536(a)(2).  Under Section 7, an action agency, like the Forest Service here, first

inquires with the Fish and Wildlife Service ("FWS") and/or the National Marine Fisheries

Service ("NMFS") whether any listed or proposed-to-be-listed species "may be present" in the

proposed action area.  *Id*. § 1536(c)(1).  If so, the action agency may prepare a biological

assessment to determine whether the identified species "is likely to be affected by such action."

*Id*.  If the action agency independently determines that the action will have "no effect" on listed

species or critical habitat, the agency has no further obligations under the ESA.  *Pac. Rivers*

*Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994) ("[I]f the agency determines that a

particular action will have no effect on an endangered or threatened species, the consultation

requirements are not triggered.").

## IV.      <u>STANDARD OF REVIEW</u>

A party objecting to the findings and recommendation of a United States Magistrate

Judge under 28 U.S.C. § 636(b) is entitled to "a de novo determination of those portions of the

. . . specified proposed findings or recommendations to which objection is made."  A de novo

review entails "an independent, non-deferential, determination concerning the question whether

the [Magistrate Judge] correctly applied the law."  *Colan v. Mesa Petroleum Co.*, 951 F.2d 1512,

1518 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 23, 1991); *see also United States v.*

*Raddatz*, 447 U.S. 667, 675 (1980) (regarding matters referred to a Magistrate Judge under

§ 636(b), "the district judge in making the ultimate determination of the matter, would have to

give fresh consideration to those issues to which specific objection has been made by a party").

This de novo review requirement following objection is necessary "to satisfy Article III

concerns." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (citation omitted).

## V.    ARGUMENT

The Findings and Recommendation was in error in determining that: (1) Plaintiffs' facial

challenge to the Amendment is justiciable; (2) the Amendment should have been subject to the

Forest Service's predecisional administrative objection process; (3) the Amendment violated the

ESA by not properly contemplating impacts to aquatic species; (4) the Amendment should have

been analyzed in an EIS; (5) the Amendment's EA failed to take a hard look at certain

environmental impacts; and (6) that the Amendment should be almost completely vacated while

an EIS is prepared.  As explained below, the Court should reject the Findings and

Recommendation's conclusions on these issues.

### A.    The Findings and Recommendation lacks any discussion of standing, which Plaintiffs lack because they have not tied their alleged procedural injury to concrete actions affecting their interests.

As explained in detail in Federal Defendants' summary judgment briefing, Plaintiffs'

challenge to the Amendment fails under the doctrines of standing and ripeness because Plaintiffs

fail to identify, much less challenge, a project that proposes to harvest large trees under the

Amendment in a manner that threatens a concrete, imminent injury.  Fed. Defs.' Mem. in Supp.

of Mot. for Summ. J. ("Defs.' Br.") 14, ECF No. 56; Fed. Defs.' Reply in Supp. of Mot. for

Summ. J. ("Defs.' Reply") 1-2, ECF No. 80.  The Findings and Recommendation erred by

failing to even address Federal Defendants' standing argument.  And, although it addressed

ripeness, FR 13-15, the Findings and Recommendation errs in concluding Plaintiffs' procedural

injuries are ripe while overlooking Plaintiffs' failure to connect their alleged procedural injuries

with any *concrete*, *imminent* impacts of the Amendment.  *Summers v. Earth Island Inst.*, 555

U.S. 488, 493 (2009) ("a plaintiff must show that he is under threat of suffering 'injury in fact'

that is concrete and particularized; the threat must be actual and imminent, not conjectural or

hypothetical[.]" (citing *Friends of Earth, Inc. v. Laidlaw Env't Servs. (TOC)*, 528 U.S. 167, 180-

181 (2000)).

While a procedural injury may be justiciable, even Plaintiffs acknowledge that their facial

challenge to the Amendment requires a showing that their alleged procedural injury is "fairly

traceable to some action that will affect" their interests.  Pls.' Reply Mem. in Supp. of Mot. for

Summ. J. ("Pls.' Reply") 6, ECF No. 75, quoting *Sierra Forest Legacy v. Sherman*, 646 F.3d

1161, 1179 (9th Cir. 2011) (per curiam).  In these situations, plaintiffs have standing only if their

"declarations connect th[eir] procedural injury to *imminent* harm in specific forests and project

areas."  *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1081 (9th Cir. 2015)

(emphasis added); *see also Wilderness Soc'y v. Rey*, 622 F.3d 1251, 1257 (9th Cir. 2010)

(holding plaintiff lacked standing to challenge Forest Service regulation in the absence of a

challenge to a project relying on that regulation).  The Findings and Recommendation carefully

parses the judicial distinctions between procedural and substantive claims, but fails to address the

fact that even in cases of procedural injury, Plaintiffs must tie their procedural injury to a

concrete, imminent, particularized injury.  FR 14 ("Thus 'a procedural injury is complete after [a

land and Resource Management Plan] has been adopted, *so long as it is traceable to some action*

*that will affect the plaintiff's interests*.'"  (emphasis added and citation omitted)).  For example,

the Findings and Recommendation make much of the distinction between procedural and

substantive challenges in the ripeness discussion in *Ohio Forestry*, quoting the opinion, but

curiously omitting the part of the quotation counseling that even a plaintiff bringing a procedural

claim must demonstrate standing in order to be heard in court.  *Compare* FR 14 ("'When [a plaintiff is] injured by a failure to comply with . . . a procedure[, they] may complain of that failure at the time the failure takes place, for the claim can never get riper." (citation omitted)), *with Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) ("Hence a person *with standing* who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper." (emphasis added)).

Here, Plaintiffs' declarations do not tie their procedural injuries to imminent harm because Plaintiffs' declarations do not identify any actual or imminent harvest of large trees proposed in projects issued under the Amendment.  *See, e.g.*, Bailey Decl. ¶¶ 5, 11, 13, 14, 15, ECF No. 42 (levying generalized grievance of not experiencing "large trees," yet failing to identify any particular project authorizing, for instance, removal of trees over 21 inches in riparian areas, or removal of trees inconsistent with the Amendment's guideline).  Rather than grapple with these fatal omissions in Plaintiffs' declarations, the Findings and Recommendation merely states with no cited support that "Plaintiffs have identified nine site-specific projects that will implement the Screens Amendment and declared that these projects will affect their use and enjoyment of the land because of the Amendment."  FR 15, n.3.  Plaintiffs' bare identification of planned projects implementing the Amendment—some of which have not even undergone NEPA analysis yet, and none of which Plaintiffs actually challenge—is much too general and speculative to meet the mark required to show standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 565 n.2 (1992)).

In sum, the Findings and Recommendation erred in failing to address Federal Defendants' standing argument and in determining that Plaintiffs' facial challenge is ripe. The Court should dismiss Plaintiffs' case on these jurisdictional grounds.

**B.**    <u>**The Findings and Recommendation erred in holding that the Forest Service was required to provide a pre-decisional objection process for the Amendment.**</u>

The Findings and Recommendation's determination on Plaintiffs' predecisional objection claim is unfounded because it: adopts the faulty reasoning of Magistrate Judge Clarke's Findings and Recommendation in the companion case; misreads the plain language of the relevant regulation, 36 C.F.R. § 219.51; and adopts an interpretation of the regulation rejected by the agency in the regulation's preamble.

Plaintiffs allege in this claim that the Forest Service violated Departmental regulations by exempting the Eastside Screens Amendment from the predecisional objection process. Pls.' Br. 19-23. The Department's regulations, however, provide that "[p]lans, plan amendments, or plan revisions proposed by the Secretary of Agriculture or the Under Secretary . . . are not subject to the [objection] procedures," but rather, "constitute[] the final administrative determination of the [Department]." 36 C.F.R. § 219.51(b). Although the Under Secretary was identified as the Responsible Official in the Final EA, AR34505, and in the DN/FONSI, AR34751, Plaintiffs and Amicus Party the Nez Perce Tribe argue that the objection process nevertheless applies because the Under Secretary was not listed as the Responsible Official in an initial notice and the Amendment's Preliminary EA, and thus, the Eastside Screens Amendment allegedly was not "proposed," only signed, by the Under Secretary. Pls.' Br. 20 (citing AR33602, AR33414, and AR33214); Amicus Br. 12-13, ECF No. 52. Plaintiffs in another case challenging the Amendment, *Blue Mountains Biodiversity Project v. Wilkes et al.*, 1:22-cv-01500-CL, raised the

*Greater Hells Canyon Council, et al. v. Wilkes, et al.*
2:22-CV-00859-HL
Fed. Defs.' Obj. to Findings & Rec.         9

same claim in front of Magistrate Judge Clarke, and despite the infirmities in both sets of

Plaintiffs' arguments, Magistrate Judge Clarke recently issued a Findings and Recommendation

favoring plaintiffs.  Findings and Recommendation, *Blue Mountains Biodiversity Project v.*

*Wilkes et al.*, 1:22-cv-01500-CL, ECF No. 38.

By "adopt[ing]" the incorrect reasoning and conclusion of Magistrate Judge Clarke's not-

yet-adopted Findings and Recommendation in this matter's companion case, the Findings and

Recommendation stumbles severely.  FR 16.  Magistrate Judge Clarke found that:

> In sum, the Under Secretary's signature on a decision notice does not exempt a
> lower ranking official's proposed plan amendment from the objection process.  If
> the Under Secretary wishes to exempt a proposed plan amendment under Section
> 219.51(b), the Under Secretary must be involved with the proposal before signing
> a decision notice.

*Id.* (quoting Judge Clarke's Findings and Recommendation).  Magistrate Judge Hallman adopted

this conclusion and reasoning after independent review, but without adding any additional

reasoning or justification.  *See id.* at 15-16.  This adoption was in error because the plain

language of the Forest Service's objection regulations make clear that a predecisional objection

period is not required for decisions by the Secretary of Agriculture or the Under Secretary for

Natural Resources and Environment.

The requisite regulation provides:

> Plans, plan amendments, or plan revisions proposed by the Secretary of Agriculture
> or the Under Secretary for Natural Resources and Environment are not subject to
> the procedures set forth in this section.  A decision by the Secretary or Under
> Secretary constitutes the final administrative determination of the U.S. Department
> of Agriculture.

36 C.F.R. § 219.51(b).  The first sentence explains that plan amendments "proposed" by the

Secretary or Under Secretary do not receive objection.  *Id.*  And the second sentence explains

that all amendment decisions by the Secretary or Under Secretary are "final" and therefore not subject to predecisional objection.  *Id.*

In construing identical language in the Forest Service's appeal regulations for projects and activities on National Forest System land, *id.* § 218.13(b), the Fourth Circuit held that decisions signed by the Under Secretary are "proposed" by him under the objection regulations. *Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 927 (4th Cir. 2022) (rejecting the reading of "proposed" adopted by the Findings and Recommendation as "too narrow and ignor[ing] the broader regulatory scheme.").  As the Fourth Circuit explained, the regulation's focus is not on the origin of a proposal, but on "how the Forest Service decides to act in response."  *Id.* at 927; *see also id.* ("[t]here is no distinction *based on the source* of the project's application" (emphasis added)).  The same reasoning applies here.  As the ultimate decisionmaker, the Under Secretary "proposed" the Amendment under 36 C.F.R. § 219.51(b).  *Cf. Wild Va.*, 24 F.4th at 926 (the Under Secretary proposed a project when "the Forest Service, via the United States Department of Agriculture's Under Secretary for Natural Resources and Environment, issued a second [Record of Decision] approving the Pipeline.").

Even if this Court disagrees with the Fourth Circuit's construction of "proposed," the Court must still give effect to the entire regulation.  *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*).  None should be ignored.  None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").  The second sentence of subsection (b) states that "[a] decision by the Secretary or Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture."  36 C.F.R. § 219.51(b).  That sentence means what it

says—final means final, and a decision that remains subject to predecisional objections is not final. "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (citation omitted). But rather than enforce the second sentence of subsection (b), the Findings and Recommendation renders it a nullity.

The preamble to the regulation also supports Defendants' reading and specifically rejects the reading of the Findings and Recommendation. *City of Las Vegas v. F.A.A.*, 570 F.3d 1109, 1117 (9th Cir. 2009) (if a regulation is susceptible to more than one reading, "we consult the preamble of the final rule as evidence of context or intent of the agency promulgating the regulations." (citation omitted)). There, the Department of Agriculture responded to a comment urging the agency to adopt a provision providing that "decisions made by the Secretary or the Under Secretary for Natural Resources and Environment affecting the Forest Service . . . be subject to administrative review." 77 Fed. Reg. at 21,247. The Department declined to do so, explaining that "[l]and management plan decisions made by the Secretary or Under Secretary for Natural Resources and Environment have never been subject to appeal or objection. The Department chooses not to change this approach." *Id.* The Finding and Recommendation, however, disregards the Department of Agriculture's contemporaneous interpretation of its own regulations and improperly imposes on the agency a procedure it expressly rejected. *See Vt. Yankee*, 435 U.S. at 524.

Finally, the Findings and Recommendation is also incompatible with the rest of the predecisional objection regulatory structure. Under the regulations, objections are made to "the line officer at the next higher administrative level above the responsible official." 36 C.F.R.

§ 219.56(e).  But the Under Secretary is the highest administrative level for the Forest Service.
*See* 7 C.F.R. § 2.20(a)(2)(ii) (delegating to the Under Secretary authority to "[p]rovide national
leadership in forestry," "[p]rotect, manage, and administer the national forests," and "[e]xercise
the administrative appeal review functions of the Secretary of Agriculture" for decisions by the
Forest Service).  There is no "line officer" above the Under Secretary of Agriculture, and the
objection regulations do not separately identify a reviewing officer for decisions by the Under
Secretary.  That fact shows the regulations were never intended to apply to the Under Secretary's
decisions.  *See Safari Club Int'l v. Haaland*, 31 F.4th 1157, 1171 (9th Cir. 2022) ("In discerning
the meaning of regulatory language, our task is to interpret the regulation as a whole, in light of
the overall statutory and regulatory scheme, and not to give force to one phrase in isolation."
(citation omitted)).  More, subjecting the Under Secretary's decisions to the predecisional
objection process deprives him of his statutory and regulatory role as the final decisionmaker
over National Forest System lands.  *See* Defs.' Br. 17-18.  In adopting Magistrate Clarke's
conclusion, the Findings and Recommendation ignores these problems.

Read plainly and in context, 36 C.F.R. § 219.51(b) provides that decisions by the Under
Secretary are not subject to the pre-decisional objection process.  The Findings and
Recommendation errs by reading the second sentence out of the regulation.  Worse, binding the
agency to an interpretation rejected in the preamble to the Rule frustrates the Under Secretary's
authority to make "the final administrative determination of the U.S. Department of
Agriculture."  *Id.*; *accord* 77 Fed. Reg. at 21,247.

The Court should review this issue de novo and decline to adopt the Findings and
Recommendation's reading of 36 C.F.R. § 219.51(b).

**C.** **The Findings and Recommendation erroneously concluded that the Forest Service's determination that the Screens Amendment would have "no effect on aquatic species" violated the ESA.**

At the outset, the Findings and Recommendation's determination that PACFISH and INFISH impose a stronger standard than the Eastside Screens' 21-inch rule for riparian logging is correct. FR 17. The Findings and Recommendation erred when concluding that the Forest Service's determination that the Amendment would have "no effect on aquatic species" was arbitrary and capricious and in violation of the ESA. *Id.* The record reflects that the Forest Service had a rational basis for its decision and that the Findings and Recommendation improperly relied on inapplicable portions of the administrative record to demonstrate that there were instances where the Screens Amendment may affect aquatic species.

First, the administrative record supports that the Forest Service had a rational connection for its "no effect" determination. As set forth in Federal Defendants' briefing, the Final EA demonstrates that the Forest Service fully considered the impact of the Amendment on aquatic resources and possible effects on ESA-listed species. Defs.' Br. 43-48; Defs.' Reply 21-25. In particular, the Forest Service compared the objectives, goals, standards and guides of PACFISH and INFISH against the Screens Amendment. *See* AR34594-96. Of note, the Forest Service found, and the Findings and Recommendation agreed, that PACFISH and INFISH guidelines remain in place and are stronger protections for aquatic species. AR34594; FR 17. Contrary to the Findings and Recommendation's assumption, the stronger standards do not stop at boundaries of RHCAs, but apply to projects outside the RHCAs with the potential to degrade the attainment of goals within these RHCAs. AR15061 (INFISH standards apply to "projects and activities in areas outside the RHCAs that are identified through NEPA analysis as potentially degrading RHCAs."); AR14717 (PACFISH applies to projects outside the RHCAs that would

degrade RHCAs' condition).  Thus, the amendment of the 21-inch standard, even when applied to RHCAs, would have no effect on the aquatic areas under the ESA because PACFISH and INFISH's stronger protections apply to RHCAs and areas outside the RHCAs that could potentially impact aquatic species.

But the Findings and Recommendation fails to address the Forest Service's analysis of its "no effect" determination and instead relies on two findings that are either irrelevant to ESA compliance or not supported by the record: 1) past projects in the National Forests demonstrate that the 21-inch standard previously applied to RHCAs; and 2) aquatic habitats may be affected from loss of trees due to upslope logging.  As described below, the portions of the administrative record relied upon in the Findings and Recommendation do not support the overall conclusion that the Amendment will have any discernible effect on riparian areas and do not cast doubt on the Forest Service's "no effect" determination.

As noted in Federal Defendants' briefing, while the Screens Amendment technically changed the 21-inch standard applicable in RHCAs, PACFISH and INFISH provide more stringent standards than the 21-inch standard or the Amendment and thus continue to govern timber harvest in RHCAs.  Defs' Reply 19, 24.  Management decisions in RHCAs will continue to operate using the same guidelines as they did prior to the Amendment, including the prohibition on timber harvest in RHCAs except under two limited circumstances for catastrophic events and "to acquire desired vegetation characteristics" to attain Riparian Management Objectives ("RMOs").  AR15062, AR14838.  Thus, the Findings and Recommendation's reliance on past projects cited in the administrative record, AR32017-18, to demonstrate that the Screens Amendment changed the 21-inch standard in RHCAs has no import for the purposes of establishing possible effects under the ESA because the stronger standards of PACFISH and

INFISH provide greater protections to aquatic species in the RHCAs than the prior 21-inch limitation or the Amendment. Likewise, the Findings and Recommendation's reliance on the project described in *Blue Mountains Biodiversity Project v. Pence*, 22 F. Supp. 2d 1136 (D. Or. 1998) does not support a finding here of possible effect on aquatic species; nor does it support a finding that removal of timber from RHCAs has been (or will be) a general practice that retards attainment of RMOs. In that case, the Forest Service recognized INFISH's application to RHCAs, but made a special exception to amend the forest plan to allow the project to proceed because the trees authorized for harvest were outcompeting desirable aspens in riparian areas. *Id.* at 1140. Thus, this case only shows that, under PACFISH and INFISH, timber harvest in RHCAs requires amendment of a forest plan and not that the 21-inch standard added any meaningful protections on top of PACFISH and INFISH in RHCAs.

The Findings and Recommendation also incorrectly concludes that aquatic habitat may be affected by the Amendment because upslope logging may lead to loss of large trees necessary for riparian conservation. FR 17 (citing AR48168). But this finding relies entirely on public comments that are devoid of any citation to scientific support and contain conclusory arguments by Plaintiffs. *See* AR48042 (unsupported conclusion that "[r]iparian forests, aquatic habitats, fish, and water quality will be significantly affected by this proposal as a result of increased logging of large trees in the uplands and within RHCAs."). The Findings and Recommendation's reliance on these unsupported comments over the analysis of the Forest Service improperly substitutes Plaintiffs' views for the agency's scientific determination and fails to afford the deference due to the agency's judgment. *See Conservation Congress v. U.S. Forest Serv.*, 720 F.3d 1048, 1054 (9th Cir. 2013) ([W]hen reviewing scientific judgments and

technical analyses within the agency's expertise, the reviewing court must be at its 'most deferential.'" (citations omitted)).

Lastly, the Findings and Recommendation mainly focuses on whether Plaintiffs established a "plausible basis" in the record to support their ESA claim rather than whether the Forest Service's determination presented a rational connection between the facts and the agency's determination. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc) *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7 (2008) (the agency's decision must be upheld if "there is a rational connection between the facts found and the conclusions made," and the determination was "not so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). But as described above, the Forest Service's no effect finding was supported by a rational basis in the record, and the EA determined that PACFISH and INFISH's stronger existing standards would provide greater protection for RHCAs and aquatic species. *See* AR34594.

In sum, the Forest Service's "no effect on aquatic species" finding under the ESA is supported by the administrative record, which shows that the limited changes caused by the Amendment would not affect ESA-listed, aquatic species. The Court should review the evidence and arguments de novo and grant judgment in favor of Federal Defendants on Plaintiffs' ESA claim.

> **D.**    **The Findings and Recommendation's determination that the Forest Service should have prepared an EIS rests on an improper mistrust of the agency and misunderstanding of the Amendment's impacts**.

The Findings and Recommendation erroneously concluded that the Amendment required preparation of an EIS because of its context, its impacts to aquatic species, and uncertainty regarding its impacts. These issues are discussed in turn.

1. **Context**

The Findings and Recommendation errs in ruling that the context of the Amendment requires preparation of an EIS by conflating the land area of the Eastside Forests with the land area and trees that the Amendment will actually impact.  FR 19-23.

NEPA requires agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *see* Defs.' Br. 12.  Before preparing an EIS, however, an agency may first prepare an EA, a "concise public document" that "include[s] brief discussions of the need for the proposal, of alternatives as required by [42 U.S.C. § 4332(2)(E)], of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1238–39 (9th Cir. 2005) (quoting 40 C.F.R. §§ 1508.9(a), (b) (2000)) (alterations in original).  If, after preparing an EA, the agency concludes that the proposed action will not have significant environmental effects, the NEPA process ends with a FONSI.  *Id.*

That is what the Forest Service did here, preparing a thorough EA for the Eastside Screens Amendment and finding no significant environmental effects.  AR34504-749 (EA); AR34763-67 (DN/FONSI).  Because that conclusion "required a high level of technical expertise," judicial deference to the agency must be "at its highest."  *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989); *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)).  The Forest Service's FONSI must be upheld so long as it is "fully informed and well-considered."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal citation omitted).  Put differently, this Court's review is limited to "whether

the agency has taken a hard look at the consequences of its actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001)(cleaned up).

Under NEPA's implementing regulations, whether a proposed action has significant environmental effects turns on the action's "context and intensity." 40 C.F.R. § 1508.27 (2019). The context of the Eastside Screens Amendment does not undermine the Forest Service's FONSI because the Amendment will not appreciably change where, how much, or what type of timber harvest occurs on the Eastside Forests. "Context simply delimits the scope of the agency's action." *In Def. of Animals v. U.S. Dep't of Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (citation omitted).

As emphasized in the Findings and Recommendation, the Amendment's analysis area includes 7,867,951 acres on six National Forests. AR34510. But the Findings and Recommendation errs in basing its conclusion that the Amendment affects a "massive" area of land based on this acreage number. FR 19, 22-23. As explained in detail in Federal Defendants' summary judgment briefing and Supplemental Brief, within the broad analysis area, the Amendment only applies to acres that are below the historic range of variability for LOS forest, and, in those areas, only when proposed harvest is outside of LOS. See Defs.' Br. 5 (chart explaining the Eastside Screens scenarios, particularly Scenario A2, where the Amendment applies); Defs.' Reply 18; Defs.' Suppl. Br. 13-15, ECF No. 89.

Further, the Findings and Recommendation's emphasis on the broad area the Amendment covers erroneously ignores the Forest Service's determination that the amount of timber harvest in the analysis area will be the same under the Amendment as it was before—about 34,000 to

54,000 acres of harvest annually.  AR34529.  While the Findings and Recommendation concedes

that the Amendment will not change annual acres of timber harvest, it incorrectly claims that the

type of trees selected for harvest *across the entire analysis area* will change with the

Amendment.  FR 22.  The record belies this claim.  The record explains that, in the areas outside

of LOS where the Amendment applies, there are relatively few trees over 21 inches dbh, and the

Amendment's mandate of "maintain[ing] and increase[ing] old and late structure forest,"

AR34516, would mean few trees above 21 inches dbh would be harvested.  AR34756,

AR34533-36, AR34711-12.  As the EA explains, the number of acres of timber harvest is not

altered by the Amendment, and in those acres harvested, the Amendment would have only

limited effects:

> Silvicultural treatments similar to those implemented over the past decade are
> projected to continue.  About 34,000-54,000 acres of timber harvest occurred
> annually over the past decade in the analysis area.  In most stands, the proposed
> alternatives would allow harvest of a handful of trees over 21 inches dbh . . . this
> would primarily occur to shift late structure closed forest to late structure open
> forest.  This means *a very small portion of the landscape would be impacted by the
> amendment* every year.  The total area affected by timber harvest will remain stable
> under all alternatives while the prescriptions within treated stands would change to
> some extent.

AR34529 (emphasis altered).

This Court's review of the 1993 Eastside Screens, which the Amendment at issue partly

replaces, is illustrative.  *Prairie Wood Products v. Glickman*, 971 F. Supp. 457, 463-64 (D. Or.

1997).  There, although the Amendment covered more than 9 million acres of land, this Court

upheld the Forest Service's use of an EA and the Forest Service's decision to define the size of

the Amendment by the acreage of projected timber sales rather than the acreage of the impacted

National Forests in their entirety.  *Id.* at 464.  In determining that the Eastside Screens was not a

significant amendment under NFMA, this Court soundly rejected plaintiffs' attempts to claim

that "the nine national forests in their entirety constitute the 'affected area.'" *Prairie Wood Products v.* Glickman, 971 F. Supp. 457, 463-64 (D. Or. 1997).  Instead, this Court found that it was proper for the agency to define the location and size of the amendment as the acreage of projected timber sales rather than the acreage of the national forests in their entirety.  *Id.* at 464.  The projected timber project acreage that this Court found insignificant in *Prairie Wood Products* was 50,000 acres, remarkably similar to the 34,000-54,000 annual projected timber harvest acres here.  *Id.* at 463.[2]

Courts counsel that "[s]ize in itself does not establish significance." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1262 (10th Cir. 2019); *see also TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) ("there is no categorical rule that sizable federal undertakings always have a significant effect on the quality of the human environment" (emphasis omitted)).  And here, the Forest Service has credibly predicted that the amount of timber harvest on the Eastside Forests will remain essentially the same post-Amendment, AR343529, and the number of trees larger than 21 inches in diameter removed in those harvests will be relatively small, *id.*, so the Amendment's context should not weigh toward a finding that the Amendment's impacts are significant.  *See W. Watersheds Project v. Bureau of Land Mgmt.*, 552 F. Supp. 2d 1113, 1120, 1135-36 (D. Nevada 2008) (upholding an EA for an

---

[2] The Findings and Recommendation attempts to distinguish *Prairie Wood Products* by claiming that the Court there relied on the temporary nature of the Eastside Screens when determining that it was not significant under NEPA and NFMA.  FR 22, n.9.  However, the Court in *Prairie Wood Products* acknowledged that, even though the Eastside Screens were only meant to be in place for 12-18 months, "more than 18 months have passed without issuance of either a draft or final Eastside Screens EIS," but that "neither this delay nor other circumstances indicate that the Regional Forester's non-significance finding under NFMA was arbitrary, capricious or otherwise not in accordance with law." *Prairie Wood Products*, 971 F. Supp. at 463.  Further, the Court in *Prairie Wood Products* declined to even mention, much less rely on, the temporary nature of the Eastside Screens when it analyzed the NEPA uncertainty significance factor at issue here.  *Id.* at 469.

amendment of two Resource Management Plans covering 7.5 million acres, in part because the impacts were not highly uncertain even though "[a]ccurate projections of number of acres impacted by [the plans] within the District's 7.5 million acres of public land [were] also difficult due to the number of variables present." (internal citation omitted)).[3]

### 2.  **Intensity: Species**

The Findings and Recommendation rightfully found that the Amendment's impacts to aquatic species are insufficient on their own to require an EIS, but the Findings and Recommendation went astray by suggesting that the Amendment's impacts to aquatic species require an EIS when combined with other intensity factors.  FR 30-31.

In determining whether a proposal's impacts are significant, NEPA's implementing regulations require agencies to assess "the degree to which the action may adversely affect" ESA-listed species or critical habitat.  40 C.F.R. § 1508.27(b)(9) (2019); *EPIC v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006) (the agency considers impacts to the species as a whole).  While adverse effects to a listed species is one factor that may warrant the preparation of an EIS, it is not dispositive.  *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1276 (10th Cir. 2004) ("[I]ssuance of an incidental take statement 'anticipating' the loss of some members of a threatened species does not automatically lead to the requirement to prepare a full EIS."); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546-47 (11th Cir. 1996) (upholding an EA

---

[3] The Findings and Recommendation improperly relies on the number of comments submitted for the Amendment when analyzing context.  FR 22-23.  Courts are not to consider the level of opposition to a decision when determining what level of NEPA analysis is required, but rather, the sufficiency of the agency's NEPA analysis and FONSI.  *See Surfrider Foundation v. Dalton*, 989 F. Supp. 1309, 1323 (S.D. Cal. 1998) ("Courts have avoided equating controversy with opposition.  Otherwise, opposition, and not the reasoned analysis set forth in an environmental assessment would determine whether an environmental impact statement would have to be prepared.  The outcome would be governed by a Heckler's veto."  (internal quotation marks and citation omitted)).

and FONSI where the project was likely to adversely affect the Florida Panther and the Eastern Indigo Snake).  NEPA's intensity factor "focuses on the *degree* to which an action may adversely affect a threatened or endangered species or critical habitat," not on whether there are *any* adverse impacts.  *EPIC*, 451 F.3d at 1012 (quotation and citation omitted).

Here, as explained in Section V.C above, the Service's "no effect" determination is well-grounded in the administrative record, which shows that the minute changes in riparian area vegetative management caused by the Screens Amendment would not affect ESA-listed, aquatic species. *See, e.g.* AR34594-96; *supra* V.C.  But even if the Court were to find, as the Findings and Recommendation did, that the Amendment could have an adverse impact on riparian species, the Court would still have to find that the *degree* of that impact was significant before finding that the Forest Service erred in not preparing an EIS.  *EPIC*, 451 F.3d at 1012.  Plaintiffs have simply not provided—nor has the Findings and Recommendation identified—information from the record remotely suggesting that the Amendment's impacts on any particular, listed aquatic species or critical habitat will be more than negligible, especially when considering impacts to any species on the whole.  *Id.* at 1010.  Thus, this intensity factor does not raise substantial questions that the Amendment carries significant impacts.

### 3.    **Intensity: Uncertainty**

The Findings and Recommendation's erroneous conclusion that the uncertainty intensity factor requires preparation of an EIS rests on four mistaken bases: (1) that the change from a Forest Plan standard to guideline introduces uncertainty; (2) that alleged confusion about the scenarios to which the Amendment applies creates uncertainty; (3) that allegedly differing statements about the importance of the Amendment's increased flexibility creates uncertainty

about its impacts; and (4) that the history of the Eastside Screens demonstrates a pattern of uncertainty in the forestry science at issue.  FR 23-27.

NEPA's implementing regulations identify "highly uncertain" impacts or "unique or unknown risks" as an intensity factor that may require an EIS.  40 C.F.R. § 1508.27(b)(5) (2019). Here, the Forest Service prepared a full vegetation analysis examining the effects of each alternative and found the impacts of the Amendment are not uncertain and that it does not have unique or unknown risks.  AR34523-44, AR34765; *see also* AR34443-99 (vegetation analysis). The vegetation analysis used a qualitative assessment to analyze a range of potential outcomes based on disturbance, succession, and management assumptions.  AR34523-24.  The analysis synthesized current landscape conditions, the dynamics of each vegetation metric, professional knowledge of forest management, and monitoring data.  *Id.*  The Forest Service also used Forest Inventory and Analysis plots to describe existing landscape conditions and how those landscapes have changed over time.  *Id.*  Finally, the Forest Service used the data it compiled for Forest Vegetation Simulator modeling, which supported and enhanced the vegetation analysis.  *Id.*; *see also* AR34402-03 (describing model).  These techniques satisfy NEPA.  *The Lands Council*, 537 F.3d at 992 ("we defer to the Forest Service as to what evidence is, or is not, necessary to support [its] analyses.").  Based on its analysis, as well as "past experience with project-specific amendments and best available science used by the interdisciplinary team," the Forest Service reasonably concluded that the Amendment does not have highly uncertain effects.  AR34765; *see also The Lands Council*, 537 F.3d at 992 ("We have approved of forest plans when they are 'based on the current state of scientific knowledge.'" (citation omitted)).

Skipping over this analysis entirely, the Findings and Recommendation myopically focuses instead on the change from a forest plan standard to a guideline and the alleged increase

in uncertainty caused by that change.  FR 23-25.  But, while not as inflexible as forest plan standards, "[a] guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, *so long as the purpose of the guideline is met.*"  36 C.F.R. § 219.15(d)(3) (emphasis added).  The amended guideline's purpose is to "[m]aintain and increase old and late structure forest.  Favor fire tolerant species where appropriate."  AR34753; *see also* AR34516 ("Managers should retain and generally emphasize recruitment of old trees and large trees, including clumps of old trees.").  Site-specific projects that implement the Amendment may thus only remove large trees where doing so moves stand composition toward HRV and protects adequate late structure.  *See, e.g.*, AR34512 ("A variety of empirical studies and science syntheses demonstrate that protection of all trees greater than 21 inches prevents restoration of conditions that are most likely to maintain old trees into the future.").  To suggest that the Agency will do otherwise and ignore the Amendment's guideline and LOS-protective purpose, as the Findings and Recommendation does, is to disregard the long-established presumption of regularity.  *See B.R. v. Garland*, 26 F.4th 827, 836 (9th Cir. 2022) ("This court applies a presumption of regularity . . . and will presume '[i]n the absence of clear evidence to the contrary . . . that public officers properly discharge their duties.'" (citation omitted)).  Although the Findings and Recommendation speculates there will be decreased opportunities for judicial review under the guideline, FR 24-25, there is nothing to stop future plaintiffs from challenging projects implemented under the Amendment by claiming under NFMA that the agency is not following the guideline.[4]  And, of course, the future extent of judicial review has no bearing on whether the environmental effects of a proposed action are uncertain under NEPA.

---

[4] The Findings and Recommendation cites *In re Big Thorne Project*, 857 F.3d 968, 974 (9th Cir. 2017) for the proposition that discretionary language prevents judicial review, but that

Further, the Forest Service built safeguards into the Amendment to mitigate any uncertainty arising from the more flexible nature of the guideline. The EA makes plain that "[i]f large trees are not increasing in number with appropriate composition, the Regional Forester will impose the Age Standard Alternative across the whole analysis area or by national forest or potential vegetation zone."). AR34517. The Findings and Recommendation fails to engage with this regulatory backstop at all, further undermining its uncertainty analysis.

Second, with little analysis, the Findings and Recommendation concludes that there is unresolved confusion about whether the Amendment applies to timber harvest within LOS forest and that the confusion creates uncertainty regarding impacts. FR 25. There is no confusion except that manufactured by Plaintiffs and now the Findings and Recommendation: the Amendment does not apply to harvest in LOS forest. AR34531 (the Amendment EA stating "Analyses for the Old and Large Tree Guideline with Adaptive Management [the Selected Alternative] . . . assume *subpart 1 of Scenario A (section 6(d)(1)) is interpreted to allow harvest of a 21-inch dbh tree* where the intent of the ecosystem standard and Scenario A wildlife standard are met" (emphasis added)). In the face of this clear statement from the record, the Finding and Recommendation's commitment to seeing a "dispute" on this issue, much less one creating uncertainty requiring an EIS, is untenable.

Third, the Findings and Recommendation cannot accept that two different, but true, concepts can coexist regarding the Amendment: that the flexibility it adds to management is

---

case is distinguishable. There, not only was the language of the forest plan aspirational, but it dealt with achieving general "sustainability" of a wolf population. *Id.* The Court there discussed that the concept of sustainability versus viability was "not sharply defined, and is made fuzzier still by the parties." *Id.* Conversely, the Amendment clearly defines what species and size is meant by "old" and "large" trees and provides clear guidance prioritizing when they should be retained. AR34753-54.

minimal, but that this small added flexibility is important.  FR 26.  The Findings and

Recommendation finds these coexisting truths "contradictory" and thus uncertain, *id.*, but the

record demonstrates that they are the reality.  The Forest Service's analysis of the Amendment's

vegetation impacts shows that the Amendment will have the positive impact for which it was

created: "[w]ithin managed areas, fire tolerant trees like ponderosa pine and larch would be

promoted within treated areas because of the increased ability to remove less fire tolerant species

like grand fir when they are young and large."  AR34537.  But the Forest Service is under no

illusion regarding the degree of change the public can expect from the Amendment.  The agency

candidly disclosed in the EA that "[d]epending on project specific goals, the relative dominance

of fire tolerant species *could* increase," but "[a]t the landscape scale, succession and fire

suppression will continue to promote the establishment and growth of shade tolerant species like

grand fir."  AR34537.  Indeed, "[l]arge trees over 21 inches [diameter at breast height ("dbh")]

would continue to increase across the landscape, but at a slightly slower rate than under [the]

Current Management Alternative."  AR34539.  Although secondary to the agency's qualitative

vegetation analysis, the Forest Service's modeling produced results consistent with its above

conclusion of positive, but incremental, impacts.  AR34537 ("Within treated areas, modeling

results show a median value increase of about 1% basal area[5] of fire tolerant species under the

[selected alternative, or the Amendment] and the Old Tree Standard compared to Current

Management within late structure stands"); AR34540 ("Simulation modeling results in a median

of 17.5 large trees per acre under the Current Management Alternative, 17.3 large trees per acre

under the [selected alternative, or the Amendment]").  The Findings and Recommendation

engages with none of this qualitative and quantitative information and instead throws up its

---

[5] Basal area is a measure of the cross-sectional area of trees at breast height.

hands, insisting that the Amendment's impacts are uncertain based on general statements that only seem inconsistent at first blush.  FR 26.

Last, the Findings and Recommendation erroneously concludes that the history of the Eastside Screens casts uncertainty on the Amendment.  *Id.*  While it is true that the Eastside Screens was meant to be temporary but was in place for decades, this history has no bearing on the Amendment at issue, which is not intended to be temporary.  Faring no better is the Findings and Recommendation's conclusion that the change in science motivating the Screens Amendment creates uncertainty.  *Id.*  Such a conclusion reads uncertainty into the necessarily ever-changing nature of science, forestry or otherwise.  *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993) ("Of course it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." (citation omitted)).  The scientific underpinning of the Amendment is not controversial, FR 27-30, and the Findings and Recommendation explains no reason why this particular science is more uncertain than any other—one would be hard pressed to find any scientific field without major developments in an almost 30-year span.

Overall, the Findings and Recommendation applies too stringent a standard to the uncertainty factor given that Plaintiffs chose to bring a facial rather than an as applied challenge to the Amendment.  *Some* speculation necessarily exists regarding the Amendment's impacts because forest plan amendments are planning documents that do not initiate action in themselves, and the Amendment *has not yet been implemented*.  *See supra* Section V.A.  For example, the Findings and Recommendation identifies uncertainty in "the variable motivations at play for each logging project" in the future, but the only reason these alleged "variable motivations" are not now known is because Plaintiffs are attempting, improperly, to challenge the Amendment

before any of these projects are in front of the Court.  FR 25.  In bringing a facial challenge,

Plaintiffs bear the heavy burden of "establish[ing] that no set of circumstances exists under

which the regulation would be valid."  *Reno v. Flores*, 507 U.S. 292, 301 (1993); *see also United*

*States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge is "the most difficult challenge to

mount successfully, since the challenger must establish that no set of circumstances exists under

which the [rule] would be valid").  Neither Plaintiffs nor the Findings and Recommendation can

carry that burden by speculating that the Forest Service will disregard the Amendment (or its

LOS-protective purpose) in future projects.  The Findings and Recommendation only compounds

this improper speculation by concluding that the EA should have accounted for the speculation

for the Amendment's impacts to be sufficiently certain.  FR 25.

In sum, the Findings and Recommendation mistakenly found significant uncertainty

where there was very little—disregarding the Forest Service's thorough impacts analysis in the

process.

## E.   The Findings and Recommendation erred in concluding that the Forest Service failed to take a hard look at the impacts of implementing a guideline or at the Amendment's impacts to aquatic species.

Building on its house of cards of other erroneous rulings, the Findings and

Recommendation mistakenly concluded that the Forest Service improperly assumed that the

Amendment's Guideline would be followed in future projects, and by assuming that the

Amendment would not impact aquatic species because of the continued existence of PACFISH

and INFISH.  FR 32-33.

As explained above, the Guideline still serves as a constraint on agency decisionmaking

even if it is not as mandatory as a standard.  Further, the Findings and Recommendation, and this

Court, cannot assume that the Forest Service will disregard its own guideline; in fact, the Court

must presume that the agency will follow all applicable laws and authorities. *B.R.*, 26 F.4th at 836. Further, there is certainly no basis for arguing that the Forest Service should have modeled the impacts of the Amendment using the speculative assumption that agency personnel would not follow the Amendment's Guideline when implementing projects. S*ee Salerno*, 481 U.S. at 745 (a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [rule] would be valid"). Thus, the agency did not apply an incorrect assumption regarding the Guideline and took a hard look at its impacts. *See Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (the hard look standard prevents an agency from "rely[ing] on incorrect assumptions").

As explained above, the Forest Service also took a hard look at the Amendment's impacts to aquatic species and appropriately assumed that the continued, stronger protections of PACFISH and INFISH meant that the Amendment would not impact aquatic species. AR34594. While the Amendment technically lifts the 21-inch limitation in RHCAs, the more restrictive PACFISH and INFISH provisions effectively supersede the Eastside Screens' diameter limit and the Amendment's Guideline. *See supra* Section V.C. Given that the Eastside Screens Amendment leaves these protective measures in place, unchanged, the Forest Service reasonably concluded that aquatic species would not be impacted by the Amendment's new guideline. AR34594.

In sum, the Forest Service took a hard look at the Amendment's impacts, and the Court should reject the Findings and Recommendation on this claim.

F.    **Regarding remedy, the Findings and Recommendation improperly ordered preparation of an EIS and improperly vacated the Amendment.**

In analyzing remedy, the Findings and Recommendation first erred in ordering

preparation of an EIS.  FR 33-34.  Whether or not the Court vacates the Amendment, if the Court

finds error in the Forest Service's NEPA analysis, the Court should refrain from ordering the

agency to complete an EIS.  *See League of Wilderness Defs./Blue Mountains Biodiversity

Project v. Pena*, No. 3:12-cv-02271-HZ, 2015 WL 1567444, *5 (D. Or. Apr. 6, 2015) ("Vacating

the FEIS and [Record of Decision] does not dictate how the agency should comply with the law

in the future.  Rather, it leaves to the agency the discretion of how to appropriately proceed after

setting aside the arbitrary and capricious agency actions"); *see also Ctr. for Biological Diversity

v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1225 (9th Cir. 2008) ("[P]reparation of

an EIS is not mandated in all cases simply because an agency has prepared a deficient EA or

otherwise failed to comply with NEPA").  For any of the potential NEPA errors the Court could

find in this case, the agency could provide more information on remand, in a revised EA, that

could better substantiate its FONSI, and this fact is reason to "remand to [the agency] to prepare

a revised EA or, as necessary, a complete EIS."  *Ctr. for Biological Diversity*, 538 F.3d at 1227;

*id.* at 1226 (reasoning that it was warranted to give the agency discretion on remand regarding

how to comply with NEPA because the agency might provide more convincing reasons in a

revised EA to back up its previously conclusory statement regarding impacts).

    Second, the Findings and Recommendation went astray by vacating the Amendment's

Guideline.  FR 33-35.  The Court "is not required to set aside every unlawful agency action."

*Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *see also Sierra Forest Legacy

v. Sherman*, 951 F. Supp. 2d 1100, 1106-07 (E.D. Cal. 2013) (declining to vacate a *forest plans

amendment*, reasoning that "[i]f vacatur in the face of a NEPA violation was virtually automatic

as Plaintiffs herein appear to suggest, then the Ninth Circuit would not have remanded to this

Court for further equitable consideration of the appropriate remedy"); *see also Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1018 (E.D. Cal. 2013) ("In sum, vacatur, like injunctive relief, is an equitable remedy that is only granted in particular circumstances; neither remedy issues as a matter of course upon the showing of a legal violation").  Whether agency action should be vacated hinges on "how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed."  *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (citation and internal quotation marks omitted).  And the Court considers three factors when determining the seriousness of the agencies' errors: the possibility of environmental harm, whether the agencies could offer better reasoning on remand, and the scope of the errors.  *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855, 884 (D. Mont. 2021), *appeal dismissed per stipulation*, No. 22-35123, 2022 WL 3447158 (9th Cir. June 15, 2022).

Addressing these standards in an analogous situation, the Eastern District of California and the Ninth Circuit declined to set aside a multi-forest plan amendment based on a procedural NEPA error.  *Sierra Forest Legacy*, 951 F. Supp. 2d at 1109, 1116; *Pac. Rivers Council*, 942 F. Supp. 2d at 1019-24, 1034.  In these cases, plaintiffs challenged the 2004 Sierra Nevada Forest Plan Amendment, which "amended the Forest Plans for 11 national forests covering 11.5 million acres."  *Pac. Rivers Council*, 942 F. Supp. 2d at 1016; *Sierra Forest Legacy*, 951 F. Supp. 2d at 1104.  In *Sierra Nevada Forest Legacy*, the court found that the Forest Service had violated NEPA by not adequately analyzing alternatives.  951 F. Supp. 2d at 1104.  The court noted that "[i]f vacatur in the face of a NEPA violation was virtually automatic as Plaintiffs herein appear to suggest, then the Ninth Circuit would not have remanded to this Court for further equitable consideration of the appropriate remedy, and instead would have simply directed that the 2004

Framework be set aside" and the former "2001 Framework be substituted in its place." *Id.* at

1106-07.  Under the two *California Communities Against Toxics* factors, the *Sierra Forest*

*Legacy* court found, first, that the agency's errors "did not have any impact on the ability of the

public or the agency to fairly compare . . . alternatives," and second, that "[v]acatur would

disrupt numerous projects presently in the decision-making pipeline." *Id.* at 1109.  Therefore,

the court "denie[d] plaintiffs' request to vacate the 2004 Framework" and remanded to the Forest

Service to "address[] the range of alternatives deficiency identified by the Court." *Id.* at 1116.

     Here, the Findings and Recommendation fail to analyze these three factors at all and

instead summarily conclude "the Services' multiple errors in this case are serious."  FR 34.  Not

so.  Under the first factor, the agencies' errors here, if any, are likely minor.  First, there is a

distinct possibility of environmental harm if the Amendment is halted: the needed flexibility

offered by the Amendment "to better adapt forest conditions to current disturbance regimes and

expected climate-induced changes" would not be realized were the Court to vacate the

Amendment.  AR34511.  Second, the Forest Service likely could offer better reasoning on

remand.  For example, if the Court held that the Forest Service violated NFMA regulations by

not holding an objection period, the agency could correct this violation by holding the objection

period while the Amendment remains in place.  Further, the agency could provide a fuller

analysis regarding the change from a standard to a guideline.

     Regarding the third factor going to the seriousness of agency error, the scope of any

errors here would likely be limited because they would not raise doubts that the "agency chose

correctly," as a substantive matter.  *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d

146, 150 (D.C. Cir. 1993); *see Pac. Rivers Council*, 942 F. Supp. 2d at 1019-24, 1034 (holding

that remand without vacatur was appropriate, in part because the Forest Service's errors were

limited).

Further, vacatur of the Amendment and a temporary return to the prior 21" harvest limit

would be disruptive to planned project-level activities that would benefit the Eastside Forests.

Projects currently signed or under analysis relying on the Amendment would have to be delayed

while the agency re-worked the analysis and/or decided to apply the old 1994 diameter limit, and

then potentially delayed again if the Amendment is reinstated after additional analysis on

remand. *See Pac. Rivers Council*, 942 F. Supp. 2d at 1022 ("[D]elaying planned projects is a

disruptive consequence that must be considered in determining whether vacatur is warranted"

(citing *Cal Cmtys. Against Toxics*, 688 F.3d at 993-94)); *see also Sierra Forest Legacy*, 951 F.

Supp. 2d at 1109 (declining to vacate a *forest plans amendment* under the disruptive

consequences inquiry because "[v]acatur would disrupt numerous projects presently in the

decision-making pipeline, obligating the agency to reconfigure and reanalyze projects that have

in some cases been in the planning process for several years"); *see also* AR34753 (explaining

that the strict 21-inch dbh limitation hampers the Forest Service's ability to move the Eastside

Forests toward resiliency to climate change-induced disturbances); *see also id.* (concluding that

repetitive project-specific amendments to remove the 21-inch dbh limitation are inefficient).

The Findings and Recommendation suggests that vacatur is not disruptive because the

Forest Service can simply issue project-specific amendments, as upheld recently in the Findings

and Recommendation in the Camp Lick Project case. *See Blue Mountains Biodiversity Project v.*

*Trulock*, No. 21-1033 (D. Or.).  But the Forest Service explained in the record that, first,

numerous site-specific amendments are inefficient, and second, that this Court has previously

questioned the site-specific amendment approach, noting that the agency "should consider the

cumulative impacts of its decisions to amend the 21-inch standard across a whole forest rather than just within a project area." AR34753. For example, in *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, Case No. 3:12-cv-02271-HZ, 2014 WL 6977611, at *29-30 (D. Or. Dec. 9, 2014), the Court *rejected* a site-specific amendment of the Eastside Screens' diameter limitation because the project area had no unique characteristics compared to the Forest on the whole that supported a site-specific amendment. Thus, judicial approval of the site-specific amendment approach has been mixed, so it is not a foregone conclusion that this approach would be uniformly successful for all projects on the Eastside Forests. Further, at minimum, each project already in the planning phase would need to be paused in order to analyze the addition of a site-specific amendment.

In sum, the Court should remand to the agency to fix any errors and decline to vacate the Amendment so that the agency can capitalize on its added flexibility for the health of the Eastside Forests.

## VI.    CONCLUSION

For the foregoing reasons, the Court should reject the Findings and Recommendation and grant summary judgment to Federal Defendants and Defendant-Intervenors.

Respectfully submitted this 21st day of September, 2023.

s/     *Hayley A. Carpenter*
HAYLEY A. CARPENTER
TYLER M. ALEXANDER
ANTHONY D. ORTIZ
Trial Attorneys
Natural Resources Section
Wildlife & Marine Resources Section
150 M St. NE
Washington, D.C. 20002
Phone: (202) 305-0242 (Carpenter)
(202) 305-0238 (Alexander)
(202) 307-1147 (Ortiz)

hayley.carpenter@usdoj.gov
tyler.alexander@usdoj.gov
anthony.d.ortiz@usdoj.gov

*Counsel for Federal Defendants*