Aaron Bruner (OSB #133113)
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119-327
Portland, Oregon 97219
Email: abruner@wrlegal.org
Phone: (503) 768-8500

Julie A. Weis (OSB #974320)
HAGLUND KELLEY LLP
2177 SW Broadway
Portland, Oregon 97201
Email: weis@hk-law.com
Phone: (503) 225-0777

*Counsel for Defendant-Intervenors*

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PENDLETON DIVISION

**GREATER HELLS CANYON COUNCIL, OREGON WILD, CENTRAL OREGON LANDWATCH, SIERRA CLUB, GREAT OLD BROADS FOR WILDERNESS**, and **WILDEARTH GUARDIANS**,

       Plaintiffs,

       v.

**HOMER WILKES**, in his official capacity as Undersecretary for Natural Resources and Environment; **GLENN CASAMASSA**, in his official capacity as Regional Forester for Region 6; and the **UNITED STATES FOREST SERVICE**,

       Defendants,

**AMERICAN FOREST RESOURCE COUNCIL**, an Oregon non-profit association, and **EASTERN OREGON COUNTIES ASSOCIATION**, an unincorporated association,

       Defendant-Intervenors.

Civil No. 2:22-cv-00859-HL

**DEFENDANT-INTERVENORS' OBJECTIONS TO FINDINGS AND RECOMMENDATION**

**Request for Oral Argument**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STANDARD OF REVIEW ....................................................................................2

I.   Review of Objections ..................................................................................2

II.  Review Under the Administrative Procedure Act........................................2

    A.   Arbitrary and Capricious Standard of Review....................................2

    B.   Deference to Agency Scientific Decision Making...............................3

EASTSIDE SCREENS AMENDMENT OVERVIEW ........................................3

ARGUMENT ........................................................................................................8

I.   The Magistrate Judge Erred in Concluding that 36 C.F.R. § 219.52(b) Required the Forest Service to Hold an Objection Process Despite the Under Secretary Having Made the Final Decision on the Eastside Screens Amendment...................................8

II.  The Magistrate Judge Erred in Concluding the Record Did Not Support the Forest Service's "No Effect" Determination for ESA-Listed Aquatic Species..................14

III. The Magistrate Judge Erred in Concluding the Eastside Screens Amendment was Significant Under NEPA........................................................17

    A.   The context of the Amendment does not counsel in favor of significance.......18

    B.   The potential impacts of the Amendment are not highly uncertain.................21

    C.   The Amendment's potential impact on ESA-listed aquatic species does not require an EIS........................................................29

IV.  The Magistrate Judge Erred in Concluding the Forest Service Failed to Take a NEPA "Hard Look" at the Eastside Screens Amendment's Potential Environmental Impacts........................................................30

    A.   The Forest Service took a "hard look" at replacing the 21-inch standard with a more flexible guideline........................................................31

    B.   The Forest Service took a "hard look" at aquatic species impacts...................32

V.   The Remedy Decision Rests on the Magistrate Judge's Erroneous Merits Determinations........................................................34

CONCLUSION...............................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. U.S. Forest Serv.*,
    907 F.3d 1105 (9th Cir. 2018) ................................................34

*Barnes v. F.A.A.*,
    865 F.3d 1266 (9th Cir. 2017) ................................................18

*Blue Mountains Biodiversity Project v. Wilkes*,
    No. 1:22-cv-01500-CL (D. Or. Apr. 27, 2023)................................9, 13

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
    688 F.3d 989 (9th Cir. 2012) ................................................34

*Cascade Forest Conservancy v. U.S. Forest Serv.*,
    577 F.Supp.3d 1153 (W.D. Wash. 2021)........................................28

*Ctr. for Biological Diversity v. Nat'l Hwy. Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008) ................................................18

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ................................................15

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
    451 F.3d 1005 (9th Cir. 2006) ............................................17-18

*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ................................................28

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
    681 F.3d 1006 (9th Cir. 2012) ................................................14

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir.2004) ..............................................30-31

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976)..........................................................20

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008), *overruled in part on other grounds by Am.*
    *Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) .........4, 23-24, 31

*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360 (1989)...........................................................4

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife,*
  551 U.S. 644 (2007)..................................................................................3-4

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
  241 F.3d 722 (9th Cir. 2001) ...................................................................18

*Nat'l Wildlife Fed'n v. Espy,*
  45 F.3d 1337 (9th Cir. 1995) ...................................................................34

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) .............................................................31, 32

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)..................................................................................30

*Sierra Club v. U.S. Forest Serv.,*
  897 F.3d 582 (4th Cir. 2018) ...................................................................13

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.,*
  100 F.3d 1443 (9th Cir. 1996) ...................................................................4

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton,*
  433 F.3d 852 (2006)..................................................................................20

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
  671 F.3d 1113 (9th Cir. 2012) .................................................................20

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.,*
  340 F.3d 969 (9th Cir. 2003) .............................................................14, 17

*Vt. Yankee Nuclear Power Corp v. Nat. Res. Def. Council, Inc.,*
  435 U.S. 519 (1978)..................................................................................11

*Wild Virginia v. U.S. Forest Serv.,*
  24 F.4th 915 (4th Cir. 2022) ..............................................................12, 13

*WildEarth Guardians v. Provencio,*
  923 F.3d 655 (9th Cir. 2019) .............................................................18, 28

## Statutes

5 U.S.C. § 706(2)(A).....................................................................................3

7 U.S.C. § 6961(a) .......................................................................................10

7 U.S.C. § 6961(c)(1)...................................................................................10

16 U.S.C. § 1536(a)(2)................................................................................14

16 U.S.C. § 1604(a) ...........................................................................................10

16 U.S.C. § 1604(g) ...........................................................................................10

28 U.S.C. § 636(b)(1) ..........................................................................................3

42 U.S.C. § 4332(2)(C) ................................................................................20, 30

**Other Authorities**

7 C.F.R. § 2.20 .............................................................................................10, 11

7 C.F.R. § 2.20(a)(2) ..........................................................................................10

36 C.F.R. § 218.13(b) ...................................................................................12, 13

36 C.F.R. § 219.15(d)(3) ...............................................................................24, 32

36 C.F.R. § 219.51(b) .................................................................................... *passim*

36 C.F.R. § 219.56(e) .........................................................................................10

40 C.F.R. § 1508.27 ...........................................................................................17

40 C.F.R. § 1508.27(a) .......................................................................................18

40 C.F.R. § 1508.27(b) .......................................................................................18

40 C.F.R. § 1508.27(b)(5) ..................................................................................21

40 C.F.R. § 1508.27(b)(9) ..................................................................................30

50 C.F.R. § 402.14(a) .........................................................................................14

51 Fed. Reg. 19,926 (June 3, 1986) ...................................................................15

77 Fed. Reg. 21,162 (Apr. 9, 2012) ...................................................................11

85 Fed. Reg. 77,142 (Dec. 1, 2020) ...................................................................13

87 Fed. Reg. 24,851 (Apr. 27, 2022) ..............................................................7, 21

FED. R. CIV. P. 72(b)(2) .......................................................................................1

FED. R. CIV. P. 72(b)(3) .......................................................................................3

Local Rule 73-3...................................................................................................1

## INTRODUCTION

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure (FRCP), Local Rule 73-3, and this Court's Order dated September 7, 2023, defendant-intervenors American Forest Resource Council (AFRC) and Eastern Oregon Counties Association (EOCA) (collectively intervenors) hereby object in part to Magistrate Judge Hallman's Findings and Recommendation dated August 31, 2023 (F&R, ECF No. 97) regarding the Forest Service's programmatic Forest Management Direction for Large Diameter Trees in Eastern Oregon and Southeastern Washington (Eastside Screens Amendment, or Amendment).

The Eastside Screens Amendment applies to six eastside forests – the Deschutes, Fremont-Winema, Malheur, Ochoco, Umatilla and Wallowa-Whitman National Forests (collectively the Eastside Forests).  AR34510 (Environmental Assessment (EA) at 7).  Plaintiffs challenged the Amendment's replacement of a rigid prohibition against the removal of any tree equal to or greater than 21 inches in diameter at breast height ($\geq$ 21 inches dbh, also referred to as the 21-inch standard) with a more flexible guideline that allows the limited removal of fire-intolerant grand fir and white fir trees less than 30 inches in diameter at breast height (< 30 inches dbh).  The Amendment replaced the rigid standard with a more flexible guideline because the 21-inch standard – which was meant to be an interim standard when adopted nearly 30 years ago – rests on stale scientific data that has been eclipsed by the best available and noncontroversial science over the ensuing decades.

The need for the Amendment is well-established and noncontroversial – on these two points, intervenors and the Magistrate Judge agree.  As the F&R rightly pointed out:

> In the face of a century of fire suppression, the eastside forests shifted to more shade-dominant species that are more competitive but less resistant to fire and disease. AR 34511052. This shift increased the occurrence of catastrophic wildfire and disease. Because of this forest composition shift, the Service's approach to forest management

changed from a drive to protect all large trees to a greater desire to maintain more historical forest structures that are more resilient to fire and disease. AR 34511. This new approach centers around slowing forest transition away from less dense stands with drier species to denser stands with more shade species. AR 34512.

F&R at 4. And as the Magistrate Judge also rightly concluded, "there is not a substantial scientific dispute about the historical conditions of the eastside forests or the fact that hard diameter limits can constrain managers' ability to achieve desired species outcomes and protect eastside forests from changing fire regimes." F&R at 30 (properly finding no NEPA controversy as to the Amendment). But despite acknowledging the sound scientific basis and need for the Amendment, the Magistrate Judge recommended *more process* under three separate statutes to the detriment of forest restoration efforts. It is on those points that intervenors object.

Intervenors specifically object to:

(1) the Magistrate Judge's determination that the Forest Service violated the National Forest Management Act (NFMA) when, after the Under Secretary for Natural Resources and Environment made the final decision to adopt the Eastside Screens Amendment, the agency acted in conformance with 36 C.F.R. § 219.51(b) by not holding an objection process. F&R at 15-16;

(2) the Magistrate Judge's determination that the Forest Service violated the Endangered Species Act (ESA) by concluding the Amendment would have no effect on ESA-listed aquatic species, which conclusion obviated the need for preparation of a biological assessment and satisfied the agency's ESA consultation obligation. *Id.* at 17-18;

(3) the Magistrate Judge's determination that the Amendment was significant under the National Environmental Policy Act (NEPA) and required the preparation of an environmental impact statement (EIS) based on its context, *id.* at 19-23, uncertain environmental impacts, *id.* at 23-27, and potential for adverse impacts to ESA-listed aquatic species. *Id.* at 30-31; and

(4) the Magistrate Judge's determination that the Forest Service failed to take a NEPA "hard look" at the potential environmental impacts of changing the 21-inch standard to a more flexible guideline that allows the limited removal of grand fir and white fir < 30 inches dbh, *id.* at 32-33, and the Amendment's potential environmental impacts on ESA-listed aquatic species. *Id.* at 33.

In sum, because the Magistrate Judge erred in evaluating the Eastside Screens Amendment under NFMA, the ESA and NEPA, the Court should not adopt the F&R's recommendations on the points enumerated above and discussed below. Further, because the remedy determination (F&R at 33-35) rests on the Magistrate Judge's erroneous merits determinations, the Court should decline to adopt the remedy recommendation and instead uphold the Eastside Screens Amendment by granting summary judgment in favor of AFRC, EOCA and federal defendants.

## STANDARD OF REVIEW

### I.    Review of Objections.

When a party objects to any part of a magistrate judge's findings and recommendation, the district court's charge is to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id. See also* FRCP 72(b)(3) (setting forth the de novo standard of review and the district court's suite of potential actions).

### II.    Review Under the Administrative Procedure Act.

#### A.    Arbitrary and Capricious Standard of Review.

Challenges to agency land management decisions are reviewed under the Administrative Procedure Act's (APA) arbitrary and capricious standard of review. 5 U.S.C. § 706(2)(A) (providing that an agency decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). The APA's arbitrary and capricious standard is a narrow one that precludes a reviewing court from substituting its own judgment (or that of a plaintiff) for that of the agency. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,

551 U.S. 644, 658 (2007); *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008),

*overruled in part on other grounds by Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d

1046 (9th Cir. 2009).  Under this standard, an agency's decision should be upheld unless the

agency "relied on factors Congress did not intend it to consider, 'entirely failed to consider an

important aspect of the problem,' . . . offered an explanation 'that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise.'"  *McNair*, 537 F.3d at 987 (citation omitted).

   **B.**    **Deference to Agency Scientific Decision Making.**

   Federal agencies are owed substantial deference by bodies reviewing agency action,

particularly agency action involving scientific matters.  *McNair*, 537 F.3d at 988.  *See also*

*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-77 (1989) (deference to an agency's

decision is particularly appropriate where questions of scientific methodology or technical

expertise are involved).  Review should be at its *most* deferential where, as here, an agency is

addressing difficult issues within its area of special expertise.  *McNair*, 537 F.3d at 993.

                    **EASTSIDE SCREENS AMENDMENT OVERVIEW**

   The action at issue in this case is exceedingly modest and discrete, *i.e.*, the Amendment's

replacement of a rigid prohibition against the removal of any tree ≥ 21 inches dbh with a more

flexible guideline that allows the limited removal of fire-intolerant grand fir and white fir trees <

30 inches dbh.  Despite its limited nature, the Amendment is of vital importance to forest

restoration and protection and has been needed for decades.

   In 1993, the Forest Service issued a letter providing direction to forest supervisors of the

Eastside Forests regarding the management of late seral or "old-growth" forests.  AR14405-06.

The letter established the Eastside Screens, a set of *interim* guidelines for how to design forest

treatment projects to promote the retention of old-growth trees.  *Id.*  Those "interim" guidelines remained in place until the adoption of the Eastside Screens Amendment by the Under Secretary in 2021.

The Eastside Screens arose out of a unique political process when House Speaker Tom Foley (Washington) and Senator Mark Hatfield (Oregon) requested the formation of an interagency panel to conduct a scientific evaluation "of the sustainability of eastern Oregon and Washington forests."  AR34508 (EA at 5).  The resulting report noted that old-growth abundance and distribution in some areas of the Eastside Forests presented a "cause for concern." AR14405-06.  In response, the Forest Service asked the panel to develop interim policies that would be replaced "within 12-18 months" after more formal landscape evaluations could be conducted.  AR34509 (EA at 6).  At the same time, political and legal pressure from environmental groups led to the establishment of the 21-inch size restriction, arrived at via negotiations with environmental advocacy groups who had sued the Forest Service.  *Id.*

The Eastside Screens revolved around the idea of historical range of variability (HRV) and sought to maintain or increase old-growth trees in areas where it was believed old tree numbers were below HRV.  AR14407.  Through the initial screening process, the Forest Service would "screen" vegetation management projects for potential impacts to riparian, ecosystem and wildlife resources.[1]  *Id.*  The Forest Service reauthorized the Eastside Screens over the following decades, even though the Eastside Screens and the 21-inch standard always were intended to be temporary:

> The interim nature of this decision and the need to protect options led to the formulation of the alternatives. The interim standards themselves were developed to be conservative

---

[1]  The riparian screen for proposed timber harvest activities was replaced quickly by the more protective Inland Native Fish Strategy (INFISH) and Pacific Anadromous Fish Strategy (PACFISH).  AR34508 (EA at 5).

> in their approach to protecting habitats i.e. they did not attempt to establish protection at
> the minimum level. This approach was taken to provide the flexibility necessary to look
> at a wide range of options when establishing more permanent standards after the Eastside
> Assessment is completed.

AR14479.

The Forest Service recognized early on that the Eastside Screens (particularly the 21-inch

standard) presented management and forest health challenges.  In 2003, then-Regional Forester

Linda Goodman noted that "screens direction, including the 21-inch diameter limitation, is

limiting the ability to meet the screens objectives of providing LOS [Late Old Structure] stands."

AR14683.  *See also* AR14685 (noting the need for increased flexibility in forest management).

To be better stewards of forest resources, some Eastside Forest managers over the years sought

increased management flexibility using site-specific forest plan amendments, an "inefficient

process" called into question by the Oregon District Court.  AR34753 (noting 24 "repetitive"

amendments to forest plans specific to the 21-inch standard).

In 2021, the Eastside Screens Amendment was adopted by the Under Secretary to move

away from the use of site-specific forest plan amendments and to instead manage the Eastside

Forests towards ecological health and resiliency based on modern science "and over 20 years of

on-the-ground experience implementing the 21-inch standard . . . ."  AR34753.  For "additional

support," F&R at 29, the Forest Service employed the Forest Vegetation Simulator (FVS) to

model how changing the 21-inch rule would affect species composition, old trees, large trees and

forest structure.  AR34523.  The Forest Service's analysis in support of the Amendment included

realistic and stark assumptions, including that "[c]limate change will increase the extent of

disturbances including fire, insects, disease, and drought" and that "[s]pecies composition will

continue to shift toward fire intolerant species like grand fir and white fir," AR34528 (EA at 25),

conditions not exclusive to the Eastside Forests.  In fact, the Biden Administration has

recognized that "the primary threats to forests, including mature and old-growth forests, include climate impacts, catastrophic wildfires, insect infestation, and disease."  87 Fed. Reg. 24,851, 24,851 (Apr. 27, 2022).  The Administration has further emphasized the need to reduce the threat of catastrophic wildfires "using active, science-based forest management . . . ."  *Id.* at 24,852.

The Eastside Screens Amendment does just that:

> 25 years of learning from science and experience demonstrate that [the Eastside Screens'] definition of late and old structure forest (LOS) did not adequately account for species composition or age and does not fully support landscape restoration and resiliency efforts. We are currently lacking forests across the analysis area that are open, multi-aged, and fire resistant with old-growth trees while late structure forests with less fire resistant trees are overabundant.

AR34523.  The best available science shows it would be "impossible to restore stands to historical conditions or conditions that would be resistant to current and future conditions without cutting some fir larger than 21-inches . . . ."  AR34544.

The Eastside Screens Amendment is modest and applies only within forest stands that currently are outside of LOS (and below the historical range of variability) and only allows for the removal of certain fire-intolerant tree species, namely grand fir and white fir trees larger than the 21-inch standard but less than 30 inches dbh.  Outside of LOS, "the Screens Amendment changed the 21-inch standard into a guideline that favors the retention of not only large trees but fire-resistant tree species as well."  F&R at 5.  More specifically:

> Managers should retain and generally emphasize recruitment of old trees and large trees, including clumps of old trees. Management activities should first prioritize old trees for retention and recruitment. If there are not enough old trees to develop LOS conditions, large trees should be retained, favoring fire tolerant species where appropriate. Old trees are defined as having external morphological characteristics that suggest an age ≥ 150 years. Large trees are defined as grand fir or white fir ≥ 30 inches dbh or trees of any other species ≥ 21 inches dbh. Old and large trees will be identified through best available science. Management activities should consider appropriate species composition for biophysical environment, topographical position, stand density, historical diameter distributions, and spatial arrangements within stands and across the landscape in order to develop stands that are resistant and resilient to disturbance.

AR34753-54 (Decision Notice at 4-5).

The Amendment provides the modest land management flexibility long needed to improve conditions in stands outside of LOS. The Amendment is not a sea change; it is a long overdue baby step in the right direction. The Magistrate Judge acknowledged the need for the Amendment, and the fact that the science supporting the Amendment is not controversial. F&R at 4, 30. Yet the F&R still recommends more process under NFMA, the ESA and NEPA, process that will delay realization of land managers' urgent need for modest flexibility with respect to the 21-inch standard, to the detriment of the natural resources that all parties seek to protect and restore.

## <u>ARGUMENT</u>

**I.**      <u>The Magistrate Judge Erred in Concluding that 36 C.F.R. § 219.51(b) Required the Forest Service to Hold an Objection Process Despite the Under Secretary Having Made the Final Decision on the Eastside Screens Amendment</u>.

The Magistrate Judge wrongly concluded the Forest Service violated NFMA regulation 36 C.F.R. § 219.51(b) by not allowing for an administrative objection process on the Eastside Screens Amendment, despite the Under Secretary having made the final decision to adopt the Amendment. 36 C.F.R. § 219.51(b) ("A decision by the Secretary of Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture."). Because the Magistrate Judge's recommendation ignores the text, context, and purpose of the regulation, as well as the statutory authority of the Secretary and Under Secretary to develop and administer land use plans for the National Forest System, the Court should not adopt it.

The regulation comprises two sentences, both of which must be given effect:

> Plans, plan amendments, or plan revision proposed by the Secretary of Agriculture or the Under Secretary for Natural Resources and Environment are not subject to the procedures set forth in this section. A decision by the Secretary of Under Secretary constitutes the final administrative determination of the U.S. Department of Agriculture.

36 C.F.R. § 219.51(b).  Ignoring the second sentence of the regulation entirely and focusing

solely on the meaning of the regulation's first sentence, the F&R endorsed the recommendation

of Magistrate Judge Clarke on the same issue in a separate case:

> "In sum, the Under Secretary's signature on a decision notice does not exempt a lower
> ranking official's proposed plan amendment from the objection process. If the Under
> Secretary wishes to exempt a proposed plan amendment under Section 219.51(b), the
> Under Secretary must be involved with the proposal before signing a decision notice."

F&R at 16 (quoting *Blue Mountains Biodiversity Project v. Wilkes*, No. 1:22-cv-01500-CL, slip

op. at 9 (D. Or. Apr. 27, 2023)).  *See also id.* (agreeing that "based on the plain language of

Section 219.51(b), the undersecretary's signature on a decision notice does not exempt a lower

ranking official's proposed plan amendment from the objection process").  The F&R's

determination as to the meaning of the regulation's first sentence is erroneous.  And the

Magistrate Judge's failure to engage with the regulation's second sentence, which plainly

provides that a decision by the Under Secretary is a final decision not subject to the objection

process, also is legal error.

Starting with the regulation's second sentence, it is undisputed that the Under Secretary

made the final decision to adopt the Eastside Screens Amendment.  *See, e.g.*, AR34767 (Decision

Notice at 18).  *See also* AR34762 (Decision Notice at 13) ("[T]his decision is the final

administrative determination by the U.S. Department of Agriculture.").  The Under Secretary

decided to adopt the Amendment – specifically the Old Tree and Large Tree Guideline with

Adaptive Management alternative – "[b]ased on [his] review of the EA and Project Planning

Record."  AR34753 (Decision Notice at 4).  *See also* AR34514 (EA at 11) (stating that the Under

Secretary "is the decision maker for this project and will decide which alternative to select. He

will compare each alternative's ability to meet the purpose and need and weigh the effects of

each alternative"); AR34763 (Decision Notice at 14) (statement of the Under Secretary that as "the responsible official, I evaluate the effects of the project . . . . I have reviewed and considered the EA and documentation included in the project record, and I have determined that the proposed action will not have a significant effect on the quality of the human environment").[2]

Application of an administrative objection process is not allowed (and would make no sense) where a decision like that of the Under Secretary constitutes "the final administrative determination of the U.S. Department of Agriculture." 36 C.F.R. § 219.51(b). The context of the regulation shows why.

Congress authorized the Secretary to develop and revise land use plans, 16 U.S.C. § 1604(a), and directed the Secretary to develop the regulations for the Forest Service's land use planning process. *Id.* § 1604(g) (directing the Secretary to "promulgate regulations . . . that set out the process for the development and revision of the land management plans"). Congress further authorized the Secretary of Agriculture to establish the Under Secretary position, 7 U.S.C. § 6961(a), and required the Secretary to delegate to the Under Secretary "those functions under the jurisdiction of the Department that are related to natural resources and environment . . . ." *Id.* § 6961(c)(1). The Secretary did so, 7 C.F.R. § 2.20, including by delegating to the Under Secretary the authority to manage the national forests. *Id.* § 2.20(a)(2). Thus, under 36 C.F.R. § 219.56(e), which identifies reviewing officers as limited to the official "at the next higher administrative level above the responsible official," there is no official to review the Under

---

[2] Although the responsible official was identified in the Preliminary EA as the Ochoco National Forest Supervisor, AR33214, an official whose decision would not have been a final decision of the U.S. Department of Agriculture, the Under Secretary was identified as the responsible official in the final EA. AR34505. The administrative record does not indicate the date on which the change in responsible official occurred, but the Nez Perce Tribe's Vice-Chairman testified he was informed of the change on December 28, 2020, 15 days before the Under Secretary issued the Decision Notice. Declaration of Shannon E. Wheeler (ECF No. 53) ¶ 8.

Secretary's decision – again, the Secretary, the only higher official, delegated to the Under

Secretary the final authority to manage the national forests.  7 C.F.R. § 2.20.  Consistent with this

logic, when the Department of Agriculture promulgated 36 C.F.R. § 219.51(b), it rejected a

request that Under Secretary decisions "be subject to administrative review," stating that:

> Land management plan decisions made by the Secretary or Under Secretary for Natural
> Resources and Environment have never been subject to appeal or objection. The
> Department chooses not to change this approach. The Agency anticipates that approvals
> of plans, plan amendments, or plan revisions by the Secretary or Under Secretary will
> continue to be rare occurrences.

77 Fed. Reg. 21,162, 21,247-48 (Apr. 9, 2012).

The Magistrate Judge never confronted the plain meaning of 36 C.F.R. § 219.51(b)'s

second sentence.  Instead, the Magistrate Judge engrafted an administrative process onto the

regulation where none is allowed for, in contravention of Supreme Court teachings disallowing

such an outcome.  *Vt. Yankee Nuclear Power Corp v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519,

524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their

discretion, but reviewing courts are generally not free to impose them if the agencies have not

chosen to grant them.").  Doing so was error.

Turning to the regulation's first sentence, the F&R adopted Magistrate Judge Clarke's

recommendation that "the Under Secretary *must be involved* with the proposal before signing a

decision notice" in order for the final decision to be exempt from the administrative review

process.  F&R at 16 (emphasis added) (adopting Magistrate Judge Clarke's "reasoning and

conclusion in its entirety").  But 36 C.F.R. § 219.51(b) contains no such "involved with"

language – again, the F&R runs afoul of the Supreme Court's admonition that "reviewing courts

are generally not free to impose [additional procedural rights] if the agencies have not chosen to

grant them."  *Vt. Yankee*, 435 U.S. at 524.  Further, the record indicates the Under Secretary *was*

involved with the proposed action before signing the Decision Notice.  The Under Secretary decided to adopt the Amendment "[b]ased on [his] review of the EA and Project Planning Record," AR34753 (Decision Notice at 4), and, based on his review, decided to do so without preparation of an EIS after confirming "the proposed action will not have a significant effect on the quality of the human environment."  *See also supra* note 2 (pointing out that the Under Secretary had been identified as the responsible official for the Amendment at least 15 days prior to signing the Decision Notice).

Under the F&R's flawed reasoning, reviewing courts would be tasked with discerning whether an Under Secretary's conduct rose to the level of being "involved with" a proposed action.  Although the Under Secretary's conduct here satisfies such a test, the Court should not adopt that judge-created procedural requirement.

A recent decision out of a sister circuit more properly concluded, based on the same regulatory language governing decisions on site-specific projects as opposed to forest plan amendments, 36 C.F.R. § 218.13(b), that "a proposal, for purposes of the exception [to the administrative review process], does not mean the application triggering action by the Forest Service but, rather, how the Forest Service decides to act in response to that application."  *Wild Virginia v. U.S. Forest Serv.*, 24 F.4th 915, 927 (4th Cir. 2022).  *Compare* 36 C.F.R. § 219.51(b) (addressing plans, plan amendments, or plan revisions proposed/decided by the Under Secretary) *with* 36 C.F.R. § 218.13(b) (addressing projects and activities proposed/approved by the Under Secretary).  This Court should conclude likewise.

In *Wild Virginia*, agencies had been working for years on the environmental analysis for a pipeline project proposed by a private party.[3]  There, like here, opponents of the project objected to the lack of an objections process where the Under Secretary had signed the decision, on the grounds that the Under Secretary was not the genesis of the proposal.  *Wild Virginia* held that the decision was not subject to the objections process despite the project having been proposed by a third party.  Rejecting the proffered distinction between a proposal and a decision as "too narrow" and contrary to the "broader regulatory scheme," *Wild Virginia* rightly concluded that the inquiry focused on the government's action, *i.e.*, the Under Secretary having signed the decision to authorize the pipeline project.  *Id.*  Because the "Under Secretary's approval 'constitutes the final administrative determination of the U.S. Department of Agriculture,'" the court properly held "the proposal not subject to the predecisional review process."  *Id.* (quoting the identical regulatory language pertaining to site-specific projects).

The F&R is silent as to *Wild Virginia*.  And although Magistrate Judge Clarke (in the F&R adopted by Magistrate Judge Hallman) attempted to distinguish *Wild Virginia*, *see Blue Mountains Biodiversity Project*, No. 1:22-cv-01500-CL, slip op. at 8, the cited distinction – that *Wild Virginia* involved an "external" proposal rather than one "from a lower-ranking official within the Forest Service" – is without merit.  Nothing in *Wild Viriginia*, or in the two regulations (36 C.F.R. §§ 219.51(b) and 218.13(b)), supports a finding that the meaning of "proposed" depends on whether the source of the proposal was external to the agency.

---

[3]  The pipeline project's first EIS issued in October 2017, so the project would have been in the analysis phase well before then.  See *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 588 (4th Cir. 2018).  The decision on review in *Wild Virginia* ultimately issued January 11, 2021 and was signed by the Under Secretary, who had been identified as the responsible official for the proposed action 40 days before making the decision on the proposal for which he was not the genesis, and which had been in the works for years.  85 Fed. Reg. 77,142, 77,144 (Dec. 1, 2020).

The foregoing shows that decisions by the Under Secretary are not subject to the objections process.  Thus, because the Under Secretary made the decision on the proposed Amendment, the Forest Service rightly did not allow for an administrative objection process. The Magistrate Judge erred by giving no effect to the second sentence in 36 C.F.R. § 219.51(b) and by construing the regulation's first sentence in a manner inconsistent with the regulation read as a whole, and inconsistent too with the context and purpose of the regulation.  Because the Magistrate Judge erred, the Court should not adopt the F&R on this issue.  The Court instead should conclude on de novo review that the Under Secretary's decision on the proposed Amendment was the final administrative determination of the U.S. Department of Agriculture and therefore not subjection to the objections process.

## II.    The Magistrate Judge Erred in Concluding the Record Did Not Support the Forest Service's "No Effect" Determination for ESA-Listed Aquatic Species.

The Court should reject the Magistrate Judge's determination that the Forest Service violated the ESA with respect to listed aquatic species.  F&R at 17-18.  Contrary to the F&R, the record supports the agency's conclusion that the Eastside Screens Amendment will have "no effect" on listed aquatic species.

The Forest Service complied with the ESA with respect to listed aquatic species.  As a general matter, the Forest Service has a duty to consult under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), for any discretionary agency action that "may affect" a listed species. *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv*., 340 F.3d 969, 974 (9th Cir. 2003) (citing 50 C.F.R. § 402.14(a)).  But neither informal nor formal consultation is required if an action will have "no effect" on a listed species, as is the case here for aquatic species.  *See, e.g.*, *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv*., 100 F.3d 1443, 1447 (9th Cir. 1996); *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012).  A determination

of "no effect" is for the action agency to make.  51 Fed. Reg. 19,926, 19,949 (June 3, 1986)

(stating that the action agency "makes the final decision on whether consultation is required").

The standard for evaluating an action agency's "no effect" determination is whether "an effect on

listed species . . . is plausible." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698

F.3d 1101, 1122 (9th Cir. 2012).

 The Forest Service did not err in determining the Amendment would have "no effect" on

listed aquatic species because the Amendment did not alter the governing "goals, standards and

guides" in riparian areas.  AR34594 (EA at 91).  The Eastside Screens originally included a

riparian screen for proposed timber harvest activities, but that screen was replaced by the more

protective Inland Native Fish Strategy (INFISH) and Pacific Anadromous Fish Strategy

(PACFISH).  AR34508 (EA at 5).  See F&R at 17 (acknowledging that INFISH and PACFISH

impose a "stronger standard" on riparian harvest activities compared with the 21-inch standard).

Because the Amendment did not change the INFISH or PACFISH standards and guidelines, an

effect on aquatic species from the Amendment is not plausible.  The record thus supports the

Forest Service's reasonable "no effect" determination.

 The Magistrate Judge acknowledged but disregarded the deference owed to the agency's

reasonable "no effect" determination.  F&R at 18.  Instead, the Magistrate Judge pointed to two

ways the Amendment might cause plausible impacts on aquatic species, both of which miss the

mark.  F&R at 17 (pointing to instances where PACFISH/INFISH might allow the removal of

trees $\geq$ 21 inches dbh absent the 21-inch standard, and speculating that "the logging of large trees

right outside of riparian areas could affect aquatic species").

 The Magistrate Judge's two concerns miss the mark because they misapprehend the way

in which PACFISH and INFISH protect riparian and aquatic processes.  The "PACFISH and

INFISH strategies focus on ecological processes and function under which riparian and aquatic ecosystems developed.  These strategies do not limit the size of trees harvested within RHCAs [Riparian Habitat Conservation Areas]."  AR34594 (EA at 91).  Because they focus on fundamental ecological processes and function instead of an arbitrary limit on tree size, the PACFISH and INFISH strategies contain standards to achieve Riparian Management Objectives (RMOs), which are the ecological habitat attributes like pool frequency, water temperature, large woody debris, bank stability, lower bank angle and width/depth ratio within which the riparian and aquatic ecosystems developed.  AR14834 (PACFISH); AR15061 (INFISH).  PACFISH and INFISH, which apply both within RHCAs and to activities outside of RHCAs that might degrade RHCA conditions, AR14717 (PACFISH); AR15061 (INFISH), prohibit activities that would retard attainment of RMOs.  AR34954 (EA at 91).  PACFISH and INFISH also prohibit the removal of trees in RHCAs, regardless of tree size, except in two limited conditions tied to the achievement and maintenance of ecological processes and function, namely salvage harvest after a catastrophic event and where silvicultural treatment is needed to meet "desired vegetation characteristics" for the attainment of RMOs.  AR14838 (PACFISH); AR15062 (INFISH).

Again, the Eastside Screens Amendment left unaltered the strongly protective PACFISH and INFISH strategies.  Thus, the Magistrate Judge's stated concern about the potential impact of "logging . . . large trees right outside of riparian areas" has no basis.  F&R at 17.  It has no basis because PACFISH and INFISH govern activities outside of RHCAs that might degrade RHCA conditions.  AR14717 (PACFISH); AR15061 (INFISH).  They did so before the Amendment, and they will continue to do so after the Amendment.  Nor is the Forest Service's "no effect" determination undermined by the Magistrate Judge's stated concern about potential impacts of the Amendment "where logging is allowed under PACFISH but limited by the current 21-inch

standard." F&R at 17. Again, the PACFISH and INFISH strategies intentionally do not limit the size of trees harvested within RHCAs because they focus not on an arbitrary size limit but rather on restoring and maintaining the historical ecological processes and function in riparian and aquatic habitats. The PACFISH and INFISH strategies did so before the Amendment, and they will continue to do so after the Amendment because the Amendment left those strategies unchanged. If, post-Amendment, the removal of a tree ≥ 21 inches dbh is called for by PACFISH or INFISH, then such activity would be subject to project-level consultation under the ESA before proceeding. *Turtle Island Restoration Network*, 340 F.3d at 974 (action agency has a duty to consult under the ESA for any discretionary action that "may affect" a listed species). But the Amendment would not be the cause of such activity. Rather, such activity would have been called for under PACFISH or INFISH consistent with the attainment of RMOs for the benefit of riparian or aquatic habitat. *See, e.g.*, AR34606 (EA at 103) ("Project level analyses will be required to address any site-specific effects that projects may have on riparian and wetland associated species and their habitats.").

The Court should afford the Forest Service's "no effect" determination the deference it is due and decline to adopt the Magistrate Judge's recommendation regarding ESA compliance. Under its de novo review, the Court instead should uphold the Forest Service's reasonable "no effect" determination for the Amendment with respect to listed aquatic species.

## III.    **The Magistrate Judge Erred in Concluding the Eastside Screens Amendment was Significant Under NEPA.**

Determining whether an EIS is required under NEPA hinges on the term "significantly" under 40 C.F.R. § 1508.27 and "depends on the project's 'context' and its 'intensity.'"[4] *Envtl.*

---

[4] All citations to NEPA regulations are to the 2019 version of the regulations. See F&R at 7 n.2.

*Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006) (*EPIC*).  *See also* 40

C.F.R. § 1508.27(a) (defining "context"); *id.* § 1508.27(b) (setting forth the NEPA intensity

factors).  An agency's determination that a project does not require an EIS will be upheld unless

it is arbitrary or capricious.  *Barnes v. F.A.A.*, 865 F.3d 1266, 1269-70 (9th Cir. 2017).  Only

"[i]f there is a *substantial question* whether an action 'may have a significant effect' on the

environment" must an agency prepare an EIS.  *Ctr. for Biological Diversity v. Nat'l Hwy. Traffic*

*Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)).  And an agency's determination that a

particular effect is insignificant will generally be "'a classic example of a factual dispute the

resolution of which implicates substantial agency expertise.'"  *WildEarth Guardians v.*

*Provencio*, 923 F.3d 655, 672 (9th Cir. 2019) (quoting *Marsh*, 490 U.S. at 376).

     Here, the Forest Service evaluated the Amendment's context and each of the NEPA

intensity factors and appropriately found the Amendment will not have "significant" impacts on

the environment.  AR34763-66 (Decision Notice at 14-17).  The Magistrate Judge's conclusion

to the contrary was in error and should not be adopted by the Court.

     **A.**     **The context of the Amendment does not counsel in favor of significance.**

     NEPA context looks at an action's potential impacts in relation to "society as a whole

(human, national), the affected region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a).

Ninth Circuit case law teaches that context "simply delimits the scope of the agency's action, including

the interests affected."  *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 731 (9th Cir. 2001).

The Magistrate Judge thus correctly stated that "[b]ecause context provides the backdrop for the

significance analysis, there is no categorical rule that large federal projects are always significant . . . ."

F&R at 20.  But the Magistrate Judge then erred by concluding the Amendment is "massive in terms of scope and setting,"[5] and that the NEPA intensity factors had to be evaluated against that backdrop.  *Id.*

The Amendment minimally alters the status quo.  It does not change the number of acres treated annually and only modestly alters which trees (only certain grand fir and white fir) may be removed from the forest landscape pursuant to that treatment.  The EA disclosed that under the Amendment, the same amount of timber harvest will occur each year as occurred previously under the Eastside Screens:

> Management trends will continue at a rate similar to the past decade, including trends in timber harvest (Figure 4) and timber volume sold (Figure 5).  Silvicultural treatments similar to those implemented over the past decade are projected to continue.  ***About 34,000-54,000 acres of timber harvest occurred annually over the past decade in the analysis area.  In most stands, the [Amendment] would allow harvest of a handful of trees over 21 inches dbh in addition to trees under 21 inches dbh.  This would primarily occur to shift late structure closed forest to late structure open forest.  This means a very small portion of the landscape would be impacted by the amendment every year.***

AR34529 (EA at 26) (emphasis in original).  Thus, the Amendment's context is largely irrelevant at all levels except the locality.  *Id.* ("The total area affected by timber harvest will remain stable under [the Amendment] while the prescriptions within treated stands would change to some extent.").  *See also* AR34568 (EA at 65) (further noting the local focus of the Amendment by observing that it may "expand opportunities to select strategic treatment locations, resulting in reduced wildfire spread and severity in locations that have important resources to protect, such as

---

[5]  The Magistrate Judge cited the size of the Amendment's analysis area (7.8 million acres) to support the "massive" characterization of the Amendment's context.  F&R at 22.  The Amendment's analysis area comprises 7,867,951 acres, AR34510 (EA at 7), but that acreage includes both LOS and non-LOS forests.  Within the analysis area, there are about 1.5 million acres of LOS, AR34535 (EA at 32), which is relevant because the Amendment applies only outside of LOS as is discussed below.  *See infra* Argument part III.B.  Further, "[o]utside of LOS, [the Amendment] would not substantially change where or how much project level management occurs because fewer trees over 21 inches dbh exist in these areas, and the green tree retention policies require large tree retention." AR34756 (Decision Notice at 7).

within old forests or near historic sites"); AR34764 (Decision Notice at 15) (describing

environmental impacts of the Amendment as "marginal" at the landscape scale).

Neither the Ninth Circuit nor any other Circuit has held that the size of a federal action is

determinative of significance.  As the D.C. Circuit held in *TOMAC, Taxpayers of Michigan*

*Against Casinos v. Norton*, 433 F.3d 852 (2006), the "relevant benchmark is whether the federal

action 'significantly affect[s] the quality of the human environment,'" not the size of the action.

*Id.* at 862 (quoting 42 U.S.C. 4332(2)(C)) (alteration in original).  And when an agency action

does not meaningfully alter the status quo, a finding of NEPA insignificance is wholly

reasonable.  For example, in *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113 (9th Cir.

2012), the court held, in a case where plaintiffs challenged an EA's "hard look" regarding the

biosafety of a new facility at a national laboratory in the event of a terrorist attack, that the

agency's context analysis, which found that the action did not alter the status quo at the national

level, was entitled to deference.  *Id.* at 1127 (so holding because "'identification of the

geographic area' within which a project's impacts on the environmental resources may occur 'is

a task assigned to the special competency of the'" agency) (quoting *Kleppe v. Sierra Club*, 427

U.S. 390, 414 (1976)).  Thus, where, as here, the Amendment minimally alters the status quo of

the Eastside Screens, AR34763 (Decision Notice at 14), the Amendment's context is not properly

characterized as "massive in terms of scope and setting."  F&R at 20, 23.  The Court thus should

not adopt the Magistrate Judge's characterization of the Amendment's context.  The Court

instead should evaluate the agency's NEPA analysis in the context of an action that "does not

dramatically change management but rather makes a small change within the broader

management context of the Eastside Screens," and where the "intent of the Eastside Screens and

even the vast majority of the process for achieving the intent of the Eastside Screens is retained." AR34763 (Decision Notice at 14).

    **B.**    <u>**The potential impacts of the Amendment are not highly uncertain**</u>.

    The Magistrate Judge erred in concluding an EIS was required under 40 C.F.R. § 1508.27(b)(5).  F&R at 23-27.  This NEPA intensity factor, which speaks to whether a proposed action's environmental impacts are highly uncertain, must be evaluated in the context of deference being afforded the agency's exercise of substantial expertise.

    The Magistrate Judge did not evaluate the Amendment under that lens and instead wrongly recommended preparation of an EIS based on: (1) inherent uncertainty in moving from a forest plan standard to a forest plan guideline, *id.* at 24-25; (2) purported uncertainty as to whether the Amendment applies within LOS, *id.* at 25; (3) the Magistrate Judge's difficulty in reconciling the Amendment's modest nature with its importance, *id.*; and (4) the fact that in hindsight, the 21-inch standard adopted three decades ago has made the Eastside Forests "more vulnerable to fire and disease."  *Id.* at 26.  Intervenors will not address that last point other than to say the Magistrate Judge's logic would favor land managers doing nothing for fear the passage of time might prove their science imperfect, a bad policy in the extreme and one not for the Court to impose on federal land managers.  *See also id.* at 30 (Magistrate Judge's agreement that "there is not a substantial scientific dispute about the historical conditions of the eastside forests or the fact that hard diameter limits can constrain managers' ability to achieve desired species outcomes and protect eastside forests from changing fire regimes"); 87 Fed. Reg. at 24,853 (Biden Administration's recognition of the need to reduce the threat of catastrophic wildfires "using active, science-based forest management").

<u>First</u>, the Magistrate Judge incorrectly found that by moving from a forest plan standard (the 21-inch standard) to a more flexible guideline, the Amendment's environmental impacts were inherently uncertain and hence per se significant under NEPA.  F&R at 24-25.  The Magistrate Judge recognized that "the entire purpose of the Amendment is to give managers greater flexibility at site-specific levels to achieve desired species outcomes."  *Id.* at 25.  But the Magistrate Judge then overstated managers' flexibility under the Amendment by incorrectly attributing a projected outcome from a *different alternative that was not the selected alternative* to characterize the Amendment as resulting "'in the widest range of potential outcomes.'"  *Id.* (citing EA discussion of the vegetation impacts of the Adaptive Management alternative, which was not the selected alternative).  The Magistrate Judge's error fatally infects the F&R's finding of NEPA uncertainty.

Under the Adaptive Management alternative, which again the Forest Service did not select, the Forest Service would have removed the 21-inch standard and "not include[d] a size or age requirement."  AR34519 (EA at 16).  The Forest Service instead selected the "Old Tree and Large Tree Guideline with Adaptive Management" alternative.  AR34753 (Decision Notice at 4). To be clear, the adaptive management component of the Old Tree and Large Tree Guideline with Adaptive Management alternative is not like the free-standing Adaptive Management alternative. Rather, the adaptive management component of the Old Tree and Large Tree Guideline with Adaptive Management alternative includes four components that enhance public oversight:  (1) local monitoring; (2) effectiveness monitoring; (3) regional review; and (4) regional adaptive management work group.  AR34516 (EA at 13).  *See also* AR34516-18 (EA at 13-15) (discussing the four types of monitoring and review).  *Cf.* F&R at 24 (expressing concern that the Amendment will reduce public oversight, when in fact the adaptive management features of the

selected alternative bolster public oversight).  The adaptive management component of the Old

Tree and Large Tree Guideline with Adaptive Management alternative provides important

sideboards to the Amendment.  For example, under the broad-scale effectiveness monitoring

requirement, "[i]f large trees are not increasing in number with appropriate composition, the

Regional Forester will impose the Age Standard Alternative across the whole analysis area or by

national forest or potential vegetation zone."  AR34517 (EA at 14).  The Age Standard

alternative, officially called the Old Tree Standard alternative, AR34518 (EA at 15), would

impose a mandatory age prohibition.  AR34519 (EA at 16) ("Trees estimated to be old (≥ 150

years) shall not be removed.").  *See also* AR34517 (EA at 14) (further providing under the

regional review requirement of the selected alternative that "[o]nce every five years, a decision

will be made [by the Regional Forester] on whether to continue with the guideline or move to the

age standard").  The Magistrate Judge ignored these protections.

Again, the foundation of the Magistrate Judge's erroneous finding was the incorrect

assumption that the Amendment would generate "the widest range of potential outcomes."  F&R

at 25.  That plain error alone should preclude the Court from adopting the Magistrate Judge's

recommendation.  But in addition, the Magistrate Judge's finding equates any change from a

standard to a guideline as being inherently uncertain and hence significant under NEPA.  F&R at

24 ("There is substantial uncertainty here because the Screens Amendment replaces a clear and

binding forest plan standard, the 21-inch rule, with a more flexibly worded guideline. The

change to a guideline is significant.").  This also is erroneous.  Because NEPA is purely

procedural, it is impermissible to impose an obligation on an action agency – preparation of an

EIS based on per se NEPA uncertainty from changing a standard to a guideline – where such

obligation is not found in NEPA.  In the Ninth Circuit's seminal *McNair* opinion, an en banc

panel held that a requirement – affirmatively addressing uncertainties in a project's EIS – could not be engrafted onto NEPA's procedural "hard look" requirement where neither the statute nor its implementing regulations imposed such an obligation.  *McNair*, 537 F.3d at 1001.  Here, the Magistrate Judge's recommendation oversteps the authority of a reviewing court even further.

The F&R also largely ignores (despite citing it) the constraining effect of 36 C.F.R. § 219.15(d)(3), which states that "[a] guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, [only] so long as the purpose of the guideline is met."  The purpose of the Amendment is stated clearly in the Decision Notice: "Maintain and increase old and late structure forest. Favor fire tolerant species where appropriate."  AR34753 (Decision Notice at 4).  Ignoring that language, the F&R concludes that the Amendment increases "uncertainty of future large tree management."  F&R at 24.  It is impossible to reconcile 36 C.F.R. § 219.15(d)(3)'s requirement that the Forest Service meet the purpose of the Amendment with the Magistrate Judge's conclusion that future large tree management under the Amendment is inherently uncertain for purposes of NEPA significance.

For all of these reasons, the Court should reject the Magistrate Judge's conclusion that changing a forest plan standard to a guideline is inherently uncertain and hence significant under NEPA.  The Amendment's potential environmental impacts are not substantially uncertain for the purpose of NEPA significance, and the Court should so hold.

Second, the Magistrate Judge's finding of "uncertainty . . . as to whether the Amendment will apply inside LOS stands" is simply wrong.  F&R at 25 (stating that "the dispute as to whether the rule will apply inside LOS stands adds weight to the uncertainty and supports the need for an EIS").  The record is clear that the Eastside Screens Amendment applies only *outside* of LOS.  AR34753 (Decision Notice at 4).  Plaintiffs' NEPA "Failure to Prepare an EIS" claim

(Claim 1, Count 1) did not even allege such uncertainty.  Am. Compl. ¶ 216 (setting forth

plaintiffs' allegations regarding "highly uncertain" effects of the challenged action).

Before the Amendment, referred to in the EA as the current management alternative,

Eastside Screens Section 6(d)(1) provided that *within* LOS:

> *Some timber sale activities can occur within LOS stages that are within or above HRV in a manner to maintain or enhance LOS with-in that biophysical environment. It is allowable to manipulate one type of LOS to move stands into the LOS stage that is deficit if this meets historical conditions.*

AR34515 (EA at 12) (italics in original).  Section 6(d)(1) did not restrict "the harvest size of

trees" inside LOS stands, although as the Forest Service noted, "[i]n practice many Forests and

projects" applied the ≥ 21 inches dbh harvest restriction inside LOS stands anyway.  *Id.*  But

under the Eastside Screens Amendment, it is undisputed that Section 6(d)(1) was left unchanged

– the Amendment does not apply within LOS.  AR34516 (EA at 13) (explaining that the

Amendment would replace the language only in Sections 6(d)(2) and 6(d)(2)(a) pertaining to

stands outside of LOS).  The EA's alternatives crosswalk likewise showed that Section 6(d)(1)

was unaltered by the Amendment.  AR34711 (EA Appendix B, Scenario A table).

When analyzing the potential effects under both the current management alternative and

the Amendment, the Forest Service assumed that land managers applying Section 6(d)(1) inside

LOS stands would not apply a ≥ 21 inches dbh restriction (which again is absent from Section

6(d)(1)) so long as "activities accomplish either 1) the maintenance or improvement of LOS

conditions or 2) the manipulation of multi-strata LOS to single strata LOS consistent with the

Historical Ranges of Variation."  AR34711-12 (EA Appendix B, Scenario A table).  But again,

the Eastside Screens Amendment did not change Section 6(d)(1) governing stands within LOS.

The Amendment plainly applies only outside LOS stands, where it replaced the ≥ 21 inches dbh

restriction with a guideline allowing for the removal of grand fir or white fir < 30 inches dbh

under specified limited circumstances.  AR34712-13.  Thus, the Magistrate Judge incorrectly

found "uncertainty . . . as to whether the Amendment will apply inside LOS stands."  F&R at 25.

The Court should not adopt that erroneous finding.

    Third, the Magistrate Judge's difficulty in reconciling the Amendment's importance with

its modest nature does not support a finding of NEPA uncertainty for purposes of NEPA

significance.  Small changes are often important changes – a small change to a vessel's heading,

for example, is important to arriving at a desired destination.  The Amendment is not a sea

change in forest management; it is a small yet important step in the right direction for the

Eastside Forests.  Small and important are not inherently inconsistent adjectives.  *Cf.* F&R at 26

(wrongly finding that the Amendment being both small and important "point[s] in two

directions").  And again, this NEPA intensity factor speaks to whether a proposed action's

*environmental impacts* are highly uncertain, not whether intervenors or anyone else rightly views

the Amendment as "'extremely important.'"  *Id.* at 26 (quoting intervenors).

    The Forest Service thoroughly analyzed and disclosed the moderate beneficial impact of

the Amendment.  The agency explained that the Amendment's potential impact is "moderate in

terms of the scope and scale of effects as described in the analysis and at the landscape scale they

are marginal (see Chapter 3 of the EA)."  AR34764 (Decision Notice at 15).  The Amendment's

anticipated environmental impact is insignificant because the Amendment is but a small first

programmatic step in the long process of trying to restore forest resiliency after many years of

fire suppression and being hobbled by the 21-inch standard.  AR34560 (EA at 57) (explaining

that "[a] century of fire exclusion" and other management actions have "led to an increase of

fuels (Hessburg et al. 2015), smaller and decreased number of forest openings (Skinner 1995),

homogenous stand structures (Agee 1998, Hessburg et al. 2015), and increased proportions of

fire-intolerant trees"). In short, there is nothing uncertain about the modest environmental impacts of the Amendment.

Nor is there any uncertainty about the Amendment's importance, even though that is not the focus of the NEPA uncertainty factor. Although the Amendment's potential benefit is quite modest, with "old and large fire tolerant trees [increasing only] slightly in abundance relative to current management," AR34555 (EA at 52), the Amendment is important, including to intervenors. This is because "[e]ven if the movement is only slightly in the upward trend, [the Amendment] still provides for a shift in species composition and stand structure and could influence the creation of diverse spatial patterns [at the local level] based on individual stand conditions by prioritizing old trees regardless of size and then large trees within the desired canopy and structure condition." *Id.* And as the EA points out, the science shows "it is impossible to restore stands to historical conditions or conditions that would be resistant to current and future conditions without cutting some fir larger than 21-inches." AR34533 (EA at 41). This is because changing the trajectory of forest succession on the Eastside Forests is an uphill battle, given that fire intolerant tree species have "light windborne seeds . . . capable of reseeding areas far away" that dominate the seed bed, AR34528 (EA at 25), resulting in "establishment rates of shade tolerant species . . . much higher than" that of the desired fire tolerant tree species. AR34533 (EA at 30).

The Forest Service candidly disclosed the modest nature of the Amendment's potential environmental benefit, particularly at the landscape level. In addition to the above-discussed explanation of non-significance, the Forest Service also explained that the Amendment has limited application – it applies only where one type of LOS forest is below the historical range of variability and the proposed harvest treatment is outside of LOS. AR34516 (EA at 13).

"Outside of LOS, this proposal would not substantially change where or how much project level management occurs because fewer trees over 21 inches dbh exist in these areas, and the green tree retention policies require large tree retention."  AR34757 (Decision Notice at 7).  *See also* AR34529 (EA at 26) (explaining that the acres of forest undergoing restoration are not expected to increase under the Amendment).

Based on the EA's robust disclosures regarding the Amendment's modest (yet important) potential beneficial environmental impact, the Decision Notice properly reached a finding of non-significance.  AR34764 (Decision Notice at 7).  Because that determination "evinced 'a rational connection between the facts found and the conclusions made,'" the finding of non-significance was reasonable and should be upheld.  *WildEarth Guardians*, 923 F.3d at 672 (citation omitted).  The Court should not endorse the Magistrate Judge's second guessing of the Forest Service's determination regarding the insignificant nature of the Amendment's modest yet important environmental benefit.  F&R at 26.  There is no question, and certainly not a substantial question, whether the Amendment's modest yet important environmental benefit is uncertain – it is not.[6]  The Court should reject the Magistrate Judge's recommendation and hold that the Amendment's modest yet important environmental impacts do not support a finding of NEPA uncertainty for purposes of NEPA significance.

///

_____

[6]  The Ninth Circuit has never held that "NEPA requires an agency to prepare an EIS when an action has a significant *beneficial* impact but no significant *adverse* impact on the environment." *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1056 (9th Cir. 2010) (emphasis in original). *Accord Cascade Forest Conservancy v. U.S. Forest Serv.*, 577 F.Supp.3d 1153, 1187 n.4 (W.D. Wash. 2021).  The Court need not concern itself with this issue because here, as in *Locke*, "the record does not demonstrate a significant beneficial impact" on the environment from the challenged action.  626 F.3d at 1056.

C.    **The Amendment's potential impacts on ESA-listed species does not require an EIS.**

As discussed above, *see supra* Argument part II, the Amendment will have "no effect" on listed aquatic species because the Amendment did not alter the highly protective INFISH and PACFISH "goals, standards and guides" governing activities in riparian areas. AR34594 (EA at 91). The Magistrate Judge thus also erred in finding NEPA significance based on "the impact on aquatic species" and "plausible concerns that the Amendment may result in large tree removal in and around riparian areas." F&R at 31.

On the first point, the Magistrate Judge simply stated without explanation that "the impact on aquatic species is an intensity factor that the Court must consider." *Id.* Although the Magistrate Judge did not identify which of the NEPA intensity factors that conclusion rested on, the omission is of no moment given that none of the intensity factors support such a finding. This is because the Amendment leaves unchanged the "PACFISH and INFISH objectives, goals, standards and guides" for all RHCAs on all Eastside Forests. AR34594 (EA at 91). The Amendment thus has no impact on aquatic species. If, going forward, the Forest Service were to propose an activity in or near an RHCA that may impact aquatic species, that activity would have to be evaluated under procedural NEPA and also under NFMA for compliance with the governing PACFISH or INFISH substantive requirements. AR34606 (EA at 103) ("Project level analyses will be required to address any site-specific effects that projects may have on riparian and wetland associated species and their habitats.").

But the programmatic Amendment before the Court is incapable of impacting aquatic species because it did not alter the existing protections for riparian and aquatic habitat.

Nor is there any basis for the Magistrate Judge's second point regarding potential impacts on ESA-listed species from "large tree removal in and around riparian areas." F&R at 31. The

stated basis for this finding is the ninth intensity factor, which requires the action agency to

evaluate the "*degree to which* the action may adversely affect" a listed species. 40 C.F.R. §

1508.27(b)(9) (emphasis added). Again, PACFISH and INFISH govern activities outside of

RHCAs, *i.e.*, in and around riparian areas, that might degrade RHCA conditions to the detriment

of attaining RMOs intended to benefit aquatic species, listed or otherwise. AR14717

(PACFISH); AR15061 (INFISH). And both PACFISH and INFISH were left unchanged by the

Amendment. Thus, there is no basis for the Magistrate Judge's conclusion that hypothetical

concerns about future large tree removal in and around riparian areas force "the Court . . . to

conclude [the Amendment] may have some effect on these species." F&R at 31. Again, the

NEPA intensity inquiry asks not whether an action may have *any* impact on a listed species but

rather the *degree to which* the action may adversely affect a listed species. Where, as here,

INFISH and PACFISH continue to prohibit activities in and around riparian areas that might

degrade RHCA conditions to the detriment of attaining RMOs, the ninth intensity factor cannot

support a finding of NEPA significance.

     For these reasons, the Court should reject the Magistrate Judge's finding of NEPA

significance with respect to aquatic species.

**IV.**    **The Magistrate Judge Erred in Concluding the Forest Service Failed to Take a NEPA "Hard Look" at the Eastside Screens Amendment's Potential Environmental Impacts.**

     NEPA requires a federal agency to examine the potential environmental impacts of a

proposed federal action and inform the public about those effects. 42 U.S.C. § 4332(2)(C). The

statute is purely procedural and mandates process without dictating any substantive

environmental result. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

A reviewing court's job, then, is to "ensure that the agency has taken a 'hard look' at the

potential environmental consequences of the proposed action."  *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,* 387 F.3d 989, 993 (9th Cir.2004) (citation omitted).  The Forest Service did so here, contrary to the Magistrate Judge's determination with respect to the < 30 inches dbh guideline for grand fir and white fir, and regarding potential impacts on aquatic species.  F&R at 32-33.

### A.    The Forest Service took a "hard look" at replacing the 21-inch standard with a more flexible guideline.

The Magistrate Judge wrongly concluded the Forest Service failed to take a NEPA "hard look" at the Amendment's replacement of a forest plan standard with a forest plan guideline. F&R at 32-33.  The stated basis for the Magistrate Judge's conclusion is the Forest Service's alleged failure to acknowledge that "guidelines are not mandatory."  *Id.* at 32.  *See also id.* at 33 (equating reliance on an "incorrect assumption" with a failure to take a NEPA "hard look," and citing *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005), for support).  The Magistrate Judge erred in reaching that conclusion.

The fundamental flaws in the Magistrate Judge's assessment of the Amendment in this respect were discussed above, *see supra* Argument part III.B, where intervenors pointed out that:

- the F&R falsely equated the disclosed impacts of the Amendment with disclosures regarding an alternative that was *not selected* by the Forest Service, *i.e.*, the Adaptive Management alternative;

- as a result of that clear error, the F&R wholly ignored the adaptive management component of the selected alternative, which includes four monitoring and oversight components that enhance public oversight and require the Forest Service to impose a prohibition on the removal of old trees ≥ 150 years of age in the event the purpose of the Amendment is not being met;

- the F&R equated any change from a standard to a guideline as being inherently uncertain and hence per se significant under NEPA, requiring the preparation of an EIS, which runs afoul of governing case law holding that reviewing courts cannot impose an obligation on an action agency where neither the statute nor its implementing regulations impose such an obligation, *McNair*, 537 F.3d at 1001; and

- the F&R pays no heed to the constraining effect of 36 C.F.R. § 219.15(d)(3), which states that "[a] guideline is a constraint on project and activity decisionmaking that allows for departure from its terms, [only] so long as the purpose of the guideline is met," particularly given that the central purpose of the Amendment is to maintain LOS and favor fire-tolerant tree species.  AR34753 (Decision Notice at 4).

Based on these errors, the Court should reject the Magistrate Judge's recommendation and instead hold that the Forest Service took a "hard look" at the Amendment's replacement of a forest plan standard with a forest plan guideline in conformance with NEPA.

### B.    The Forest Service took a "hard look" at aquatic species impacts.

The Magistrate Judge wrongly concluded that the Forest Service failed to take a NEPA "hard look" at the Amendment's potential impacts on aquatic species.  F&R at 33.  The F&R reached that conclusion for the stated reason that "it was incorrect for the [Forest] Service to conclude that amending the Screens would not affect logging in riparian areas and thus aquatic endangered species."  *Id.* (referring to the F&R's earlier discussion of the agency's ESA "no effect" determination for listed aquatic species).  In support of its determination, the F&R cited to case law equating reliance on an "incorrect assumption" with a failure to take a NEPA "hard look." *Id.* (citing *Native Ecosystems Council*, 418 F.3d at 964).  The Magistrate Judge erred because the foregoing discussion shows the Forest Service did not err in concluding the Amendment would have no effect on aquatic species.  *See supra* Argument parts II, III.C.

The Amendment has no effect on aquatic species because it did not change the "PACFISH and INFISH objectives, goals, standards and guides" governing RHCAs on all Eastside Forests. AR34594 (EA at 91).  PACFISH and INFISH intentionally "do not limit the size of trees harvested within RHCAs" because those protective strategies instead focus more holistically on restoring and protecting "the ecological processes and function under which riparian and aquatic ecosystems developed."  AR34594 (EA at 91).  Rather than prohibiting the harvest of trees based on tree size,

PACFISH and INFISH instead prohibit the removal of any trees in RHCAs, except in two limited circumstances, namely salvage harvest after a catastrophic event and where silvicultural treatment is needed to meet "desired vegetation characteristics" for the attainment of RMOs. AR14838 (PACFISH); AR15062 (INFISH). PACFISH and INFISH apply not only within RHCAs but also outside of RHCAs where proposed activities might degrade RHCA conditions in a manner retarding the attainment of RMOs. AR1477 (PACFISH); AR15061 (INFISH); AR34954 (EA at 91).

Because the Amendment does not alter PACFISH or INFISH in any way, the Forest Service reasonably concluded that "[a]quatic and riparian species habitat are protected through the guidance of the PACFISH/INFISH strategies and will not change under this amendment." AR34606 (EA at 103). The agency further disclosed that because the Amendment will leave all existing protections in place:

> Wet areas at all elevations – including, for example, wetlands, wet meadows, riparian areas, stream banks, shorelines, marshes, open water, and vernal pools – would continue to be managed by the objectives, goals, standards, and guides in PACFISH and INFISH . . . which only allow vegetation treatments within RHCAs to maintain habitat that support populations of well-distributed native and desired non-native plant, vertebrate, and invertebrate populations that contribute to the viability of riparian-dependent communities (INFISH Appendix E; PACFISH Appendix C).

AR34626 (EA at 123). The agency further noted that if in the future, the Forest Service were to propose an activity in or near an RHCA that may impact aquatic species, "[p]roject level analyses will be required to address any site-specific effects that projects may have on riparian and wetland associated species and their habitats." AR34606 (EA at 103). But the agency action presently before the Court – the Eastside Screen Amendment – will have no potential environmental impacts on wet areas and the species associated with such habitat because PACFISH and INFISH will continue to govern those areas on all Eastside Forests.

Because the Forest Service did not rely on an incorrect assumption, the Court should reject the Magistrate Judge's recommendation and instead hold that the Forest Service took the requisite NEPA "hard look" at the Amendment's potential impacts on aquatic species.

## V.    The Remedy Decision Rests on the Magistrate Judge's Erroneous Merits Determinations.

The Magistrate Judge, having erroneously found violations of NFMA, the ESA and NEPA, recommended vacatur of the EA and Finding of No Significant Impact and preparation of an EIS.  F&R at 33-36.  But based on the foregoing, the Court can and should conclude that the Amendment complies with all applicable laws such that no remedy need be ordered.  If the Court were to conclude otherwise, however, it still should revisit the issue of an appropriate remedy.

Courts are "not required to set aside" agency action deemed legally deficient.  *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).  Rather, a court's "decision to grant or deny injunctive or declaratory relief under [the] APA is controlled by principles of equity." When equity so demands, an agency action may "be left in place while the agency reconsiders . . . the action, or to give the agency time to follow the necessary procedures."  *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018).

Whether an agency action should be left in place depends on two factors, namely "how serious the agency's errors are and the disruptive consequences of" vacatur.  *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (internal quotation and citation omitted). Intervenors believe the Forest Service did not err, and know that requiring more process will not benefit the Eastside Forests.  *See* F&R at 30 ("[T]here is not a substantial scientific dispute about the historical conditions of the eastside forests or the fact that hard diameter limits can constrain managers' ability to achieve desired species outcomes and protect eastside forests from changing fire regimes.").

Given the compelling need for the Amendment's implementation, the Court should conclude that neither vacatur nor an order requiring preparation of an EIS are appropriate remedies in this case. At most, the Court could remand the matter to the agencies to remedy any minor deficiencies without vacating the Amendment and without mandating preparation of an EIS. Intervenors would welcome an opportunity to provide further briefing on the issue of remedy after the Court rejects the Magistrate Judge's erroneous recommendations.

## **CONCLUSION**

Although the F&R rightly concluded that the Eastside Screens Amendment is not controversial under NEPA, the Magistrate Judge erred on the NFMA, ESA and NEPA procedural issues discussed above. Thus, based on the foregoing, and for the reasons set forth in the federal defendants' objections, AFRC and EOCA respectfully ask the Court not to adopt the Magistrate Judge's F&R on the NFMA, ESA and NEPA procedural issues decided in plaintiffs' favor, and to instead uphold the Eastside Screens Amendment in its entirety.

DATED: September 21, 2023

/s/ Julie A. Weis
Julie A. Weis (OSB #974320)
HAGLUND KELLEY LLP
2177 SW Broadway
Portland, Oregon 97201
Email: weis@hk-law.com; Phone: 503.225.0777

Aaron Bruner (OSB #133113)
WESTERN RESOURCES LEGAL CENTER
9220 SW Barbur Blvd., Suite 119-327
Portland, Oregon 97219
Email: abruner@wrlegal.org; Phone: 503.768.8500

*Counsel for Defendant-Intervenors*

## <u>CERTIFICATE OF SERVICE</u>

I, Julie Weis, hereby certify that on September 21, 2023, I caused the foregoing to be served upon counsel of record through the Court's electronic service system.

Dated this 21st day of September, 2023.

<u>/s/ Julie Weis</u>
Julie Weis

CERTIFICATE OF SERVICE